**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| WILLIAM AMOR, | ) | |
| | ) | |
| *Plaintiff*, | ) | Case No. 20-cv-01444 |
| | ) | |
| v. | ) | Judge: Honorable Jorge L. Alonso |
| | ) | |
| JOHN REID & ASSOCIATES, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |

**DEFENDANTS' LOCAL RULE 56.1(A)(2) STATEMENT OF UNCONTESTED FACTS
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT[1]**

**JURISDICTION AND VENUE**

1. This action was brought pursuant to 42 U.S.C. §1983 and Illinois Law. This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §1331, and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367. (Dkt. 45 at ¶¶ 2-3).

2. Venue is proper under 28 U.S.C. §1391(b) as acts giving rise to Plaintiff's claim occurred in this judicial district. (Dkt. 45 at ¶ 4).

**THE PARTIES**

3. Plaintiff William Amor was investigated, arrested, prosecuted, and convicted for starting a fire which occurred at 218 E. Bailey Avenue in Naperville, Illinois on September 10, 1995, and resulted in the death of Marianne Miceli. (Dkt. 45 at ¶¶ 5, 11, 13, 38-41).

4. Plaintiff William Amor died on January 31, 2023, and Jeanne Olson, not individually but as Trustee of the William Amor Revocable Living Trust was substituted as Plaintiff. (Dkt. 108, 110-1, 124).

---

[1] The facts set forth in this Rule 26 Statement of Uncontested Facts are admitted solely for purposes of Defendants' Motion for Summary Judgment.

5.      Defendant John Reid & Associates, Inc. (hereinafter Reid & Associates) is an Illinois Corporation with its principal place of business at 209 W. Jackson Blvd., Suite 400, Chicago, IL 60606. (Dkt. at ¶ 45) On one occasion, October 3, 1995, Plaintiff was brought to Reid & Associates by Naperville Police Department to be polygraphed and interviewed.

6.      Michael Masokas is a licensed polygrapher and employee of Reid & Associates who interviewed and polygraphed Amor on October 3, 1995. (Ex.1, Masokas Dep. Tr. at 13:20-23; 33:17- 34:1.)

7.      Defendant Estate of Arthur T. Newey was a former employee of Reid & Associates and a senior polygraph examiner in 1995. He reviewed Amor's polygraph results and interviewed Amor on October 3, 1995. ( Ex. 2, Buckley Dep. Tr. at 89:14-19; Ex. 1 at 88:7- 90:15.)

### REID & ASSOCIATES POLYGRAPH PROCEDURES

8.      Mr. Masokas was an experienced polygraph examiner with a bachelor's degree in criminal justice from St. Xavier College before obtaining a Master's Degree from Reid College in the area of detection of deception. He had been a licensed polygraph examiner since March of 1982 and a member of the Illinois Polygraph Society. He began working with Reid & Associates in May of 1985. (Ex. 1 Masokas Dep. Tr. at 13:20-23; 33:17- 34:1.)

9.      The first step of administering a polygraph at Reid & Associates is obtaining permission to take the test. A subject must voluntarily consent to a test in order to receive a polygraph. In addition to reading and signing a consent form, they are also asked verbally and told that they are free to leave. Then, subjects fill out a short medical form to confirm there are no physical problems. (Ex. 1 Masokas Dep. Tr. at 36:4-11, 38:4-13, 38:14-18.)

10.     This is followed by a conversational pre-test interview. The purpose of this pretest interview is to give an opportunity to explain or answer questions about the individual in question,

2

observe their state of mind, develop a rapport, and confirm they are suitable for the polygraph. (Ex. 1 Masokas Dep. Tr. at 38:22-23, 65:15-21.)

11. The polygraph questions are formulated, and reviewed with the subject before any test is given so that they know exactly what will be asked during the polygraph. Individuals are then attached to the polygraph and the test is run. (Ex. 1 Masokas Dep. Tr. at 37:1-10.)

12. In the event the subject is found to be truthful, they are thanked for their time and sent on their way. If the test results are found to be deceptive, a post-test interview is done to afford them an opportunity to offer a reason or explanation as to why they may not be passing the test. (Ex. 1 Masokas Dep. Tr. at 39:1-6.) In addition to truthful and deceptive, the results could be considered inconclusive, unresponsive, and purposeful non-cooperation if the subject is deliberately doing things to throw the test off. Unresponsive includes when a subject lacks sleep or is overly medicated where they do not have a physiological response to the test. (Ex. 1 Masokas Dep. Tr. at 42:16-24.)

