# EXHIBIT 1

Page 1

1          IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3

  WILLIAM AMOR,                        )
4                                      )
                   Plaintiff,          )
5                                      )
        vs.                            )  No. 20-cv-01444
6                                      )
  JOHN REID & ASSOCIATES, et al.,      )
7                                      )
                   Defendants.         )
8

9

10          The videoconference deposition of

11  MICHAEL MASOKAS, called by the Plaintiff for

12  examination, taken pursuant to notice and pursuant to

13  the Federal Rules of Civil Procedure for the United

14  States District Courts pertaining to the taking of

15  depositions, taken before Christina J. Atto, Certified

16  Shorthand Reporter and Notary Public, in Joliet,

17  Illinois, commencing at 2:31 p.m. on the 25th day of

18  August, A.D., 2022.

19

20

21

22

23

24



Page 2

```
1   APPEARANCES:
2        LOEVY & LOEVY
         MS. MARIAH GARCIA (via videoconference)
3        311 North Aberdeen Street
         Third Floor
4        Chicago, Illinois 60607
         Phone: (312) 243-5900
5        E-mail: mariah@loevy.com
6            On behalf of the Plaintiff;
7   RODERICK AND SOLANGE MACARTHUR JUSTICE CENTER
    NORTHWESTERN UNIVERSITY SCHOOL OF LAW
8   MR. LOCKE E. BOWMAN (via videoconference)
    375 East Chicago Avenue
9   Chicago, Illinois 60611
    Phone: (312) 503-0844
10  E-mail: l-bowman@law.northwestern.edu
11           On behalf of the Plaintiff;
12  LEWIS BRISBOIS BISGAARD & SMITH LLP
    MR. F. MICHAEL PASQUALINO (via videoconference)
13  550 West Adams Street
    Suite 300
14  Chicago, Illinois 60661
    Phone: (312) 345-1718
15  E-mail: F.Pasqualino@lewisbrisbois.com
16           On behalf of the Defendants.
17
18
19
20
21
22
23
24
```

Page 3

```
1              I N D E X
2   WITNESS                              PAGE
3   MICHAEL MASOKAS
4       Direct Examination by Ms. Garcia ........ 4
5              E X H I B I T S
6   DEPOSITION EXHIBIT                   PAGE
7       Exhibit No. 1 (Polygraph Case History) ... 56
        Exhibit No. 2 (Medical Data Sheet) ....... 68
8       Exhibit No. 3 (Pretest Interview) ........ 75
        Exhibit No. 4 ............................ 76
9       (Polygraph Test Question Sheet)
10
          (ALL EXHIBITS RETAINED BY MS. GARCIA)
11
```

Page 4

```
1       THE COURT REPORTER: The deposition of Michael
2   Masokas is being conducted remotely via LegalView by
3   agreement of the parties. Today's date is August 25th,
4   2022, and the time is 2:31 p.m.
5       The witness is located in Joliet, Illinois.
6   My name is Christina Atto.
7       At the conclusion of today's deposition, I
8   will ask that counsel place their orders on the record.
9       Mr. Masokas, please raise your right hand.
10          (Witness sworn.)
11  THE COURT REPORTER: Thank you.
12  WHEREUPON:
13          MICHAEL MASOKAS,
14  called as a witness herein, having been first duly
15  sworn, was examined and testified as follows:
16          DIRECT EXAMINATION
17  BY MS. GARCIA:
18  Q.  All right. Hello, Mr. Masokas.
19  A.  Hello.
20  Q.  My name is Mariah and I'm an attorney for the
21  plaintiff, Bill Amor. And before we get started, can
22  you please state your name and spell it for the record?
23  A.  Michael Mas- -- It's actually pronounced
24  Masokas.
```

Page 5

```
1   Q.  Masokas. I apologize.
2   A.  With a long O. Masokas, M A S O K A S.
3   Q.  Okay. And I know this question [sic] because
4   I was there at your last deposition, but have you ever
5   been deposed before?
6   A.  Yes.
7   Q.  And how many times have you been deposed would
8   you estimate?
9   A.  One ... Two ... Maybe about half a dozen
10  times.
11  Q.  Okay. And was one of those depositions in the
12  Amor V. Cross matter which is 18 CV 2523?
13  A.  In regards to the Cross/Naperville?
14  Q.  Yes.
15  A.  Yes.
16  Q.  Okay. And do you have -- Actually, strike
17  that. I'll ask that later.
18      Since you know about depositions, you've done
19  one before, I'll just briefly lay out some rules.
20  Because we're over Zoom, it's really important for us to
21  let each other talk. So if you let me answer [sic] my
22  question, I will let you give a full answer just so long
23  as we don't talk over each other. Do you understand
24  that?
```



Page 6

1    A.   Yes.
2    Q.   Okay.  If there's a question I give that's not
3  well crafted or you don't understand, please don't
4  hesitate to clarify.  I want to make sure I'm not asking
5  you any gotcha questions.  Okay?
6    A.   Yes.
7    Q.   Awesome.  And if you need a break at any time,
8  let me know and we can take a break as soon as I finish
9  whatever that line of questioning is.  Okay?
10   A.   Yes.
11   Q.   Great.  And then one other question before we
12 get into the substance of this, do you have any
13 conditions that may affect your ability to provide
14 truthful and accurate testimony today?
15   A.   No.
16   Q.   Okay.  Do you have any conditions that affect
17 your memory?
18   A.   No.
19   Q.   Okay.  Are you currently taking any
20 medications that may affect your ability to provide
21 truthful and accurate testimony today?
22   A.   No.
23   Q.   Okay.  Are you taking any medications that may
24 affect your memory?

Page 7

1    A.   No.
2    Q.   Okay.  And, Mr. Masokas -- Am I pronouncing
3  that right?
4    A.   Yes.
5    Q.   Okay.  Do you want me to call you Mr. Masokas
6  or is Mike okay?
7    A.   Mike is fine.  That's fine.
8    Q.   All right.  Mike, are you currently employed?
9    A.   Yes.
10   Q.   And where are you employed?
11   A.   John Reid & Associates.
12   Q.   Okay.  And what is your current role at John
13 Reid & Associates?
14   A.   I am an instructor.
15   Q.   And what sort of -- Actually, strike that.
16       Is there specific courses that you give
17 instruction in through John Reid & Associates?
18   A.   Primarily interviewing (inaudible).
19   THE COURT REPORTER:  I'm sorry.  It muffled.
20 BY MS. GARCIA:
21   Q.   You muted a little bit.
22   THE COURT REPORTER:  Yeah.
23 BY THE WITNESS:
24   A.   I'm sorry.  What was that?

Page 8

1    THE COURT REPORTER:  You were muffled there in the
2  beginning so I missed it.
3    THE WITNESS:  Oh, I'm sorry.
4  BY THE WITNESS:
5    A.   Interviewing and interrogation.
6    THE COURT REPORTER:  Thank you.
7  BY MS. GARCIA:
8    Q.   Okay.  And how long have you been teaching
9  that course?
10   A.   Full-time since 2005.
11   Q.   Okay.  Did you prepare in -- Strike that.
12       Did you do anything to prepare for this
13 deposition?
14   A.   Yes.
15   Q.   Without going into any conversations you had
16 with counsel, can you please tell me what you did to
17 prepare for this deposition?
18   A.   Well, consult with counsel, but also I
19 reviewed my prior deposition that I gave in the Cross
20 case as well as review the file of William Amor.
21   Q.   Okay.  And what documents specifically did you
22 review from the file of Mr. Amor?
23   A.   His polygraph file which would have been all
24 of the documentation from his polygraph examination.

Page 9

1    Q.   Okay.  Anything else?
2    A.   No.
3    Q.   Okay.  And you said that you reviewed your
4  prior deposition in this -- in the Amor V. Cross matter
5  with Naperville, correct?
6    A.   Yes.
7    Q.   Okay.  Did you review any other testimony
8  you've given in connection with the Amor investigation?
9  So that would be either in this case or in the Amor V.
10 Cross case?
11   A.   No.
12   Q.   Okay.  And when was the last time you reviewed
13 your deposition testimony from the Amor V. Cross case?
14   A.   About four, five days ago.
15   Q.   Okay.  And do you have any reason to believe
16 that the deposition you gave in that case does not
17 contain truthful and accurate testimony?
18   A.   No.
19   Q.   Okay.  And if you were called upon to give
20 testimony related to that deposition, would it be the
21 same now as it was then?
22   A.   Yes.
23   Q.   Okay.  And other than counsel, have you
24 discussed this deposition with anybody else?



Amor vs Reid
Michael Masokas - 08/25/2022                                                    Pages 10..13

Page 10

1    A.   Well, with my co-workers.  Well, specifically,
2    Joe Buckley, my boss.
3        Q.   Okay.  And is it fair to assume that it was
4    just telling him it was going to happen and a basic time
5    and place?
6        A.   Yes.
7        Q.   Okay.  Did you discuss anything substantive
8    about the deposition with him?
9        A.   Just in regards to the Amor case in general,
10   but nothing in regards to testimony.
11       Q.   When you say you talked to him about things
12   generally in the Amor case, what does that mean?
13       A.   We discussed what -- He was not part of the
14   case so we talked about when Mr. Amor was in our office,
15   what transpired when he was in the office, and
16   everything in regards to Mr. Amor's time that he spent
17   with us.
18       Q.   Okay.  And ...  Sorry.  Strike that.
19            Prior to today's deposition, and again without
20   getting into the substance of the conversation, how many
21   times did you either telephonically meet with counsel or
22   meet in person to prepare?
23       A.   Well, I have a question.
24       Q.   Yes.

Page 11

1        A.   In regards to this specific deposition or also
2    considering the prior deposition?  Because there were --
3        Q.   In regards -- Sorry.  Go ahead.
4        A.   Because there was two separate depositions.
5        Q.   And that's a good clarifying question.  Thank
6    you.  With regards to this deposition?
7        A.   Okay.  This particular deposition?
8        MR. PASQUALINO:  Just hold on, Mike.  For the
9    record, we weren't a part of the prior deposition.
10       MS. GARCIA:  Yeah.
11   BY MS. GARCIA:
12       Q.   Go ahead.
13       A.   So --
14       MR. PASQUALINO:  Go ahead, Mike.
15   BY THE WITNESS:
16       A.   Okay.  So in regards to this deposition, I
17   don't know.  Maybe half a dozen times.
18       Q.   Okay.
19       A.   I'm kind of guessing.
20       Q.   And when was the first time you met with
21   counsel in preparation for this deposition?
22       A.   Well, we never met personally.
23       MR. PASQUALINO:  I'll just object to form and
24   foundation.

Page 12

1    BY MS. GARCIA:
2        Q.   Okay.  You said that you -- Did you meet --
3    Did you ever meet personally with counsel to prepare for
4    this deposition?
5        A.   No.
6        Q.   Were your -- Was your preparation with counsel
7    for this deposition over the phone?
8        A.   Yes.
9        Q.   And so then it would be fair to say you had
10   about half a dozen phone calls with counsel to prepare
11   for this deposition?
12       A.   I'd say that's fair.
13       Q.   Okay.  And when did that first phone call
14   occur?
15       A.   That, I don't know.  I don't have a specific
16   memory as to when.
17       Q.   Okay.  Would it have been more than three
18   months ago?
19       A.   I would think so, yes.
20       Q.   Okay.  More than six months ago?
21       MR. PASQUALINO:  I'm just going to object to this
22   line of questioning on privilege, but ...
23   BY THE WITNESS:
24       A.   Your question was again?

Page 13

1        Q.   Did you -- The first conversation over the
2    phone to prepare for this deposition, was it over six
3    months ago?
4        A.   Probably.  And, again, I don't want to
5    necessarily say prepare.  It was -- Because -- This goes
6    way back to 2020 I think.  The first deposition I think
7    was 2019; is that correct?
8        Q.   Yes.
9        A.   And so we were not part of that case until
10   early 2020 is when we were named in the case.
11       Q.   Sure.
12       A.   And so that's when just conversations would
13   have occurred, but with whom, I couldn't be specific.
14       Q.   Okay.  When was -- Strike that.
15            So other than reviewing the documents that you
16   listed and speaking with counsel approximately half a
17   dozen times, is there anything else you did to prepare
18   for this deposition?
19       A.   No.
20       Q.   Okay.  And now turning back to your employment
21   at John Reid & Associates, when did you first begin
22   working at John Reid & Associates?
23       A.   May 15th, 1983.
24       Q.   And have you worked at John Reid & Associates



Page 14

1   from 1983 up until the present day?
2       A.   Yes.
3       Q.   Okay.  And can you give me a brief overview of
4   the positions and roles you've held within John Reid &
5   Associates since then?
6       A.   Sure.  When I started with the company, I was
7   hired on as a polygraph examiner.  And then in
8   approximately 1988/'89, I started taking on more
9   responsibility, overseeing the other polygraph
10  examiners.  So the title -- It was more of an informal
11  title.  It was chief examiner.
12      Q.   Okay.
13      A.   And then over time, over a few years, that
14  title changed and the title changed to Director of
15  Services.  So it -- We -- At -- This was early '90s
16  maybe.
17      Q.   Okay.
18      A.   And we had two divisions in the company:
19  training and services.  Services provided polygraph
20  services, and so I was overseeing that part of the
21  business.  And I was basically in that role up until I
22  want to say 2005.
23      Q.   Okay.
24      A.   Because in 2005, I transferred full-time into

Page 15

1   training.
2       Q.   Okay.  And why did you decide to make the
3   transfer from services into training?
4       A.   Services started -- The business started
5   slowing down, a law had changed to where polygraph was
6   not being utilized as much and so we were doing more
7   interviewing as opposed to polygraph.  And the business
8   just basically started slowing down and there was really
9   nowhere to move from there as far as employment other
10  than into training where there were more opportunities.
11      Q.   Okay.  And when you say that business started
12  to slow down because laws started to change, what laws
13  are you referring to?
14      A.   Specifically on EPPA.  It's the Employee
15  Polygraph Protection Act which I think took effect in
16  1989, January 1st of 1989.  And once that law passed,
17  businesses were no longer able to utilize pre-employment
18  polygraph testing which was a large part of our
19  business.  And it also impacted training.  We had a
20  polygraph school.  And because of that law prohibiting
21  pre-employment testing, our school closed.
22      Q.   Okay.  And I just wanted to expand on your
23  role as an instructor currently.  I believe you said
24  it's an interviewing and interrogation instructor,

Page 16

1   correct?
2       A.   Yes, ma'am.
3       Q.   What -- Or strike that.
4            Where do you teach that class?  Or what's the
5   form in which that class is taught?
6       A.   I'm not sure I fully understand your question
7   when you say form.
8       Q.   Sure.  So you said that you had a school for
9   pre-employment that closed down, correct?
10      A.   No.  The school was a polygraph training
11  school.
12      Q.   Okay.
13      A.   It was called -- The school was Reid College.
14  It was a six-month program for training polygraph
15  examiners and that was -- I think John Reid opened that
16  school in the '60s and it would have closed in about
17  1990.  So that was specifically training polygraph
18  examiners.  That had --
19      Q.   Okay.
20      A.   That had nothing to do with interviewing and
21  interrogation.  That was a whole separate part of the
22  business.
23      Q.   Okay.  So I guess my question is:  With the
24  interview and interrogation course, is that -- that's

Page 17

1   through John Reid & Associates?
2       A.   Yes.  It's a seminar.  It's a three- to
3   five-day seminar -- or -- Yeah, three- to four-day
4   seminar.
5       Q.   And is that strictly held in the John Reid &
6   Associates' offices in Chicago or is it all across the
7   country?
8       A.   It's international.
9       Q.   International.  Okay.  Do you travel a lot for
10  these seminars or have they kind of transitioned into
11  remote similar to what we're doing now?
12      A.   No.  It's primarily travel.  It's in person.
13      Q.   And is there a specific type of student or a
14  person who engages in these seminars?  For example, like
15  primarily police officers or is there a good mix?
16      A.   It's a mix.  Police officers.  We get
17  investigators from different companies, but, you know,
18  private sector:  United Airlines, General Electric, you
19  know, various corporations that would have the security
20  department or an investigations department.  So we see
21  people from all walks of life.
22      Q.   Okay.  And is there any specific curriculum
23  you use when teaching the seminar?
24      A.   Well, it's our manual, our training manual



Page 18

1    that John Reid & Associates developed.
2        Q.   Okay.  And The John Reid & Associates manual,
3    is that something that's updated frequently?
4        A.   Yes.  Yes.  Whenever -- They print X amount of
5    number of outlines, training manual outlines.  And when
6    the number starts to deplete where they need to be
7    reprinted, there may be updates and changes at that time
8    before they reprint it.  So it really all depends how
9    quickly we go through the books.  I mean, it could be
10   once a year.  It could be twice a year.
11       Q.   And have you ever participated in reforming or
12   making changes to the manual?
13       A.   Well, everybody does.  All instructors have
14   input.  And so if an instructor feels that something
15   needs to be changed, added, or just a format of the
16   layout changed, they'll offer suggestions.  And then if
17   the suggestions are accepted by pretty much the Board of
18   Directors is what it is, they make the decisions then if
19   changes are implemented.
20       Q.   Okay.  And are you on the Board of Directors?
21       A.   I am not.
22       Q.   Okay.  And shifting away from Reid &
23   Associates briefly, do you have any secondary education?
24       A.   Secondary as a college?

Page 19

1        Q.   Yes.
2        A.   Through a second, I do.
3        Q.   And what college or graduate level degrees do
4    you have?
5        A.   Well, I graduated from St. Xavier College in
6    Chicago with a bachelor's degree in criminal justice.
7    Back when Reid College, the polygraph school, was
8    opened --
9        Q.   Uh-huh.
10       A.   -- they were accredited by the State of
11   Illinois to grant master's degrees specifically in the
12   area of detection of deception and so I did receive a
13   master's degree through John Reid College in the field
14   of detection of deception.  I also have a master's
15   degree from Moody Theological Seminary.
16       Q.   And at the theological seminary, was there a
17   specific degree you got?
18       A.   Yes.  It's in spiritual formation and
19   discipleship.
20       Q.   And I'm really just interested in this, but
21   why did you decide to get a degree in spiritual
22   formation and discipleship?
23       A.   Well --
24       Q.   It's a very interesting title.

Page 20

1        A.   -- there was a time a few years back that I
2    was almost ready to leave Reid & Associates and become
3    an associate pastor of a church full-time, but there was
4    certain changes that occurred, things happened, and it
5    just didn't work out and so I decided to stay with John
6    Reid.
7        Q.   And you said a full-time pastor at the church.
8    Had you been a part-time pastor previously?
9        A.   No.  I was there.  I was working full-time
10   with John Reid and then I was considered part-time with
11   a church as -- And it wasn't necessarily associate
12   pastor at that time.  The title was ministry director.
13       Q.   Okay.
14       A.   And so there was consideration for bringing me
15   on as associate pastor.
16       Q.   And what year if you can recall were you
17   considering switching from Reid & Associates to becoming
18   an associate pastor?
19       A.   It would have been around 2000- -- maybe '08
20   through 2011.
21       Q.   And was one of your considerations for
22   potentially moving because you were not satisfied with
23   your job at John Reid & Associates?
24       A.   No.  No.  John Reid & Associates was fine.  I

Page 21

1    just felt I was being called in a different direction.
2        Q.   Understandable.  Do you recall what year you
3    got your degree from the theological seminary?
4        A.   Yeah.  It was the longest degree in history
5    because I was trying to do it working full-time.
6        Q.   Uh-huh.
7        A.   And so I started the program I want to say in
8    2006 and completed -- actually completed it in 2017.
9        Q.   Does it matter how long it takes?  It just
10   matters that you got it done.
11       A.   That's exactly -- That's what my wife tells
12   me.
13       Q.   Sounds like a smart lady.
14       A.   Oh, my gosh.
15       Q.   What year did you graduate from St. Xavier?
16       A.   1981.
17       Q.   Okay.  And when did you get your master's at
18   Reid College?
19       A.   That was approximately 2005/2006.
20       Q.   How long was the process of obtaining your
21   master's from Reid College?
22       A.   It was not necessarily classes.  It was
23   research.  You had to do a research project and then
24   write a paper and have that published through some sort



Page 22

1  of polygraph journal or something of that nature.
2      Q.   So when did you start your research project
3  for Reid College?
4      A.   Gosh, I couldn't be specific.  Again, I would
5  say maybe it was around -- Did I say -- What was the
6  year I said?  2000?
7      Q.   2005/2006.
8      A.   That's completely wrong.  That's completely
9  wrong.  It would have been 1985/'86.  It was still when
10  the Reid College, the polygraph school, was open.  So
11  research would have started maybe in early -- I'm
12  guessing in 1985.  It was probably about a year, a year
13  and a half of doing the research.
14      Q.   Okay.  What was the process for applying to
15  Reid College?
16      A.   Well, there was an application and then an
17  interview, a polygraph test.  They had -- Back then,
18  they also did paper and pencil honesty tests.  I don't
19  know if you're familiar with those.
20      Q.   (Shaking head.)
21      A.   I don't think they do those anymore.  And then
22  if everything goes well -- A background check, a
23  thorough background check.  And if everything goes well,
24  then you're accepted into the school and -- Now,

Page 23

1  you're -- Let me back it up, make sure I have the right
2  question.  Are you asking to get into John Reid, the
3  polygraph school, or ...  Well, yeah.  That's what your
4  question was, right?  I'm getting confused.
5      Q.   Is there -- Did you attend Reid College for
6  polygraph and for a master's in detection of deception?
7      A.   Two separate things.  To get accepted into the
8  polygraph school initially, it was what I had just
9  explained:  fill out the application, the interview,
10  polygraph, paper and pencil test.  And if all goes well,
11  then you're accepted into the school which is six
12  months.
13           And then the other aspect that you were asking
14  about, the master's, that came later on.  That was a few
15  years later.
16      Q.   So if I'm getting this -- my timeline
17  correctly, you would have applied for the polygraph
18  school in around 1985?
19      A.   No.
20      Q.   When did you apply for the polygraph school?
21      A.   I graduated from St. Xavier in 1981.
22      Q.   Uh-huh.
23      A.   And it would have been right after graduation
24  or possibly even right before graduation I applied

Page 24

1  because I was accepted and I started Reid College, the
2  polygraph school, in August of 1981.
3      Q.   Okay.  And that was about six months you said?
4      A.   Yes.  I completed it in February of 1982.
5      Q.   Okay.  And then your master's was a few years
6  later?
7      A.   That was a few years later, correct.
8      Q.   Okay.  And what was the process for starting a
9  master's through Reid College?
10      A.   Well, you just -- At the time, the director of
11  the school, the polygraph school, was a gentleman named
12  Brian Jayne and you would approach the director,
13  Mr. Jayne, tell him that you are considering getting a
14  master's.  He would say, well, what topics are you
15  interested in, you know, developing here?  And then it
16  was just from there.  He would say, well, that's
17  acceptable, that's not acceptable, and then you start
18  and reason.
19      Q.   And when you went to -- Sorry.  Do you mind
20  giving me his name again?
21      A.   Brian.
22      Q.   Brian?
23      A.   Jayne, J A Y N E.
24      Q.   Jayne.  N E?  Got it.  I was hearing James

Page 25

1  with an M.
2      A.   No.
3      Q.   So when you went to Mr. Jayne, did you already
4  have the topic of detection of deception on your mind as
5  a research topic?
6      A.   You know, I don't specifically recall.  I know
7  we did have a discussion as to some ideas and then
8  ultimately decided upon one.  So I can't say I had a
9  specific topic when I walked in his office, but we had
10  talked about it and then eventually agreed on one.
11      Q.   Okay.  And what interested you about the topic
12  of detection of deception?
13      A.   Well, originally when I went to school -- I
14  was born and raised in Chicago.
15      Q.   Uh-huh.
16      A.   And I was hoping to get on with the Chicago
17  Police Department.  I was dating a girl back in high
18  school.  Her father was a police officer and I knew a
19  couple of other officers so I had this goal of getting
20  on with the police department.  So right out of college
21  I took the test, the exam, and we were told at the time
22  of the exam that it may be a couple years before we even
23  get a call.  And so here I am just graduating college
24  without a job and couldn't sit around so I heard about



Page 26

1  Reid College, the polygraph school, and I thought, well,
2  if I were to go to the polygraph school, pass --
3  hopefully pass, get a license ... Because in order to
4  run polygraph in the State of Illinois, you need the
5  license through the State so I thought that that might
6  be a benefit to me down the road when I apply for jobs,
7  just something to put on my resume.  So I applied and
8  was accepted.
9      Q.  Okay.  And circling back, I had asked you why
10  you were interested in the topic of detection of
11  deception.  Was that interest -- Did that interest stem
12  from your initial interest in doing police work?
13      A.  Primarily, yeah, because honestly I knew
14  nothing about polygraph.  It was new to me.  I really
15  didn't know much about it.  It kind of piqued my
16  interest and so I thought, well, this could be a feather
17  in my cap as far as my resume goes.  Something other
18  people don't have.
19      Q.  Okay.  And your initial application with the
20  Chicago Police Department, did you ever get a response
21  from the department itself?
22      A.  No.  I must have bombed it.
23      Q.  Did you apply again after that first time?
24      A.  No, I did not.