## THE REID TECHNIQUE

13. In addition to polygraph services, Reid & Associates published a manual regarding interviewing and interrogation which an employee of Reid & Associates was to utilize during an interrogation in 1995. (Ex. 2 Buckley Dep. Tr. at 42:11-13.)

14. This manual included nine steps as well as core principals which included treating the subject with decency and respect, following the guidelines established by the courts, never engaging in promises of leniency, never engaging in physical harm, the threat of physical harm, or the threat of inevitable consequences. Extra caution was to be used with juveniles and people with mental impairments, and the subject's legal rights and physical needs were to be honored. (Ex. 2 Buckley Dep. Tr. at 42:1-11).

**LACK OF RELATIONSHIP BETWEEN REID & ASSOCIATES AND NAPERVILLE POLICE DEPARTMENT**

15. On September of 1995, Reid & Associates was a service-oriented company. They provided the service of polygraph, but did not otherwise participate in the Amor investigation. They had very few contracts, and most police department used them on an ad hoc basis. Naperville was not a regular customer of Reid & Associates, and other than the Amor case, no other specific instances of services to Naperville Police Department could be recalled. (Ex. 2 Buckley Dep. Tr. at 104:1-8, 101:10-19, 23:9-17, 23:25-5.)

16. In order to schedule a polygraph, an agency would contact Reid & Associates and schedule it. (Ex. 1 Masokas Dep. Tr. p. 53:3-23.)

**EVENTS FROM SEPTEMBER 10, 1995- OCTOBER 3, 1995**

17. On September 10, 1995, Amor resided at 218 E. Bailey, Naperville, Illinois with his wife, Tina, and Tina's mother Marianne Miceli. (Dkt. 45 at ¶ 11.)

18. In the evening of September 10, 1995, after Amor and his wife left the home, a fire began resulting in the death of Marianne Miceli. (Dkt. 45 at ¶¶11-14.)

19. The fire was investigated by the Naperville Fire Department and Naperville Police Department Detectives Cross and Guerrieri. Detective Cross was a member of the interdisciplinary Fire Investigation Team (FIT) comprised of members of both the Naperville Police Department and the Naperville Fire Department. (Ex. 3, Cross Dep. Tr.[2] at 307:21-308:4, 309:5-11.) During the investigation into this fire, Naperville Fire Department Lieutenant David Ferreri was the lead member of the FIT from the fire department and ultimately the person responsible for researching

---

[2] The Parties in this matter have stipulated to using the discovery and transcripts of fact witnesses taken in 18-cv-02523 *Amor v. Naperville Police Department* as though taken in this matter and fully incorporated herein.

4

and determining the cause and origin of the fire. (Ex.3, Cross Dep. Tr. at 308:5-8; Ex. 4, Ferreri Dep. Tr. at 37:3-6, 64:1-12.) Cross was a member of the FIT team but not a certified fire investigator. (Ex. 3 Cross Dep. Tr. at 304:20-305:1, 307:21-24.)

20. Detective Cross was trained in interrogation at the police academy, as well as attending Reid College for Interview and Interrogation training. (Ex. 3 Cross Dep Tr. at 58:20-59:2.) He then took what he learned at Reid College and applied it to his own technique and developed his own techniques for interviewing people. (*Id*. at 60:19-24.) He believed there were some aspects of the Reid training when he used when interviewing suspects. (*Id*. at 60:22-61:1.)

21. During the investigation, on the morning of September 12, 1995, Amor took a polygraph examination at the Naperville Police Department administered by Richard T. O'Brien, the results of which were inconclusive because he had consumed alcohol prior to the exam. (Ex. 3 Cross Dep. Tr. at 108:4, Det Cross Report at 5, Ex. 4 to Cross Dep. Tr, Ex. 5 Mr. O'Brien's report.) Mr. O'Brien is not affiliated with Reid & Associates. (Ex. 1 Masokas Dep. Tr. at 103:13-19.)