Page 27

1      Q.  And so earlier I believe you mentioned that
2  you did research for about a year and a half for your
3  master's degree, correct?
4      A.  Uh-huh.  Yes.
5      Q.  And in order to get a master's, you had to
6  write a paper, correct?
7      A.  Yes, ma'am.
8      Q.  What was the topic of your paper?
9      A.  It was the validity of pre-employment
10  polygraph testing.  No.  The -- Or the accuracy and the
11  validity of pre-employment polygraph testing.
12      Q.  I'm not familiar about too much, but what was
13  your thesis of this paper?
14      A.  Well, what we had decided to do is because we
15  were doing a lot of pre-employment testing for
16  companies, specifically trucking companies, and so we
17  began asking a specific polygraph question on the exam
18  about -- and I can't be specific, but it had to do with
19  moving violations.  So the truck drivers applying for a
20  driving job at a company, they used our services, our
21  polygraph services.  And so one of the test questions
22  was, you know, regarding moving violations in the last
23  twelve months.  And then what we were able to do is we
24  were able to compare what they told us with their actual

Page 28

1  driving record because we were able to pull their
2  driving record through the State to determine if they
3  were telling the truth or not.
4      Q.  And --
5      A.  Does that make sense?
6      Q.  Yes, it makes perfect sense.
7          And did you find that there was validity to
8  the pre-employment polygraph testing at least within
9  that realm?
10      A.  I think -- Yeah, I don't remember specifically
11  the exact outcome, but I know that it was more in the
12  favor of the polygraph as opposed to, you know, the
13  other way.
14      Q.  And did -- That paper was eventually
15  published, correct?
16      A.  It was -- I think it was in a polygraph
17  journal.
18      Q.  Okay.  Do you recall the name of that journal?
19      A.  I have no idea to be honest.
20      Q.  That's fine.
21      A.  This goes back to 1986.
22      Q.  Of course.  Of course.
23          Okay.  I just wanted to ask a couple of
24  background questions.  Apologies if these are intrusive,

Page 29

1  but have you ever been fired or suspended from a job for
2  any reason?
3      A.  No.
4      Q.  Have you ever been officially disciplined at a
5  job?
6      A.  No.
7      Q.  Have you ever been unofficially disciplined at
8  a job?
9      A.  I like that question, but no.
10      Q.  Have you ever been disciplined by or asked to
11  leave any institution of higher learning?
12      A.  No.
13      Q.  And have you ever been convicted of a felony?
14      A.  No.
15      Q.  Okay.  And I just wanted to turn back now to
16  the polygraph school specifically.
17      A.  (Nodding.)
18      Q.  And that was approximately six months you
19  said.  What topics were covered within the polygraph
20  school?
21      A.  There were several.  Psychology, pharmacology,
22  question formulation, (inaudible) interpretation.
23          THE COURT REPORTER:  I'm sorry?  What was that?
24



Page 30

BY THE WITNESS:

1 BY THE WITNESS:
2   A.   Chart, C H A R T.  Chart interpretation, legal
3 aspects, and I think there was a section on the law.
4   Q.   And at the end of -- Oh, sorry.  Strike that.
5       When you were getting the -- At the polygraph
6 school, those took place in a classroom setting,
7 correct?
8   A.   Yes.
9   Q.   And approximately how many people were in your
10 class?
11   A.   We started off with six and then after a week
12 or two, one dropped out so we finished with five.
13   Q.   And of the five, did anybody else end up
14 working at John Reid & Associates?
15   A.   No.
16   Q.   Do you recall who your instructors were at the
17 polygraph college?
18   A.   No.  I don't -- I can't -- When I went
19 through, the only person I can give you was the person
20 who was the head of the school at that time.  His name
21 was Dan Malloy, M A L L O Y.
22   Q.   Great.  And so you eventually started working
23 at John Reid & Associates in 1983.  So after you
24 graduated from the polygraph school in 1982 until you

Page 31

1 started in 1983, what were you doing professionally?
2   A.   I was working -- Well, I actually had two
3 jobs.  I was working part-time with a gentleman in
4 Hinsdale, Illinois who had a polygraph company and I was
5 working part-time for him during the day.  The company
6 name was F, F like Fred, L like Larry, Hunter,
7 H U N T E R.  And so I did that part-time during the
8 day.  And then at night, I worked part-time for UPS.
9   Q.   And when did you decide to apply for John Reid
10 & Associates?
11   A.   Well, I worked for Hunter for about one year
12 and then I had heard that there was a full-time opening,
13 full-time position with Reid & Associates and I don't
14 know if I applied or called.  I can't remember how it
15 transpired, but ultimately wound up going back there
16 full-time.
17   Q.   And after you graduated -- Or strike that.
18       Was there any sort of testing or certification
19 necessary to become a polygraph examiner in Illinois?
20   A.   Yes.  The State of Illinois -- Back then, it
21 was called the Department of Professional Regulation.  I
22 don't know what it's called today, but you had to take
23 an exam that they offered in order to receive a license.
24 And so I did, I took the test, I fortunately passed, and

Page 32

1 got my license.
2   Q.   And when did you take the test?
3   A.   Well, it would have been I want to say at the
4 end -- no -- maybe beginning of March 1982.  It was
5 right after the polygraph -- right after I graduated the
6 polygraph school.
7   Q.   And what topics were tested on the exam?
8   A.   Everything we just talked about:
9 psychology ... everything that was taught at Reid
10 College, there were questions on all of that as well as
11 chart, chart interpretation where you had to evaluate
12 some polygraph charts.
13   Q.   Okay.  With the polygraph, when you pass a
14 test, you get a polygraph license, correct?
15   A.   Yes.
16   Q.   And how -- What do you need to do in order to
17 keep that license current, if anything?
18   A.   Well, stay up on any research that comes out
19 basically.  There was no peer review or anything
20 regarding the license.
21   Q.   Okay.
22   A.   It's like once you were licensed, you pay your
23 dues annually and they -- or however it was -- I think
24 it was -- I can't remember how long it was before the

Page 33

1 license expired.  Maybe four, five years and then you
2 would just pay the fee and you're good for another four
3 years.
4   Q.   Okay.  And so is there any sort of continuing
5 education you have to do in order to maintain your
6 license?
7   A.   Nothing that's mandatory.  It's mostly by
8 choice as far as attending various training seminars or
9 training programs.  So it was really by choice, not
10 anything mandatory to renew the license.
11   Q.   Okay.  And what has been your practice in
12 terms of attending seminars and engaging in any
13 continuing education in this field?
14   A.   Well, we had -- We were part of a couple of
15 associations, members.  For instance, there was the
16 Illinois Polygraph Society.  We were members -- I was
17 specifically a member of the Illinois Polygraph Society.
18 They would hold -- Every year they would hold a couple
19 of training programs, like a two-day seminar, things
20 like that, but we were also members of the American
21 Polygraph Association and they have an annual conference
22 along with other training programs that they would offer
23 throughout the year.  And so if possible, if available,
24 time permitting, we would attend those.



Amor vs Reid
Michael Masokas - 08/25/2022
Pages 34..37

Page 34

1    Q.   And this is probably a difficult question to
2    answer, but if you could ballpark, how many polygraphs
3    would you estimate you've taken over the years?
4    A.   A lot.  Considering both pre-employment
5    polygraph tests as well as specific-issue polygraph
6    tests such as stealing or something like that, all
7    together, again, I'm guessing here, but probably around
8    9-, 10-, 11,000 because I worked from 1983 to nearly
9    2005.
10   Q.   And as your role as an instructor currently,
11   do you ever take polygraph tests?
12   A.   No.
13   Q.   Okay.  And if -- Are there any more categories
14   just broadly within polygraph testing other than the
15   pre-employment test or an issue-specific test?  Are
16   there like more categories that I should be aware of?
17   A.   Sort of because there -- Back in the '90s,
18   there was this wave of polygraphs kind of sweeping over
19   the country.  It started on the West Coast and moved
20   east and it was for -- I don't know how to phrase it --
21   sexual offenders.
22   Q.   Okay.
23   A.   And there was a program that started out I
24   think it was in Utah where probation departments, county

Page 35

1    probation departments specifically for sexual offenders
2    started working with polygraph examiners to where --
3    when they would release an offender, every six months
4    they would have that offender take a polygraph test to
5    determine whether the offender re-offended during that
6    period of time.  It was part of the probation process.
7    And so that -- at -- that program moved across the
8    country east and it finally came to Illinois.  And so we
9    were involved in doing they call them monitoring tests.
10   Q.   Okay.  So would it be fair to say that -- And
11   I'm not trying to create like specific-specific
12   categories, but broadly within polygraph testing that
13   you've done, it was pre-employment testing, monitoring
14   testing, and issue-specific testing?
15   A.   That's -- It's fair to say.  Sure.
16   Q.   Okay.  And would you say that there was a --
17   using those same broad categories -- one category you
18   did more of than the others or were they split pretty
19   evenly?
20   A.   Pre-employment was probably most.
21   Q.   Okay.  And then again just talking generally,
22   what are the steps of polygraphing somebody?
23   A.   Now when you say "steps," could you be more
24   specific?

Page 36

1    Q.   Sure.  So let's say you -- Actually, that's a
2    good question.  What would you say the beginning of a
3    polygraph test is?
4    A.   The very, very beginning is where we need
5    their permission to take the test.  They have to
6    voluntarily consent to take the test.  If they're not
7    voluntarily consenting, if they're saying that they're
8    being forced, then we do not give the test, and that
9    applies for all polygraph tests.  And so that would be
10   the very first step as we have them read and sign a
11   consent form.
12   Q.   And then assuming that they read and sign the
13   consent form, what is the next step?
14   A.   After that, we'd have them fill out a very
15   short medical form, just want to make sure that they're
16   healthy.  You know, there's no physical problems.  And
17   then after that, depending on what type of test it is,
18   we would go through an interview.  If it's a
19   pre-employment test, then obviously those questions are
20   going to be different than say, for example, if it's a
21   burglary obviously.  So we go through the interview.
22   Once the pre- -- We call it a pretest interview because
23   it's before the actual polygraph.
24   Q.   Uh-huh.

Page 37

1    A.   And then once the interview is complete, we
2    formulate the test questions that will be on the test.
3    Once the questions have been formulated, we review the
4    questions with the subject before any test is given so
5    they know exactly every single question that they're
6    going to be asked on the test.
7    Q.   Okay.
8    A.   And then once the questions are reviewed,
9    they're attached to the polygraph.  We would run the
10   actual test and then it's done.
11   Q.   Okay.  And I will come back to what happens
12   after the test is over.
13   A.   Sure.
14   Q.   But I just wanted to go back through the
15   steps.  So the first step is voluntary consent, correct?
16   A.   Yes.
17   Q.   And why is it important to receive voluntary
18   consent prior to a polygraph examination?
19   A.   Because they have to want to take the test.
20   If they don't want to take the test, that's their right.
21   And if -- And we're not going to force them to take the
22   test.  So they've got to be agreeable and say okay.
23   Yeah, I'm willing to do this.
24   Q.   And do you feel that having the test subject



Amor vs Reid
Michael Masokas - 08/25/2022                                                    Pages 38..41

Page 38

1  read the voluntary consent form and then signing it
2  indicates that they are willing to take the test and
3  they want to do it?
4      A.   Well, not -- There's more to it than just
5  reading and signing.  We also ask them verbally, and we
6  tell them that they're free to leave if they don't want
7  to be here.  You have a right -- There's actually a part
8  on the document, a statement that says I understand that
9  I'm free to leave at any time.  And then we have them
10 initial off on that after we explain to them that
11 they're free to go, that they don't have to be here.  So
12 it's not just the reading and the signing.  We usually
13 will get verbal confirmation as well.
14      Q.   And have you ever had an experience where
15 someone has had that conversation with you and has
16 decided to leave the polygraph examination?
17      A.   Yes.  Yeah.  I can't be specific and say on
18 this particular date this happened, but I know in 20 --
19 you know, almost 25 years of writing polygraph, I know
20 that's happened where we've had people say, okay, I'm
21 done.  I don't want to proceed and they left.
22      Q.   Okay.  And after a polygraph test is
23 completed, what is the next step?
24      A.   If we evaluate the test results as being

Page 39

1  truthful, we would thank them for their time and send
2  them on their way.  If we evaluate the test as being
3  deceptive, then what we would do is we would conduct a
4  post-test interview in which we afford them an
5  opportunity to offer a reason or explanation as to why
6  they may not be passing the test.
7      Q.   And then is it within your practice or the
8  practice of Reid & Associates to conduct a second
9  polygraph test if there's indications of deception?
10      A.   Not at that time, no.
11      Q.   At what time?
12      A.   It would be days later.  We would say at least
13 24 -- at least a minimum of 24 hours later.
14      Q.   And why would you say at least?  What's the
15 importance of waiting that 24 hours?
16      A.   Because if afterwards somebody were talking
17 about, for instance, a specific test question and now we
18 have this discussion on why they're not passing and then
19 they offer an explanation, if we were to immediately
20 give them the test after that because their emotions are
21 so, for lack of a better term, hyped up, there's a good
22 chance that the test would simply be inconclusive.  And
23 so we want to give them time to -- They just went
24 through this polygraph test.  We want to give them time

Page 40

1  to relax, take it easy, and then come back when they're
2  refreshed.
3      Q.   And speaking of inconclusive, what are the
4  different results that a polygraph test can have?  Is it
5  only truthful, deceptive, or inconclusive or is there
6  something I'm missing?
7      A.   There's a few others.  There's truthful,
8  deceptive, inconclusive, there's unresponsive which
9  means we're not getting any response at all on any of
10 the questions, and there's also another result called
11 purposeful non-cooperation.  And that last one is where
12 the subject is deliberately doing things on the
13 polygraph test to throw it off.
14      Q.   And what are some examples of that that you've
15 experienced?
16      A.   One of the things is they'll change their
17 breathing on a question.  For instance, if I -- if I
18 were giving you a polygraph test, one of the questions
19 would be:  Do they call you Mariah?  Did I pronounce
20 that right?
21      Q.   You did.
22      A.   Okay.  So -- So -- And you would say obviously
23 yes.  And so you know that's a truthful answer.  Well,
24 if I asked you the next question, you know, did you

Page 41

1  steal my pen and you stole my pen and you're going to
2  lie about that, well, sometimes people would change
3  their breathing on that first question to make it look
4  different.  Does that make sense?
5      Q.   That makes a lot of sense.  Other than
6  changing your breathing, are there other ways you've
7  experienced people engaging in purposeful
8  non-cooperation?
9      A.   Yeah.  Another thing they'll do is they'll
10 flex the muscle in their arm which then distorts the
11 blood pressure recording.  So on certain questions
12 they'll flex their muscle and then the pen kind of goes
13 really funny to -- and because in their mind, they think
14 they're making it look different.
15      Q.   Uh-huh.
16      A.   And they don't want us to get a valid reading.
17 So breathing or sometimes they'll wiggle around in the
18 chair.  They won't sit still or other times they'll
19 talk.  They'll start talking in between questions.
20          (Enter Mr. Bowman via videoconference.)
21 BY THE WITNESS:
22      A.   So that's the different types of -- some of
23 the different types of distortions that we'll see.
24      Q.   Do those distortions show up within the



Amor vs Reid
Michael Masokas - 08/25/2022
Pages 42..45

Page 42

1  polygraph readout itself or is it something that you
2  would observe and then utilize when you're evaluating
3  the polygraph data?
4      A.   Is -- I'm sorry.  I didn't catch the full
5  question.
6      Q.   Yeah.  You said there's like these different
7  indicators of purposeful non-cooperation.  Would those
8  be something that you could see in the polygraph
9  readout, in the data, or is that something that you
10 would observe as you're giving a polygraph and then use
11 that as an analysis of the raw data itself?
12     A.   No.  I most -- In most of those instances, you
13 can actually see it as the test is being given.  It's
14 very obvious.  It's right there on the tracing in most
15 situations.
16     Q.   And then I understand the other categories of
17 response:  inconclusive, deceptive, truthful.  What
18 would an unresponsive -- What would cause an
19 unresponsive result?
20     A.    Someone who had a lack of sleep.  Maybe they
21 were up for two days and just exhausted.  Someone who
22 may be overly medicated.  It's just -- It's like they're
23 asleep during the test.  They're just -- Just their
24 breathing is the same.  Blood pressure is the same.

Page 43

1  There's no type of physiological response at all on any
2  of the questions.
3      Q.   And what -- How would you define physiological
4  response within the realm of polygraphing?
5      A.   Well, changes in respiration, a change from
6  the normal, changes in blood pressure, a galvanic skin
7  response, the little electrodes on the fingers.  And so
8  it's a change from their normal.  So we see a normal
9  breathing pattern and all of a sudden we ask a question
10 and it could be a suppression in breathing, the blood
11 pressure starts to go up and things of that sort.
12     Q.   Okay.  When you are -- Okay.  So after the
13 polygraph itself is given, once everything is hooked up
14 to the machine, you review the data, correct?
15     A.   Yes.
16     Q.   And do you -- Is it your practice or the
17 practice at John Reid & Associates to review the data
18 as -- individual or with the team?
19     A.   Individually.  We do it individually.
20     Q.   And when you're analyzing the data, is there a
21 specific method you use in order to score it?
22     A.   We use -- It was called -- It's called visual
23 inspection.
24     Q.   And what is the visual inspection method?

Page 44

1      A.   We -- We'll look at -- We're looking at the
2  polygraph charts and then we go one question at a time.
3  So, for instance, on Question Number 3, we'll look at
4  the respiration and then determine if there's any type
5  of physiological response.  And then if there is a
6  physiological response, we'll basically interpret that
7  either as deception or -- Well, let's say I'm going to
8  use these terms generically:  deceptive, very deceptive,
9  or extremely deceptive.  And I'm just using -- kind of
10 using those as an example.  And so with visual
11 inspection, the way we were taught through Reid College
12 is we use a little checkmark.  The darker the check, the
13 more significant the response.  So a light check,
14 deceptive response.  A little bit of a darker check,
15 very deceptive response.  Or like a really heavy dark
16 check, like we could say extremely deceptive response or
17 more significant.  Does that make sense?
18     Q.   Yeah.  And are you only checking for
19 indicators of deception or are there also indications of
20 truthfulness within the data?
21     A.   The truthfulness report comes at the end.
22     Q.   Okay.
23     A.   So at the end when we evaluate the entire test
24 and then we're looking at these various checkmarks,

Page 45

1  there's two questions that we haven't discussed in the
2  polygraph called control questions, and those control
3  questions are also evaluated.  And with a truthful
4  result, the control questions will show more deception
5  than the relevant questions.  "Relevant" meaning did you
6  start the fire?  Does that make sense?  So --
7      Q.   Yeah.  Is that because the control questions
8  are, you know, super -- not anywhere near truthful and
9  so they would --
10     A.   Right.
11     Q.   -- compare it to a truthful statement, have a
12 stronger indication of deception?
13     A.   Correct.
14     Q.   Okay.  And have you ever -- In marking the
15 checks down in variations of light to heavy, is there
16 ever an issue with interpreting the results either at
17 the time you're doing so or as you're reviewing later on
18 if you do review later on?
19     A.   I'm not sure I follow the question.  When you
20 say --
21     Q.   Sure.  I will just -- I'll say for myself as
22 badly of giving -- I may -- you know, I would worry
23 personally, you know, that I would have a light check --
24 me to have a light check but have a heavy checkmark on



Page 46

1  the sheet that I'm scoring on.  Have you ever had a
2  similar issue?
3      A.  No.  No.
4      MR. PASQUALINO:  I'll just object to the form.
5  BY THE WITNESS:
6      A.  No, because once you do it a few times, you
7  know, you get used to what you're doing and so -- No,
8  not any issues like -- of that nature.
9      Q.  Okay.  And was the checkmark method one that
10 you were using when you polygraphed Mr. Amor in 1995?
11     A.  Yes.
12     Q.  Okay.  In 1995, were there other types of
13 scoring techniques that were utilized?
14     A.  There was a new form of scoring that was
15 coming out.  There was no industry standard, so to
16 speak, at the time.  There's been -- There were new
17 types of scoring being developed using numbers.
18     Q.  So numerical scoring?
19     A.  Numerical scoring, but there were different
20 schools of numerical scoring and they weren't agreeing
21 on the right approach for numerical scoring, so it was
22 still -- They were still developing that particular
23 scoring technique.  And so as far as I know, it was just
24 the numerical -- the different aspects of numerical

Page 47

1  scoring that were starting to come out.
2      Q.  And was there a method -- Were you trained on
3  anything besides the checkmark method?
4      A.  Not specifically trained, no.  We were aware
5  of numerical scoring and we understood how it worked,
6  but, again, it wasn't to the point where there was any
7  industry standard as to which one is more accurate.
8  Not -- No, accurate is not even the right word.  There
9  was no agreement on which one to go with at the time.
10     Q.  Is there an agreement now on what the
11 preferred method is?
12     A.  I believe -- I don't know if there's industry
13 agreements, so to speak, but I do believe a lot of
14 examiners do use the numerical.  Now, I'm not sure what
15 aspect of the numerical scoring, but I do believe that
16 quite a few examiners are using numerical scoring today.
17 I haven't done a polygraph since 2004 so I've been out
18 of the field for a while so I couldn't give you
19 specifics.
20     Q.  That's completely fine.
21         Based on your knowledge of numerical scoring
22 and your training on the checkmark technique, do you
23 have any understanding of what the pros and cons were
24 for each of these techniques?

Page 48

1      A.  No.  I don't think I could answer that
2  question.  I'm ...
3      Q.  Okay.  Put another way.  Based on your
4  knowledge, is there a reason why if someone would prefer
5  a checkmark technique over a numerical technique?
6      A.  It's just because that's how we were trained.
7      Q.  Okay.  And does the -- Can the different types
8  of methodology in your experience in -- Sorry.  Strike
9  that.  That was a bad question.
10         Do you have any reason to believe that one
11 methodology is more reliable than another?
12     A.  No.
13     Q.  Do you have any knowledge of literature that
14 might speak to this?
15     A.  I don't.  Like I said, I've been out of the
16 field for several years so I could not tell you one way
17 or the other.  I'm sure there might be something out
18 there, but I don't know.
19     Q.  Sure.  And that dovetails into my next
20 question.  So, you know, you're currently an instructor
21 in interviewing and interrogation.  Does polygraph and
22 polygraph techniques, is that something that's included
23 in your courses on interviewing and interrogation?
24     A.  No.

Page 49

1      Q.  Okay.  And what would you classify an
2  interrogation as versus an interview?
3      A.  An interview should be completely
4  non-accusatory.  An interview is where we're asking
5  questions.  It's more of a dialogue, question and
6  answer.  An interview can be basically conducted at
7  different types of environments whereas an
8  interrogation, I would say it's really going to be
9  probably more on the accusatory side.  The purpose of an
10 interview is to develop information.  The purpose of the
11 interrogation is to determine the truth.  I think an
12 interrogation probably need a little bit more of a
13 controlled environment as opposed to just doing it
14 anywhere.  And I think those are the big differences.
15     Q.  Okay.  And in your experience as someone who's
16 done a multitude of polygraph examinations and is now an
17 instructor in interviewing and interrogation, do you
18 believe that a polygraph examination can be part of the
19 process of interviewing somebody?
20     A.  Yes.
21     Q.  In what ways have you experienced polygraphing
22 as a form of interview?
23     A.  Well, it's not necessarily a form of interview
24 I wouldn't say.  It's part -- It can be part of the



Page 50

1  interview process.  Another aspect of the interview
2  process where we did polygraph testing, the -- we would
3  always conduct a pretest interview before the test.  So
4  the test was just one segment of the process, you know.
5  So the interview and then the polygraph.  You can
6  always --
7     **Q.   Okay.**
8     A.   You can always interview somebody without a
9  polygraph, you know, so --
10    **Q.   Very true.**
11    A.   -- it's just one bit -- It would just be one
12 part of the procedure.
13    **Q.   So it would be fair to say that a polygraph
14 can be used as a process of interviewing a subject?**
15    A.   Sure.
16    **Q.   And --**
17    A.   Part of the procedure, part of the process.
18    **Q.   Okay.  And similarly, would it also be fair to
19 say that a polygraph examination could be part of the
20 procedure of interrogating a subject?**
21    A.   It can be part of the process, yes.  If
22 polygraph was initially conducted, yes.  So, you know, I
23 guess, yeah, it would be part of the procedure.
24    **Q.   And turning back to the course you've been**

Page 51

1  **teaching, what are the subjects that you cover in your
2  interviewing and interrogation course?**
3     A.   When you say "subjects," I mean it's
4  interviewing and then it's interrogation.
5     **Q.   Sure.  But --**
6     A.   Can you be more specific?
7     **Q.   Yeah, more specific.  And you can go, you
8  know, interview and then interrogation or interrogation
9  or interviewing, whatever is easiest for you to explain.**
10    A.   When you say what are the courses, I mean, I'm
11 not sure I understand because it's -- part of it is
12 interviewing, part of it is interrogation.  Is there
13 anything specific in regards to those things?
14    **Q.   Yeah.  So if I was going to take a seminar
15 with you and I walk in on the first day, what would the
16 topics that we covered look like?**
17    A.   The first morning we're probably -- Well, not
18 probably.  What we're talking about is laying the
19 foundation for conducting a proper interview such as
20 interview environment, interview work characteristics,
21 basic interview characteristics, and then we would talk
22 about a little bit the difference between an interview
23 and an interrogation, just kind of laying the foundation
24 as to what these things are and then we would get into

Page 52

1  some specifics as far as interview environment,
2  conducting an interview in someone's home as opposed to
3  at your own office and different locations.
4        In the afternoon, we would get into behavior
5  symptom analysis which is basically assessing the
6  subject's verbal behavior, their nonverbal behavior.
7        And then the following morning is we would
8  conclude that section on behavior symptom analysis.  And
9  then in the afternoon on the second day, we would
10 specifically talk about the interview process and then
11 the third day would be interrogation.
12    **Q.   Okay.  Great.  And within the seminar, do you
13 ever discuss what is colloquially termed the Reid
14 Technique?**
15    A.   What is what?
16    **Q.   Colloquially termed the Reid Technique.**
17    A.   The entire seminar is the Reid Technique.
18    **Q.   And you're teaching off of the Reid manual so
19 I suppose that's fair.**
20    A.   Yeah.
21    MS. GARCIA:  I don't know if you want to take a
22 quick break because I'm going to go into the specifics
23 of the interviewing of Mr. Amor.  Do you mind if we have
24 time to take a quick bathroom break?