22. On September 15, 1995, Amor was scheduled to take a second polygraph but he called to cancel as he had been drinking. (Ex. 3, Cross Dep. Tr. at 109:2-10; Det. Cross Report at 6, Ex. 4 to Cross Dep. Tr.)

23. Later that day, on September 15, 1995, being interviewed by Naperville Police Amor gave a hand written statement stating, "On Sunday September 10th… I went to refill my drink and by accident knocked over the vodka bottle spilling it on the newspaper. I felt it would cause no harm so I didn't wipe off the paper. When leaving at 6:00 pm I don't recall blowing out the candle and cannot remember when and where I put out my last cigarette." (Ex. 6 Amor September 15, 1995 Written Statement.)

5

24. Amor was incarcerated at DeKalb County Jail on an outstanding warrant where he remained until October 3, 1995. (Ex. 7 Amor Dep. Tr. at 65:18-66:6.)

### OCTOBER 3, 1995 POLYGRAPH AND INTERVIEW AT REID & ASSOCIATES

25. On October 3, 1995, Detective Cross picked up Amor from DeKalb County Jail with the goal of talking to him while sober as he felt that the investigation had been hindered by Plaintiff being intoxicated. (Ex. 3 Cross Dep. Tr. at 163:7-10; 156:17-21.)

26. Detective Cross planned to take Amor to Reid & Associates when Amor was released from jail because they were "the best in the business" as far as polygraph examiners in the area and very good interviewers. (Ex. 3 Cross Dep. Tr. at 163:19-24.)

27. Detective Cross had used Reid & Associates for polygraph services on previous instances, possibly twenty times. However, prior to October 3, 1995, Cross had not met Masokas or Newey. Cross has no recollection of Mr. Newey. (Ex. 3 Cross Dep. Tr. at 180:12-20; 180:21-181:8; 194:202.) Someone from Naperville had called and gotten on the schedule for the same day. (Ex. 1 Masokas Dep. Tr. at 55:3-23.)

28. Prior to October 3, 1995, there was no mention of Reid & Associates to Amor. (Ex. 7 Amor Dep. Tr. at 62:16-21.)

29. When picked up, Amor was asked if he would like to go take a polygraph and he answered yes. (Ex. 7 Amor Dep. Tr. 72:22-24.)

30. Detectives Cross and Guerrieri transported Amor from DeKalb County Jail to Reid & Associates in Chicago and during that ride was the first time he heard of the name Reid & Associates. Amor assumed they were working together based only on the fact that he was picked up and taken right to Reid & Associates. He also did not ask whether Reid & Associates were working with the police. (Ex. 7 Amor Dep. Tr. at 73:23-74:3, 97:7-14; 108:4-13.)

6

31. Amor was never placed in handcuffs when being transported or while at Reid & Associates. (Ex. 7 Amor Dep. Tr. at 74:5-8, 77:20-23.)

32. Upon arrival at Reid & Associates, Amor was placed alone in the reception area, without handcuffs, for 30-45 minutes while Cross and Guerrieri spoke to Mr. Masokas in an office. During this period, Amor was allowed to use the bathroom. (Ex. 7 Amor Dep. Tr. at 79:9-19; 81:9-11.)

33. While at Reid & Associates, Amor was never threatened and he was never told he could not leave. While there, he was treated "you know, good, bad or indifferent, they're just – they have a job just like you do and I do." (Ex. 7 Amor Dep. Tr. at 106:19-107:2.) While at Reid & Associates, no one raised their voice to him and he was only touched in order to administer the voluntary polygraph. (*Id*. at 107:13-21).

34. Masokas first spoke to Cross and Guerrieri for 30-40 minutes regarding the investigation for the polygraph in a side office while Amor waited in the lobby. He wrote notes on a fact sheet with a timeline of events at Reid in the righthand margin. (Ex. 8 Reid & Associates Polygraph Records at 1, 5-6, 9-11). This included details of who the subject was, cause of death, that there was a $100,000 life insurance policy, the details of which Amor denied knowledge of. Masokas was also told that Amor said he spilled vodka and maybe left a burning cigarette in an ashtray that may have fallen out of the ashtray. The information included that Amor had a history of scamming families out of money and had recently spent six months in lock up for forgery. (Ex. 1 Masokas Dep. Tr. at 57:16- 59:16.) Cross and Guierrieri waited in the lobby after this point for the duration of the polygraph and interview. (Ex. 3 Cross Dep. Tr. at 185:8-16, 188:13-15.)