Page 53

1     MR. PASQUALINO:  Yeah.  Let's take, what, until
2  3:50, or ...
3     MS. GARCIA:  3:50 is perfect.
4     MR. PASQUALINO:  All right.
5     THE WITNESS:  3:50?
6     MS. GARCIA:  Yep.
7     THE WITNESS:  Okay.  We'll see you then.
8     MS. GARCIA:  Thanks.
9     THE WITNESS:  Thank you.
10              (A short break was had.)
11 BY MS. GARCIA:
12    **Q.   All right.  Mike, do you have an independent
13 recollection of taking Mr. Amor's polygraph on
14 October 3rd, 1995?**
15    A.   Some.  Not everything.  I recall some things,
16 but other things are more vague.
17    **Q.   Okay.  And do you recall how you initially
18 learned that the Naperville Police Department were
19 interested in having Reid & Associates polygraph
20 Mr. Amor?**
21    A.   That, I don't.  All I remember is somehow they
22 were on our schedule.  How they wound up on the
23 schedule, I don't know.
24    **Q.   And do you recall what the process was for**



Amor vs Reid
Michael Masokas - 08/25/2022

Pages 54..57

Page 54

1  scheduling a polygraph at Reid & Associates at that
2  time?
3      A.   Someone from their agency would have contacted
4  our office and more than likely the receptionist would
5  have passed that call back to someone. Whoever was
6  available would have spoken with the representative from
7  the department. And then based on their request, we
8  were able to either fulfill their request or have to
9  schedule them at some other point. So somehow, some way
10  they talked to somebody and wound up -- it wound up
11  getting put on the schedule for that particular day.
12      Q.   And if something was put on the schedule, was
13  it specifically assigned to an employee or was it
14  whoever was available at that time?
15      A.   Both. It could have been both. If -- For
16  instance, if I took a call and spoke to an investigator
17  from a particular agency or company, he provided -- he
18  or she provided some background and wanted an
19  appointment, then we put it on the schedule on a day
20  that I was available or it could have been a situation
21  where if they wanted it sooner, it could have been
22  assigned to somebody else. So there -- It goes both --
23  It would have went both ways.
24      Q.   Okay. And in the instance of Mr. Amor's

Page 55

1  polygraph, do you recall who told you that it was
2  scheduled for that afternoon and evening?
3      A.   I don't. I don't.
4      Q.   And do you recall around what time Mr. Amor
5  and the two Naperville detectives, Cross and Guerreri,
6  arrived at Reid & Associates?
7      A.   It was approximately 3:50 p.m.
8      Q.   And when they arrived, was there anybody else
9  in the office besides you, Mr. Amor, and the two
10  detectives?
11      A.   Yes.
12      Q.   Who was in the office?
13      A.   Well, the receptionist would have been still
14  at their desk. I believe there were two up front at the
15  time. Mr. Newey, Art Newey, was another employee who
16  was there that day. Probably Lou Sagan who worked for
17  the other -- the training department at the time. His
18  office was there. It was -- This is in '95. There was
19  a woman working for us in accounting, Marion. I think
20  she would have still been there at the time. So there
21  were several people still in the office when they
22  arrived.
23      Q.   Okay. And when they arrived, who did you talk
24  to first?

Page 56

1      A.   It would have been both detectives. Once they
2  arrived, we were informed -- I was informed that they
3  had gotten there by the receptionist and then the first
4  thing we did was take the two detectives to a side
5  office and Mr. Amor then sat out in our lobby while I
6  spoke with the detectives. And at that point they were
7  able to provide all of the information -- the
8  investigative information for the polygraph.
9      Q.   What information do you recall being told by
10  the officers about the investigation?
11      A.   Well, if you have my file, it's written down
12  on my fact sheets.
13      Q.   Sure. Let me see -- pull up ... I'm going to
14  share my screen really quickly. I'm sharing what is
15  Bates SDT Reid 21 through SDT Reid 15 -- Actually,
16  strike that.
17           Let's just look at from Bates SDT Reid 21
18  through SDT Reid 22 which says Polygraph Case History at
19  the top.
20      A.   Sure.
21      Q.   Do you see that?
22      A.   Yes.
23      Q.   And would this -- Does this sheet contain the
24  information that you were told by the two detectives

Page 57

1  from Naperville when they came in for Mr. Amor's
2  polygraph examination?
3      A.   Yes. They -- As they provided the
4  information -- They were just talking. I was writing,
5  trying to keep up with them as they spoke, just kind of
6  jotting down some of the things that they were saying.
7  So the notes here are my notes with the poor
8  handwriting. And, again, just trying to keep up as they
9  were speaking.
10      Q.   And I'll give you a second to read, but would
11  you summarize what your writing says starting with where
12  I think I'm -- I don't know if I'm highlighting this on
13  here.
14      A.   Yeah, I got it. I see it.
15      Q.   Great.
16      A.   Yeah. So they said there was a
17  hundred-thousand-dollar life insurance policy on
18  Subject 2 who's Marianne at the top there. They just --
19  These are not in any particular order. These were the
20  names they gave me first. Who's to be tested is number
21  one, Mr. William Amor, and then they said Marianne
22  Miceli was the victim in this case, and Tina Miceli was
23  the daughter of Subject 2. This is supposed to say
24  Subject 2. So one-hundred-thousand-dollar life



Page 58

1  insurance policy on Subject 2 who's Miss Marianne
2  Miceli.  Subject 2 is the victim.  Cause of death:
3  Smoke inhalation.  On September 10th, '95, there was a
4  fire in Subject 2's apartment.  Subject 2 calls the fire
5  department at 6:40 p.m., says she can't exit the
6  apartment because of chairs blocking the doors and both
7  burning.  What does that -- I can't make that out.  Oh,
8  one at, it looks like, the exit and one in the middle of
9  the living room.
10      Q.   Great.  That was very helpful.  It looks like
11  there may be more notes coming down?
12      A.   Yep.  Yep.  On the -- This is on the back
13  page.  Subject 2 -- And, again, they're talking, I'm
14  writing so any verbiage here is I'm just writing what
15  I'm hearing.
16      Q.   Of course.
17      A.   Subject 2 mentally retarded.  Subject 1
18  initially romantically involved with Subject 2 [sic],
19  then Subject 1 became involved with Subject 3.  Now,
20  here's where I made an error.  I got the numbers mixed
21  up.  It says Subject 2 and Subject 3 said they left the
22  apartment at 6:25 to 6:30.  This should be Subject 1 and
23  Subject 3.  Subject 2 is the victim so I just -- I
24  accidentally got the numbers mixed up from the previous

Page 59

1  page.  Does that make sense?
2      Q.   Yes.
3      A.   And then further on down -- Again, the number
4  is mixed up.  It should be Subject 1 I believe, Mr. Amor
5  denies any knowledge of the insurance policy.  Friends
6  of Subject 1 and Subject 3 claim that Subject 1 and
7  Subject 3 spoke openly about the policy in their
8  presence.  And then further on down after a number of
9  interviews, Subject 1 says that he spilled vodka and
10  maybe left a burning cigarette in an ashtray that may
11  have fallen out of the ashtray.
12      And then at the bottom, Subject 1 has a
13  history of scamming families out of money.  Just prior
14  to this, Subject 1 spent six months in a lockup for
15  forgery.  And so that was all the information they
16  provided at that time.
17      Q.   Great.  Thank you for taking me through that.
18      A.   Sure.
19      Q.   Approximately how long would you say, if you
20  recall, you spent speaking with the Naperville
21  detectives regarding this background information?
22      A.   It was -- Well, if you have my notes there,
23  it's on my notes.  Off the top of my head, I'm going to
24  say maybe 30 to 40 minutes, but I have it written down.

Page 60

1      Q.   Would that be the notes I just shared?
2      A.   No.  No.  It's a different -- I don't know if
3  your screen shows colors, but it's kind of a yellow
4  sheet, legal-size.  It's got writing down the left
5  margin.
6      Q.   I think we can move on.  30 to 40 minutes --
7      A.   Approximately.
8      Q.   -- is a good approximation I think.
9      All right.  And then after you spoke with the
10  detectives, what happened next?
11      A.   At that point they would have been escorted
12  back out to our lobby at which time then Mr. Amor was
13  escorted back into one of our interview rooms.  And so
14  it would have been myself and Mr. Amor that went back to
15  the interview room.  Once we got into the interview
16  room, he was read his Miranda Rights which he waived.
17  He signed off on that document and then he was presented
18  with the release of information form which is also the
19  consent form.  And he read the form, he signed the form.
20  We talked about him being free to leave.  He's not in
21  custody.  He actually initialed the consent form at the
22  bottom stating that he understood he knew he was free to
23  leave.  And then I asked him if he was in custody?  He
24  said no.  I said, Sir -- And so I confirmed, you know

Page 61

1  you're not in custody?  Correct.  I said you know you're
2  free to leave?  Yes.  So why don't you then write that
3  down in your own writing in front of that consent form.
4  And that's when he wrote -- At the bottom I think he
5  wrote something to the effect of I understand I'm not in
6  custody and then he initialed off on that as well.
7      Once he was done with that, he filled out a
8  medical sheet, a short medical form that took him a
9  couple of minutes and then we discussed that for a short
10  period of time and then we would have started the
11  pretest interview.
12      Q.   And I know you testified that the consent form
13  was a standard form you would have folks fill out.  Was
14  the Miranda Rights form a standard form you would have
15  folks fill out prior to a polygraph exam?
16      A.   Only if it was a criminal case where law
17  enforcement was involved.
18      Q.   Great.  And so Mr. Amor got brought in
19  around -- or you took him back to be polygraphed around
20  4:30, 4:35?  Would that be fair to say?
21          (Enter Mr. Bowman via videoconference.)
22  BY THE WITNESS:
23      A.   I'm sorry.  Could you repeat that again, the
24  times?



Amor vs Reid
Michael Masokas - 08/25/2022                                              Pages 62..65

Page 62

1    Q.   Sure.  I can ask it a better way.  What time
2    did you take Mr. Amor back to be polygraphed?
3        A.   It was approximately I want to say around
4    4:40.  Maybe -- You know what?  Maybe a little bit even
5    before that because if I recall my notes, the actual
6    pretest interview started at 4:40 so it would have
7    probably been around 4:35.
8        Q.   Okay.  And the room that you were in when you
9    first interrogated -- first were delivering the
10   polygraph examination to Mr. Amor, did it have any
11   windows?
12       A.   No.
13       Q.   Okay.
14       A.   Well, I take that back.  No.  Well, I don't
15   remember.  Some of our rooms -- I'm trying to remember.
16   Some of our rooms had a mirror, a -- like an observation
17   room, but I don't think that one did.  I'm almost
18   positive that was not a room that had the observation.
19   So I would say, no, it did not.
20       Q.   If there was a room with a mirrored
21   observation room, how would a party or someone get into
22   that mirrored observation room?
23       A.   Well, it's hard to say because our office
24   configuration changed so many times over the years.

Page 63

1    Sometimes it was part of a closet.  We would have to go
2    in through a closet door.  Other times it was just
3    strictly an observation room where they had two -- one
4    of the rooms had two doors.  You can enter in from a
5    hallway or from our lunchroom, so it varied.  The rooms
6    varied and -- especially over the years when our office
7    configuration changed.
8        THE COURT REPORTER:  I'm sorry.  Is that
9    Mr. Bowman?  Can he mute by chance?  The feedback.
10       THE WITNESS:  Is that me?
11       THE COURT REPORTER:  No.
12       MS. GARCIA:  No.  That was Locke, the other
13   counsel.  I think it's muted now.
14   BY MS. GARCIA:
15       Q.   Okay.  So in order to -- When there's a
16   mirrored window, you have the meeting room that would --
17   essentially where either the interrogation or interview
18   was taking place, correct?
19       A.   Yes.
20       Q.   And then there would be an observation room
21   for that on the other --
22       A.   Sometimes, yes.
23       Q.   And in the instances where there was an
24   observation room, who was allowed into the observation

Page 64

1    room?
2        A.   Staff.
3        Q.   Only staff?
4        A.   Only staff.
5        Q.   It would be inappropriate for anybody other
6    than John Reid & Associates' employees to be in an
7    observation room?
8        A.   Correct, unless there were students.  But the
9    polygraph school had been closed by that point and so it
10   would have only been staff.
11       Q.   And would that room be accessible to someone
12   who was not staff?  Put another way:  Was it locked?
13   Was -- Did you need to have an access code?
14       A.   No.  No, but it was not accessible to the
15   lobby.
16       Q.   Okay.
17       A.   You had to be in the office to get to those
18   rooms.
19       Q.   All right.  And so going back to the pretest
20   interview, can you walk me through the steps, what you
21   recall of the first pretest -- Sorry.  Strike that.
22       At 4:40 you had the pretest interview.  What
23   was the process of the interview with Mr. Amor?
24       A.   We just went through a bunch of questions.  I

Page 65

1    asked him a number of questions about the fire, about
2    what transpired the day -- September 10th I think the
3    date was of the fire.  And so it was just question and
4    answer.  It was more conversational.  I'd ask a
5    question, he'd answer the question and that went from
6    about 4:40 till about 5:20.
7        Q.   Is a half an hour or so typical of a pretest
8    interview in your practice?
9        A.   Well, this was a little bit longer.  This was
10   about 40 minutes.  It can go -- Depending on what the
11   issue is, it can go 45 minutes to 60.  Sometimes more,
12   sometimes less depending, again, what the issue is.
13       Q.   Okay.  And during -- What is the purpose a
14   pretest interview?
15       A.   He want to give them an opportunity -- Well,
16   first of all, we want to give them an opportunity to
17   explain or answer questions about the incident in
18   question.  We want to make some observations as far as
19   their state of mind, you know, if they're suitable for a
20   polygraph, and we just want to -- just maybe establish a
21   little bit of rapport so that they feel comfortable.
22       Q.   And is the pretest interview indicative of
23   whether an individual will pass or fail a polygraph?
24       A.   No.



Amor vs Reid
Michael Masokas - 08/25/2022

Pages 66..69

Page 66

1    Q.   And why do you say no?
2    A.   Because we're not assessing anything in the
3  interview to determine whether they're going to pass or
4  fail a polygraph.  The polygraph is the polygraph and so
5  those are the results that we're going to evaluate.
6    Q.   Okay.  And so after you and Mr. Amor went
7  over -- had the pretest interview, what happened next?
8    A.   At that time I stepped out of the room.  I
9  explained to him that I'll be formulating the questions,
10 the test questions that we'll have on the polygraph.  I
11 stepped out maybe around 5:20, came back into the room
12 about 5:25, 5- -- Well, 5- -- No.  5:35, 5:40 I want to
13 say, and the first thing that we would have done is
14 review the questions with him that were going to be on
15 the polygraph so that way he knew the questions ahead of
16 time.
17   Q.   And did you formulate questions individually
18 or was Mr. Newey brought on to help --
19   A.   That, I don't remember.  I can't be specific
20 right now as to -- if he was part of the conversation or
21 not.  Standard practice over the years, we primarily
22 developed them on our own based on the information that
23 was provided to us from the investigators, so I -- He
24 may have.  We may have had some discussion about some of

Page 67

1  the questions.  I don't know.  So I can't be specific on
2  that.
3    Q.   Okay.  And what is the process through which
4  you formulate questions after a pretest interview?
5    A.   It was pretty straightforward.  I mean, in
6  regards to -- Depending on the issue, if it's a theft
7  issue, for instance, example $5,000, you know, the
8  questions are:  Did you steal the $5,000?  Were you
9  involved in stealing the $5,000?  Do you know who stole
10 the $5,000?  So the relevant test questions are pretty
11 straightforward.  It's pretty much all dependent on what
12 the issue is.
13   Q.   Okay.  And is there -- Let's say you have a
14 very long list of questions you need to ask.  Would
15 there be a specific amount that you would cut off your
16 questioning at maybe to split into two different
17 sessions or would you just formulate anything relevant
18 based on the information you received?
19   A.   Well, it's going to be dependent on, again,
20 what the issue is and what they're trying to determine,
21 but issue-specific polygraphs like this, more often than
22 not -- Well, I shouldn't -- More often than not, they're
23 usually a one-to-one test, but, again, if there's a lot
24 of different issues that they're looking to determine

Page 68

1  truthfulness on, then it might be split into two.
2    Q.   Okay.  So it has more to do with the issues
3  that are being presented to be tested and less to do
4  with the quantity of questions within an issue-specific
5  polygraph?
6    A.   Correct.
7    Q.   Okay.
8    A.   Correct.  That's -- That's -- I would agree
9  with that.
10   Q.   Great.  So you come in around 5:30 you said?
11   A.   5:35.
12   Q.   5:35?
13   A.   You know, roughly.
14   Q.   And you review the questions with Mr. Amor?
15   A.   Yes.
16   Q.   And actually before we go into that, Mr. Amor
17 filled out a medical sheet as well, correct?
18   A.   He did.
19   Q.   Was that before or after the pretest
20 interview?
21   A.   Before.
22   Q.   Okay.  And I'll pull that up.  Just give me
23 one moment.  All right.  And let's mark this as
24 Exhibit 2.  It's the medical data sheet and the Bates

Page 69

1  is -- Oh, my goodness.  The Bates is -- I guess there
2  isn't a Bates number on this one.  Is this the medical
3  data sheet, Mr. Masokas, that Mr. Amor filled out on
4  his -- in his polygraph examination on October 3rd,
5  1995?
6    A.   Yes.
7    Q.   Okay.  And is there any part of this form
8  that -- this -- Strike that.
9         Is there part of this data sheet that you
10 filled out or was it all filled out by Mr. Amor?
11   A.   No.  I have some handwritten notes there in
12 the middle of the page letter C where it says
13 respiratory or lung problem?  He checked yes.  And then
14 I asked him about that.  He said he had surgery for some
15 spots on his lungs back in the mid '80s, but he's no
16 longer under a doctor's care for that.
17   Q.   Great.  And other than that handwriting, is
18 there anything else on this data sheet that you filled
19 out?
20   A.   No.
21   Q.   Okay.  And can --
22   A.   No.  That's all his.
23   Q.   Great.  And can you remind me the importance
24 of having an examinee fill out a medical data sheet



Amor vs Reid
Michael Masokas - 08/25/2022

Pages 70..73

Page 70

1  prior to a polygraph?
2     A.   What -- I'm sorry.  What was your question?
3     Q.   Can you remind me of the importance of having
4  an examinee fill out a medical data sheet prior to a
5  polygraph examination?
6     A.   Sure.  We want to make sure that they're
7  suitable for a polygraph test.  So, for example, if
8  someone's got heart problems and they recently had a
9  heart attack, we may not proceed with the test unless we
10  have a doctor's note.  If someone's got high blood
11  pressure, we'd like to know that because we'd like to
12  know if they're on medication.  We recommend -- If
13  somebody does have high blood pressure, we recommend
14  that they take their medication, that they don't stop
15  taking it, and so that would be important.  Yeah, we
16  just want to make sure that they're suitable for a test,
17  that there's no significant health problems.
18     Q.   And how would -- Taking the heart problem as
19  an example, why would you need a doctor's note prior --
20  or would you prefer a doctor's note prior to taking a
21  polygraph examination of someone with a heart problem?
22     A.   Well, if they recently had a heart attack, we
23  don't want them to have a heart attack in our office.
24     Q.   That's fair.

Page 71

1     A.   I understand it is a bit of a stressful thing,
2  you know, having to take a polygraph so we want to make
3  sure they're healthy.
4     Q.   Is it important to try and keep a polygraph
5  examinee calm and not stressed?
6     A.   Well, no one is going to be not stressed.
7  Truthful people are going to be stressed because it's
8  not something you do every day so we expect that and we
9  actually anticipate that.  We know people are going to
10  be nervous.  We know there's going to be anxiety so it's
11  not something that's -- You know, no one is going to be
12  void of any nervousness or anxiety.
13     Q.   And forgive my ignorance and all things
14  polygraph, but within the physiological and galvanic
15  responses in a polygraph, does stress and anxiety show
16  up within the readings themselves?
17     A.   Not necessarily normal stress and anxiety.  I
18  mean, their blood pressure may be elevated slightly, but
19  it doesn't discriminate between questions.  It's across
20  the board.
21     Q.   So you're basically trying to find the
22  baseline with the understanding or the theory being that
23  that would include the kind of normal stress someone
24  would be under in taking a polygraph examination?

Page 72

1     A.   Yes.
2     Q.   Okay.  And I can pull it up if you need.  I
3  believe on the medical data sheet, Mr. Amor answered
4  that in the last 24 hours he had only had four hours of
5  sleep.  Do you recall that?
6     A.   Yes.
7     Q.   Did that concern you when you were taking this
8  polygraph?
9     A.   A little bit.  A little bit, but not greatly
10  simply because at the time we were speaking, he was very
11  alert.  He was obviously awake.  He was responding to
12  questions.  He was fluent.  He was -- He did not appear
13  as though he was tired.  His voice was clear.
14     Q.   What are indications in your experience that
15  someone is too tired to take a polygraph examination?
16     A.   Sometimes, yes.
17     Q.   So what would that look like in your
18  experience?
19     A.   Where they can barely keep their eyes open.
20  They would continue to ask for questions to be repeated.
21  They're not very alert and they just appear as if
22  they're tired and people who worked a 24-hour shift and
23  then they come in for a polygraph and they just start
24  practically falling asleep in the chair.

Page 73

1     Q.   And other than lack of sleep, heart problems,
2  and high blood pressure, are there any other areas that
3  you would be concerned about someone displaying prior to
4  a polygraph examination?
5     A.   I'm not sure I follow your question.  Can you
6  rephrase it?
7     Q.   Sure.  So you said you would be concerned if
8  someone was exhausted, correct?
9     A.   Yes.
10     Q.   Would you also be concerned if someone were
11  intoxicated?
12     A.   Yes.  If they were intoxicated at the time?
13     Q.   Yes.
14     A.   Of the exam?
15     Q.   Yes.
16     A.   Yes.
17     Q.   And when you were trained on polygraph
18  examinations, was there a module or aspect that --
19  Sorry.  Strike that.
20          When you were trained on polygraph
21  examinations, what types of behavior were you taught to
22  be on the lookout for in terms of behavior that could
23  undermine the reliability of polygraph examinations?
24     A.   Well, things we just talked about.