35. After speaking to the detectives, Amor was taken into an interview room at around 4:35p.m. He was told he was free to leave and not in custody. (Ex. 1 Masokas Dep. Tr. at 60:11-

7

61:11, 62:3-7, Ex. 8 Reid & Associates Polygraph Records at 1) Ex Amor voluntarily agreed to be polygraphed at Reid & Associates, initialing and signing a consent form and Miranda Waiver. (Ex. 7 Amor Dep. Tr. at 82:10-14, 84:9-10, 86:11, 87:2-5, Ex. 8 Reid & Associates Polygraph Records at 7.)

36. Mr. Masokas conducted a pretest interview from 4:40 p.m. to 5:20 p.m. which was conversational and included questions about the fire and what transpired on the date of the fire. (Ex. 1 Masokas Dep. Tr. at 65:15-21. Ex. 8 Reid & Associates Polygraph Records at 1,4)

37. Mr. Masokas then stepped out of the room and formulated questions for the polygraph alone before reviewing them with Amor. (Ex. 1 Masokas Dep. Tr. at 66:8-16). Det. Cross did not participate in the format of the questions or the polygraph. (Ex. 3 Cross Dep. Tr. at 185: 8-12.)

38. Amor was hooked up to the polygraph machine and given a polygraph examination from 5:30 p.m. to 6:15 p.m. (Ex. 1 Masokas Dep. Tr. at 85:17-21, Ex. 8 Reid & Associates Polygraph Records at 1.)

39. Both Mr. Masokas and Mr. Newey scored the test results and found Amor to be deceptive. (Ex. 1 Masokas Dep. Tr. at 85:17-21,Ex. 8 Reid & Associates Polygraph Records at 9-11.)

40. Amor was polygraphed once at Reid & Associates. (Ex. 3 Cross Dep. Tr. at 188: 21-23, Ex 8 Reid & Associates Polygraph Records at 19-35.)

41. After the fact, at the time of his deposition, Joseph Buckley, President of Reid & Associates, also scored the test results and found Amor to be deceptive. (Ex. 2 Buckley Dep. Tr. at 111:11-16.)

42. Defendants' retained expert, Dr. Frank Horvath, also scored the test results, and found Amor to be deceptive. (Ex. 9 Report of Defendants' Expert Dr. Frank Horvath.)

43. After the examination, Mr. Masokas informed Amor he had failed the test. He began the post-test interview which took place off and on from 6:30 p.m. to 9:15 p.m. (Ex. 1 Masokas Dep Tr. at 8:1-5, Ex. 8 Reid & Associates Polygraph Records at 1.) Amor spoke to Mr. Masokas from 6:30 to 7:30pm, Mr. Newey and Mr. Masokas together from 7:45 to 8:30pm, and then Mr. Newey alone from 8:45-9:15pm. (Ex 8 Reid & Associate's Polygraph Records at 1). They discussed possibilities as to why he had failed including that he had knowledge after the fact and was afraid to say something, or that Amor thought he spilled some vodka and a cigarette fell. (Ex. 1 Masokas Dep. Tr. at 85:8-24; Ex. 7 Amor Dep. Tr. at 101:14-21, 105:1-2, 17-20.)

44. The Reid Technique was used by Mr. Masokas and Mr. Newey while conducting the post-polygraph interview with the purpose of determining the truth and what had caused the deceptive result. (Ex. 1 Masokas Dep. Tr. at 96:16-97:4, 99:3-10.)

45. At all times while interviewed by Mr. Masokas and Mr. Newey, and while at Reid & Associates, Amor denied any involvement in the fire. (Ex. 1 Masokas Dep. Tr. at 88 line 4-6, Ex 8 Reid & Associate's Polygraph Records at 9-11.)

46. Mr. Masokas and Mr. Newey advised the police that Mr. Amor had failed the test and was denying involvement. (Ex. 1 Masokas Dep. Tr. at 89:15-18.)