Amor vs Reid
Michael Masokas - 08/25/2022                                                    Pages 74..77

Page 74

1    Q.   So lack of sleep?
2    A.   I guess some slurring of the speech, bloodshot
3  eyes, smell of alcohol or some form of maybe cannabis,
4  inability to comprehend questions.  You know, those
5  types of things.
6    Q.   If someone hadn't eaten for a significant
7  amount of time, would that be a concern prior to a
8  polygraph examination?
9    A.   Maybe a little bit.  It wouldn't be a
10  significant concern unless they -- unless they said they
11  can't proceed.  You know, look, I'm so hungry, I can't
12  go on.  But aside from that, if -- it wouldn't be that
13  major of a concern.
14   Q.   Okay.  And did Mr. Amor ever indicate to you
15  that he was hungry while you were polygraphing him the
16  first time?
17   A.   Not that I can recall, no.
18   Q.   Okay.  And did Mr. Amor indicate to you that
19  he was tired?
20   A.   I don't believe so.  If he would have, we
21  would have talked about it.  But, again, as I said, he
22  was alert, he was answering questions.  So if he said he
23  was tired, we may have talked about it, but it did not
24  appear to me he was falling asleep.  That's why we

Page 75

1  proceeded.
2    Q.   Great.  Okay.  So turning back to after -- now
3  going over the questions with Mr. Amor.  Did he have any
4  responses to the questions?  Did he have any concerns
5  with them?
6    A.   You mean reviewing the test --
7    MR. PASQUALINO:  I'm going to object to --
8  BY THE WITNESS:
9    A.   (Continuing.) -- questions with him?
10   Q.   Yes.
11   MR. PASQUALINO:  -- form.  Is this the pretest or
12  the polygraph test, Mariah?  I'm sorry.
13   MS. GARCIA:  The polygraph test.
14   MR. PASQUALINO:  Okay.  Just for clarity.
15   MS. GARCIA:  Of course.
16  BY THE WITNESS:
17   A.   So you're talking about reviewing the
18  polygraph questions with him prior to the test?
19   Q.   Uh-huh.  Yes.
20   A.   Yeah.  He had no concerns.
21   Q.   And after you reviewed the questions with him,
22  what happened next?
23   A.   Once the questions are reviewed, he's attached
24  to the polygraph instrument.  We describe and explain to

Page 76

1  him what the attachments measure.  If he's got questions
2  about anything, we're able to answer those for him at
3  that time.  Once he's attached to the polygraph
4  instrument, we -- the tests begins.  And so the very
5  first thing we would do is run a test chart to make sure
6  everything is functioning properly.  It lasts about
7  30 seconds.  We inflate the blood pressure cuff, that
8  way he gets used to how that's going to feel.  And,
9  again, it's about 30 seconds.  Once that's done, once
10  everything is adjusted, then we start with the very
11  first test.  And what we do on the first test is we
12  inflate the blood pressure cuff, the test begins, and we
13  read the questions in the same order we reviewed the
14  questions with him.  And so we tell him we're going to
15  go right down the list in the same order we just did.
16  All you have to do is listen to the question and simply
17  answer with a yes or a no.  At that point the test is
18  started.
19   Q.   And do you recall how long Mr. Amor's initial
20  polygraph test was?
21   A.   The whole series you mean?  The entire test?
22   Q.   Yes.
23   A.   It would have gone from approximately 5:40
24  until about 6:15.

Page 77

1    Q.   Let me just pull up what we can call
2  Exhibit 3.  Sorry.  Give me one moment.  Can you see
3  this, Mr. Masokas?
4    A.   Yes.
5    Q.   For the record, this is Bates SDT Reid 47 to
6  49.  And is this your handwriting, Mr. Masokas?
7    A.   Yes.
8    Q.   And is this -- I will scroll through for you
9  slowly, but let me know if you need me to stop.  Is this
10  the -- this first page, the formulation of the questions
11  you asked during the polygraph examination?
12   A.   No.  What you're looking at is the pretest
13  interview.
14   Q.   Okay.  On the second page, is that the pretest
15  interview as well?
16   A.   Correct.
17   Q.   Okay.  And then I'm going to flip to another
18  exhibit.  We'll call this Exhibit -- I just need to find
19  it.  Not this one.  This is Exhibit 4 and this is Bates
20  SDT Reid 46.  Is this -- Can you describe what you see
21  on this page?
22   A.   Yeah.  That's the polygraph test question
23  sheet.  Those were the questions asked on the polygraph.
24   Q.   Okay.  And can you go over the questions with



Amor vs Reid
Michael Masokas - 08/25/2022
Pages 78..81

Page 78

1  me very quickly?  So --
2      A.    Sure.  Can you enlarge it a little bit?
3      Q.    Yeah, of course.  It says number one.  Can you
4  recall what it says on number one?
5      A.    Sure.  Do they call you Bill?  His answer was
6  yes.
7            Are you over 35 years old?  His answer was
8  yes.
9            On Sunday, September 10th, 1995, did you do
10  anything to start a fire in your apartment in -- I think
11  it says in parenthesis -- in Naperville?  The answer was
12  no.
13            Question 4:  Are you in Chicago right now?
14  His answer was yes.
15            Number 5:  Did you help or plan with anyone to
16  start that fire?  His answer was no.
17            Number 6:  Besides traffic violations and
18  stealing, did you ever do anything else against the law?
19  His answer was no.
20            Question 7:  Did you ever go to school?
21            Question -- It's 8(a).  You see 8(a)?  On --
22      Q.    Uh-huh.
23      A.    On September 10th, '95, before you left to the
24  movie, did you know your apartment was going to be

Page 79

1  destroyed by a fire?  He said no.
2            Question 9(b) down there:  Do you know who set
3  that fire in your apartment?  He said no.
4            And then the very last one, Question 11:
5  Besides an argument, have you ever done anything to
6  intentionally hurt someone?  He said no.
7      Q.    Okay.  That's very helpful.  Thank you.
8      A.    Yes.
9      Q.    I'm just going to go over some of the symbols
10  on the sheet.  Would it be fair to assume that the plus
11  next to several questions, but specifically Question 1
12  is an indication of yes?
13      A.    Correct.
14      Q.    And the minus sign is an indication of no?
15      A.    Correct.
16      Q.    And it's in the top right corner right where
17  it says -- next to RE:  X date card, X time, can you
18  describe what this writing that I'm highlighting --
19      A.    Yeah.  That's my -- That's some notes that I
20  made.  It said subject used the washroom two or three
21  times and was offered cigarettes and water.
22      Q.    Okay.
23      A.    And then further on down, there's a timeline
24  there that I just jotted notes down.  Where you see time

Page 80

1  4:40 p.m. to 5:20 where the -- Does it say 2s?  So
2  that's what we're asking -- That was the pretest
3  interview.  And then 4:40, it says charts.  That means
4  we started the charts.  And then 6:15 out.  That was the
5  charts are over.  I stepped out of the room.  And then
6  with the arrow going down where it says post, that's
7  where the post-test interview would have started at
8  6:30.  Left that room at 7:30 where it says out.  And
9  then in, back in the room 7:45, equal ATN and MFM.  So,
10  in other words, myself and Art Newey went back in the
11  room at 7:15 to speak with Mr. Amor and then we stepped
12  out at 8:30.  And then ATN, Art Newey, went back in the
13  room at 8:45.  He was in there for a half hour, stepped
14  out at 9:15.  And then at the bottom down there, NPD,
15  Naperville PD, went in the room at 9:30.  They came out
16  at 10:00 and then they left our office at 10:30.
17      Q.    Great.  That's really helpful.  And then just
18  one more question about the markings.  On the left-hand
19  side under where it says body type, there's a grid
20  pattern.  Do you see that?
21      A.    Yes.
22      Q.    Is this --
23      A.    Those -- That -- Those are the checkmarks.
24  Remember we talked about the scoring with the

Page 81

1  checkmarks?
2      Q.    Yes.  And --
3      A.    That's what those are.
4      Q.    So next to 3, for example, it looks like
5  there's three checkmarks.  What would you characterize
6  those checkmarks as based on your earlier testimony that
7  it goes from light, medium, and dark checkmarks in order
8  to score polygraph examinations?
9      A.    Right.  You see the first checkmark closest to
10  the number 3 --
11      Q.    Uh-huh.
12      A.    -- the one in the far right?
13      Q.    Yes.
14      A.    Yeah.  It's a light checkmark so, you know, a
15  light response, deceptive response.  And then to the
16  left of that, it's a little bit heavier so it was a
17  stronger response.  And then to the left of that one,
18  it's a little bit lighter again.  And then the fourth
19  one and the last one at the top there, it's a heavier
20  response.  But above the checkmark, you can see the
21  letter B?
22      Q.    Yes.
23      A.    B for -- B stands -- is for blood pressure.
24  So a checkmark with a B is a blood pressure response.



Amor vs Reid
Michael Masokas - 08/25/2022                                                   Pages 82..85

Page 82

1 So it was a pretty significant blood pressure response.
2 And then right above the B is a number 6.  Do you see
3 that?
4     Q.   Yes.
5     A.   The number 6 means ...  This Question No. 3 is
6 stronger than Question No. 6.  We're comparing
7 Question 3 with Question 6.  So it's 3 over 6.
8     Q.   And do you make these marks during the
9 polygraph examination or after?
10    A.   After.
11    Q.   Okay.  And what's the significance of one
12 question having a greater response than another?  So,
13 for example --
14    A.   If you look --
15    Q.   -- like you said, you know, 6 has a stronger
16 indication of blood pressure.
17    A.   Right.  So his response to the question:  On
18 Sunday, September 10th, did you do anything to start the
19 fire?  That response was much more significant than his
20 response on the control question:  Besides traffic
21 violations and stealing, did you do anything else
22 against the law?  So his focus -- his primary focus was
23 on the question of starting the fire, not the control
24 question.

Page 83

1     Q.   And the control question --
2     A.   Number 6.
3     Q.   -- was Number 6?  Okay.
4     A.   Besides traffic violations and stealing, have
5 you ever done anything else against the law?
6     Q.   And going down the grid next to Number 5, it
7 looks like there's an 11?
8     A.   Uh-huh.
9     Q.   What does the 11 indicate?
10    A.   Just like the prior question with the 6,
11 Question No. 5 is greater than Question 11.  The two
12 control questions are 6 and 11 so we're comparing
13 Question 5 to Question 11.
14    Q.   All right.  And is this an X or a plus?
15    A.   It's a plus.
16    Q.   Okay.
17    A.   So the checkmark -- A single checkmark is a
18 response in the respiration.  A checkmark with a plus
19 means there are two responses.  One in the respiration
20 and one in the blood pressure.  A checkmark with the
21 letter B is -- it's a single response in the blood
22 pressure.
23    Q.   And what about checkmarks that don't have a B
24 or a plus?

Page 84

1     A.   It's -- That's respiration.  It's just a
2 checkmark?  It's just respiration response.
3     Q.   Okay.  And what are the different types of
4 responses that you're analyzing when attempting to
5 figure out if a -- there is deception on an answer
6 given?
7     A.   I'm not following you.
8     Q.   Sure.  So you said that there was various --
9 you know, there's blood pressure responses, there's
10 respiratory responses that in your experience go towards
11 whether or not someone is being deceptive, correct?
12    A.   It's a physiological response.  There's no
13 physiological response indicative of deception per se.
14 It's the totality of the responses.  In other words,
15 there's a physiological response on a particular
16 question and then we look at the consistency in all of
17 the tests.
18    Q.   Okay.  And so my question based off that is
19 what are the types of physiological responses that
20 you're analyzing when attempting to figure out whether
21 or not someone was being deceptive on a polygraph
22 examination?
23    A.   And we talked about this earlier.
24 Respiration; there could be a change in amplitude; there

Page 85

1 could be a change in rate; as far as blood pressure, if
2 there's a rise or a fall in blood pressure; galvanic
3 skin response, there's a rise in galvanic skin response.
4 So -- I mean, we're looking at all of these different
5 types of responses on each question.
6     Q.   Sure.  And so I'm not going to have you go
7 over the raw data because I know you did that in the
8 prior deposition.
9     A.   Yes.
10    Q.   I didn't have to ask you that.
11         So after you give the test to Mr. Amor, what
12 did you do next?
13    A.   When the test was complete, I stepped out of
14 the room, I took the charts with me, evaluated the test.
15 And at that point it was evaluated as being deceptive.
16 Mr. Newey was there in the office.  He would have scored
17 the test as well, confirmation that, you know, we're
18 both on the same page here.  And then at that point I
19 went back in the room.  It was approximately 6:30, went
20 back in the room to give Mr. Amor the results of the
21 polygraph.
22    Q.   Do you recall what you said to Mr. Amor when
23 you entered the room?
24    A.   I cannot be specific as far as verbatim what



Amor vs Reid
Michael Masokas - 08/25/2022                                         Pages 86..89

Page 86

1    was said, however, it was probably something to the
2    effect of you're not passing the polygraph.  The results
3    of the polygraph indicate that you are involved or have
4    knowledge of the fire.  So we just let him know he's --
5    he did not pass the test.
6        Q.    And how did he react when you told him he
7    didn't pass the test?
8        A.    Again, I can't be specific exactly how he
9    responded, but it was not a very strong response simply
10   because that was something that stood out to me and
11   that's why I remembered him in the first place because
12   he wasn't very emotional about it.  He did not offer a
13   very strong denial at that point.
14       Q.    And did Mr. Amor's lack of denial in your view
15   indicate anything about whether or not he had something
16   to do with the fire?
17       A.    Well, his lack of denial definitely is more of
18   an indicator of someone who's deceptive.  Now, it's not
19   the only indicator, but it's just -- it's one of in the
20   big picture something that we would consider.
21       Q.    Okay.  So then after you told Mr. Amor that he
22   didn't pass the polygraph examination, what happened
23   next?
24       A.    At that point I sat down with him, told him

Page 87

1    that I want to talk to him a little bit to see if we
2    could get something clarified as to why he's not
3    passing.  And at that point then I had offered some
4    suggestions to him as to what may be causing the
5    problem.
6        Q.    And what did you say may be causing the
7    problem?
8        A.    Again, specifically I cannot say for certain,
9    but based on the polygraph questions, it would have
10   probably been something to the effect of if you know who
11   did this and you're just afraid to say, that could be a
12   reason why you're not passing and it's something that
13   you should explain.  That would clarify the results.  Or
14   maybe you found out who did this the day after it
15   happened.  You found out -- You had knowledge after the
16   fact and you're just afraid to say anything.  Either you
17   don't want to get anybody into trouble or maybe you were
18   threatened into not saying anything.  Or on the other
19   hand, maybe it's a situation where you may have spilled
20   some vodka and you're thinking the cigarette fell out
21   and maybe that's what you're thinking, but there's some
22   reason why you're not passing the test.  And if we can
23   explain, then that would give us an idea as to what
24   the problem is.

Page 88

1        Q.    And what was his response?  I know you can't
2    say verbatim, but do you recall what his response was
3    when you said that?
4        A.    Yeah.  Sure.  He continued to deny involvement
5    and deny knowledge.  He just kept saying, no, I didn't
6    do it.  I don't know anything about it.
7        Q.    And what was your -- After he denied the
8    knowledge, what happened next?
9        A.    Well, again, this went on for about an hour,
10   from 5- -- 6:30 to about 7:30.  And then at 7- --
11   Around 7:30, he was still offering his denials without
12   any explanation and so at that point is when I left the
13   room and spoke with Mr. Newey.  I felt as though, you
14   know what?  Maybe Mr. Newey can make him -- have a
15   better connection than I can.  Sometimes people -- If
16   you don't connect with somebody, they don't want to talk
17   to you and we've experienced that before, rapport.  And
18   so I -- Art Newey had a different personality than I
19   did.  He was a bit more gregarious.  He was a smoker
20   which Mr. Amor was a smoker at the time and sometimes
21   Art would have a cigarette with this person and so I
22   thought maybe Art could make a better connection.  So
23   Art and I went back in the room at about 7:45, 7:30?  It
24   was about 7:45 until about 8:15.  Now, during that half

Page 89

1    hour, he was the one doing most of the talking at that
2    point, offering, again, suggestions as to why he may be
3    failing the test.  Half hour later Mr. Amor was still
4    saying he didn't do it so we stepped out of the room
5    again and just figured, you know, he's got no
6    explanation for why he's not passing.
7        Q.    And what happened after you stepped out -- you
8    conferred with Mr. Newey?
9        A.    I believe -- Again, I cannot be 100 percent
10   sure, but I think at that point we may have spoken to
11   the detectives who were still out in the lobby area.  At
12   no time did they have access to our office because the
13   door was locked.  They could not have gotten in.  So we
14   went out to the lobby, conferred with them, let them
15   know that Mr. Amor was not passing the polygraph, that
16   we had spoken to him and he was still denying any
17   involvement and that there was no explanation on his
18   part why he was not passing.  After a short conversation
19   with the detectives, Mr. Newey felt as though he wanted
20   to talk with Mr. Amor one more time, just the two of
21   them this time without me in the room or anybody else.
22   He thought maybe he could have a better connection just
23   the two of them, more rapport.  So I believe it was
24   around 8:45 that Mr. Newey went back in the room, spoke



Page 90

1  with Mr. Amor for another 30 minutes.  I want to say it
2  was around 9:15 Mr. Amor was still denying any
3  involvement, any knowledge, and so Mr. Newey left,
4  stepped out of the office again around 9:15.  As far as
5  I know, at that point he conferred with the detectives.
6  I was gone.  I left about 9:00 o'clock that evening.  So
7  Mr. Newey was going to conclude things with the
8  detectives and then I believe the detectives went in and
9  spoke with Mr. Amor, the two of them, for about a half
10 hour, 9:30 to 10:00, and Mr. Amor was still denying any
11 involvement or knowledge.  And then between 10:00 and
12 10:30, I don't know what they were doing.  I think they
13 were speaking with Mr. Newey and then they left about
14 10:30.  The two detectives and Mr. Amor left our office
15 about 10:30.
16     Q.   Great.  After you met with Mr. Newey to
17 discuss the results after the first polygraph
18 examination, did Mr. Newey or yourself do another
19 polygraph examination of Mr. Amor?
20     A.   No.
21     Q.   Okay.  And was Mr. Amor with -- Did you ever
22 move from one room to another while you were
23 polygraphing Mr. Amor?
24     A.   Yes, that we did do.  After the pretest

Page 91

1  interview, before we started the polygraph test, he
2  would have been moved from the interview room to another
3  office that contained the actual polygraph.  It was
4  right across the hall from the original room.  And so we
5  ran the polygraph test in this smaller office which
6  again went from approximately 5:40 to 6:15.  And then
7  once the polygraph test was completed, he was moved back
8  across the hall to the bigger room.  It's a little more
9  comfortable.  The chair is a little more comfortable
10 than the polygraph chair.  So he was just moved across
11 the hall and back into the big -- original room.  And
12 then at that point I said I'll be back in a little bit,
13 I'm going to evaluate the test.  So he would have been
14 moved the first time to the polygraph room.  The second
15 time back to the original interview room.
16     Q.   And do you recall the layout of the polygraph
17 room?
18     A.   Yes.  Yes.  I think this is the same room.
19 You enter the door.  There is a desk to your left and
20 kind of coming out towards the door.  It's against the
21 wall.  It's coming out towards the door.  It's kind of
22 in the middle of the wall and it's got the polygraph
23 instrument, the machine right built in the desk, and
24 then there's a chair on either side.

Page 92

1     Q.   Was there a window in the polygraph room?
2     A.   No.
3     Q.   Okay.  And there was an observation -- There
4  wasn't an observation room for which someone could watch
5  the polygraph occurring?
6     A.   No.
7     Q.   And you mentioned you left at 9:00 o'clock
8  that night, approximately, correct?
9     A.   Yes.
10    Q.   Did you speak with Mr. Newey after you left
11 regarding the examination?
12    A.   It would have been the next morning when I
13 spoke to him.
14    Q.   And do you recall what he said the next
15 morning?
16    A.   Yeah.  He filled me in.  He basically told me
17 that after I had left at 9:00, you know, he was in the
18 room with Mr. Amor until 9:15 and that's when he came
19 out, he stepped out, conferred with the detectives that
20 Mr. Amor was still saying he had nothing to do with it,
21 that he was not involved, he had no knowledge of the
22 fire.  And then he told me that the two investigators
23 went into the room with Mr. Amor for approximately a
24 half hour, from 9:30 to 10:00.  They spoke with him.

Page 93

1  And then at 10:00 o'clock, they came out of the room.
2  Mr. Amor was still denying any involvement at that
3  point.  And then Mr. Newey apparently I believe spoke
4  with them for maybe a half hour and then they left our
5  office at 10:30.  So he had filled me in on what had
6  transpired after I left.
7     Q.   Okay.  And in your experience at Reid &
8  Associates, was it standard practice to allow law
9  enforcement agents to conduct post-polygraph
10 interrogations of a suspect?
11    A.   Once we were done, once our part of it was
12 over, if they wanted to talk with him after, we would
13 allow them to use the room for a short period of time.
14 Obviously, they're not allowed to be in there for four
15 hours, but if they needed to talk with him for a couple
16 of minutes before they left, then we would allow that.
17 But it was not a necessarily standard practice, but it's
18 not something that we forbade.  You know, it's not like,
19 well, no, you can't do that.  They were about to leave
20 and so -- Again, our part of it was over and so they
21 were allowed to use the room for a few minutes.
22    Q.   And if you --
23 MR. BOWMAN:  This is Locke Bowman.  Sorry.  This is
24 Locke Bowman.  I was wondering if I could propose that



Amor vs Reid
Michael Masokas - 08/25/2022

Pages 94..97

Page 94

1  we take a short break at this point?  We've been going
2  for a little while.
3      MS. GARCIA:  Yeah.  I would like a break to go to
4  the bathroom if that's possible.
5      MR. PASQUALINO:  Yeah.  That's fine.  Mariah, how
6  much more do you think you have?  Timing purposes.
7      MS. GARCIA:  Yeah.  I have a couple more questions.
8  I will -- When we take the break, I'll also look over
9  and I can give you a better estimate once we're back.
10  I'll look over my notes.
11     MR. PASQUALINO:  So another, what, seven minutes?
12     MS. GARCIA:  Sure.
13     MR. PASQUALINO:  5:05?
14     MS. GARCIA:  Yeah, 5:05.
15     MR. PASQUALINO:  Okay.
16     MS. GARCIA:  Great.
17         (A short break was had.)
18  BY MS. GARCIA:
19     Q.  Mr. Masokas, I probably should have clarified
20  this earlier, but do you have anything in front of you
21  right now?
22     A.  I do not.
23     Q.  Okay.  Do you have your file in front of you?
24     A.  My file is next to me, but it's not open in

Page 95

1  case you needed anything from me, but it's not open.
2      Q.  Okay.  And have you opened the file at all
3  during the course of the deposition?
4      A.  No.
5      Q.  Okay.  And so everything that you testified to
6  outside of questions that were based around the
7  documents that I showed you is coming from your own
8  independent recollection?
9      A.  Yes.
10     Q.  And so you gave a pretty extensive
11  recollection of the event which is 27 years ago or so.
12  Is there a reason why -- Actually, strike that.  That's
13  a bad question.
14         Is the Amor case memorable for you in some
15  way?
16     MR. PASQUALINO:  I'll object to form, foundation.
17         Go ahead.
18  BY THE WITNESS:
19     A.  Yes.
20     Q.  And why is that?
21     A.  Well, at the previous deposition I was asked
22  the same question and the first reason I remember him is
23  because he had a pretty cool name, Amor, like love.
24  William Love.  We don't get people like that often and

Page 96

1  so that was something of interest that kind of stood
2  out.  Art and I kind of joked about the name a little
3  bit.  But also his case, I had to testify.  I was called
4  to testify at the suppression hearing several months
5  later.  And so it was something that because of that, I
6  had reviewed the case, reviewed my file, and so it is
7  something that just stuck considering that I was part of
8  this particular issue.
9      Q.  Okay.  And going back to the time period after
10  the polygraph exam was given when you and Mr. Amor were
11  speaking, were you using any particular interview
12  technique while speaking to him?
13     A.  When you say interview technique --
14     Q.  Yes.
15     A.  -- do you mean the pretest interview?
16     Q.  No.  After you had scored the polygraph
17  examination and it came back that it had been deceptive
18  or indications of deception, did you use any particular
19  interview technique when speaking with Mr. Amor?
20     A.  Absolutely.  The Reid Technique.  The name of
21  the company is John Reid.
22     Q.  Yeah.  And now you asked [sic] my question
23  which is did you use the Reid Technique when you were
24  interviewing Mr. Amor?

Page 97

1         And I know you weren't in every single
2  interview with Mr. Newey, but did Mr. Newey, likewise,
3  use the Reid Technique when interviewing Mr. Amor?
4      A.  Yes.
5      Q.  Okay.  And when you were -- You spoke with him
6  after -- I think I'm recalling your testimony correctly,
7  you spoke with him -- Mr. Amor after the examination for
8  about an hour or so, correct?
9      A.  Yes.
10     Q.  And then Mr. Newey spoke to him for a chunk of
11  half an hour and then 15 minutes, correct?
12     A.  Yes, about 45 minutes.  Well, that's when both
13  of us were in there.  It was about an additional
14  45 minutes.
15     Q.  Okay.  And so --
16     A.  I do recall that.
17     Q.  And the police then spoke to him for around
18  30 minutes after, correct?
19     A.  Yes.
20     Q.  And you testified earlier that you spoke to
21  Mr. Amor after the test to try and understand what --
22  why there may have been indications of deception,
23  correct?
24     A.  Yes, ma'am.