47. The Naperville Detectives then spoke to Mr. Amor, alone, in a Reid & Associates interview room from 9:30 p.m. to 10:00 p.m., at which time they left the Reid & Associates office. (Ex. 1 Masokas Dep. Tr. at 90:14-15, Ex. 8 Reid & Associate's Polygraph Records at 1.) Before leaving, Mr. Newey was advised by the officers that he was still denying involvement. *Id.*

9

48. In the evening of October 3, 1995, Mr. Amor was told that he was free to leave, but agreed to go with the two Naperville Police Officers back to the Naperville Police Department to be interviewed. (Ex. 7 Amor Dep. Tr. 109:17-20.)

49. No one from Reid & Associates accompanied Amor to Naperville and Amor had no further interactions with Reid & Associates employees while at Naperville Police Department. (Ex. 7 Amor Dep. Tr. 110:14-20.)

## EVENTS AFTER AMOR LEFT REID & ASSOCIATES

50. After traveling back to Naperville Police Department, Amor was interrogated by Naperville Police Officers. He was told by Cross that his wife believed he set the fire. He was also served divorce papers while at Naperville Police Department. He was again Mirandized and gave a voluntary statement that he intentionally set the fire by pouring vodka on a newspaper and flicking a cigarette into the fire. (Ex. 7 Amor Dep. Tr. 112:14-24, Ex. 10 Signed October 4, 1995 Statement.) This statement was not made or signed in the presence of anyone from Reid & Associates. (Ex. 7 Amor Dep. Tr. 115:9-13.)

51. Mr. Masokas was never made aware that after leaving Reid & Associates, Amor was brought to Naperville Police Department, served divorce papers, or that he confessed. (Ex 1 Masokas Dep. Tr. 101:12-103:6). He was also never made aware of the circumstances or contents of Mr. Amor's confession. (*Id*. at 103:20-24).

52. Mr. Amor was then charged with first-degree murder and aggravated arson, tried, and convicted of both on September 17, 1997, (Dkt. 45 ¶ ¶38-41.)

53. The Second District of the Illinois Appellate Court then affirmed that conviction, finding, among other things, that (1) the trial court's determination that the defendant's inculpatory statements were voluntary was not against the manifest weight of the evidence and (2) defendant

was proven guilty beyond a reasonable doubt. *People v. Amor*, 2020 IL App (2d) 190475 at ¶ 4, 180 N.E3d 170, 173 (2d 2020) citing *People v. Amor*, No. 2-97-1189 (1999)(unpublished order pursuant to Illinois Supreme Court Rule 23).

## POST-CONVICTION RELIEF

54. Amor filed a petition for post-conviction relief under the Post-Conviction Hearing Act (725 ILCS 5/12-1 t seq) raising issues of ineffective assistance by trial and appellate counsels, which was dismissed and affirmed. *People v. Amor*, 2020 IL App (2d) 190475 at ¶ 5, 180 N.E3d at173 (2d 2020) citing *People v. Amor*, No. 2-01-0962 (2002)(unpublished order pursuant to Illinois Supreme Court Rule 23).

55. Amor then filed a successive petition for postconviction relief in 2015, raising an issue of actual innocence and presented evidence that the details of his confession-- specifically that vodka is not an ignitable liquid and a cigarette is not a competent ignition source for ignitable liquids, as well as evidence that questioned physical evidence regarding the fire's point of origin that was originally used to corroborate Plaintiff's statement. Plaintiff argued this evidence was new, and "today, investigators would not believe the confession because they now know that a fire cannot ignite in that manner." (Ex. 11 William Amor's Argument in Support of Relief After Post-Conviction Evidentiary Hearing at p. 30.)

56. The trial court which vacated Plaintiff's conviction ruled, "there can be no question that the lynchpin of the State's case at trial was [Amor's] confession, which the State and Defense experts today agree is scientifically impossible. Whatever the reason for [Amor's] scientifically impossible confession, the *new evidence* places the evidence presented at trial in a different light and undercuts this Court's confidence in the factual correctness of the guilty verdict." *People v. Amor*, 2020 IL App (2d) 190475 at ¶ 7, 180 N.E3d 170, 173 (2d 2020) (emphasis added).