Page 98

1   Q.   Is that a standard practice within John Reid &
2   Associates?
3   A.   Yes.
4   Q.   And is it standard practice to speak to
5   someone for over an hour in an attempt to clarify why
6   they had some sort of deception indicated on their exam?
7   A.   Sometimes, yes.
8   Q.   So you don't find it excessive to have asked
9   for an hour and a half -- or an hour and 45 minutes why
10  Mr. Amor believed he failed the exam?
11  A.   No, not at all.
12  Q.   And why not?
13  A.   Because an hour and a half -- You said an hour
14  and a half?
15  Q.   An hour and a half?  An hour, 45?  I'm adding
16  the time you spoke to Mr. Amor and Mr. Newey spoke to
17  him.
18  A.   I don't really consider an hour, hour and a
19  half excessive.
20  Q.   What would be excessive in your view?
21  A.   10 hours, 15 hours, 20 hours.  We just talked
22  to him initially for an hour.
23  Q.   And other than having him clarify why he
24  failed the test, you were also seeking to have him admit

Page 99

1   that he started the fire or knew information about who
2   started the fire, correct?
3   A.   Well, we were trying to figure out what the
4   truth was.  There was deception on the polygraph.  We
5   had no idea why.  Is it because he started the fire?  I
6   don't know.  Is it because he helped someone start the
7   fire?  I don't know.  Is it because he just had
8   knowledge of who started the fire?  I don't know.  And
9   so we were trying to figure out what is causing the
10  deceptive results.
11  Q.   Okay.
12  A.   And so, again, we're trying to determine, you
13  know, what the truth was.  I mean, if there would have
14  been some sort of explanation, it would have given us
15  some idea at least what could have been causing those
16  results.
17  Q.   And in other cases where you were attempting
18  to clarify why someone's results were deceptive
19  (inaudible.)
20        (Enter Mr. Bowman via videoconference.)
21  THE COURT REPORTER:  I'm sorry.  Can you start
22  over?
23  MS. GARCIA:  Of course.
24  THE COURT REPORTER:  Thank you.

Page 100

1   BY MS. GARCIA:
2   Q.   Actually, let me ask that a different way.
3        Okay.  Did you often talk to suspects or
4   persons you had polygraphed after they failed an
5   examination for upwards of an hour and 45 minutes?
6   A.   Have there been other times where we've done
7   that?  Is that your question?
8   Q.   Yes.
9   A.   Yes.
10  Q.   And approximately how many other times would
11  you say?
12  A.   I have no idea.  I can't answer that.
13  Q.   Is it within --
14  A.   I have done polygraph for 25 years.  I have no
15  idea.
16  Q.   Is it -- Put another way:  Is it common for
17  you to try -- attempt to clarify why there's indications
18  of deception on someone's test for upwards of an hour
19  and 45 minutes?
20  A.   Yes, that does happen.  Sure.
21  Q.   I'm not asking if it happened.  I'm asking if
22  it's common within your practice?
23  A.   Well, depending on what the issue is, yes --
24  Q.   Okay.

Page 101

1   A.   -- it would be common.
2   Q.   And is that something that you're trained to
3   do under the Reid Technique?
4   A.   Yes.
5   Q.   And is that something that you're trained to
6   do within polygraph school?
7   A.   I don't know what's taught at other polygraph
8   schools, but I do know at other polygraph schools, a
9   form of interrogation is taught.  Now, whether that's
10  the Reid Technique or a different technique, I don't
11  know, but it would be part of a polygraph curriculum,
12  yes.
13  Q.   And you testified earlier that you spoke with
14  Mr. Newey the next day regarding what occurred after you
15  left Reid & Associates, correct?
16  A.   Yes.
17  Q.   And can you -- What did Mr. Newey tell you
18  occurred?
19  A.   Exactly what I had told you earlier, that he
20  was in the room with Mr. Amor, the two of them, until
21  approximately 9:15.  Mr. Amor was still denying any
22  involvement or knowledge of the fire.  Mr. Newey stepped
23  out of the room, spoke with the investigators, let them
24  know that, you know, Mr. Amor was still saying he had



Amor vs Reid
Michael Masokas - 08/25/2022

Pages 102..105

Page 102

1  nothing to do with it.  At that point the two
2  investigators went into the room with Mr. Amor for
3  30 minutes.  They came out at approximately
4  10:00 o'clock, let Mr. Newey know that Mr. Amor was not
5  admitting anything, was still denying any involvement or
6  knowledge, and then they left our office at 10:00 --
7  approximately 10:30.
8      Q.   And did Mr. Newey discuss or have knowledge of
9  what occurred after Mr. Amor and the detectives left
10 Reid & Associates?
11     A.   No.
12     Q.   So the next day were you made aware that
13 Mr. Amor was brought to Naperville Police Department
14 after the polygraph exam at Reid & Associates?
15     A.   I mean, not specifically, no.  We were
16 never -- No one called us.  No one said, Oh, afterwards
17 we took him back.  No, not -- that did not happen.
18     Q.   Okay.  And were you made aware that after
19 Mr. Amor was placed in an interrogation room in the
20 Naperville Police Department, he was served with divorce
21 papers from Ms. Tina Miceli?
22     A.   I did not know that.
23     Q.   Okay.  And were you made aware that after he
24 had received those divorce papers, he confessed to

Page 103

1  setting fire purposefully in the Miceli household?
2      A.   At some point we learned that he did confess.
3  When we learned that? I don't know.  It could have been
4  several months later when I was called for the
5  suppression hearing.  I don't know.  I cannot give you a
6  specific date as to when we heard or how we heard.  I
7  don't know.  Because once they left our office, we were
8  no longer part of it.  We were done.  No.  We -- The
9  reason they called us and came to us is they -- we
10 provide a service.  We give polygraph tests.  It's a --
11 We're a services-oriented company.  Various departments
12 use our services.  Private companies use our services
13 and that's what they did.  My understanding, their
14 polygraph, their regular polygraph examiner was Rich
15 O'Brien from O'Brien & Associates because I understand
16 that Ms. Miceli took a polygraph from O'Brien.  And so
17 we were not -- Naperville was not our -- a regular
18 customer of ours.  So once they left our office, we were
19 done.
20     Q.   And were you eventually made aware of the
21 circumstances of Mr. Amor's confession?
22     A.   No.  To this day, I have no idea what he said
23 specifically.
24     Q.   Okay.

Page 104

1      A.   We were not involved in the investigation.
2  We're -- All we did is provide a service, a polygraph
3  service.  That's it.  As far as the investigation goes,
4  I have no idea or Reid has no idea what was involved in
5  the investigation before they got to our office or after
6  they left our office.  So what he said during his
7  statement to the police, I don't know what that was
8  other than he admitted setting the fire.
9      Q.   And based on your experience in interview and
10 interrogation, do you think after getting out of jail,
11 only having four hours of sleep, having been polygraphed
12 for several hours, and then several more hours being
13 spent at your offices being questioned pen the Reid
14 Technique, it was appropriate for the Naperville Police
15 Department officers to continue the interrogation at
16 Naperville Police Department?
17     MR. PASQUALINO:  I'll just object to form and
18 foundation.
19          If you know, go ahead.
20 BY THE WITNESS:
21     A.   I can't answer whether it was appropriate or
22 not because I wasn't there and I don't know what
23 transpired.  So I have no facts, I have no details or
24 anything as far as what was said and what was done so

Page 105

1  I'm really not in a position to answer that.
2      Q.   Well, you've been teaching interview and
3  interrogation techniques for over 15 years, correct?
4      A.   Correct.
5      Q.   So based on your understanding of interview
6  and interrogation techniques, do you think it was
7  appropriate for the Naperville Police Department to
8  continue questioning Mr. Amor after he had gone through
9  a polygraph examination, had been told he failed which
10 you yourself said can cause someone to be distressed to
11 the point where they shouldn't be polygraphed again for
12 at least 24 hours especially considering he had only
13 four hours of sleep and hadn't eaten for the entire day?
14     A.   Uh-huh.  Again, I don't know -- I wasn't there
15 to assess Mr. Amor's mental state, his physical state.
16 So to say, no, it was inappropriate or, yes, it was
17 inappropriate, again, I don't have all the details, you
18 know, to really say one way or the other because I
19 wasn't present.
20     Q.   And would you agree or disagree that it was
21 inappropriate for there to be any other attempts at
22 clarifying why Mr. Amor flunked the polygraph
23 examination after you and Mr. Newey had questioned him
24 for upwards of an hour and 45 minutes?



Page 106

1    MR. PASQUALINO:  Form, foundation.
2  BY THE WITNESS:
3    A.   Again -- Can you repeat your question?  I'm
4  sorry.
5    Q.   Sure.  Based on your experience as someone who
6  teaches and has experience in interviewing and
7  interrogation, do you agree it was appropriate or
8  inappropriate -- sorry -- do you agree it was
9  inappropriate for the Naperville Police Department to
10  conduct further attempts to clarify why Mr. Amor flunked
11  the polygraph after you and Mr. Newey had already
12  extensively asked that of him?
13    MR. PASQUALINO:  Same objection.
14  BY THE WITNESS:
15    A.   I can't say that it was inappropriate.  Again,
16  not being present, if -- Depending on what's being
17  discussed, how it's being discussed, all plays a role
18  here.  If it was an interview and they're asking him
19  questions, look, you're not passing the test.  Why
20  aren't you passing the test or if it was something other
21  than that, I can't say.  I have to take into, you know,
22  consideration the totality of everything and I wasn't
23  there at the time.  I mean, I can understand on the way
24  back if -- Did they -- I don't even know if they drove

Page 107

1  in together.  Do you know that, if they came to our
2  office in the same vehicle?  I don't.  Because --
3    Q.   Yes.
4    A.   Okay.  So on the way back in the car, I don't
5  think it would be inappropriate for them to talk to him.
6  Like, what -- You know, you're not passing the
7  polygraph.  What happened?  What's going on here?  The
8  test -- This test says you're not telling the truth.
9  So, you know, in the car, I think it would be almost
10  common -- a common thing to ask him those questions.
11  Once they got back to the department, however, I don't
12  know what transpired.
13    Q.   Okay.  And do you believe that given all the
14  circumstances surrounding Mr. Amor's polygraph, the time
15  that he spent within the office, the time that he spent
16  prior to getting to the office without any sleep or any
17  sustenance, that it was appropriate for them to -- the
18  Naperville Police Department to serve divorce papers on
19  Mr. Amor in the course of interrogation -- interrogating
20  him?
21    MR. PASQUALINO:  Form, foundation.
22  BY THE WITNESS:
23    A.   Serving divorce papers in the midst of an
24  interrogation I don't think is appropriate.  I don't --

Page 108

1  Again, I don't know specifics.  I don't know how things
2  transpired, but just from a general perspective, a
3  general statement, I don't think that would be
4  appropriate.
5    Q.   Great.  And when if at any time are you made
6  aware that Mr. Amor had been served divorce papers the
7  evening or early morning after you polygraphed him at
8  Reid & Associates?
9    MR. PASQUALINO:  I'm going to object to a
10  mischaracterization of testimony.  I don't think he ever
11  knew Mr. Amor was served.
12    But if you know, go ahead.
13  BY THE WITNESS:
14    A.   No, I didn't.  I had no idea.  I had no idea.
15  I -- You know, I had said we were not part of this
16  investigation either before he got to our office or once
17  he left our office.  So anything that was occurring with
18  the detectives once he left our office, anything that
19  was said, we had no knowledge, we were not a part of it.
20  I never knew about any divorce papers.
21    Q.   And obviously since you were part of the
22  post-conviction -- Sorry.  Strike that.
23    You've been made aware that Mr. Amor was
24  exonerated for the conviction of murder based on this

Page 109

1  fire that was set -- that occurred, correct?
2    A.   Well, I don't know exactly what transpired.  I
3  was told -- From what I heard, I was told that the fire
4  could not have been -- could not have started in the
5  manner in which he stated it was started.  That's what I
6  had heard.
7    Q.   Okay.
8    A.   As far as him being exonerated, that -- I was
9  not told that.
10    Q.   Okay.  And considering the fact that Mr. Amor
11  has since been exonerated, do you have any regrets
12  regarding the role you played in bringing about his
13  confession?
14    MR. PASQUALINO:  I'll object.  Form and foundation
15  and role.
16  BY THE WITNESS:
17    A.   Can I ask for clarification?
18    Q.   Sure.
19    A.   When you say "exonerated," what do you mean?
20    Q.   In this instance, I mean he was retried for
21  this conviction and was found not guilty of setting the
22  fire.
23    A.   He was, in fact, retried?
24    Q.   He was retried.  He had a second trial.



Page 110

1    A.  Okay.  So based on the results of the second
2  trial is what you're saying is exonerated?
3    Q.  Yes.
4    A.  Okay.  And so what was the question?  Do I
5  have any regrets?
6    Q.  Yes.
7    A.  No.
8    Q.  Why not?
9    A.  Because I still have a polygraph test with
10  deceptive results that I have no explanation for.
11    Q.  And within polygraphing, is there such a thing
12  as a false-positive?
13    A.  Sure.
14    Q.  And how often does that occur?
15    A.  That, I don't know.  Again, I've been out of
16  polygraph for several years.  So to give you statistics,
17  I can't do that right now.  Does it occur?  Yes.
18    Q.  Has it occurred on a case -- Are you aware of
19  any time it has occurred on cases or polygraph
20  examinations that you've given?
21    A.  Me specifically?  No.  Has it ever happened at
22  Reid & Associates?  Sure, probably.  The company has
23  been around over 70 years.  But with me specifically,
24  no, I can't say that I have that I'm aware of anyway.

Page 111

1    Q.  And do you agree that it's possible that
2  Mr. Amor's polygraph examination in this matter was a
3  false-positive?
4    A.  Is it possible?
5    Q.  (Nodding.)
6    A.  Anything is possible.  But from my experience,
7  I'd say no.
8    Q.  Well, given the fact that Mr. Amor was
9  exonerated and given the fact that Mr. Amor won at
10  his -- or was found not guilty at his retrial on this
11  matter, do you believe it's possible that the polygraph
12  examination was a false-positive and that he didn't, in
13  fact, show signs of deception?
14    MR. PASQUALINO:  Objection to form, foundation.
15  BY THE WITNESS:
16    A.  No.  Again, I would have to say no on that.
17    Q.  And what are instances when those
18  false-positives occur if you have that knowledge?
19    A.  Again, I can't answer that.  I've been out of
20  polygraph for several years so that's something I can't
21  be -- can't answer right now.  So I couldn't say.
22    Q.  And so you believe that Mr. Amor's polygraph
23  examination does, in fact, still indicate signs of
24  deception?

Page 112

1    A.  Yes.
2    Q.  And you do not believe that this is a
3  false-positive?
4    A.  I don't.
5    Q.  And you don't believe it's a false-positive
6  despite the fact that Mr. Amor was exonerated, despite
7  the fact that Mr. Amor was being given this polygraph
8  examination after two weeks in jail, after -- only is
9  receiving four hours of sleep and not eating for the
10  entire day?
11    A.  Correct.
12    MS. GARCIA:  Okay.  I just have a couple of last
13  questions and I'll be done.  Mike, just let me review my
14  notes for like two minutes just so I know what I'm going
15  to ask and then we can finish this up.
16        (A short break was had.)
17  BY MS. GARCIA:
18    Q.  So after you wrote -- After you and Mr. Newey
19  were done polygraphing Mr. Amor on that evening of
20  October 3rd, did you author a report of any kind?
21    A.  Yes.
22    MR. PASQUALINO:  I'm just going to object to form
23  and testimony.  Newey didn't administer the polygraph,
24  so ...  Just for clarity.  Go ahead.  I'm sorry.

Page 113

1    MS. GARCIA:  Yeah.
2  BY MS. GARCIA:
3    Q.  And is writing a report after a polygraph
4  examination something that's standard practice or was it
5  something that you were specifically asked to do by the
6  Naperville Police Department?
7    A.  No.  It's standard practice.
8    Q.  And you provided testimony in the motion to
9  suppress hearing I believe it was in 1996 or 1997?
10    A.  I think it was -- I think it was March of '96.
11    Q.  Okay.  And other than -- And you provided the
12  report prior to this testimony, correct?
13    A.  Yes.
14    Q.  So after writing the report and before you
15  testified2, did you do anything else to assist the
16  Naperville Police Department within the Amor
17  investigation?
18    A.  No.
19    Q.  And then after you testified at the motion to
20  suppress hearing, when was the next time, if any, that
21  you were involved in the Amor matter?
22    A.  The deposition in 2019.
23    Q.  Okay.  So '96 to 2019?
24    A.  Yes.



Page 114

1     Q.   Okay.  Earlier you stated, and correct me if
2 I'm wrong, that you view the polygraph as a part of the
3 interrogation -- Strike that.
4         Earlier today you testified that you view the
5 polygraph as part of the procedure for conducting
6 interviews and interrogations, correct?
7     A.   Yes.  Yes, sometimes.
8     Q.   And you also testified that, you know, a
9 polygraph examination would be stressful for any human
10 being --
11     A.   Sure.
12     Q.   -- even somebody who's innocent, correct?
13     A.   Yes.
14     Q.   And so do you believe it's possible that the
15 stress of the polygraph examination by Mr. -- of
16 Mr. Amor led him to falsely confess to Naperville Police
17 Department that he purposely set the fire at the Miceli
18 residence?
19     A.   Do I think the stress of the polygraph test
20 caused him to confess?
21     Q.   Yes.
22     A.   No.
23     Q.   Do you think it could have been a contributing
24 factor?

Page 115

1     A.   I mean, anything is possible, but the
2 polygraph alone a contributing factor? No, not at all.
3     Q.   Do you think the combination of the polygraph,
4 the hour and 45 minutes of conversation you and
5 Mr. Newey had with Mr. Amor, and the totality of the
6 circumstances surrounding the polygraph examination may
7 have been one of the contributing factors to Mr. Amor's
8 false confession?
9     A.   What I can say is what we did in our office
10 with Mr. Amor, the pretest interview, the polygraph
11 test, the post-test interviews, we followed all
12 procedures.  We did what we were trained to do.  When
13 Mr. Amor left our office, he was still denying any
14 involvement.  He said he didn't know who set the fire,
15 he had no knowledge, he had no involvement.  Now, what
16 happened once he left our office, what was said and what
17 was done, I don't know because I wasn't there so I
18 really can't answer that question.  All I can say is
19 when he left our office, he still said I know nothing
20 about this.  And so, you know, the polygraph test, the
21 stress as to what occurred in our office did not cause
22 him to confess to us.  So, again, what was said and what
23 was done once they arrived back at Naperville, I don't
24 know so I can't answer your question.  All I can say is

Page 116

1 when he left our office, he was still saying he had
2 absolutely nothing to do with this.
3     Q.   So flipping that question, would you say that
4 the polygraph examination as well as the subsequent
5 interviews and prior interviews that same day didn't
6 lead to Mr. Amor's false confession?
7     A.   Again, let me just say -- Well, what happened
8 in our office -- I'll say it again.  From the time he
9 arrived until the time he left, he was saying he had
10 nothing to do with this.  So as far as stress, as far as
11 anxiety, Mr. Amor was in full control of what he was
12 saying and what he was doing when he left our office,
13 and he was free to leave at any time.  He was not in
14 custody.  He -- There were no locks on any of the doors
15 for him to leave.  He could have left whenever he wanted
16 to.  And so all I can tell you is what transpired in our
17 office, and the stress and anxiety did not cause him to
18 confess to us.  So we follow procedure, we follow
19 protocol, and we did exactly what we were trained to do.
20 And so what happened after he left, I don't know.
21     Q.   Okay.  And just a follow up to that, you
22 testified earlier that when there's -- someone is told
23 that they have failed a polygraph examination, that
24 would lead someone to experience levels of emotion and

Page 117

1 levels of stress, correct?
2     A.   Yes.
3     Q.   And so knowing that, having that testimony and
4 knowing the circumstances surrounding his polygraph
5 examination, you know, including the lack of sleep,
6 including the lack of adequate food, being told that he
7 had failed a polygraph examination which was asking him
8 questions about whether or not he had something to do
9 with the death of his mother-in-law, would it be fair to
10 say that at least some part of the polygraph examination
11 was a contributing factor to Mr. Amor's confession which
12 occurred after he left the Reid & Associate offices?
13     MR. PASQUALINO:  I'm going to object, asked and
14 answered.
15     Go ahead.
16 BY THE WITNESS:
17     A.   Again, I can't say that the polygraph test was
18 a contributing factor to his confession.  I can't say
19 that because, again, you have to take into account the
20 totality of the circumstances.  And what was said and
21 what was done once they left our office, I don't know.
22 You know, you can't just -- I can't just say, well, this
23 particular thing alone with this, this, and this could
24 be a contributing factor.  As I said earlier, anything



Amor vs Reid
Michael Masokas - 08/25/2022

Pages 118..121

Page 118

1  is possible.  But what was said and what was done once
2  they left also is very important to take into
3  consideration.  And I don't know what was said and what
4  was done after they left and neither does Mr. Newey
5  because he wasn't there either.
6       Q.  So you don't believe that the stress of being
7  told that he failed the polygraph examination could have
8  caused him to give a false confession?
9       A.  That by itself?  I would -- I strongly would
10 disagree with that.  That one thing alone, I would
11 strongly disagree with.  Just because you're told you
12 failed, so what?  Polygraphs are not admissible in
13 court.  You can't use a polygraph -- Everybody knows
14 that and -- I mean, everybody knows polygraphs are
15 inadmissible.  And so you failed a polygraph.  Okay.  So
16 what?  So I would be hard-pressed to say just because
17 someone is told they failed a polygraph is going to
18 cause him to confess to something they did not do.
19 There's got to be other factors taken into
20 consideration.
21      Q.  And may some of those factors be lack of
22 sleep, having spent two weeks in jail, not having
23 anything to eat that day, being told that the polygraph
24 said that they had something to do with the death of

Page 119

1  their mother-in-law?
2       A.  Based on Mr. Amor's state of mind the last
3  time I saw him, I would say no.  He's telling me he had
4  nothing to do with it.  He said I didn't do it.  I don't
5  know anything about it.  And so, again, I'm not in a
6  position to say, well, you know, this could have
7  happened or that could have happened because I wasn't
8  there.  Plain and simple, I wasn't.  I don't know what
9  was said as far as contributing factors.  I said it
10 before.  I'll say it again.  Anything is possible.  But
11 to be specific and make those statements?  I can't.
12      Q.  Okay.  I'm going to move on to just a couple
13 more questions.
14          After you left the office on October 3rd,
15 1995, did you have contact with Mr. Amor?
16      A.  No.
17      Q.  Have you had contact with him since?
18      A.  No.
19      Q.  Okay.  And has anything that we've talked
20 about today cause you to remember anything about the
21 investigation that you haven't otherwise testified to?
22      A.  No.
23      MS. GARCIA:  Okay.  I have no further questions.
24      MR. PASQUALINO:  All right.  Signature, we will

Page 120

1  reserve.
2       MS. GARCIA:  Okay.
3       THE COURT REPORTER:  Okay.  Will counsels state
4  their orders on the record for both depositions?
5          (Brief pause.)
6       THE COURT REPORTER:  If you'd like to --
7       MS. GARCIA:  I'm not going to order Mr. Amor's, but
8  we will order Mr. Masokas's.
9       THE COURT REPORTER:  Okay.
10      MS. GARCIA:  I'm saying that right, right, Mike?
11      THE WITNESS:  Yes.
12      MS. GARCIA:  Masokas?
13      THE WITNESS:  Yes.  Yes.
14      MS. GARCIA:  Okay.
15      THE COURT REPORTER:  Okay.
16      THE WITNESS:  You got it right.
17      MS. GARCIA:  Okay.
18      MR. PASQUALINO:  We'll order Amor's and a copy of
19 Masokas.
20      THE COURT REPORTER:  Okay.  Thank you.  We're off
21 the record at 5:48 p.m.
22          (Witness excused.)
23
24

Page 121

1          IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION
3
   WILLIAM AMOR,                    )
4                                   )
                Plaintiff,          )
5                                   )
        vs.                         )  No. 20-cv-01444
6                                   )
   JOHN REID & ASSOCIATES, et al.,  )
7                                   )
                Defendants.         )
8
9
10      I, MICHAEL MASOKAS, state that I have read the
11 foregoing transcript of the testimony given by me at my
12 deposition on the 25th day of August, 2022, and that
13 said transcript constitutes a true and correct record of
14 the testimony given by me at said deposition except as I
15 have so indicated on the errata sheets provided herein.
16
17
18                              _____
                                     MICHAEL MASOKAS
19 SUBSCRIBED AND SWORN to
   before me this _____ day
20 of _____, 2022.
21
   _____
22   NOTARY PUBLIC
23
24