11


57. Plaintiff was retried and found not guilty on all charges, in its extensive order, the trial court ruled, "clearly [Amor's] vodka soaked newspaper/cigarette story believed by the investigating officers and fire experts who testified in 1997, cannot serve as a basis for finding of guilt with the advanced in modern fire science knowledge." *Amor*, 2020 IL App (2d) 190475 at ¶ 7, 180 N.E.3d at 174.

58. Defendant then filed a petition for Certificate of Innocence under 735 ILCS 5/2-702( 2016) seeking a certificate of innocence along with the expungement and impounding of his criminal records. *Amor*, 2020 IL App (2d) 190475 at ¶ 9, 180 N.E.3d at 174. This was denied by the trial court stating:

> Certainly there are issues in this case that are somewhat unique. For example, having the defendant served with divorce papers during the course of a homicide interrogation isn't something I've ever seen before, heard of, read about, or even seen on fictional TV. Yet, that was considered by the appellate court, and the appellate court took a look at the defendant's education, the fact that he was provided with sustenance and, otherwise, apparently, treated fairly, according to the appellate court, and they found that his statements to the police were freely and voluntarily given….Certainly I agree with the defendants [*sic*] that it's an unreliable confession, but that doesn't seem to equate with the defendant involuntarily providing a confession, so I'm not ruling on the first three paragraphs of the defendant's burden. I am taking a look at whether or not the petition[er] did or did not by [his own] conduct voluntarily cause or bring about his conviction, and I believe that the defendant did act in such a manner voluntarily to bring about his or her own conviction. I'm only focusing on that. It appears the defendant did give a [***9] statement—gave a statement to the police. It wasn't the effect—wasn't the product of any physical abuse or such verbal conduct or sleep deprivation or any other type of interrogation tactic that would bring about an involuntary confession. Although it certainly has issues, as the appellate court noted, I can't find anything about the confession, despite [its] unreliability, that would make it the product of either illegal police conduct or some other activity that would cause the statement to be something other than a voluntary statement; and, therefore, I do find that the defendant brought about his conviction through his own conduct.

*Amor*, 2020 IL App (2d) 190475 at ¶ 12, 180 N.E.3d at 174. The trial court's decision was affirmed. *Id*.

## PLAINTIFF'S EXPERTS

59. Plaintiff now brings the instant matter, in which Plaintiff has retained and disclosed three experts.

60. First, Plaintiff's expert Dr. Richard Leo, a purported expert on interrogation and false confession testified that he had "no reason to doubt that [Mr. Masokas] believed based on the visual scoring method and the questions he asked that [Mr. Masokas] thought Mr. Amor failed that exam." (Ex. 12 Plaintiff's Expert Dr. Richard Leo Dep. Tr. at 158:18-24.) He had no opinions regarding any relationship, contract, or agreement between Naperville Police Department and Reid & Associates in September of 1995 other than Reid & Associates provided polygraph services to Naperville Police Department on this occasion. (Ex. 12 Plaintiff's Expert Dr. Richard Leo Dep. Tr. at 99:17-102:12.)

61. Second, Plaintiff's expert Daniel Sosnowski, a purported polygraph expert was critical of the way Mr. Masokas scored the polygraph test, but gave no opinion that he lied to Amor about the results of the test, fabricated evidence, or conspired with Naperville Police Department. (Ex. 13 Plaintiff's Expert Dan Sosnowski Dep. Tr. at 171:21-172:6).

62. Last, Plaintiff's expert, Douglas Carpenter, a purported fire science expert, opined regarding the origin and source of the September 10, 1995, but had no knowledge or opinions regarding Reid & Associates, Mr. Newey, or Mr. Masokas. (Ex. 14 Plaintiff's Expert Douglas Carpenter Dep. Tr. at 49:18-50:19).

Respectfully submitted,

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

By: */s/ F. Michael Pasqualino*
    One of the attorneys for Defendants

13

Jonathan W. Goken, ARDC No. 6278837
F. Michael Pasqualino, ARDC No. 6311292
Alexandra W. Sternberg ARDC No. 6310249
**LEWIS BRISBOIS BISGAARD & SMITH LLP**
550 West Adams Street, Suite 300
Chicago, Illinois 60661
(312) 345-1718/Fax: (312) 345-1778
Jonathan.Goken@lewisbrisbois.com
F.Pasqualino@lewisbribois.com
Alexandra.Sternberg@lewisbrisbois.com