Amor vs Reid
Michael Masokas - 08/25/2022

Pages 122..124

Page 122

```
1    UNITED STATES OF AMERICA      )
     NORTHERN DISTRICT OF ILLINOIS )
2    EASTERN DIVISION              )    SS.
     STATE OF ILLINOIS             )
3    COUNTY OF COOK                )
4
5         I, Christina J. Atto, Certified Shorthand
6    Reporter and Notary Public, do hereby certify that
7    MICHAEL MASOKAS was first duly sworn by me to testify to
8    the whole truth and that the above videoconference
9    deposition was reported stenographically by me and
10   reduced to typewriting under my personal direction.
11        I further certify that the said
12   videoconference deposition was taken at the time and
13   place specified and that the taking of said
14   videoconference deposition commenced on the 25th day of
15   August, A.D., 2022, at 2:31 p.m.
16        I further certify that I am not a relative or
17   employee or attorney or counsel of any of the parties,
18   nor a relative or employee of such attorney or counsel,
19   nor financially interested directly or indirectly in
20   this action.
21
22
23
24
```

Page 123

```
1         In witness whereof, I have hereunto set my
2    hand and affixed my seal of office at Chicago, Illinois,
3    this 7th day of September, A.D., 2022.
4
5
6
7
8
9
10                  CHRISTINA J. ATTO, CSR, RPR
                    180 North LaSalle Street
11                  Suite 2800
                    Chicago, Illinois 60601
12                  Phone:  (312) 236-6936
13
14
     CSR No.  084-004321
15
16
17
18
19
20
21
22
23
24
```

Page 124

```
1    Errata Sheet
2
3    NAME OF CASE: Amor vs Reid
4    DATE OF DEPOSITION: 08/25/2022
5    NAME OF WITNESS: Michael Masokas
6
7    Page _____ Line _____ Reason _____
8    From _____ to _____
9    Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
12   From _____ to _____
13   Page _____ Line _____ Reason _____
14   From _____ to _____
15   Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
18   From _____ to _____
19   Page _____ Line _____ Reason _____
20   From _____ to _____
21   Page _____ Line _____ Reason _____
22   From _____ to _____
23
24   _____
     SIGNATURE OF DEPONENT
```



## $

**$5,000** 67:7,8,9,10

## 0

**08** 20:19

## 1

**1** 58:17,19,22 59:4,
6,9,12,14 79:11

**10** 98:21

**10-** 34:8

**100** 89:9

**10:00** 80:16 90:10,
11 92:24 93:1
102:4,6

**10:30** 80:16 90:12,
14,15 93:5 102:7

**10th** 58:3 65:2
78:9,23 82:18

**11** 79:4 83:7,9,11,
12,13

**11,000** 34:8

**15** 56:15 97:11
98:21 105:3

**15th** 13:23

**18** 5:12

**1981** 21:16 23:21
24:2

**1982** 24:4 30:24
32:4

**1983** 13:23 14:1
30:23 31:1 34:8

**1985** 22:12 23:18

**1985/'86** 22:9

**1986** 28:21

**1988/'89** 14:8

**1989** 15:16

**1990** 16:17

**1995** 46:10,12
53:14 69:5 78:9

119:15

**1996** 113:9

**1997** 113:9

**1st** 15:16

## 2

**2** 57:18,23,24 58:1,
2,4,13,17,18,21,23
68:24

**2's** 58:4

**20** 38:18 98:21

**2000** 22:6

**2000-** 20:19

**2004** 47:17

**2005** 8:10 14:22,24
34:9

**2005/2006** 21:19
22:7

**2006** 21:8

**2011** 20:20

**2017** 21:8

**2019** 13:7 113:22,
23

**2020** 13:6,10

**2022** 4:4

**21** 56:15,17

**22** 56:18

**24** 39:13,15 72:4
105:12

**24-hour** 72:22

**25** 38:19 100:14

**2523** 5:12

**25th** 4:3

**27** 95:11

**2:31** 4:4

**2s** 80:1

## 3

**3** 44:3 58:19,21,23
59:6,7 77:2 81:4,

10 82:5,7

**30** 59:24 60:6 76:7,
9 90:1 97:18 102:3

**35** 78:7

**3:50** 53:2,3,5 55:7

**3rd** 53:14 69:4
112:20 119:14

## 4

**4** 77:19 78:13

**40** 59:24 60:6
65:10

**45** 65:11 97:12,14
98:9,15 100:5,19
105:24 115:4

**46** 77:20

**47** 77:5

**49** 77:6

**4:30** 61:20

**4:35** 61:20 62:7

**4:40** 62:4,6 64:22
65:6 80:1,3

## 5

**5** 78:15 83:6,11,13

**5-** 66:12 88:10

**5:05** 94:13,14

**5:20** 65:6 66:11
80:1

**5:25** 66:12

**5:30** 68:10

**5:35** 66:12 68:11,
12

**5:40** 66:12 76:23
91:6

**5:48** 120:21

## 6

**6** 78:17 82:2,5,6,7,
15 83:2,3,10,12

**60** 65:11

**60s** 16:16

**6:15** 76:24 80:4
91:6

**6:25** 58:22

**6:30** 58:22 80:8
85:19 88:10

**6:40** 58:5

## 7

**7** 78:20

**7-** 88:10

**70** 110:23

**7:15** 80:11

**7:30** 80:8 88:10,
11,23

**7:45** 80:9 88:23,24

## 8

**8(a)** 78:21

**80s** 69:15

**8:15** 88:24

**8:30** 80:12

**8:45** 80:13 89:24

## 9

**9(b)** 79:2

**9-** 34:8

**90s** 14:15 34:17

**95** 55:18 58:3
78:23

**96** 113:10,23

**9:00** 90:6 92:7,17

**9:15** 80:14 90:2,4
92:18 101:21

**9:30** 80:15 90:10
92:24

## A

**ability** 6:13,20

**absolutely** 96:20
116:2

**acceptable** 24:17

**accepted** 18:17
22:24 23:7,11 24:1
26:8

**access** 64:13
89:12

**accessible** 64:11,
14

**accidentally**
58:24

**account** 117:19

**accounting** 55:19

**accredited** 19:10

**accuracy** 27:10

**accurate** 6:14,21
9:17 47:7,8

**accusatory** 49:9

**Act** 15:15

**actual** 27:24 36:23
37:10 62:5 91:3

**added** 18:15

**adding** 98:15

**additional** 97:13

**adequate** 117:6

**adjusted** 76:10

**administer**
112:23

**admissible**
118:12

**admit** 98:24

**admitted** 104:8

**admitting** 102:5

**affect** 6:13,16,20,
24

**afford** 39:4

**afraid** 87:11,16



Amor vs Reid
Michael Masokas - 08/25/2022

2

**afternoon** 52:4,9
55:2

**agency** 54:3,17

**agents** 93:9

**agree** 68:8 105:20
106:7,8 111:1

**agreeable** 37:22

**agreed** 25:10

**agreeing** 46:20

**agreement** 4:3
47:9,10

**agreements**
47:13

**ahead** 11:3,12,14
66:15 95:17
104:19 108:12
112:24 117:15

**Airlines** 17:18

**alcohol** 74:3

**alert** 72:11,21
74:22

**allowed** 63:24
93:14,21

**American** 33:20

**Amor** 4:21 5:12
8:20,22 9:4,8,9,13
10:9,12,14 46:10
52:23 53:20 55:4,9
56:5 57:21 59:4
60:12,14 61:18
62:2,10 64:23 66:6
68:14,16 69:3,10
72:3 74:14,18 75:3
80:11 85:11,20,22
86:21 88:20 89:3,
15,20 90:1,2,9,10,
14,19,21,23 92:18,
20,23 93:2 95:14,
23 96:10,19,24
97:3,7,21 98:10,16
101:20,21,24
102:2,4,9,13,19
105:8,22 106:10
107:19 108:6,11,
23 109:10 111:8,9
112:6,7,19 113:16,
21 114:16 115:5,
10,13 116:11
119:15

**Amor's** 10:16
53:13 54:24 57:1
76:19 86:14
103:21 105:15
107:14 111:2,22
115:7 116:6
117:11 119:2
120:7,18

**amount** 18:4
67:15 74:7

**amplitude** 84:24

**analysis** 42:11
52:5,8

**analyzing** 43:20
84:4,20

**annual** 33:21

**annually** 32:23

**answering** 74:22

**anticipate** 71:9

**anxiety** 71:10,12,
15,17 116:11,17

**anymore** 22:21

**apartment** 58:4,6,
22 78:10,24 79:3

**Apologies** 28:24

**apologize** 5:1

**apparently** 93:3

**application** 22:16
23:9 26:19

**applied** 23:17,24
26:7 31:14

**applies** 36:9

**apply** 23:20 26:6,
23 31:9

**applying** 22:14
27:19

**appointment**
54:19

**approach** 24:12
46:21

**approximately**
13:16 14:8 21:19
29:18 30:9 55:7
59:19 60:7 62:3
76:23 85:19 91:6

92:8,23 100:10
101:21 102:3,7

**approximation**
60:8

**area** 19:12 89:11

**areas** 73:2

**argument** 79:5

**arm** 41:10

**arrived** 55:6,8,22,
23 56:2 115:23
116:9

**arrow** 80:6

**Art** 55:15 80:10,12
88:18,21,22,23
96:2

**ashtray** 59:10,11

**asleep** 42:23
72:24 74:24

**aspect** 23:13
47:15 50:1 73:18

**aspects** 30:3
46:24

**assess** 105:15

**assessing** 52:5
66:2

**assigned** 54:13,
22

**assist** 113:15

**associate** 20:3,
11,15,18 117:12

**Associates** 7:11,
13,17 13:21,22,24
14:5 17:1 18:1,2,
23 20:2,17,23,24
30:14,23 31:10,13
39:8 43:17 53:19
54:1 55:6 93:8
98:2 101:15
102:10,14 103:15
108:8 110:22

**Associates'** 17:6
64:6

**Association**
33:21

**associations**
33:15

**assume** 10:3
79:10

**assuming** 36:12

**ATN** 80:9,12

**attached** 37:9
75:23 76:3

**attachments** 76:1

**attack** 70:9,22,23

**attempt** 98:5
100:17

**attempting** 84:4,
20 99:17

**attempts** 105:21
106:10

**attend** 23:5 33:24

**attending** 33:8,12

**Atto** 4:6

**attorney** 4:20

**August** 4:3 24:2

**author** 112:20

**awake** 72:11

**aware** 34:16 47:4
102:12,18,23
103:20 108:6,23
110:18,24

**Awesome** 6:7

---

**B**

**bachelor's** 19:6

**back** 13:6,20 19:7
20:1 22:17 23:1
25:17 26:9 28:21
29:15 31:15,20
34:17 37:11,14
40:1 50:24 54:5
58:12 60:12,13,14
61:19 62:2,14
64:19 66:11 69:15
75:2 80:9,10,12
85:19,20 88:23
89:24 91:7,11,12,
15 94:9 96:9,17
102:17 106:24
107:4,11 115:23

**background**
22:22,23 28:24
54:18 59:21

**bad** 48:9 95:13

**badly** 45:22

**ballpark** 34:2

**barely** 72:19

**based** 47:21 48:3
54:7 66:22 67:18
81:6 84:18 87:9
95:6 104:9 105:5
106:5 108:24
110:1 119:2

**baseline** 71:22

**basic** 10:4 51:21

**basically** 14:21
15:8 32:19 44:6
49:6 52:5 71:21
92:16

**Bates** 56:15,17
68:24 69:1,2 77:5,
19

**bathroom** 52:24
94:4

**began** 27:17

**begin** 13:21

**beginning** 8:2
32:4 36:2,4

**begins** 76:4,12

**behavior** 52:4,6,8
73:21,22

**believed** 98:10

**benefit** 26:6

**big** 49:14 86:20
91:11

**bigger** 91:8

**Bill** 4:21 78:5

**bit** 7:21 44:14
49:12 50:11 51:22
62:4 65:9,21 71:1
72:9 74:9 78:2
81:16,18 87:1
88:19 91:12 96:3

**blocking** 58:6



Amor vs Reid
Michael Masokas - 08/25/2022

3

**blood** 41:11 42:24
43:6,10 70:10,13
71:18 73:2 76:7,12
81:23,24 82:1,16
83:20,21 84:9
85:1,2

**bloodshot** 74:2

**board** 18:17,20
71:20

**body** 80:19

**bombed** 26:22

**books** 18:9

**born** 25:14

**boss** 10:2

**bottom** 59:12
60:22 61:4 80:14

**Bowman** 41:20
61:21 63:9 93:23,
24 99:20

**break** 6:7,8 52:22,
24 53:10 94:1,3,8,
17 112:16

**breathing** 40:17
41:3,6,17 42:24
43:9,10

**Brian** 24:12,21,22

**briefly** 5:19 18:23

**bringing** 20:14
109:12

**broad** 35:17

**broadly** 34:14
35:12

**brought** 61:18
66:18 102:13

**Buckley** 10:2

**built** 91:23

**bunch** 64:24

**burglary** 36:21

**burning** 58:7
59:10

**business** 14:21
15:4,7,11,19 16:22

**businesses** 15:17

## C

**call** 7:5 12:13
25:23 35:9 36:22
40:19 54:5,16
77:1,18 78:5

**called** 4:14 9:19
16:13 21:1 31:14,
21,22 40:10 43:22
45:2 96:3 102:16
103:4,9

**calls** 12:10 58:4

**calm** 71:5

**cannabis** 74:3

**cap** 26:17

**car** 107:4,9

**card** 79:17

**care** 69:16

**case** 8:20 9:9,10,
13,16 10:9,12,14
13:9,10 56:18
57:22 61:16 95:1,
14 96:3,6 110:18

**cases** 99:17
110:19

**catch** 42:4

**categories** 34:13,
16 35:12,17 42:16

**category** 35:17

**caused** 114:20
118:8

**causing** 87:4,6
99:9,15

**certification**
31:18

**chair** 41:18 72:24
91:9,10,24

**chairs** 58:6

**chance** 39:22 63:9

**change** 15:12
40:16 41:2 43:5,8
84:24 85:1

**changed** 14:14
15:5 18:15,16

62:24 63:7

**changing** 41:6

**characteristics**
51:20,21

**characterize** 81:5

**chart** 30:2 32:11
76:5

**charts** 32:12 44:2
80:3,4,5 85:14

**check** 22:22,23
44:12,13,14,16
45:23,24

**checked** 69:13

**checking** 44:18

**checkmark** 44:12
45:24 46:9 47:3,22
48:5 81:9,14,20,24
83:17,18,20 84:2

**checkmarks**
44:24 80:23 81:1,
5,6,7 83:23

**checks** 45:15

**Chicago** 17:6 19:6
25:14,16 26:20
78:13

**chief** 14:11

**choice** 33:8,9

**Christina** 4:6

**chunk** 97:10

**church** 20:3,7,11

**cigarette** 59:10
87:20 88:21

**cigarettes** 79:21

**circling** 26:9

**circumstances**
103:21 107:14
115:6 117:4,20

**claim** 59:6

**clarification**
109:17

**clarified** 87:2
94:19

**clarify** 6:4 87:13
98:5,23 99:18

100:17 106:10

**clarifying** 11:5
105:22

**clarity** 75:14
112:24

**class** 16:4,5 30:10

**classes** 21:22

**classify** 49:1

**classroom** 30:6

**clear** 72:13

**closed** 15:21 16:9,
16 64:9

**closest** 81:9

**closet** 63:1,2

**co-workers** 10:1

**Coast** 34:19

**code** 64:13

**college** 16:13
18:24 19:3,5,7,13
21:18,21 22:3,10,
15 23:5 24:1,9
25:20,23 26:1
30:17 32:10 44:11

**colloquially**
52:13,16

**colors** 60:3

**combination**
115:3

**comfortable**
65:21 91:9

**common** 100:16,
22 101:1 107:10

**companies** 17:17
27:16 103:12

**company** 14:6,18
27:20 31:4,5 54:17
96:21 103:11
110:22

**compare** 27:24
45:11

**comparing** 82:6
83:12

**complete** 37:1
85:13

**completed** 21:8
24:4 38:23 91:7

**completely** 22:8
47:20 49:3

**comprehend**
74:4

**concern** 72:7
74:7,10,13

**concerned** 73:3,
7,10

**concerns** 75:4,20

**conclude** 52:8
90:7

**conclusion** 4:7

**conditions** 6:13,
16

**conduct** 39:3,8
50:3 93:9 106:10

**conducted** 4:2
49:6 50:22

**conducting** 51:19
52:2 114:5

**conference** 33:21

**conferred** 89:8,14
90:5 92:19

**confess** 103:2
114:16,20 115:22
116:18 118:18

**confessed** 102:24

**confession**
103:21 109:13
115:8 116:6
117:11,18 118:8

**configuration**
62:24 63:7

**confirmation**
38:13 85:17

**confirmed** 60:24

**confused** 23:4

**connect** 88:16

**connection** 9:8
88:15,22 89:22

**cons** 47:23

**consent** 36:6,11,



Amor vs Reid
Michael Masokas - 08/25/2022

4

13 37:15,18 38:1
60:19,21 61:3,12

**consenting** 36:7

**consideration**
20:14 106:22
118:3,20

**considerations**
20:21

**considered** 20:10

**consistency**
84:16

**consult** 8:18

**contact** 119:15,17

**contacted** 54:3

**contained** 91:3

**continue** 72:20
104:15 105:8

**continued** 88:4

**continuing** 33:4,
13 75:9

**contributing**
114:23 115:2,7
117:11,18,24
119:9

**control** 45:2,4,7
82:20,23 83:1,12
116:11

**controlled** 49:13

**conversation**
10:20 13:1 38:15
66:20 89:18 115:4

**conversational**
65:4

**conversations**
8:15 13:12

**convicted** 29:13

**conviction**
108:24 109:21

**cool** 95:23

**copy** 120:18

**corner** 79:16

**corporations**
17:19

**correct** 9:5 13:7
16:1,9 24:7 27:3,6
28:15 30:7 32:14
37:15 43:14 45:13
61:1 63:18 64:8
68:6,8,17 73:8
77:16 79:13,15
84:11 92:8 97:8,
11,18,23 99:2
101:15 105:3,4
109:1 112:11
113:12 114:1,6,12
117:1

**correctly** 23:17
97:6

**counsel** 4:8 8:16,
18 9:23 10:21
11:21 12:3,6,10
13:16 63:13

**counsels** 120:3

**country** 17:7
34:19 35:8

**county** 34:24

**couple** 25:19,22
28:23 33:14,18
61:9 93:15 94:7
112:12 119:12

**courses** 7:16
48:23 51:10

**court** 4:1,11 7:19,
22 8:1,6 29:23
63:8,11 99:21,24
118:13 120:3,6,9,
15,20

**cover** 51:1

**covered** 29:19
51:16

**crafted** 6:3

**create** 35:11

**criminal** 19:6
61:16

**Cross** 5:12 8:19
9:4,10,13 55:5

**Cross/naperville**
5:13

**cuff** 76:7,12

**current** 7:12 32:17

**curriculum** 17:22
101:11

**custody** 60:21,23
61:1,6 116:14

**customer** 103:18

**cut** 67:15

**CV** 5:12

---

**D**

**Dan** 30:21

**dark** 44:15 81:7

**darker** 44:12,14

**data** 42:3,9,11
43:14,17,20 44:20
68:24 69:3,9,18,24
70:4 72:3 85:7

**date** 4:3 38:18
65:3 79:17 103:6

**dating** 25:17

**daughter** 57:23

**day** 14:1 31:5,8
51:15 52:9,11
54:11,19 55:16
65:2 71:8 87:14
101:14 102:12
103:22 105:13
112:10 116:5
118:23

**days** 9:14 39:12
42:21

**death** 58:2 117:9
118:24

**deception** 19:12,
14 23:6 25:4,12
26:11 39:9 44:7,19
45:4,12 84:5,13
96:18 97:22 98:6
99:4 100:18
111:13,24

**deceptive** 39:3
40:5,8 42:17 44:8,
9,14,15,16 81:15
84:11,21 85:15
86:18 96:17 99:10,
18 110:10

**decide** 15:2 19:21
31:9

**decided** 20:5 25:8
27:14 38:16

**decisions** 18:18

**define** 43:3

**degree** 19:6,13,
15,17,21 21:3,4
27:3

**degrees** 19:3,11

**deliberately**
40:12

**delivering** 62:9

**denial** 86:13,14,17

**denials** 88:11

**denied** 88:7

**denies** 59:5

**deny** 88:4,5

**denying** 89:16
90:2,10 93:2
101:21 102:5
115:13

**department** 17:20
25:17,20 26:20,21
31:21 53:18 54:7
55:17 58:5 102:13,
20 104:15,16
105:7 106:9
107:11,18 113:6,
16 114:17

**departments**
34:24 35:1 103:11

**dependent** 67:11,
19

**depending** 36:17
65:10,12 67:6
100:23 106:16

**depends** 18:8

**deplete** 18:6

**deposed** 5:5,7

**deposition** 4:1,7
5:4 8:13,17,19 9:4,
13,16,20,24 10:8,
19 11:1,2,6,7,9,16,
21 12:4,7,11 13:2,
6,18 85:8 95:3,21
113:22

**decided** 20:5 25:8
27:14 38:16

**depositions** 5:11,
18 11:4 120:4

**describe** 75:24
77:20 79:18

**desk** 55:14 91:19,
23

**destroyed** 79:1

**details** 104:23
105:17

**detection** 19:12,
14 23:6 25:4,12
26:10

**detectives** 55:5,
10 56:1,4,6,24
59:21 60:10 89:11,
19 90:5,8,14 92:19
102:9 108:18

**determine** 28:2
35:5 44:4 49:11
66:3 67:20,24
99:12

**develop** 49:10

**developed** 18:1
46:17 66:22

**developing** 24:15
46:22

**dialogue** 49:5

**difference** 51:22

**differences** 49:14

**difficult** 34:1

**DIRECT** 4:16

**direction** 21:1

**director** 14:14
20:12 24:10,12

**Directors** 18:18,
20

**disagree** 105:20
118:10,11

**discipleship**
19:19,22

**disciplined** 29:4,
7,10

**discriminate**
71:19



Amor vs Reid
Michael Masokas - 08/25/2022
5

**discuss** 10:7
52:13 90:17 102:8

**discussed** 9:24
10:13 45:1 61:9
106:17

**discussion** 25:7
39:18 66:24

**displaying** 73:3

**distortions** 41:23,
24

**distorts** 41:10

**distressed**
105:10

**divisions** 14:18

**divorce** 102:20,24
107:18,23 108:6,
20

**doctor's** 69:16
70:10,19,20

**document** 38:8
60:17

**documentation**
8:24

**documents** 8:21
13:15 95:7

**door** 63:2 89:13
91:19,20,21

**doors** 58:6 63:4
116:14

**dovetails** 48:19

**dozen** 5:9 11:17
12:10 13:17

**drivers** 27:19

**driving** 27:20
28:1,2

**dropped** 30:12

**drove** 106:24

**dues** 32:23

**duly** 4:14

---

**E**

**earlier** 27:1 81:6
84:23 94:20 97:20

101:13,19 114:1,4
116:22 117:24

**early** 13:10 14:15
22:11 108:7

**easiest** 51:9

**east** 34:20 35:8

**easy** 40:1

**eat** 118:23

**eaten** 74:6 105:13

**eating** 112:9

**education** 18:23
33:5,13

**effect** 15:15 61:5
86:2 87:10

**Electric** 17:18

**electrodes** 43:7

**elevated** 71:18

**emotion** 116:24

**emotional** 86:12

**emotions** 39:20

**employed** 7:8,10

**employee** 15:14
54:13 55:15

**employees** 64:6

**employment**
13:20 15:9

**end** 30:4,13 32:4
44:21,23

**enforcement**
61:17 93:9

**engages** 17:14

**engaging** 33:12
41:7

**enlarge** 78:2

**enter** 41:20 61:21
63:4 91:19 99:20

**entered** 85:23

**entire** 44:23 52:17
76:21 105:13
112:10

**environment**
49:13 51:20 52:1

**environments**
49:7

**EPPA** 15:14

**equal** 80:9

**error** 58:20

**escorted** 60:11,13

**essentially** 63:17

**establish** 65:20

**estimate** 5:8 34:3
94:9

**evaluate** 32:11
38:24 39:2 44:23
66:5 91:13

**evaluated** 45:3
85:14,15

**evaluating** 42:2

**evening** 55:2 90:6
108:7 112:19

**evenly** 35:19

**event** 95:11

**eventually** 25:10
28:14 30:22
103:20

**exact** 28:11

**exam** 25:21,22
27:17 31:23 32:7
61:15 73:14 96:10
98:6,10 102:14

**examination** 4:16
8:24 37:18 38:16
49:18 50:19 57:2
62:10 69:4 70:5,21
71:24 72:15 73:4
74:8 77:11 82:9
84:22 86:22 90:18,
19 92:11 96:17
97:7 100:5 105:9,
23 111:2,12,23
112:8 113:4 114:9,
15 115:6 116:4,23
117:5,7,10 118:7

**examinations**
49:16 73:18,21,23
81:8 110:20

**examined** 4:15

**examinee** 69:24

70:4 71:5

**examiner** 14:7,11
31:19 103:14

**examiners** 14:10
16:15,18 35:2
47:14,16

**examples** 40:14

**excessive** 98:8,
19,20

**excused** 120:22

**exhausted** 42:21
73:8

**exhibit** 68:24 77:2,
18,19

**exit** 58:5,8

**exonerated**
108:24 109:8,11,
19 110:2 111:9
112:6

**expand** 15:22

**expect** 71:8

**experience** 38:14
48:8 49:15 72:14,
18 84:10 93:7
104:9 106:5,6
111:6 116:24

**experienced**
40:15 41:7 49:21
88:17

**expired** 33:1

**explain** 38:10 51:9
65:17 75:24 87:13,
23

**explained** 23:9
66:9

**explanation** 39:5,
19 88:12 89:6,17
99:14 110:10

**extensive** 95:10

**extensively**
106:12

**extremely** 44:9,16

**eyes** 72:19 74:3

---

**F**

**fact** 56:12 87:16
109:10,23 111:8,9,
13,23 112:6,7

**factor** 114:24
115:2 117:11,18,
24

**factors** 115:7
118:19,21 119:9

**facts** 104:23

**fail** 65:23 66:4

**failed** 98:10,24
100:4 105:9
116:23 117:7
118:7,12,15,17

**failing** 89:3

**fair** 10:3 12:9,12
35:10,15 50:13,18
52:19 61:20 70:24
79:10 117:9

**fall** 85:2

**fallen** 59:11

**falling** 72:24 74:24

**false** 115:8 116:6
118:8

**false-positive**
110:12 111:3,12
112:3,5

**false-positives**
111:18

**falsely** 114:16

**familiar** 22:19
27:12

**families** 59:13

**father** 25:18

**favor** 28:12

**feather** 26:16

**February** 24:4

**fee** 33:2

**feedback** 63:9

**feel** 37:24 65:21
76:8



**feels** 18:14

**fell** 87:20

**felony** 29:13

**felt** 21:1 88:13 89:19

**field** 19:13 33:13 47:18 48:16

**figure** 84:5,20 99:3,9

**figured** 89:5

**file** 8:20,22,23 56:11 94:23,24 95:2 96:6

**fill** 23:9 36:14 61:13,15 69:24 70:4

**filled** 61:7 68:17 69:3,10,18 92:16 93:5

**finally** 35:8

**find** 28:7 71:21 77:18 98:8

**fine** 7:7 20:24 28:20 47:20 94:5

**fingers** 43:7

**finish** 6:8 112:15

**finished** 30:12

**fire** 45:6 58:4 65:1, 3 78:10,16 79:1,3 82:19,23 86:4,16 92:22 99:1,2,5,7,8 101:22 103:1 104:8 109:1,3,22 114:17 115:14

**fired** 29:1

**five-day** 17:3

**flex** 41:10,12

**flip** 77:17

**flipping** 116:3

**fluent** 72:12

**flunked** 105:22 106:10

**focus** 82:22

**folks** 61:13,15

**follow** 45:19 73:5 116:18,21

**food** 117:6

**forbade** 93:18

**force** 37:21

**forced** 36:8

**forgery** 59:15

**forgive** 71:13

**form** 11:23 16:5,7 36:11,13,15 38:1 46:4,14 49:22,23 60:18,19,21 61:3, 8,12,13,14 69:7 74:3 75:11 95:16 101:9 104:17 106:1 107:21 109:14 111:14 112:22

**format** 18:15

**formation** 19:18, 22

**formulate** 37:2 66:17 67:4,17

**formulated** 37:3

**formulating** 66:9

**formulation** 29:22 77:10

**fortunately** 31:24

**found** 87:14,15 109:21 111:10

**foundation** 11:24 51:19,23 95:16 104:18 106:1 107:21 109:14 111:14

**four-day** 17:3

**fourth** 81:18

**Fred** 31:6

**free** 38:6,9,11 60:20,22 61:2 116:13

**frequently** 18:3

**Friends** 59:5

**front** 55:14 61:3 94:20,23

**fulfill** 54:8

**full** 5:22 42:4 116:11

**full-time** 8:10 14:24 20:3,7,9 21:5 31:12,13,16

**fully** 16:6

**functioning** 76:6

**funny** 41:13

---

**G**

**galvanic** 43:6 71:14 85:2,3

**GARCIA** 4:17 7:20 8:7 11:10,11 12:1 52:21 53:3,6,8,11 63:12,14 75:13,15 94:3,7,12,14,16,18 99:23 100:1 112:12,17 113:1,2 119:23 120:2,7,10, 12,14,17

**gave** 8:19 9:16 57:20 95:10

**general** 10:9 17:18 108:2,3

**generally** 10:12 35:21

**generically** 44:8

**gentleman** 24:11 31:3

**girl** 25:17

**give** 5:22 6:2 7:16 9:19 14:3 30:19 36:8 39:20,23,24 47:18 57:10 65:15, 16 68:22 77:2 85:11,20 87:23 94:9 103:5,10 110:16 118:8

**giving** 24:20 40:18 42:10 45:22

**goal** 25:19

**good** 11:5 17:15

33:2 36:2 39:21 60:8

**goodness** 69:1

**gosh** 21:14 22:4

**gotcha** 6:5

**graduate** 19:3 21:15

**graduated** 19:5 23:21 30:24 31:17 32:5

**graduating** 25:23

**graduation** 23:23, 24

**grant** 19:11

**Great** 6:11 30:22 52:12 57:15 58:10 59:17 61:18 68:10 69:17,23 75:2 80:17 90:16 94:16 108:5

**greater** 82:12 83:11

**greatly** 72:9

**gregarious** 88:19

**grid** 80:19 83:6

**Guerreri** 55:5

**guess** 16:23 50:23 69:1 74:2

**guessing** 11:19 22:12 34:7

**guilty** 109:21 111:10

---

**H**

**half** 5:9 11:17 12:10 13:16 22:13 27:2 65:7 80:13 88:24 89:3 90:9 92:24 93:4 97:11 98:9,13,14,15,19

**hall** 91:4,8,11

**hallway** 63:5

**hand** 4:9 87:19

**handwriting** 57:8 69:17 77:6

**handwritten** 69:11

**happen** 10:4 100:20 102:17

**happened** 20:4 38:18,20 60:10 66:7 75:22 86:22 87:15 88:8 89:7 100:21 107:7 110:21 115:16 116:7,20 119:7

**hard** 62:23

**hard-pressed** 118:16

**head** 22:20 30:20 59:23

**health** 70:17

**healthy** 36:16 71:3

**heard** 25:24 31:12 103:6 109:3,6

**hearing** 24:24 58:15 96:4 103:5 113:9,20

**heart** 70:8,9,18,21, 22,23 73:1

**heavier** 81:16,19

**heavy** 44:15 45:15,24

**held** 14:4 17:5

**helped** 99:6

**helpful** 58:10 79:7 80:17

**hesitate** 6:4

**high** 25:17 70:10, 13 73:2

**higher** 29:11

**highlighting** 57:12 79:18

**Hinsdale** 31:4

**hired** 14:7

**history** 21:4 56:18 59:13



Amor vs Reid
Michael Masokas - 08/25/2022

7

**hold** 11:8 33:18 69:23 70:3

**home** 52:2

**honest** 28:19

**honestly** 26:13

**honesty** 22:18

**hooked** 43:13

**hoping** 25:16

**hour** 65:7 80:13 88:9 89:1,3 90:10 92:24 93:4 97:8,11 98:5,9,13,15,18,22 100:5,18 105:24 115:4

**hours** 39:13,15 72:4 93:15 98:21 104:11,12 105:12, 13 112:9

**household** 103:1

**human** 114:9

**hundred-thousand-dollar** 57:17

**hungry** 74:11,15

**Hunter** 31:6,11

**hurt** 79:6

**hyped** 39:21

**I**

**idea** 28:19 87:23 99:5,15 100:12,15 103:22 104:4 108:14

**ideas** 25:7

**ignorance** 71:13

**Illinois** 4:5 19:11 26:4 31:4,19,20 33:16,17 35:8

**immediately** 39:19

**impacted** 15:19

**implemented** 18:19

**importance** 39:15

**important** 5:20 37:17 70:15 71:4 118:2

**inability** 74:4

**inadmissible** 118:15

**inappropriate** 64:5 105:16,17,21 106:8,9,15 107:5

**inaudible** 7:18 29:22 99:19

**incident** 65:17

**include** 71:23

**included** 48:22

**including** 117:5,6

**inconclusive** 39:22 40:3,5,8 42:17

**independent** 53:12 95:8

**indication** 45:12 79:12,14 82:16

**indications** 39:9 44:19 72:14 96:18 97:22 100:17

**indicative** 65:22 84:13

**indicator** 86:18,19

**indicators** 42:7 44:19

**individual** 43:18 65:23

**individually** 43:19 66:17

**industry** 46:15 47:7,12

**inflate** 76:7,12

**informal** 14:10

**information** 49:10 56:7,8,9,24 57:4 59:15,21 60:18 66:22 67:18 99:1

**informed** 56:2

**inhalation** 58:3

**initial** 26:12,19 38:10 76:19

**initialed** 60:21 61:6

**initially** 23:8 50:22 53:17 58:18 98:22

**innocent** 114:12

**input** 18:14

**inspection** 43:23, 24 44:11

**instance** 33:15 39:17 40:17 44:3 54:16,24 67:7 109:20

**instances** 42:12 63:23 111:17

**institution** 29:11

**instruction** 7:17

**instructor** 7:14 15:23,24 18:14 34:10 48:20 49:17

**instructors** 18:13 30:16

**instrument** 75:24 76:4 91:23

**insurance** 57:17 58:1 59:5

**intentionally** 79:6

**interest** 26:11,12, 16 96:1

**interested** 19:20 24:15 25:11 26:10 53:19

**interesting** 19:24

**international** 17:8,9

**interpret** 44:6

**interpretation** 29:22 30:2 32:11

**interpreting** 45:16

**interrogated** 62:9

**interrogating** 50:20 107:19

**interrogation** 8:5 15:24 16:21,24 48:21,23 49:2,8, 11,12,17 51:2,4,8, 12,23 52:11 63:17 101:9 102:19 104:10,15 105:3,6 106:7 107:19,24 114:3

**interrogations** 93:10 114:6

**interview** 16:24 22:17 23:9 36:18, 21,22 37:1 39:4 49:2,3,4,6,10,22, 23 50:1,3,5,8 51:8, 19,20,21,22 52:1, 2,10 60:13,15 61:11 62:6 63:17 64:20,22,23 65:8, 14,22 66:3,7 67:4 68:20 77:13,15 80:3,7 91:1,2,15 96:11,13,15,19 97:2 104:9 105:2,5 106:18 115:10

**interviewing** 7:18 8:5 15:7,24 16:20 48:21,23 49:17,19 50:14 51:2,4,9,12 52:23 96:24 97:3 106:6

**interviews** 59:9 114:6 115:11 116:5

**intentionally** 79:6

**intoxicated** 73:11,12

**intrusive** 28:24

**investigation** 9:8 56:10 104:1,3,5 108:16 113:17 119:21

**investigations** 17:20

**investigative** 56:8

**investigator** 54:16

**investigators** 17:17 66:23 92:22 101:23 102:2

**involved** 35:9 58:18,19 61:17 67:9 86:3 92:21 104:1,4 113:21

**involvement** 88:4 89:17 90:3,11 93:2 101:22 102:5 115:14,15

**issue** 45:16 46:2 65:11,12 67:6,7, 12,20 96:8 100:23

**issue-specific** 34:15 35:14 67:21 68:4

**issues** 46:8 67:24 68:2

**J**

**jail** 104:10 112:8 118:22

**James** 24:24

**January** 15:16

**Jayne** 24:12,13, 23,24 25:3

**job** 20:23 25:24 27:20 29:1,5,8

**jobs** 26:6 31:3

**Joe** 10:2

**John** 7:11,12,17 13:21,22,24 14:4 16:15 17:1,5 18:1, 2 19:13 20:5,10, 23,24 23:2 30:14, 23 31:9 43:17 64:6 96:21 98:1

**joked** 96:2

**Joliet** 4:5

**jotted** 79:24

**jotting** 57:6

**journal** 22:1 28:17,18

**justice** 19:6



Amor vs Reid
Michael Masokas - 08/25/2022

8

## K

**kind** 11:19 17:10
26:15 34:18 41:12
44:9 51:23 57:5
60:3 71:23 91:20,
21 96:1,2 112:20

**knew** 25:18 26:13
60:22 66:15 99:1
108:11,20

**knowing** 117:3,4

**knowledge** 47:21
48:4,13 59:5 86:4
87:15 88:5,8 90:3,
11 92:21 99:8
101:22 102:6,8
108:19 111:18
115:15

## L

**lack** 39:21 42:20
73:1 74:1 86:14,17
117:5,6 118:21

**lady** 21:13

**large** 15:18

**Larry** 31:6

**lasts** 76:6

**law** 15:5,16,20
30:3 61:16 78:18
82:22 83:5 93:8

**laws** 15:12

**lay** 5:19

**laying** 51:18,23

**layout** 18:16 91:16

**lead** 116:6,24

**learned** 53:18
103:2,3

**learning** 29:11

**leave** 20:2 29:11
38:6,9,16 60:20,23
61:2 93:19 116:13,
15

**led** 114:16

**left** 38:21 58:21

59:10 60:4 78:23
80:8,16 81:16,17
88:12 90:3,6,13,14
91:19 92:7,10,17
93:4,6,16 101:15
102:6,9 103:7,18
104:6 108:17,18
115:13,16,19
116:1,9,12,15,20
117:12,21 118:2,4
119:14

**left-hand** 80:18

**legal** 30:2

**legal-size** 60:4

**Legalview** 4:2

**letter** 69:12 81:21
83:21

**level** 19:3

**levels** 116:24
117:1

**license** 26:3,5
31:23 32:1,14,17,
20 33:1,6,10

**licensed** 32:22

**lie** 41:2

**life** 17:21 57:17,24

**light** 44:13 45:15,
23,24 81:7,14,15

**lighter** 81:18

**likewise** 97:2

**list** 67:14 76:15

**listed** 13:16

**listen** 76:16

**literature** 48:13

**living** 58:9

**lobby** 56:5 60:12
64:15 89:11,14

**located** 4:5

**locations** 52:3

**Locke** 63:12
93:23,24

**locked** 64:1
89:13

**locks** 116:14

**lockup** 59:14

**long** 5:2,22 8:8
21:9,20 32:24
59:19 67:14 76:19

**longer** 15:17 65:9
69:16 103:8

**longest** 21:4

**lookout** 73:22

**lot** 17:9 27:15 34:4
41:5 47:13 67:23

**Lou** 55:16

**love** 95:23,24

**lunchroom** 63:5

**lung** 69:13

**lungs** 69:15

## M

**machine** 43:14
91:23

**made** 58:20 79:20
102:12,18,23
103:20 108:5,23

**maintain** 33:5

**major** 74:13

**make** 6:4 15:2
18:18 23:1 28:5
36:15 41:3,4 44:17
45:6 58:7 59:1
65:18 70:6,16 71:2
76:5 82:8 88:14,22
119:11

**makes** 28:6 41:5

**making** 18:12
41:14

**Malloy** 30:21

**mandatory** 33:7,
10

**manner** 109:5

**manual** 17:24
18:2,5,12 52:18

**March** 32:4 113:10

**margin** 60:5

**Mariah** 4:20 40:19
75:12 94:5

**Marianne** 57:18,
21 58:1

**Marion** 55:19

**mark** 68:23

**marking** 45:14

**markings** 80:18

**marks** 82:8

**Mas-** 4:23

**Masokas** 4:2,9,13,
18,24 5:1,2 7:2,5
69:3 77:3,6 94:19
120:12,19

**Masokas's** 120:8

**master's** 19:11,
13,14 21:17,21
23:6,14 24:5,9,14
27:3,5

**matter** 5:12 9:4
21:9 111:2,11
113:21

**matters** 21:10

**meaning** 45:5

**means** 40:9 80:3
82:5 83:19

**measure** 76:1

**medical** 36:15
61:8 68:17,24
69:2,24 70:4 72:3

**medicated** 42:22

**medication**
70:12,14

**medications**
6:20,23

**medium** 81:7

**meet** 10:21,22
12:2,3

**meeting** 63:16

**member** 33:17

**members** 33:15,
16,20

**memorable** 95:14

**memory** 6:17,24
12:16

**mental** 105:15

**mentally** 58:17

**mentioned** 27:1
92:7

**met** 11:20,22
90:16

**method** 43:21,24
46:9 47:2,3,11

**methodology**
48:8,11

**MFM** 80:9

**Miceli** 57:22 58:2
102:21 103:1,16
114:17

**Michael** 4:1,13,23

**mid** 69:15

**middle** 58:8 69:12
91:22

**midst** 107:23

**Mike** 7:6,7,8 11:8,
14 53:12 112:13
120:10

**mind** 24:19 25:4
41:13 52:23 65:19
119:2

**minimum** 39:13

**ministry** 20:12

**minus** 79:14

**minutes** 59:24
60:6 61:9 65:10,11
90:1 93:16,21
94:11 97:11,12,14,
18 98:9 100:5,19
102:3 105:24
112:14 115:4

**Miranda** 60:16
61:14

**mirror** 62:16

**mirrored** 62:20,22
63:16





Amor vs Reid
Michael Masokas - 08/25/2022

9

**mischaracterizati on** 108:10

**missed** 8:2

**missing** 40:6

**mix** 17:15,16

**mixed** 58:20,24 59:4

**module** 73:18

**moment** 68:23 77:2

**money** 59:13

**monitoring** 35:9, 13

**months** 12:18,20 13:3 23:12 24:3 27:23 29:18 35:3 59:14 96:4 103:4

**Moody** 19:15

**morning** 51:17 52:7 92:12,15 108:7

**mother-in-law** 117:9 119:1

**motion** 113:8,19

**move** 15:9 60:6 90:22 119:12

**moved** 34:19 35:7 91:2,7,10,14

**movie** 78:24

**moving** 20:22 27:19,22

**muffled** 7:19 8:1

**multitude** 49:16

**murder** 108:24

**muscle** 41:10,12

**mute** 63:9

**muted** 7:21 63:13

---

**N**

**named** 13:10 24:11

**names** 57:20

**Naperville** 9:5 53:18 55:5 57:1 59:20 78:11 80:15 102:13,20 103:17 104:14,16 105:7 106:9 107:18 113:6,16 114:16 115:23

**nature** 22:1 46:8

**necessarily** 13:5 20:11 21:22 49:23 71:17 93:17

**needed** 93:15 95:1

**nervous** 71:10

**nervousness** 71:12

**Newey** 55:15 66:18 80:10,12 85:16 88:13,14,18 89:8,19,24 90:3,7, 13,16,18 92:10 93:3 97:2,10 98:16 101:14,17,22 102:4,8 105:23 106:11 112:18,23 115:5 118:4

**night** 31:8 92:8

**Nodding** 29:17 111:5

**non-accusatory** 49:4

**non-cooperation** 40:11 41:8 42:7

**nonverbal** 52:6

**normal** 43:6,8 71:17,23

**note** 70:10,19,20

**notes** 57:7 58:11 59:22,23 60:1 62:5 69:11 79:19,24 94:10 112:14

**NPD** 80:14

**number** 18:5,6 44:3 57:20 59:3,8 65:1 69:2 78:3,4, 15,17 81:10 82:2,5 83:2,3,6

**numbers** 46:17 58:20,24

**numerical** 46:18, 19,20,21,24 47:5, 14,15,16,21 48:5

---

**O**

**O'BRIEN** 103:15, 16

**object** 11:23 12:21 46:4 75:7 95:16 104:17 108:9 109:14 112:22 117:13

**objection** 106:13 111:14

**observation** 62:16,18,21,22 63:3,20,24 64:7 92:3,4

**observations** 65:18

**observe** 42:2,10

**obtaining** 21:20

**obvious** 42:14

**occur** 12:14 110:14,17 111:18

**occurred** 13:13 20:4 101:14,18 102:9 109:1 110:18,19 115:21 117:12

**occurring** 92:5 108:17

**October** 53:14 69:4 112:20 119:14

**offender** 35:3,4,5

**offenders** 34:21 35:1

**offer** 18:16 33:22 39:5,19 86:12

**offered** 31:23 79:21 87:3

**offering** 88:11 89:2

**office** 10:14,15 25:9 52:3 54:4 55:9,12,18,21 56:5 62:23 63:6 64:17 70:23 80:16 85:16 89:12 90:4,14 91:3,5 93:5 102:6 103:7,18 104:5,6 107:2,15,16 108:16,17,18 115:9,13,16,19,21 116:1,8,12,17 117:21 119:14

**officer** 25:18

**officers** 17:15,16 25:19 56:10 104:15

**offices** 17:6 104:13 117:12

**officially** 29:4

**one-hundred-thousand-dollar** 57:24

**one-to-one** 67:23

**open** 22:10 72:19 94:24 95:1

**opened** 16:15 19:8 95:2

**opening** 31:12

**openly** 59:7

**opportunities** 15:10

**opportunity** 39:5 65:15,16

**opposed** 15:7 28:12 49:13 52:2

**order** 26:3 27:5 31:23 32:16 33:5 43:21 57:19 63:15 76:13,15 81:7 120:7,8,18

**orders** 4:8 120:4

**original** 91:4,11, 15

**originally** 25:13

**outcome** 28:11

**outlines** 18:5

**overly** 42:22

**overseeing** 14:9, 20

**overview** 14:3

---

**P**

**p.m.** 4:4 55:7 58:5 80:1 120:21

**paper** 21:24 22:18 23:10 27:6,8,13 28:14

**papers** 102:21,24 107:18,23 108:6, 20

**parenthesis** 78:11

**part** 10:13 11:9 13:9 14:20 15:18 16:21 33:14 35:6 38:7 49:18,24 50:12,17,19,21,23 51:11,12 63:1 66:20 69:7,9 89:18 93:11,20 96:7 101:11 103:8 108:15,19,21 114:2,5 117:10

**part-time** 20:8,10 31:3,5,7,8

**participated** 18:11

**parties** 4:3

**party** 62:21

**PASQUALINO** 11:8,14,23 12:21 46:4 53:1,4 75:7, 11,14 94:5,11,13, 15 95:16 104:17 106:1,13 107:21 108:9 109:14 111:14 112:22 117:13 119:24 120:18

**pass** 26:2,3 32:13 65:23 66:3 86:5,7, 22




**passed** 15:16 31:24 54:5

**passing** 39:6,18 86:2 87:3,12,22 89:6,15,18 106:19, 20 107:6

**pastor** 20:3,7,8, 12,15,18

**pattern** 43:9 80:20

**pause** 120:5

**pay** 32:22 33:2

**PD** 80:15

**peer** 32:19

**pen** 41:1,12

**pencil** 22:18 23:10

**people** 17:21 26:18 30:9 38:20 41:2,7 55:21 71:7, 9 72:22 88:15 95:24

**percent** 89:9

**perfect** 28:6 53:3

**period** 35:6 61:10 93:13 96:9

**permission** 36:5

**permitting** 33:24

**person** 10:22 17:12,14 30:19 88:21

**personality** 88:18

**personally** 11:22 12:3 45:23

**persons** 100:4

**perspective** 108:2

**pharmacology** 29:21

**phone** 12:7,10,13 13:2

**phrase** 34:20

**physical** 36:16 105:15

**physiological** 43:1,3 44:5,6

71:14 84:12,13,15, 19

**picture** 86:20

**piqued** 26:15

**place** 4:8 10:5 30:6 63:18 86:11

**Plain** 119:8

**plaintiff** 4:21

**plan** 78:15

**played** 109:12

**plays** 106:17

**point** 47:6 54:9 56:6 60:11 64:9 76:17 85:15,18 86:13,24 87:3 88:12 89:2,10 90:5 91:12 93:3 94:1 102:1 103:2 105:11

**police** 17:15,16 25:17,18,20 26:12, 20 53:18 97:17 102:13,20 104:7, 14,16 105:7 106:9 107:18 113:6,16 114:16

**policy** 57:17 58:1 59:5,7

**polygraph** 8:23, 24 14:7,9,19 15:5, 7,15,18,20 16:10, 14,17 19:7 22:1, 10,17 23:3,6,8,10, 17,20 24:2,11 26:1,2,4,14 27:10, 11,17,21 28:8,12, 16 29:16,19 30:5, 17,24 31:4,19 32:5,6,12,13,14 33:16,17,21 34:5, 11,14 35:2,4,12 36:3,9,23 37:9,18 38:16,19,22 39:9, 24 40:4,13,18 42:1,3,8,10 43:13 44:2 45:2 47:17 48:21,22 49:16,18 50:2,5,9,13,19,22 53:13,19 54:1 55:1 56:8,18 57:2 61:15

62:10 64:9 65:20, 23 66:4,10,15 68:5 69:4 70:1,5,7,21 71:2,4,14,15,24 72:8,15,23 73:4, 17,20,23 74:8 75:12,13,18,24 76:3,20 77:11,22, 23 81:8 82:9 84:21 85:21 86:2,3,22 87:9 89:15 90:17, 19 91:1,3,5,7,10, 14,16,22 92:1,5 96:10,16 99:4 100:14 101:6,7,8, 11 102:14 103:10, 14,16 104:2 105:9, 22 106:11 107:7, 14 110:9,16,19 111:2,11,20,22 112:7,23 113:3 114:2,5,9,15,19 115:2,3,6,10,20 116:4,23 117:4,7, 10,17 118:7,13,15, 17,23

**polygraphed** 46:10 61:19 62:2 100:4 104:11 105:11 108:7

**polygraphing** 35:22 43:4 49:21 74:15 90:23 110:11 112:19

**polygraphs** 34:2, 18 67:21 118:12, 14

**poor** 57:7

**position** 31:13 105:1 119:6

**positions** 14:4

**positive** 62:18

**possibly** 23:24

**post** 80:6

**post-conviction** 108:22

**post-polygraph** 93:9

**post-test** 39:4 80:7 115:11

**potentially** 20:22

**practically** 72:24

**practice** 33:11 39:7,8 43:16,17 65:8 66:21 93:8,17 98:1,4 100:22 113:4,7

**pre-** 36:22

**pre-employment** 15:17,21 16:9 27:9,11,15 28:8 34:4,15 35:13,20 36:19

**prefer** 48:4 70:20

**preferred** 47:11

**preparation** 11:21 12:6

**prepare** 8:11,12, 17 10:22 12:3,10 13:2,5,17

**presence** 59:8

**present** 14:1 105:19 106:16

**presented** 60:17 68:3

**pressure** 41:11 42:24 43:6,11 70:11,13 71:18 73:2 76:7,12 81:23,24 82:1,16 83:20,22 84:9 85:1,2

**pretest** 36:22 50:3 61:11 62:6 64:19, 21,22 65:7,14,22 66:7 67:4 68:19 75:11 77:12,14 80:2 90:24 96:15 115:10

**pretty** 18:17 35:18 67:5,10,11 82:1 95:10,23

**previous** 58:24 95:21

**previously** 20:8

**primarily** 7:18 17:12,15 26:13 66:21

**primary** 82:22

**print** 18:4

**prior** 8:19 9:4 10:19 11:2,9 37:18 59:13 61:15 70:1, 4,19,20 73:3 74:7 75:18 83:10 85:8 107:16 113:12 116:5

**private** 17:18 103:12

**privilege** 12:22

**probation** 34:24 35:1,6

**problem** 69:13 70:18,21 87:5,7,24

**problems** 36:16 70:8,17 73:1

**procedure** 50:12, 17,20,23 114:5 116:18

**procedures** 115:12

**proceed** 38:21 70:9 74:11

**proceeded** 75:1

**process** 21:20 22:14 24:8 35:6 49:19 50:1,2,4,14, 17,21 52:10 53:24 64:23 67:3

**Professional** 31:21

**professionally** 31:1

**program** 16:14 21:7 34:23 35:7

**programs** 33:9, 19,22

**prohibiting** 15:20

**project** 21:23 22:2

**pronounce** 40:19

**pronounced** 4:23

**pronouncing** 7:2

**proper** 51:19



Amor vs Reid
Michael Masokas - 08/25/2022

11

**properly** 76:6

**propose** 93:24

**pros** 47:23

**Protection** 15:15

**protocol** 116:19

**provide** 6:13,20
56:7 103:10 104:2

**provided** 14:19
54:17,18 57:3
59:16 66:23 113:8,
11

**psychology**
29:21 32:9

**published** 21:24
28:15

**pull** 28:1 56:13
68:22 72:2 77:1

**purpose** 49:9,10
65:13

**purposeful** 40:11
41:7 42:7

**purposefully**
103:1

**purposely** 114:17

**purposes** 94:6

**put** 26:7 48:3
54:11,12,19 64:12
100:16

---

**Q**

**quantity** 68:4

**question** 5:3,22
6:2,11 10:23 11:5
12:24 16:6,23
23:2,4 27:17 29:9,
22 34:1 36:2 37:5
39:17 40:17,24
41:3 42:5 43:9
44:2,3 45:19 48:2,
9,20 49:5 65:3,5,
18 70:2 73:5 76:16
77:22 78:13,20,21
79:2,4,11 80:18
82:5,6,7,12,17,20,
23,24 83:1,10,11,
13 84:16,18 85:5
95:13,22 96:22

100:7 106:3 110:4
115:18,24 116:3

**questioned**
104:13 105:23

**questioning** 6:9
12:22 67:16 105:8

**questions** 6:5
27:21 28:24 32:10
36:19 37:2,3,4,8
40:10,18 41:11,19
43:2 45:1,2,3,4,5,7
49:5 64:24 65:1,17
66:9,10,14,15,17
67:1,4,8,10,14
68:4,14 71:19
72:12,20 74:4,22
75:3,4,9,18,21,23
76:1,13,14 77:10,
23,24 79:11 83:12
87:9 94:7 95:6
106:19 107:10
112:13 117:8
119:13,23

**quick** 52:22,24

**quickly** 18:9 56:14
78:1

---

**R**

**raise** 4:9

**raised** 25:14

**ran** 91:5

**rapport** 65:21
88:17 89:23

**rate** 85:1

**raw** 42:11 85:7

**re-offended** 35:5

**react** 86:6

**read** 36:10,12 38:1
57:10 60:16,19
76:13

**reading** 38:5,12
41:16

**readings** 71:16

**readout** 42:1,9

**ready** 20:2

**realm** 28:9 43:4

**reason** 9:15 24:18
29:2 39:5 48:4,10
87:12,22 95:12,22
103:9

**recall** 20:16 21:2
25:6 28:18 30:16
53:15,17,24 55:1,4
56:9 59:20 62:5
64:21 72:5 74:17
76:19 78:4 85:22
88:2 91:16 92:14
97:16

**recalling** 97:6

**receive** 19:12
31:23 37:17

**received** 67:18
102:24

**receiving** 112:9

**recently** 70:8,22

**receptionist** 54:4
55:13 56:3

**recollection**
53:13 95:8,11

**recommend**
70:12,13

**record** 4:8,22 11:9
28:1,2 77:5 120:4,
21

**recording** 41:11

**referring** 15:13

**reforming** 18:11

**refreshed** 40:2

**regrets** 109:11
110:5

**regular** 103:14,17

**Regulation** 31:21

**Reid** 7:11,13,17
13:21,22,24 14:4
16:13,15 17:1,5
18:1,2,22 19:7,13
20:2,6,10,17,23,24
21:18,21 22:3,10,
15 23:2,5 24:1,9
26:1 30:14,23
31:9,13 32:9 39:8
43:17 44:11 52:13,

16,17,18 53:19
54:1 55:6 56:15,
17,18 64:6 77:5,20
93:7 96:20,21,23
97:3 98:1 101:3,
10,15 102:10,14
104:4,13 108:8
110:22 117:12

**related** 9:20

**relax** 40:1

**release** 35:3 60:18

**relevant** 45:5
67:10,17

**reliability** 73:23

**reliable** 48:11

**remember** 28:10
31:14 32:24 53:21
62:15 66:19 80:24
95:22 119:20

**remembered**
86:11

**remind** 69:23 70:3

**remote** 17:11

**remotely** 4:2

**renew** 33:10

**repeat** 61:23
106:3

**repeated** 72:20

**rephrase** 73:6

**report** 44:21
112:20 113:3,12,
14

**REPORTER** 4:1,
11 7:19,22 8:1,6
29:23 63:8,11
99:21,24 120:3,6,
9,15,20

**representative**
54:6

**reprint** 18:8

**reprinted** 18:7

**request** 54:7,8

**research** 21:23
22:2,11,13 25:5
27:2 32:18

**reserve** 120:1

**residence** 114:18

**respiration** 43:5
44:4 83:18,19
84:1,2,24

**respiratory** 69:13
84:10

**responded** 86:9

**responding** 72:11

**response** 26:20
40:9 42:17 43:1,4,
7 44:5,6,13,14,15,
16 81:15,17,20,24
82:1,12,17,19,20
83:18,21 84:2,12,
13,15 85:3 86:9
88:1,2

**responses** 71:15
75:4 83:19 84:4,9,
10,14,19 85:5

**responsibility**
14:9

**result** 40:10 42:19
45:4

**results** 38:24 40:4
45:16 66:5 85:20
86:2 87:13 90:17
99:10,16,18 110:1,
10

**resume** 26:7,17

**retarded** 58:17

**retrial** 111:10

**retried** 109:20,23,
24

**review** 8:20,22 9:7
32:19 37:3 43:14,
17 45:18 66:14
68:14 112:13

**reviewed** 8:19
9:3,12 37:8 75:21,
23 76:13 96:6

**reviewing** 13:15
45:17 75:6,17

**Rich** 103:14

**Rights** 60:16
61:14



Amor vs Reid
Michael Masokas - 08/25/2022                                                                12

rise 85:2,3

road 26:6

role 7:12 14:21
15:23 34:10
106:17 109:12,15

roles 14:4

romantically
58:18

room 58:9 60:15,
16 62:8,17,18,20,
21,22 63:3,16,20,
24 64:1,7,11 66:8,
11 80:5,8,9,11,13,
15 85:14,19,20,23
88:13,23 89:4,21,
24 90:22 91:2,4,8,
11,14,15,17,18
92:1,4,18,23 93:1,
13,21 101:20,23
102:2,19

rooms 60:13
62:15,16 63:4,5
64:18

roughly 68:13

rules 5:19

run 26:4 37:9 76:5

**S**

Sagan 55:16

sat 56:5 86:24

satisfied 20:22

scamming 59:13

schedule 53:22,
23 54:9,11,12,19

scheduled 55:2

scheduling 54:1

school 15:20,21
16:8,10,11,13,16
19:7 22:10,24
23:3,8,11,18,20
24:2,11 25:13,18
26:1,2 29:16,20
30:6,20,24 32:6
64:9 78:20 101:6

schools 46:20
101:8

score 43:21 81:8

scored 85:16
96:16

scoring 46:1,13,
14,17,18,19,20,21,
23 47:1,5,15,16,21
80:24

screen 56:14 60:3

scroll 77:8

SDT 56:15,17,18
77:5,20

secondary 18:23,
24

seconds 76:7,9

section 30:3 52:8

sector 17:18

security 17:19

seeking 98:24

segment 50:4

seminar 17:2,3,4,
23 33:19 51:14
52:12,17

seminars 17:10,
14 33:8,12

seminary 19:15,
16 21:3

send 39:1

sense 28:5,6 41:4,
5 44:17 45:6 59:1

separate 11:4
16:21 23:7

September 58:3
65:2 78:9,23 82:18

series 76:21

serve 107:18

served 102:20
108:6,11

service 103:10
104:2,3

services 14:15,
19,20 15:3,4
27:20,21 103:12

services-
oriented 103:11

Serving 107:23

sessions 67:17

set 79:2 109:1
114:17 115:14

setting 30:6 103:1
104:8 109:21

sexual 34:21 35:1

shaking 22:20

share 56:14

shared 60:1

sharing 56:14

sheet 46:1 56:23
60:4 61:8 68:17,24
69:3,9,18,24 70:4
72:3 77:23 79:10

sheets 56:12

shift 72:22

shifting 18:22

short 36:15 53:10
61:8,9 89:18 93:13
94:1,17 112:16

show 41:24 45:4
71:15 111:13

showed 95:7

shows 60:3

sic 5:3,21 58:18
96:22

side 49:9 56:4
80:19 91:24

sign 36:10,12
79:14

Signature 119:24

signed 60:17,19

significance
82:11

significant 44:13,
17 70:17 74:6,10
82:1,19

signing 38:1,5,12

signs 111:13,23

similar 17:11 46:2

similarly 50:18

simple 119:8

simply 39:22
72:10 76:16 86:9

single 37:5 83:17,
21 97:1

Sir 60:24

sit 25:24 41:18

situation 54:20
87:19

situations 42:15

six-month 16:14

skin 43:6 85:3

sleep 42:20 72:5
73:1 74:1 104:11
105:13 107:16
112:9 117:5
118:22

slightly 71:18

slow 15:12

slowing 15:5,8

slowly 77:9

slurring 74:2

smaller 91:5

smart 21:13

smell 74:3

Smoke 58:3

smoker 88:19,20

Society 33:16,17

someone's 52:2
70:8,10 99:18
100:18

sooner 54:21

sort 7:15 21:24
31:18 33:4 34:17
43:11 98:6 99:14

Sounds 21:13

speak 46:16 47:13
48:14 80:11 92:10
98:4

speaking 13:16
40:3 57:9 59:20
72:10 90:13 96:11,
12,19

specific 7:16 11:1
12:15 13:13 17:13,
22 19:17 22:4 25:9
27:17,18 35:24
38:17 39:17 43:21
51:6,7,13 66:19
67:1,15 85:24 86:8
103:6 119:11

specific-issue
34:5

specific-specific
35:11

specifically 8:21
10:1 15:14 16:17
19:11 25:6 27:16
28:10 29:16 33:17
35:1 47:4 52:10
54:13 79:11 87:8
102:15 103:23
110:21,23 113:5

specifics 47:19
52:1,22 108:1

speech 74:2

spell 4:22

spent 10:16 59:14,
20 104:13 107:15
118:22

spilled 59:9 87:19

spiritual 19:18,21

split 35:18 67:16
68:1

spoke 54:16 56:6
57:5 59:7 60:9
88:13 89:24 90:9
92:13,24 93:3
97:5,7,10,17,20
98:16 101:13,23

spoken 54:6
89:10,16

spots 69:15

St 19:5 21:15
23:21

staff 64:2,3,4,10,
12



**standard** 46:15
47:7 61:13,14
66:21 93:8,17
98:1,4 113:4,7

**stands** 81:23

**start** 22:2 24:17
41:19 45:6 72:23
76:10 78:10,16
82:18 99:6,21

**started** 4:21 14:6,
8 15:4,8,11,12
21:7 22:11 24:1
30:11,22 31:1
34:19,23 35:2
61:10 62:6 76:18
80:4,7 91:1 99:1,2,
5,8 109:4,5

**starting** 24:8 47:1
57:11 82:23

**starts** 18:6 43:11

**state** 4:22 19:10
26:4,5 28:2 31:20
65:19 105:15
119:2 120:3

**stated** 109:5 114:1

**statement** 38:8
45:11 104:7 108:3

**statements**
119:11

**stating** 60:22

**statistics** 110:16

**stay** 20:5 32:18

**steal** 41:1 67:8

**stealing** 34:6 67:9
78:18 82:21 83:4

**stem** 26:11

**step** 36:10,13
37:15 38:23

**stepped** 66:8,11
80:5,11,13 85:13
89:4,7 90:4 92:19
101:22

**steps** 35:22,23
37:15 64:20

**stole** 41:1 67:9

**stood** 86:10 96:1

**stop** 70:14 77:9

**straightforward**
67:5,11

**stress** 71:15,17,23
114:15,19 115:21
116:10,17 117:1
118:6

**stressed** 71:5,6,7

**stressful** 71:1
114:9

**strictly** 17:5 63:3

**strike** 5:16 7:15
8:11 10:18 13:14
16:3 30:4 31:17
48:8 56:16 64:21
69:8 73:19 95:12
108:22 114:3

**strong** 86:9,13

**stronger** 45:12
81:17 82:6,15

**strongly** 118:9,11

**stuck** 96:7

**student** 17:13

**students** 64:8

**subject** 37:4,24
40:12 50:14,20
57:18,23,24 58:1,
2,4,13,17,18,19,
21,22,23 59:4,6,7,
9,12,14 79:20

**subject's** 52:6

**subjects** 51:1,3

**subsequent**
116:4

**substance** 6:12
10:20

**substantive** 10:7

**sudden** 43:9

**suggestions**
18:16,17 87:4 89:2

**suitable** 65:19
70:7,16

**summarize** 57:11

**Sunday** 78:9
82:18

**super** 45:8

**suppose** 52:19

**supposed** 57:23

**suppress** 113:9,
20

**suppression**
43:10 96:4 103:5

**surgery** 69:14

**surrounding**
107:14 115:6
117:4

**suspect** 93:10

**suspects** 100:3

**suspended** 29:1

**sustenance**
107:17

**sweeping** 34:18

**switching** 20:17

**sworn** 4:10,15

**symbols** 79:9

**symptom** 52:5,8

---

**T**

**takes** 21:9

**taking** 6:19,23
14:8 53:13 59:17
63:18 70:15,18,20
71:24 72:7

**talk** 5:21,23 41:19
51:21 52:10 55:23
87:1 88:16 89:20
93:12,15 100:3
107:5

**talked** 10:11,14
25:10 32:8 54:10
60:20 73:24 74:21,
23 80:24 84:23
98:21 119:19

**talking** 35:21
39:16 41:19 51:18
57:4 58:13 75:17
89:1

**taught** 16:5 32:9
44:11 73:21 101:7,

9

**teach** 16:4

**teaches** 106:6

**teaching** 8:8
17:23 51:1 52:18
105:2

**team** 43:18

**technique** 46:23
47:22 48:5 52:14,
16,17 96:12,13,19,
20,23 97:3 101:3,
10 104:14

**techniques** 46:13
47:24 48:22 105:3,
6

**telephonically**
10:21

**telling** 10:4 28:3
107:8 119:3

**tells** 21:11

**term** 39:21

**termed** 52:13,16

**terms** 33:12 44:8
73:22

**test** 22:17 23:10
25:21 27:21 31:24
32:2,14 34:15 35:4
36:3,5,6,8,17,19
37:2,4,6,10,12,19,
20,22,24 38:2,22,
24 39:2,6,9,17,20,
22,24 40:4,13,18
42:13,23 44:23
50:3,4 66:10
67:10,23 70:7,9,16
75:6,12,13,18
76:5,11,12,17,20,
21 77:22 85:11,13,
14,17 86:5,7 87:22
89:3 91:1,5,7,13
97:21 98:24
100:18 106:19,20
107:8 110:9
114:19 115:11,20
117:17

**tested** 32:7 57:20
68:3

**testified** 4:15
61:12 95:5 97:20

9

101:13 113:19
114:4,8 116:22
119:21

**testified2** 113:15

**testify** 96:3,4

**testimony** 6:14,21
9:7,13,17,20 10:10
81:6 97:6 108:10
112:23 113:8,12
117:3

**testing** 15:18,21
27:10,11,15 28:8
31:18 34:14 35:12,
13,14 50:2

**tests** 22:18 34:5,6,
11 35:9 36:9 76:4
84:17 103:10

**theft** 67:6

**theological**
19:15,16 21:3

**theory** 71:22

**thesis** 27:13

**thing** 41:9 56:4
66:13 71:1 76:5
107:10 110:11
117:23 118:10

**things** 10:11 20:4
23:7 33:19 40:12,
16 43:11 51:13,24
53:15,16 57:6
71:13 73:24 74:5
90:7 108:1

**thinking** 87:20,21

**thought** 26:1,5,16
88:22 89:22

**threatened** 87:18

**three-** 17:2,3

**throw** 40:13

**till** 65:6

**time** 4:4 6:7 9:12
10:4,16 11:20
14:13 18:7 20:1,12
24:10 25:21 26:23
30:20 33:24 35:6
38:9 39:1,10,11,
23,24 44:2 45:17
46:16 47:9 52:24



Amor vs Reid
Michael Masokas - 08/25/2022

14

54:2,14 55:4,15,
17,20 59:16 60:12
61:10 62:1 66:8,16
72:10 73:12 74:7,
16 76:3 79:17,24
88:20 89:12,20,21
91:14,15 93:13
96:9 98:16 106:23
107:14,15 108:5
110:19 113:20
116:8,9,13 119:3

**timeline** 23:16
79:23

**times** 5:7,10 10:21
11:17 13:17 41:18
46:6 61:24 62:24
63:2 79:21 100:6,
10

**Timing** 94:6

**Tina** 57:22 102:21

**tired** 72:13,15,22
74:19,23

**title** 14:10,11,14
19:24 20:12

**today** 6:14,21
31:22 47:16 114:4
119:20

**today's** 4:3,7
10:19

**told** 25:21 27:24
55:1 56:9,24 86:6,
21,24 92:16,22
101:19 105:9
109:3,9 116:22
117:6 118:7,11,17,
23

**top** 56:19 57:18
59:23 79:16 81:19

**topic** 25:4,5,9,11
26:10 27:8

**topics** 24:14 29:19
32:7 51:16

**totality** 84:14
106:22 115:5
117:20

**tracing** 42:14

**traffic** 78:17 82:20
83:4

**trained** 47:2,4
48:6 73:17,20
101:2,5 115:12
116:19

**training** 14:19
15:1,3,10,19
16:10,14,17 17:24
18:5 33:8,9,19,22
47:22 55:17

**transfer** 15:3

**transferred** 14:24

**transitioned**
17:10

**transpired** 10:15
31:15 65:2 93:6
104:23 107:12
108:2 109:2
116:16

**travel** 17:9,12

**trial** 109:24 110:2

**trouble** 87:17

**truck** 27:19

**trucking** 27:16

**true** 50:10

**truth** 28:3 49:11
99:4,13 107:8

**truthful** 6:14,21
9:17 39:1 40:5,7,
23 42:17 45:3,8,11
71:7

**truthfulness**
44:20,21 68:1

**turn** 29:15

**turning** 13:20
50:24 75:2

**twelve** 27:23

**two-day** 33:19

**type** 17:13 36:17
43:1 44:4 80:19

**types** 41:22,23
46:12,17 48:7 49:7
73:21 74:5 84:3,19
85:5

**typical** 65:7

## U

**Uh-huh** 19:9 21:6
23:22 25:15 27:4
36:24 41:15 75:19
78:22 81:11 83:8
105:14

**ultimately** 25:8
31:15

**undermine** 73:23

**understand** 5:23
6:3 16:6 38:8
42:16 51:11 61:5
71:1 97:21 103:15
106:23

**Understandable**
21:2

**understanding**
47:23 71:22
103:13 105:5

**understood** 47:5
60:22

**United** 17:18

**unofficially** 29:7

**unresponsive**
40:8 42:18,19

**updated** 18:3

**updates** 18:7

**UPS** 31:8

**upwards** 100:5,18
105:24

**Utah** 34:24

**utilize** 15:17 42:2

**utilized** 15:6 46:13

## V

**vague** 53:16

**valid** 41:16

**validity** 27:9,11
28:7

**variations** 45:15

**varied** 63:5,6

**vehicle** 107:2

**verbal** 38:13 52:6

**verbally** 38:5

**verbatim** 85:24
88:2

**verbiage** 58:14

**versus** 49:2

**victim** 57:22 58:2,
23

**videoconference**
41:20 61:21 99:20

**view** 86:14 98:20
114:2,4

**violations** 27:19,
22 78:17 82:21
83:4

**visual** 43:22,24
44:10

**vodka** 59:9 87:20

**voice** 72:13

**void** 71:12

**voluntarily** 36:6,7

**voluntary** 37:15,
17 38:1

## W

**waiting** 39:15

**waived** 60:16

**walk** 51:15 64:20

**walked** 25:9

**walks** 17:21

**wall** 91:21,22

**wanted** 15:22
28:23 29:15 37:14
54:18,21 89:19
93:12 116:15

**washroom** 79:20

**watch** 92:4

**water** 79:21

**wave** 34:18

**ways** 41:6 49:21

54:23

**week** 30:11

**weeks** 112:8
118:22

**West** 34:19

**wife** 21:11

**wiggle** 41:17

**William** 8:20
57:21 95:24

**window** 63:16
92:1

**windows** 62:11

**woman** 55:19

**won** 111:9

**wondering** 93:24

**word** 47:8

**words** 80:10 84:14

**work** 20:5 26:12
51:20

**worked** 13:24
31:8,11 34:8 47:5
55:16 72:22

**working** 13:22
20:9 21:5 30:14,22
31:2,3,5 35:2
55:19

**worry** 45:22

**wound** 31:15
53:22 54:10

**write** 21:24 27:6
61:2

**writing** 38:19
57:4,11 58:14 60:4
61:3 79:18 113:3,
14

**written** 56:11
59:24

**wrong** 22:8,9
114:2

**wrote** 61:4,5
112:18



Amor vs Reid
Michael Masokas - 08/25/2022                                        15

---
### X

**Xavier** 19:5 21:15
23:21

---
### Y

**year** 18:10 20:16
21:2,15 22:6,12
27:2 31:11 33:18,
23

**years** 14:13 20:1
23:15 24:5,7 25:22
33:1,3 34:3 38:19
48:16 62:24 63:6
66:21 78:7 95:11
100:14 105:3
110:16,23 111:20

**yellow** 60:3

---
### Z

**Zoom** 5:20

