# EXHIBIT 2

1        IN THE UNITED STATES DISTRICT FOR THE

2         NORTHERN DISTRICT OF ILLINOIS

3           HON. JOHN Z. LEE

4        MAG. J. JEFFREY I. CUMMINGS

5         CASE NO. 20-CV-01444

6

7          WILLIAM AMOR,

8            Plaintiff

9

10             v.

11

12     JOHN REID & ASSOCIATES, ET AL.,

13           Defendants

14

15

16

17

18

19

20

21

22  DEPONENT: JOHN REID & ASSOCIATES CORPORATE

23  REPRESENTATIVE 30(B)(6)

24  DATE:  AUGUST 26, 2022

25  REPORTER:  KORTNEY CHASE

Read and Sign Only



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1                          APPEARANCES

2

3    ON BEHALF OF THE PLAINTIFF, WILLIAM AMOR:

4    Mariah Garcia, Esquire

5    Loevy & Loevy

6    311 North Aberdeen

7    Third Floor

8    Chicago, Illinois 60607

9    Telephone No.: (312) 243-5900

10   E-mail:  mariah@loevy.com

11   (Appeared via videoconference)

12

13   ON BEHALF OF THE DEFENDANTS, JOHN REID & ASSOCIATES,

14   MICHAEL MASOKAS, AND THE ESTATE OF ARTHUR T. NEWEY:

15   F. Michael Pasqualino, Esquire

16   Lewis Brisbois

17   550 West Adams Street

18   Suite 300

19   Chicago, Illinois 60661

20   Telephone No.: (312) 463-3464

21   E-mail: f.pasqualino@lewisbrisbois.com

22   (Appeared via videoconference)

23

24

25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



                              INDEX

                                                   Page

PROCEEDINGS                                          5

DIRECT EXAMINATION BY MS. GARCIA                     6


                           EXHIBITS

Exhibit                                            Page

1 - Notice of Deposition                            38

2 - The Reid Technique of Interviewing *            38

      and Interrogation Manual




      * Will forward upon receipt

Read and Sign Only

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1                        STIPULATION

2

3    The VIDEO deposition of JOHN REID & ASSOCIATES CORPORATE

4    REPRESENTATIVE 30(B)(6) was taken at KENTUCKIANA

5    REPORTERS, 30 SOUTH WACKER DRIVE, 22ND FLOOR, CHICAGO,

6    ILLINOIS 60606, via videoconference in which all

7    participants attended remotely, on FRIDAY the 26TH day

8    of AUGUST, 2022 at 10:02 a.m.; said deposition was taken

9    pursuant to the FEDERAL Rules of Civil Procedure. The

10   oath in this matter was sworn remotely pursuant to FRCP

11   30.

12

13   It is agreed that KORTNEY CHASE, being a Notary Public

14   and Court Reporter for the State of ILLINOIS, may swear

15   the witness and that the reading and signing of the

16   completed transcript by the witness is not waived.

17

18

19

20

21

22

23

24

25

Read and Sign Only

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                    PROCEEDINGS
 2
 3            COURT REPORTER:  We are now on the record.  My
 4        name is Kortney Chase.  I'm the online video
 5        technician and court reporter today representing
 6        Kentuckiana Reporters located at 30 South Wacker
 7        Drive, 22nd floor, Chicago, Illinois, 60606.  Today
 8        is the 26th day of August, 2022 and the time is
 9        10:02 a.m.  We are convened by video conference to
10        take the deposition of Joseph P. Buckley in the
11        matter of William Amor versus John Reid and
12        Associates et al pending in the United States
13        District Court for the Northern District of
14        Illinois.
15            Case Number: 20-CV-01444.  Will everyone but
16    the witness, please state your appearance, how you are
17    attending and location you are attending from starting
18    with plaintiff's Counsel?
19            MS. GARCIA:  This is Mariah Garcia from the
20        plaintiff.  I'm attending virtually from Chicago,
21        Illinois.
22            MR. PASQUALINO:  Michael Pasqualino for
23        defense, attending from Chicago, Illinois.
24            COURT REPORTER:  Mr. Buckley, will you please
25        state your full name for the record?
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              THE WITNESS:  Joseph Paul Buckley, B-U-C-K-L-

 2        E-Y.

 3              COURT REPORTER:  And do all parties agree that

 4        the witness is in fact Joseph P.  Buckley?

 5              MS. GARCIA:  Plaintiff so stipulates.

 6              MR. PASQUALINO:  Defense agrees.

 7              COURT REPORTER:  Okay.  Mr. Buckley, will you

 8        please raise your right hand?  Do you solemnly swear

 9        or affirm that the testimony you are about to give

10        will be the truth, the whole truth and nothing but

11        the truth?

12              THE WITNESS:  I do.

13              COURT REPORTER:  Thank you.  You may begin.

14                   DIRECT EXAMINATION

15   BY MS. GARCIA:

16        Q    Hi, Mr. Buckley.  My name is Mariah Garcia and

17   I'm an attorney for the plaintiff, Bill Amor.  Before we

18   get started, will you please state your name and spell

19   it for the record?

20        A    Joseph, J-O-S-E-P-H, Paul, P-A-U-L, Buckley,

21   B-U-C-K-L-E-Y.

22        Q    Great, and Mr. Buckley, are you currently an

23   employee of John Reid and Associates?

24        A    Yes.

25        Q    And what is your title at John Reid and
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   Associates?

 2        A    President.

 3        Q    Mr. Buckley, have you given depositions

 4   before?

 5        A    Yes.

 6        Q    Okay.  Given your familiarity with

 7   depositions, I'm going to just lay down a few brief

 8   ground rules before we get started.  So first, because

 9   we're on Zoom, sometimes there can be a bit of a lag, so

10   it's important for us to not speak over each other, and

11   what I mean by that is if I ask a question, just let me

12   get to the end of the question before you answer and I

13   will let you answer your question fully.  Does that make

14   sense?

15        A    Yes.

16        Q    Okay.  Because we have a court reporter,

17   please also keep your answers verbal and audible.  So no

18   shaking of your head or nodding of your head.  Okay?

19        A    Okay.

20        Q    And if you have any need to take a break, just

21   let me know.  I'm happy to give you any breaks you want

22   or need.  Just let me finish my line of questioning

23   before we go on that break.  Okay?

24        A    Yes.

25        Q    And then I have a couple more questions before
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    we get into the designation.  The first one is, do you

2    have any conditions that may affect your ability to

3    provide truthful and accurate testimony today?

4         A    No.

5         Q    Do you have any conditions that affect your

6    memory?

7         A    No.

8         Q    Do you take any medications that may impact

9    your ability to provide a truthful and accurate

10   testimony today?

11        A    No.

12        Q    And do you take any medications that may

13   affect your memory?

14        A    No.

15        Q    Okay.  So we're here today for a Rule 30(b)(6)

16   deposition, which is essentially you being designated on

17   behalf of John Reid and Associates to provide binding

18   testimony on a number of subjects.  Do you understand

19   that you have been designated in that role?

20        A    Yes.

21        Q    Okay.  So the federal rules require me to read

22   the subjects you're designated on and make sure that

23   you're giving consent to provide that testimony.  So I'm

24   going to share my screen and go over the topics that

25   you're designated on.  Okay?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1        A    Okay.

 2        Q    And I pull up the deposition notice.  Give me

 3   one second.  Can you see that, Mr. Buckley?

 4        A    It's a little small, but I get --

 5        Q    Or I can -- I can zoom in for you.

 6        A    That's better.

 7        Q    Great, and so these -- there are four topics

 8   and there are subtopics within those topics.  So

 9   actually what makes the most sense is to have you read

10   this to yourself and then when you're done or you need

11   me to scroll down, let me know, and then we can you

12   continue on questioning after that.  Okay?

13        A    Okay.  We can scroll up or down.  Okay, that's

14   good.  We can scroll.  Okay.

15        Q    Okay.  And so for the record, have you had a

16   chance to review the deposition notice that designates

17   certain topics for you to testify on today?

18        A    Yes.

19        Q    And again, just for the record, are you

20   willing and able to provide binding testimony on behalf

21   of Reid and Associates regarding the subjects within the

22   deposition subpoena?

23        A    Yes.

24        Q    Okay, great.  So Mr. Buckley, you are

25   president of John Reid and Associates currently.
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Correct?

2         A    Yes.

3         Q    And how long have you held that position?

4         A    Since 1982.

5         Q    When did you first start working at Reid and

6    Associates?

7         A    June of 1971.

8         Q    Okay.  Can you give me a brief overview of the

9    positions and roles that you've held within John Reid

10   and Associates from between 1971 until 1982?

11        A    Well, for those first two decades through 70s,

12   up to the first ten year -- 11 years, I was primarily a

13   polygraph examiner.

14        Q    Okay.  And so in 1982, that's when you

15   switched from being a polygraph examiner to becoming

16   president?

17        A    In 1978, I became chief examiner for Reid,

18   which oversees all of the testing, polygraph testing,

19   investigative interviews that we did.  In 1980, I became

20   Director of the Chicago Office and then in '82,

21   president, but I was still a working person in terms of

22   doing polygraph tests, teaching training seminars, that

23   kind of thing.

24        Q    Great, and so just to break down the dates one

25   more time for me.  In 1978, you were the chief examiner,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1   correct?
2        A    Yes, I believe that was '78 to '80.
3        Q    '80, and then from 1980 to '82 is when you
4   were the Director of the Chicago Office?
5        A    Yeah.
6        Q    And after that is when you were instated as
7   the president?
8        A    Yes.
9        Q    Okay.  And you said throughout your time from
10  1971 until 1982, you were still conducting polygraph
11  examinations and working as a instructor on the Reid
12  Technique or methodology?
13       A    Primarily, as a polygraph examiner.  The
14  training programs really didn't begin to develop into
15  any extensive type of program until the mid-80s.
16       Q    Okay.  And breaking down the roles that you
17  held, what would you say the primary responsibilities
18  you had as a polygraph examiner from 1971 to 1982?
19       A    What were my primary responsibilities?
20       Q    Yes.
21       A    In terms of conducting examinations?
22       Q    Yes.
23       A    Well, we have a protocol that we follow.
24  Appointments would be made by clients for their subjects
25  or their employees or their suspects, depending on if
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    it's attorney or a police department, et cetera.  They

2    would come to our office.  We had different kinds of

3    tests that we did.  We tested police candidates about

4    their background to see if they might be qualified to

5    continue in the selection process for a given

6    department.  We tested people who are suspected of

7    wrongdoing; could be an employee, could be a criminal

8    suspect.  We tested people for attorneys who had an

9    interest in whether or not their client was being

10   truthful, and then the exam itself had certain protocol

11   to follow.

12        Q    Great.  Sorry, I'm turning off my phone.  And

13   so when you became the chief examiner, would it be fair

14   to say that added on responsibilities on top of the

15   polygraph examination you were already doing or did you

16   shift into a different role?

17        A    No, it added some responsibilities, but I was

18   still active as an examiner.

19        Q    And what were the responsibilities that were

20   added when you became a chief examiner?

21        A    To work with the staff members on their cases

22   depending on the circumstances, work with them on

23   question formulation or I reviewing the charts, talking

24   about a strategy for the interview process, that kind of

25   thing.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      Q     And would it be fair to assume it was a
 2   supervisory role?
 3      A     To some extent, sure.
 4      Q     Okay.  Were you the only chief examiner or was
 5   it kind of a title that many people had?
 6      A     Well, there usually was one at one time, but
 7   other people became chief examiners over the years.
 8      Q     And in the late 70s, how many Reid and
 9   Associate offices were there?
10      A     I believe we had Denver, Milwaukee and
11   Chicago.
12      Q     And was there a chief examiner for each
13   location or how did that work across the offices?
14      A     In Milwaukee, there was only one staff person.
15      Q     Okay.
16      A     In Denver, I think there were three or four
17   and there was a director of that office because of the
18   size of it.  They didn't need a second person designated
19   as a chief examiner.
20      Q     Fair, and as a chief examiner, approximately
21   how many people were you working with or supervising?
22      A     I think we had seven or eight staff members at
23   the time.
24      Q     What was the process for being named the chief
25   examiner?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1        A     Mr. Reid named me.  I can't tell you that on

 2   that.

 3        Q     Did you have to go through any interviews or

 4   do an application?

 5        A     No.  I had been working with Mr. Reid for 11

 6   years at that point or for seven years at that point.

 7        Q     Great.  Okay.  So after chief examiner, you

 8   became Director of the Chicago Office.  A similar

 9   question, was there any steps or application process you

10   had to undergo to become the director?

11        A     No.

12        Q     Similarly, was it Mr. Reid deciding, because

13   he had seen your work over the years, that you would

14   make a good fit for that position?

15        A     Yes.

16        Q     Okay.  And as the Director of the Chicago

17   Office, what were your roles and responsibilities?

18        A     A little bit more on the business end in terms

19   of working with the accountants and, you know, lawyers

20   and that kind of thing, which as a chief examiner, I

21   really didn't have much activity with.

22        Q     Okay.  And you said the business aspect of

23   things, will that include any sort of contractual

24   agreements that maybe needed to be worked out with

25   entities that were working with the Chicago Office?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Sure.

 2        Q    Okay.  And during this time, just to clarify,

 3   you were still doing polygraph examinations?

 4        A    Yes.

 5        Q    Okay.  And so then in 1982, you were named

 6   president.  What was the process like for that naming of

 7   you as president?

 8        A    John Reid had left the company ownership to

 9   the employees and the employees at the recommendation of

10   Mr. Reid designated me as the president.

11        Q    And is that still the process where the

12   employees decide who was in the role of president?

13        A    It would be if that came up, yes.

14        Q    In the time that you've been president, is

15   there a process for reinstituting or revoting you in as

16   president?  Forgive my ignorance in this.

17        A    Sure.  Every year, the board -- the

18   shareholders have a meeting and they elect the board of

19   directors and, you know, the board of directors identify

20   and elect the officers.

21        Q    How many people are in the board of directors?

22        A    Three.

23        Q    And what are the officer positions within Reid

24   and Associates?

25        A    President, vice president, secretary
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    treasurer.

2         Q    Great, and prior to starting as a polygraph

3    technician at Reid and Associates, can you give me a

4    brief overview of your employment history?

5         A    I came to Reid right out of graduating from

6    Loyola University.

7         Q    That's a great transition to my next question,

8    which was going to be about your education.  So what

9    secondary degrees, if any, did you receive?

10        A    A Bachelor's degree in English from Loyola

11   University in 1971, and then a Master's of Science

12   degree in the Detection of Deception from the State of

13   Illinois.

14        Q    In what year did you receive the deception and

15   detection degree?

16        A    I believe it was 1973.

17        Q    What was the process for receiving the

18   deception and detection degree?

19        A    John Reid and Associates had a polygraph

20   training school called the Reid College.

21        Q    Uh-huh.

22        A    And Reid College would train individuals to

23   qualify for the state examination of licensure.  Once

24   they were licensed and they were working for us or were

25   graduates of our school, they could follow a two year

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    process to qualify for a master's degree by writing a

2    thesis, taking a written examination and conducting some

3    live examinations under observation by some of the

4    senior people.

5        Q    Okay.  And do you recall what your thesis was

6    on?

7        A    I believe it was on the comparison of

8    abdominal and thoracic respiration recordings during the

9    polygraph examination.

10       Q    Great, and was that paper published anywhere?

11       A    I believe it might have been published in the

12   American Polygraph Association Journal.

13       Q    And so other than the Loyola degree in

14   Literature -- and by the way, I have a bachelor's degree

15   in history literature, so we are similar ilk -- and the

16   master's degree you got in deception and detection, was

17   there any other degrees that you have received?

18       A    No.

19       Q    Okay.  And so I just wanted to briefly talk

20   about any preparation you did for the deposition.  So my

21   first question is, without going into any conversations

22   you had with, you know, counsel, please tell me

23   everything you did to prepare for today's deposition?

24       A    Well, this past Wednesday we had a conference

25   call between Attorney Pasqualino, Charles Marino, who's



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    our corporate attorney, James Nyeste.  I'll spell that

2    for you. N-Y-E-S-T-E.  He's an attorney for the firm and

3    Michael Masokas, who is a polygraph examiner with the

4    firm.  Beyond that, I reviewed Mr. Masokas' deposition

5    and discussed the case with him, and that is essentially

6    it.

7         Q    Okay.  And other than re reviewing his

8    deposition, did you review any other documents?

9         A    I don't believe so.  I mean, I saw the file,

10   the polygraph file for Mr. Amor.  So I saw those

11   documents, question sheets and that kind of thing but

12   outside of that, no.

13        Q    Yeah, that was going to be my follow up

14   question was, when you were reviewing the deposition of

15   Mr. Masokas, did you also review the exhibits which

16   would've formed the file of Mr. Amor?

17        A    Yes.

18        Q    Okay.  And again, without going into any of

19   the conversations you had at this conference call with

20   your attorneys, approximately how long did the

21   conference call last?

22        A    Probably two hours.

23        Q    Great.

24        A    (coughing) Excuse me.

25        Q    Do you need any water or anything?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    I've got water.

 2        Q    Okay, great.

 3        A    Okay.  So that's --

 4        Q    Okay.  And other than that conference call and

 5   reading the deposition with the exhibits attached from

 6   Mr. Masokas' previous dep, did you do anything else to

 7   prepare for the deposition?

 8        A    No.

 9        Q    Okay.  And do you have any files or papers in

10   front of you as we currently sit?

11        A    I do have in front of me a list of the test

12   questions.

13        Q    Okay.

14        A    They were on the examination in case I

15   referred to them and a couple of notes that I took from

16   our conference call.

17        Q    Okay.  And I'm likely not going to go too much

18   into the deposition of Mr. Amor, specifically, but if I

19   do, other than the list of questions, I would prefer you

20   not to refer to your notes if I'm just asking questions

21   about the substance of it.  Okay?

22        A    Yes.

23        Q    Okay.  Then I have a line of questioning

24   regarding your employment.  Have you ever been fired or

25   suspended from any job?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    No.

 2        Q    Okay.  Have you ever been officially

 3   disciplined at any job?

 4        A    No.

 5        Q    Have you ever been unofficially disciplined at

 6   any job?

 7        A    No.

 8        Q    Okay.  Have you ever been disciplined by or

 9   asked to leave an institution of higher learning?

10        A    No.

11        Q    And have you ever been asked to leave an

12   institution or professional organization?

13        A    No.

14        Q    Okay.  And have you ever been convicted of a

15   felony?

16        A    No.

17        Q    Okay.  So first I wanted to ask about the

18   corporate side of Reid and Associates.  So just broadly,

19   what is the process through which someone would contract

20   or retain you for polygraph services?

21        A    Well, as a general rule, they would contact

22   our office.  We have two receptionists who would handle

23   phone calls coming in, and they would discuss the fact

24   they wanted to make an appointment.  Depending on the

25   kind of appointment they would make, the receptionist
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**KENTUCKIANA**
COURT REPORTERS

Case 1:20-cv-01444-Document #: 145-2 Filed: 02/09/24 Page 22 of 136 PageID #:808
Deposition of JOHN REID & ASSOCIATES CORPORATE REPRESENTATIVE JOHN (2), taken August 26, 2022
30(b)(6)                                                                                        21

1  could schedule that time period or if it was something

2  that was more involved, they would contact or pass the

3  call to one of the examiners to talk to the prospective

4  client.

5       Q    Okay.  And similarly -- actually, what are the

6  type of services that Reid and Associate provides

7  broadly?

8       A    Provide what?

9       Q    Provides broadly.

10      A    Broadly?  Well, our primary service had been

11 polygraph examinations, both the pre-employment type and

12 the specific issue investigation type.  In the mid-70s,

13 we began training programs on interviewing and

14 interrogation techniques, which came to fruition in the

15 mid-80s and has expanded significantly over the

16 following decades.

17      Q    So would it be fair to say that currently, the

18 work or the services that Reid and Associates provides

19 is primarily training on interrogation and interviewing

20 techniques?

21      A    Yes.

22      Q    How much of the services that Reid and

23 Associates provides would you say is polygraph

24 examinations versus training on various interview

25 techniques?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-01444-Document #: 145-2 Filed: 02/09/24 Page 23 of 136 PageID #:809

```
 1        A    To date, 0 percent.

 2        Q    Okay.  0 percent on polygraph?

 3        A    Yes.

 4        Q    And I know you said that in the mid-70s,

 5   that's, you know, there was a switch over or was it the

 6   mid-70s or mid-80s?  My apologies.

 7        A    The mid-70s, we began and introduced our

 8   training programs.  They began to blossom and get

 9   recognition in the mid-80s.

10        Q    Okay.

11        A    It became more frequent.

12        Q    Great, and so at some point though, there was

13   a shift within Reid and Associates away from polygraph

14   examinations.  Correct?

15        A    Yes.

16        Q    Around what time would you say that occurred?

17        A    I would say probably in the last couple of

18   years.

19        Q    And why is that?

20        A    We can make more money training.

21        Q    And other than the financial considerations,

22   were there other considerations for the shift towards

23   training and away from polygraph?

24        A    Nope.

25        Q    Were there ever, in your experience first as a
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    director now as the president, longer term contracts

2    that you held with municipalities regarding either

3    polygraph services or training services?

4         A    No.

5         Q    And when you're contracting, when John Reid

6    and Associates is contracting with an entity rather,

7    what are the forms and/or documents that are created in

8    that process?

9         A    In my experience with the company, we've had

10   very few contracts.  We had one many years ago with the

11   Chicago Police Department where we would interview

12   people who made bribery or brutality allegations, and

13   then if they passed the polygraph test, we would then

14   interview the police officer.  And that was a formal

15   contract.  Other than that, I can't think of another

16   contract.  Most departments simply at an ad hoc basis

17   will call us when they need us.

18        Q    Great, and so you were in the Chicago office

19   in 1995, correct?

20        A    Yes.

21        Q    Okay.  And were you aware of any contract or

22   agreement entered into between Reid and Associates and

23   the City of Naperville in and around that time period?

24        A    No.

25        Q    Okay.  And outside of the services that were

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-01444 Document #: 145-2 Filed: 02/09/24 Page 25 of 136 PageID #:811
Deposition of JOHN KIFFE & ASSOCIATES CORPORATE REPRESENTATIVE JOHN (5) taken August 26, 2022
30(b)(6)
24

1    provided to Naperville Police Department during the Amor

2    investigation, are you aware of any other times that you

3    provided services to the Naperville Police Department?

4         A    I'm sure we have over the 50 years, but I

5    couldn't tell you anything of specific about anything.

6         Q    Okay.  And going back to the process of

7    providing services, outside of a formal contract, if

8    someone in this instance, the Naperville Police

9    Department, called in and said, you know, we have

10   someone we want you to polygraph.  What sort of

11   documentation would've been created in that instance?

12        A    Well, probably the receptionist would give

13   that call to one of the examiners because she wouldn't

14   know what to ask, how much time to allot, et cetera. The

15   examiner would talk to the person calling, possibly a

16   detective or someone representing the department,

17   discuss the case, agree on a mutual time, let them know

18   what our fees are, or were at the time and schedule the

19   exam.

20        Q    And from that, you know, the documentation

21   would've been whatever was parallel to the services

22   being provided and then an invoice of some sort?

23        A    Well there, I don't think there was any

24   documentation at the time of the appointment.  I think

25   the documentation came when the folks came in and began

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Deposition of ... JOHN REID & ASSOCIATES CORPORATE REPRESENTATIVE 30(b)(6)
Case 1:20-cv-01444-Document #: 145-2 Filed: 02/09/24 Page 26 of 136 PageID #:812
... taken ... August 26, 2022
30(b)(6)
25

1    to give us the background on the case, which sometimes

2    they did over the phone as well.  And the invoice is

3    sent after we're done with the case, not before we do

4    the case.

5         Q    Great.  Okay, sorry.  My screen is freezing

6    up.  Give me one moment.

7         A    Sure.

8         Q    **This is the issue with technology sometimes.**

9    **I'd like to turn now to the process of training that is**

10   **utilized by John Reid and Associates.   In 1995, what**

11   **would've been the requirements for a polygraph**

12   **technician prior to being hired by John Reid and**

13   **Associates?**

14        A    Well, if I can kind of set the foundation.

15        Q    **Sure.**

16        A    In the mid-1960s, the Illinois legislature

17   passed a law called the Illinois Detection of Deception

18   Examiner Act, which required anyone who wanted to

19   practice polygraph testing had to be licensed by the

20   state.  And the statute established a six month training

21   program for that requirement and subsequent rules and

22   regulations detailed the content of that training.  And

23   so John Reid and Associates in the late '60s, early '70s

24   created a training arm of the company called Reid

25   College, which would implement that six month training

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  program for people interested in becoming polygraph

2  examiners.  And it consisted of classroom training and

3  eventually an internship where the individuals would do

4  actual live training under supervision with a senior

5  person.  And we would train people both to work for us

6  and for other agencies or departments around the

7  country.

8      Q    Great.  And so if someone was applying for a

9  polygraph technician job, would it be mandatory for them

10  to have gotten their licensure from Reid College or was

11  there other schools that would've been acceptable?

12      A    They would have to have a license from the

13  State of Illinois.

14      Q    Okay.  So the State of Illinois specifically.

15  Were there other schools or training seminars at the

16  time that a polygraph examiner could attend in Illinois?

17      A    I believe that there have been over the

18  decades.  I couldn't quote a name to you, but I'm -- I'm

19  sure there have been some.

20      Q    Okay.  And actually, does Reid College still

21  exist?

22      A    No.

23      Q    And what year did Reid College cease to exist?

24      A    Probably 1988 or '89.

25      Q    And what was the reason that it stopped

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    existing in 1988 or '89?

2         A    Congress passed the Employee Polygraph

3    Protection Act, which basically prevented private

4    employers from using polygraph as part of their

5    investigations.  And when -- prior to that, a lot of

6    businesses would have subjects come to us for testing.

7    For example, over the weekend $1,000, $100,000

8    disappears from a safe.  Fifteen people had access to

9    that money.  They'd ask all 15 people to come to us for

10   polygraph tests.  We would oftentimes allow the more

11   senior students in the school program to do some of

12   those tests under supervision, because the probability

13   of them being truthful were pretty high.  When the

14   Employee Polygraph Protection Act came into place, we no

15   longer had that base of testing that would be

16   appropriate for students to do.  We couldn't put them on

17   a police case.  We couldn't put them on attorney's case.

18   So we just decided to disband the college.

19        Q    Okay.  And prior to disbanding the college,

20   however, you mentioned there was like a two-step process

21   of first classroom training and then internships,

22   correct?

23        A    Yes.

24        Q    And approximately how long was the classroom

25   training?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A    Well, it was ongoing probably for the first

2   three months, probably pretty steady.  Early on the

3   first several weeks, I'm sure it was daily, all day.  And

4   then they would also take time to observe some of the

5   senior examiners doing examinations and, you know,

6   following their guidance.  And then towards the second

7   half of the internship or of the six months I should

8   say, the internship began where they began to do actual

9   live examinations under supervision.

10     **Q    And what topics were taught within the**

11  **curriculum of Reid College?**

12     A    Physiology, psychology, chart interpretation,

13  question formulation, legal considerations, ethics, and

14  undoubtedly others that I'm not thinking of.

15     **Q    And was there any sort of standard of how many**

16  **people would be in a class per year, how many**

17  **instructors would be, you know, given for a certain**

18  **number of people?**

19     A    I don't think we ever accepted more than six

20  for a class.

21     **Q    And why is that?**

22     A    Well, because we wanted to give them

23  individual attention and that internship where they did

24  live examinations, you know, six people would, you know,

25  have to do a fair number.  And so we wanted to make sure

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    that our senior people were still actively involved and

2    observing, et cetera.

3         Q    Who was typically an instructor within Reid

4    College?

5         A    Senior staff members.

6         Q    From Reid Associates?

7         A    Yes.  With the exception of legal.  We had to

8    have a lawyer teach the legal part and on the psychology

9    a psychologist teach that part.

10        Q    Okay.  And during the internship, that would

11   be within Reid and Associate's offices as well?

12        A    Yes.

13        Q    Okay.  Was part of the curriculum formulated

14   in preparation for the licensure testing?

15        A    Oh, I'm sure.  When it got to that stage, they

16   would view -- review the critical elements.  Sure.

17        Q    Okay.  And within Reid and Associates itself,

18   once someone becomes a polygraph technician, is there

19   continuing training that's required?

20        A    There's probably ongoing supervision by a

21   supervisor, particularly when they're still new.  But as

22   they gain a few years of experience, they're oftentimes

23   they're pretty much on their own.

24        Q    Okay.  Is there any sort of formalized

25   continuing education that necessary when you're a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    polygraph technician at Reid and Associates?

2         A    Well, I don't know if it was something that

3    was required, but I know that all of the students,

4    particularly in the '80s, when we had our interview and

5    interrogation program would all go to that training.

6    Which was more extensive than probably some of the in-

7    house lectures we had.

8         Q    But there was no formalized requirement by

9    Reid and Associates when there is, you know, a branch of

10   polygraph examination to have continuing polygraph

11   training?

12        A    Correct.

13        Q    Okay.  And you presuppose my next question,

14   which is about the interview and interrogation courses

15   that are taught.  Just to refresh my recollection,

16   because I think you've already spoken to this, but when

17   approximately did Reid and Associates start teaching

18   interview and interrogation classes or seminars?

19        A    Well, I think our first ones were in 1975,

20   1976.

21        Q    Okay.  And if you know, who was teaching those

22   courses?

23        A    Members of our firm.

24        Q    And at the time, was there some sort of what

25   was the formalized curriculum, if there was any?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

 1        A    Originally it was a five day program.  It was

 2    done in our building.  We owned a building on north

 3    Dearborn.  We had a sub-basement type room that probably

 4    accommodated 12 to 15 people.  And the basic content was

 5    what we call behavior symptom analysis.  How do we

 6    evaluate the credibility of a subject based on their

 7    verbal and nonverbal skills.  How to structure the

 8    investigative interview, the kinds of questions to ask,

 9    et cetera.  And then of course, how to conduct an

10    interrogation.

11        Q    Great.  And how, if at all, has that

12    curriculum shifted over the years?

13        A    Well, it's become more refined.  It's

14    developed based on laws because one of our guiding

15    principles to always conduct interviews and

16    interrogations in accordance with the guidelines

17    established by the Courts.  And so we have to be up to

18    speed on that.  And some states over the years have

19    passed specific legislation.  Like you cannot lie to a

20    juvenile or things of that nature.  So you know, it

21    changes particularly in accordance with legal

22    considerations.

23        Q    All right.  And is the interrogation and

24    interview seminar currently five days?

25        A    Four days.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-01444 Document #: 145-2 Filed: 02/09/24 Page 33 of 136 PageID #:819

1      Q     Four days.

2      A     We have shorter versions, but our core program

3   is four days.

4      **Q     And was being trained on interviews and**

5   **interrogations, something that was required of polygraph**

6   **examiner at Reid and Associates in 1995?**

7      A     They would've gone through our program.  Sure.

8   And they would've gotten individual training during the

9   course of their work with the firm.  Because a person

10  would do an interview, do an interrogation, a senior

11  person might observe it, sit down, critique them, give

12  them feedback, suggest different options of what they

13  could have said or done, that kind of thing.

14     **Q     It's my understanding that there is a Reid and**

15  **Associate manual that is still being utilized today?**

16     A     Well, there are two books that we have

17  published that are the guidelines for on the one hand

18  polygraph.  It's called Truth and Deception, the

19  Polygraph Lie Detector Technique by John Reid and Fred

20  Inbau.  And then the second book is Criminal

21  Interrogation and Confessions.  And that focuses on the

22  interview/interrogation process.

23     **Q     I'm sorry, can you repeat the last title for**

24  **me again?  Criminal --**

25     A     Interrogation.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q      Interrogation.

 2        A      And Confessions.

 3        Q      And confessions.  What year was Truth and

 4   Deception published approximately?

 5        A      I believe the first edition in 1966, the

 6   second edition in 1977.

 7        Q      And when was Criminal Investigation and

 8   Confessions published?

 9        A      Criminal Interrogation.

10        Q      Interrogations, yes.  And confessions.

11        A      First Edition, 1962.  The Fifth Edition, 2013.

12        Q      And do you recall the authors of the Criminal

13   Interrogation and Confessions?

14        A      The first two editions were John Reid and Fred

15   Inbau.  I joined them for the third, fourth, and fifth

16   editions.  And one of our colleagues, Bryan Jayne, J-A-

17   Y-N-E, joined us from the fourth and fifth editions.  I

18   don't think he was on the third.

19        Q      And so when you were working to create the

20   third, fourth and fifth editions, what was the process

21   of doing that?  Just kind of broadly?

22        A      Well, when I got involved they had already

23   published two versions.  And after X number of years,

24   they thought it was time to write a third version and

25   update it with court decisions, legal observations, and
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    things that we had learned from our work.  Because one

2    of the things that we do on a regular basis is we

3    conduct what are called post confession interviews.

4    After somebody confesses and tells us what they did and

5    give us the appropriate corroborating detail, we

6    interview them and find out why did you decide to tell

7    us.  What did the investigators say that made you decide

8    to tell him or her what happened?  And after doing that

9    for a number of years, we learned new things about the

10   best way to approach people based on their personal

11   experience with the process.  And so we would add

12   different steps in as we learn them.

13        **Q     I'm not trying to be difficult.  I'm just**

14   **trying to get to the reasoning why you would publish a**

15   **new edition as a specific point.  Is there a certain**

16   **amount of years that go by, you decide that it's**

17   **necessary to update, or does it have certain focal**

18   **points in your practice that necessitate a new edition?**

19   **Yeah.  New addition of some sort.**

20        A     Okay.  Yeah.  Well, yes.  I mean, for example,

21   in the last two editions, the fourth and fifth edition,

22   we included information and chapters we didn't have in

23   our prior books.  Such as how to distinguish a truthful

24   confession from a false confession.  What are some of

25   the research that social psychologists have done on the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    issue of interrogation.  What do social psychologists

2    testify to as to issues with law enforcement,

3    interrogations, et cetera.  What do they say that's

4    accurate.  What do they say that's not accurate.  What

5    would you as a police officer say, if you were presented

6    with a question like this, et cetera.  So sure things do

7    change over time.

8         Q    And --

9         A    Excuse me.  There you go.  Okay.

10        Q    Of course.  And so within the teaching of

11   interviews and interrogation is reading Truth and

12   Deception and the current copy of the Criminal

13   Investigations [sic] and Confessions requirement?

14        A    For who?

15        Q    For someone within the seminar itself?

16        A    No.

17        Q    Is it a requirement for Reid and Associate

18   employees?

19        A    Well, all of our current employees, I know for

20   a fact have read both books.  The Truth and Deception

21   book is used as one of the training manuals during their

22   six month training program.  And the earlier editions,

23   depending on when they went to school with us, Criminal

24   Interrogation is also one of the books that's used.

25   Students at our training programs, get a workbook for

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   that training program that has a lot of the information

2   in there, but it is not the books.

3       Q    And what is the process for creating the

4   workbooks?

5       A    Well, we had an original workbook that we

6   began to expand and develop additional information for

7   depending on changes in the way we approach things, the

8   addition of new procedures, the issues of false

9   confessions, the issue of juvenile interrogations.  And

10  so the book would expand as our course material would

11  expand.

12      Q    Okay.  And I'm going to pull up --

13      A    (clears throat) Excuse me.

14      Q    Of course.  So let's circle back around to

15  documentation really quickly.  What is the practice of

16  Reid and Associates when it comes to documenting

17  polygraph examinations?

18      A    We write -- we typically write a report.

19      Q    Okay.  And is there any training given to

20  polygraph examiners for writing a report after a

21  polygraph exam has been given?

22      A    Oh, I'm sure.

23      Q    Do you have knowledge of what that training

24  is?

25      A    Sure.  I mean, we would teach them the format

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    that we like to follow.  We would introduce the subject

2    matter of the examination, who the examinee was, the

3    dated examination.  We would discuss if it was relevant,

4    any pre-test discussion that shed light on the issue.  We

5    would list the test questions that were asked.  We will

6    list our opinion as to whether the person was truthful

7    or deceptive.  And any post-test acknowledgements or

8    admissions that might have taken place.

9        Q    Okay.  And would that training have been

10   something that occurred during the six month course that

11   you guys provided or Reid and Associate provided, or is

12   that something that is an in-house training once

13   someone's been hired?

14       A    Well, I think they'd be both.  I think they'd

15   be introduced to the fact that a written report is

16   written and given the outline of it.  And then when they

17   actually did cases on their own and were writing

18   reports, they probably had guidance from senior people

19   as to, you know, how to frame the questions, or how to

20   frame the statements, et cetera.

21       Q    Okay.  And are there any types of forms that

22   Reid and Associate employees are trained to utilize when

23   conducting an interrogation?

24       A    Forms for an interrogation?

25       Q    Sure.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    No.  I'm not aware of what you have in mind,
 2   but no.
 3        Q    Okay.  And when would Reid and Associates
 4   expect polygraph examiner to utilize a Miranda waiver?
 5        A    When a person is in custody or where there is
 6   -- brought in by the police departments.  And I am not
 7   happy with some of this because some of the Courts say
 8   when someone's a suspect, they should be advised of
 9   their rights.  When someone is somebody who's the focus
10   on an investigation, they should be advised of their
11   rights.  When in fact, the Supreme Court says it's only
12   custody.  So we give the rights to people who are coming
13   in on behalf of law enforcement, simply as a CYA.
14        Q    As a CYA?
15        A    Yeah.
16        Q    What's a CYA?
17        A    We just want to make sure we have all our
18   bases covered.
19        Q    Okay.  Now I actually want turn towards a
20   manual that we produced during discovery.  And I believe
21   the deposition notice would be Exhibit 1.  So let's say
22   this is an Exhibit 2.  And it says the Reid Technique of
23   Interviewing and Interrogation.  Now I'm going to posit
24   to you that this is a long document.  So I'm just going
25   to kind of ask broad questions, but I'm going to scroll
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    through the first few pages and ask whether or not you

2    recognize what this document is and how it would've been

3    utilized?

4            (EXHIBIT 1 MARKED FOR IDENTIFICATION)

5            (EXHIBIT 2 MARKED FOR IDENTIFICATION)

6        A    Sure.  That's one of the workbooks that we

7    distribute to our students at our training programs.

8        Q    Great.  And I wasn't able to find a date on

9    this.  I assume, given the copyright -- do you see the

10   copyright here?

11       A    Yes.

12       Q    That it would've been sometime after 2012.

13       A    Yes.

14       Q    But do you have knowledge of when this

15   workbook I can go to the table of contents would've been

16   utilized?

17       A    No.  Not more specific than post 2012.  Yeah.

18       Q    Okay.  And then more specifically, however,

19   and I can go to the specific steps and pages of

20   necessary.  Where I'm highlighting the Reid Nine Steps

21   of Interrogation.  Do you see that?

22       A    Yes.  Yes.

23       Q    "The posit of confrontation, interrogation

24   themes, handling denial, overcoming objections,

25   procurement and retention of the subject's attention,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  handling the subject's passive mood, presenting an

2  alternative question, having suspect orally relate

3  various details of the offense, and elements of oral and

4  written statements." Would it be fair to say that's the

5  current nine steps within the Reid method or Reid

6  technique, whatever, however you want to classify it?

7      A    Yes.

8      Q    Okay.  And these nine steps, were these

9  initially formulated by Mr. Reid and I'm going to

10  mispronounce his name, but Fred Inbau in the '60s and

11  '70s?

12      A    In the 1960s?

13      Q    Yes.

14      A    No.

15      Q    And when were these nine steps within the Reid

16  technique developed specifically?

17      A    They were developed over a period of years

18  through the '70s.  I think we might have first

19  introduced them at some point in the 1980s.

20      Q    Okay.  And is the Reid technique or these nine

21  steps something that you'd teach within your interview

22  and interrogation courses?

23      A    Yes.

24      Q    And are these nine steps something that

25  someone who is going through the Reid College for

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   polygraph examination would also be familiar with?

2        A    Yes.  If we were doing that today, yes.

3        Q    Okay.  And if someone was a -- you know 1995,

4   going back to the incident in question of this

5   litigation, would these nine steps be something you'd

6   expect a polygraph examiner to utilize when interviewing

7   or interrogating a suspect?

8        A    Well, you used two words there, you used

9   interviewing and interrogation and they're very

10  different.

11       Q    Sure.  So let's take interviewing first. Would

12  this be something you'd expect an employee in 1995 at

13  John Reid and Associates to utilize during an interview?

14       A    No.

15       Q    And would these nine steps be something you

16  would expect a Reid employee in 1995 to utilize during

17  an interrogation?

18       A    Yes.

19       Q    Okay.  And outside of these nine steps there

20  are there any other principles of the Reid technique

21  that are not listed here?

22       A    Well, sure.  We have a set of core principles

23  that underline everything that we do.

24       Q    Would you mind outlining those core principles

25  for me?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      A    Sure.  Number 1, always treat the subject with

 2   decency and respect.  Number 2, always follow the

 3   guidelines established by the Courts.  Number 3, never

 4   engage in promises of leniency.  Number 4, never engage

 5   in physical harm, the threat of physical harm, or the

 6   threat of inevitable consequences.  Use extra caution

 7   with juveniles and people with mental impairments.  And

 8   be sure to honor the subject's rights and both their

 9   legal rights and if it -- if they've been with you for

10   an extended bit of time, their physical needs.  And I

11   think those are the primary principles.

12      Q    Great.  So that just wanted to go through that

13   one more time.  So I know I have it down correctly.  So

14   that's treating people with decency and respect would be

15   one.

16      A    Yes.

17      Q    Following the guidelines of the Court would be

18   another?

19      A    Yes.

20      Q    Not making any promises of leniency would be

21   another?

22      A    Yes.

23      Q    Okay.  No physical harm or threats and

24   intimidation would be another?

25      A    Yes.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1       Q     And I believe you said no threat of inevitable

 2   consequences; is that correct?

 3       A     Yes.

 4       Q     Okay.  You also said that no deception of

 5   minors.  Am I getting that right?

 6       A     Use extra caution.

 7       Q     Use extra caution.

 8       A     When in interviewing or interrogating,

 9   particularly socially immature juveniles. (coughing)

10   Excuse me.

11       Q     Of course.  And tending to the needs of a

12   subject, especially if they've been there for a long --

13   being interrogated or interviewed for a long time?

14       A     Yeah.  If they've been there for, you know --

15   you know, quite a long time, you know, and somebody

16   says, gee, I need my inhaler.  It would be inappropriate

17   and say, we'll get your inhaler after you tell us what

18   happened.

19       Q     And then I believe you also said respecting

20   the legal rights of subject, is that correct?

21       A     Of course never denying them any of their

22   rights.

23       Q     Never.  And did I miss any?

24       A     I think I'm leaving something out, but I could

25   -- oh, be care -- do not conduct interrogations for an
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Read and Sign Only

Deposition of John Doe & Associates Corporate Representative John (D) taken Aug 26, 2022
Case 1:20-cv-01444 Document #: 145-2 Filed: 02/09/24 Page 45 of 136 PageID #:831
30(b)(6)                                                                        44

1  excessive period of time.

2      Q    Okay.  Part of the reason I'm asking this is

3  because I wanted to go through these with you and go

4  over some of the reasoning behind these core principles.

5  So I think, you know, treating people with decency and

6  respect and following legal guidelines is pretty

7  straightforward.  But I wanted to ask you why one of the

8  core principles is not promising someone leniency?

9      A    Because the Courts have found that promises of

10 leniency -- look, if you tell us you did this, you're

11 going to go home, we're not going to put you behind bars

12 is coercive and could lend or create an environment

13 where an innocent person confesses.

14     Q    So if someone said, for example, if you tell

15 us this you're free to leave, or if you -- I'll phrase

16 that better.  If you admit to a crime, you can go home.

17 That would be a promise of leniency that you would

18 believe was coercive.  Correct.

19     A    If it's not true.  If they're going to let

20 them go home, then it's a true statement.

21     Q    And what other promises of leniency would you

22 consider to be coercive in nature?

23     A    Look, you're charged with a homicide.  If you

24 just plead out to whatever minor level of homicide would

25 be, we'll make sure you get less time in jail.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com
KENTUCKIANA COURT REPORTERS

1    Manslaughter or whatever it is.  I don't know how that

2    ranks.

3        Q    All right.  And moving on to the no physical

4    harm and intimidation. What is considered intimidation

5    within these core principles?

6        A    Well, if -- if I'm a suspect and you come into

7    a room and you threaten that, if I don't tell you what

8    happened, you're going to shoot me in the leg.  That

9    would be intimidation.

10       Q    Outside of threats, are there other forms of

11   intimidation that you train someone interrogating a

12   subject to not engage in?

13       A    Oh, I'm sure there's all kinds.  I mean, in

14   our book, we lay out all kinds of different cases where

15   the Court says, this is improper.  This is improper.

16   This is improper.  You know, telling somebody that --

17   look, let's say in a SIDS case where baby has died.  If

18   you go to jail, you know what they do to, you know,

19   fathers who kill their babies?  They're baby killers.

20   Okay.  You're not going to last their more than six

21   months.  You know, threatening them with that kind of

22   future harm, that kind of thing.  It is certainly an

23   intimidation factor.

24       Q    Okay.  And then moving to the no threats of

25   inevitable consequences, can you expand on that

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1    principle for me?

 2         A    If you don't tell me you did this, I'll make

 3    sure you never see your family again.  If you don't tell

 4    me you did this, I'll make sure your kids are taken away

 5    from you.

 6         Q    And so that would be if you don't agree with

 7    what I'm saying or follow along with what I'm saying,

 8    you're going to face this consequence.

 9         A    Yeah.

10         Q    Makes sense.  Okay.  And with the principle of

11    using extra caution for minors, or I think you said

12    something to the lines of people who are less

13    developmentally --

14         A    Socially immature.

15         Q    Socially immature.  Would that only apply to -

16    - in your practice, does that only apply to minors or

17    does that also apply to someone who might have a

18    developmental disability, for example?

19         A    Oh, yeah.  One of our principles, and I guess

20    I didn't say it, is to you exercise caution with people

21    with mental or psychological impairments.  If you've got

22    somebody with a very low IQ, you have a question about

23    whether or not they can understand the Miranda rights,

24    you should take extra time to walk them through each one

25    and talk to them about it to make sure they know the
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    case.  Several years ago in Illinois, they passed

2    legislation that juveniles have an expanded Miranda

3    right qualification that police have to go through.

4        Q    And with regards to the psychological

5    impairments, what are the types of psychological

6    impairments that you train interrogators to be on a

7    lookout for when they're interrogating a suspect?

8        A    Oh, schizophrenia, neurosis, psychopathy or

9    psychopaths, you know, bizarre kind of behaviors, not

10   somebody who had a bad day or that kind of thing.

11       Q    Okay.  Do you provide any training on whether

12   or not how to recognize if someone is in acute mental

13   distress?

14       A    In one of our books called the investigator

15   anthology, we have chapters on personality disorders and

16   some of the signs that you might look for.  I don't know

17   that one is specifically mentioned, but it could be.

18       Q    Is the training that you provide on

19   interrogation specifically cover how to recognize if

20   someone's in acute mental distress?

21       A    Not so much interrogation, but on interviewing

22   because interviewing is typically the first step.  And

23   one of the things that we teach to do with the outset of

24   the interview is to establish a behavioral norm or

25   baseline for this subject.  So you talk to them about

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    their background, what they do for a living, maybe some

2    recent news event or weather event in the area to kind

3    of get a baseline.  Are they conversant?  Do they

4    understand?  Are their answers reasonable for whatever

5    you've asked about, that kind of thing.  And so then as

6    you go through the interview process and you begin

7    asking questions about the issue under investigation and

8    you see a significant change in those behaviors, it may

9    suggest a level of anxiety because of possible

10   involvement.  We can't make that judgment, but it's

11   something that we are aware of.

12       **Q     One of the core principles that you mentioned**

13   **is not conducting an interrogation for an excessive**

14   **period of time, correct?**

15       A     Yes.

16       **Q     And what would you consider an excessive**

17   **period of time to be?**

18       A     Well, I'll give you an example.  When you look

19   at the body of false confession cases from DNA

20   exonerations and from research done by Richard Leo and

21   Steve Drizen, they found that the average false

22   confession case came after 16 hours of constant

23   interrogation.

24       **Q     Okay.  So past 16 hours, you would consider**

25   **that to be excessive.**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Well, you could --

 2             MR. PASQUALINO:  Object to form.  Go ahead.  I

 3        think mischaracterizes testimony.  Go ahead.  Joe,

 4        you could --

 5             THE WITNESS:  Okay.  You could have a coerced

 6        confession in 30 seconds.  If I walk into a room and

 7        put my gun to your head and say, if you don't tell

 8        me what happened, I'm going to blow your head out

 9        and the guy confesses, it's a coerced confession,

10        but it took 30 seconds.  So the Courts have never

11        established a specific time because they want to

12        look at the totality of circumstances.

13   BY MS. GARCIA:

14        Q    So has Reid and Associates established a

15   specific time they train on in terms of this is -- if

16   you've hit this level of time, it's excessive?

17        A    Well, what we say in our book is that if you

18   interrogate somebody for three or four hours and they're

19   adamant in their denials, very vocal in their denials,

20   consistent in their denials and you're not making any

21   headway at all, it might be time to step back and see,

22   are we on the right track?

23        Q    And is there a specific amount or even

24   approximate amount of time, you would say if there's

25   persistent denials that it's time to switch tracks?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     The three to four hours I mentioned.

 2        Q     Yes.  That it would be three to four hours?

 3        A     Yes.

 4        Q     Okay.  Great.  And now turning actually back

 5   to the nine steps of interrogation, can I first ask you

 6   what the purpose of the Reid Technique is?  How is it

 7   formulated to work?

 8        A     Well, when you say the Reid Technique, you

 9   mean the read technique of interrogation?

10        Q     Yes.

11        A     Okay.  The purpose is to learn the truth.

12        Q     Okay.  And outside of its truth telling

13   function, are there other purposes of the Reid Technique

14   of interrogation?

15        A     No.

16        Q     Would you agree that the Reid Technique is

17   formulated in such a way to elicit a confession from a

18   subject?

19        A     No.

20        Q     Okay.  One of the steps of the Reid Technique

21   of interrogation is overcoming objections, correct?  And

22   so if someone was continuing to object and say that, you

23   know, I didn't do whatever I'm being accused of and

24   continuing to speak over those objections, would that

25   perform a truth compelling function or wouldn't that
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   more fairly be seen as trying to elicit a confession of

2   some sort?

3        A    Well, what you described is not an objection.

4   What you described is a denial.

5        Q    Okay.

6        A    An objection is when somebody uses something

7   to kind of suggest they couldn't do it.  For example,

8   let's say in a child abuse case, the subject says to

9   you, "Look, I could never do something like that.  I'm a

10  Catholic." Or money is stolen from the safe and the

11  person says, "I could never do that.  I don't have the

12  combination." So they're not denying that they did it.

13  They're giving a reason why they "couldn't".  So that's

14  a different process than the denial phase.  Now, to

15  clarify, innocent and guilty people both deny they did

16  it, but to learn the truth, if I can expand on that,

17  there are four possible outcomes to an interrogation.  1

18  is that the deceptive person acknowledges what they did

19  and gives us corroborating detail.  2, the person may be

20  innocent, but he may say to us the interrogation, "Look,

21  I didn't do it, but I know who did.  Okay.  And I didn't

22  tell you that because I'm afraid of what he'll do if he

23  finds out, but I can tell you now, here's who did it." A

24  third outcome might be a truthful person who says to us,

25  "Look, it had nothing to do with this thing, but look,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    this is embarrassing, but I was somewhere that night I

2    wasn't supposed to be.  I was with somebody I shouldn't

3    have been with and I don't want my family to know." And

4    a fourth outcome is where the investigator steps out of

5    the room and says -- or thinks or says to a colleague,

6    "This guy's adamant in his denial.  He's very strong.  I

7    think we better take a second look."

8         Q    And when you take a second look, would you

9    expand on that a little bit?

10        A    Maybe there are other people that we want to

11   interview or talk to.  Maybe there are other people that

12   we want to get some background information on.  Maybe he

13   refers to someone in the interview that we need to look

14   at who might have guilty knowledge and might help us in

15   some way.  It's hard to say, but we might step back and

16   say this guy bit my head off for three hours.  There's

17   no way at this point I can believe that he did it.

18        Q    Right.  And when it comes to the Reid

19   Technique of interrogation, the process itself starts

20   off with a positive confrontation, correct?

21        A    Yes.  Statement of involvement.

22        Q    And can you expand on what a positive

23   confrontation would be within the Reid nine steps of

24   interrogation?

25        A    Interrogation associated with the polygraph

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    test or independent?

2        Q    First independent and then polygraph?

3        A    Okay.  In independent, the results of our

4    investigation clearly indicate you broke into the

5    Jason's jewelry store.  If the polygraph test had been

6    questions about did he break into the Jason's jewelry

7    store, we may say the results of the polygraph test

8    indicated you haven't told the truth about the break in

9    Jason's jewelry store.

10       Q    So in the polygraph example, the positive

11   confrontation would come after there was a deceptive

12   test of some sort?

13       A    Correct.

14       Q    Okay.  And so would fair to say the positive

15   confrontation is, here's this set of facts that indicate

16   you had something to do with, in this example, breaking

17   into this jewelry store.  Can you explain that?

18       A    Yes.

19       Q    Okay.  And step two is interrogation themes,

20   correct?

21       A    Step two.  Yes.

22       Q    Okay.  And can you expand on what that means

23   within the technique?

24       A    Yeah.  In step two, which is typically a

25   monologue, the investigator proposes psychological

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   justifications or reasons for the subject to commit the

2   crime.  So let's just say on an embezzlement case,

3   "Look, Charlie, I know the pressures you've been under.

4   I know your wife lost her job in covid.  I know you were

5   furloughed for, you know, for 12 months.  I know you've

6   got a lot of medical bills.  I think you got involved in

7   this kind of thing to help your family, to take care of

8   your family.  I don't think you're trying to get money

9   to go out and buy drugs or party.  I think it was for

10  your family." So we're giving him a psychologically

11  acceptable reason, not a legally acceptable reason

12  because just because he stole money to take care of his

13  family doesn't make it obviously legally acceptable, but

14  we're making -- we're giving him a reason that makes it

15  more understanding.  That's an example.

16        Q    Okay.  And when it comes to giving a, you

17  know, psychological reason that may make it more

18  understanding this person committed a crime.  Have there

19  ever been concerns that in offering psychological

20  justifications for why someone might have committed a

21  crime, it may elicit a false confession?

22        A    By itself?  No.

23        Q    Yeah.  Why not?

24        A    Because the proof of a confession is the

25  details.  Somebody walking into our office and saying I

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1   did it means nothing.  They have to give us information

 2   that corroborates what they say they did.  Now, if they

 3   take us to the murder weapon, they take us to the stolen

 4   jewelry, they take us to the bloody clothes that they

 5   were wearing, that's corroboration that "I did it" is an

 6   accurate statement.  As you know, when -- when you have

 7   a high profile murder somewhere, hundreds of people walk

 8   in and say, "I did it" because they're typically

 9   suffering from psychological issues.  But saying I did

10   it doesn't mean anything.

11        Q    All right.  And so after the kind of

12   interrogation themes or the psychological themes are

13   expanded upon, the next step is handling denials,

14   correct?

15        A    Step 2, theme development, is intermingled

16   with handling denials and overcoming objections because

17   as you're developing the theme, inevitably, subjects

18   will attempt to interject themselves saying, "I didn't

19   do it." And so we know from experience we never win the

20   argument.  Yes, you did.  No, I didn't.  Yes, you did.

21   No, I didn't.  So when the person is beginning to

22   introduce their denial, can I say something?  Could I

23   explain?  We'll say to them, "Mary or John, just hold on

24   one second.  Let me make this one for further point." We

25   try to minimize the frequency of the denials.  We never
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-01444 Document #: 145-2 Filed: 02/09/24 Page 57 of 136 PageID #:843

1  stop anybody from saying what they want to say, but we

2  do try to discourage them.  And quite frankly, a lot of

3  guilty people deny it anyway, but that's the intent.

4       Q    And what's the intent of minimizing denials?

5       A    To avoid yes, I did.  No, I didn't.  Yes, you

6  did.  No, I didn't because once you're on that track,

7  it's hard to get off.

8       Q    Okay.  And when you handle denials, what are

9  some of the techniques that are taught for, you know,

10  confronting someone who is continuing to deny, deny,

11  deny?

12       A    Well, most deceptive people introduce their

13  denials with permission phrases.  Can I say something?

14  Would you listen to me?  Truthful people don't.

15  Truthful.  People get in our faces, say, "I don't care

16  what's in that file.  I had nothing to do with this

17  thing," and they're all over us.  Deceptive people, "Can

18  I say something?" So when we hear that, we teach our

19  investigators to interject yourselves.  "John, just hold

20  on for a second," and use nonverbal gestures to

21  reiterate that.  Kind of the stop sign, turning your

22  head away and the person pauses, you continue your

23  theme.  And this could go on many times during the

24  course of an interrogation.

25       Q    And what's your basis for the belief that

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   deceptive people tend to have the type of denial you

2   described of, "Can I say something," or something to

3   that effect.

4        A    From looking at verified cases.  So when we

5   have an interrogation and where that kind of language

6   took place, they admit the crime, they take us to

7   corroborating evidence such as the murder weapon, the

8   stolen jewelry, et cetera.  We can look back and see

9   what they said and kind of say this came from a known

10  guilty person.  And when you start seeing that repeat

11  itself over hundreds of interrogations, it begins to

12  establish a pattern or practice, if you will.

13       Q    Have you regarding the pattern or practice, is

14  there any sort of research or scientific papers that

15  have been published regarding this claim that deceptive

16  people tend to interject in the way you described?

17       A    Scientific papers are for the most part,

18  useless in our business.  We're looking for what real

19  people tell us was their motivation, what real people

20  would tell us was their reason for doing it.  See, many

21  of the scientific papers, if you will, are creating

22  false environments and testing them.  For example, a

23  professor will have 30 college students volunteer for a

24  project.  He'll tell 15 of them to go into the

25  professor's room, steal the $200 out of the drawer and

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    then all 30 will be interviewed by an investigator and

2    half of the 30 who stole the money are supposed to deny

3    it and see if he recognized that they're guilty.  Half

4    might admit it, depending on what they say.  And so they

5    speculate based on that kind of research, what are

6    effective techniques, what behaviors are reliable when

7    there's no correlation between that and the real world.

8    A college student has nothing at stake if he screws up,

9    if he's found to be guilty when he was really innocent,

10   isn't when he is guilty.  The most that's going to

11   happen, he can't keep the money he's stole or whatever.

12   So they're very misleading because they don't really

13   mirror the real world.  And Sal Casten, who I'm sure

14   you're familiar with, has said that in several of those

15   publications.  That you have to be very careful about

16   drawing inferences from our student research, if you

17   will, to the real world.

18        Q    Sure.  And just broadening this out to the

19   Reid Technique of interrogation, more generally have

20   you, in your time as president or other stakeholders

21   within John Reid and Associates, considered partnering

22   with someone, such a social psychologist to undergo

23   research into the efficacy of the technique?

24        A    Oh, there's no problem with the efficacy of

25   the technique.  We don't need research on that.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1     Q     And what's your basis for that claim?

2     A     Well, the efficacy of the technique, you mean

3   the reliability of it?  Do you mean the accuracy of it?

4     Q     Yes.

5     A     The corroboration in step 8, getting

6   corroboration.

7     Q     Okay.  Turning back to the steps themselves

8   because I feel like we've kind of talked about step 2,

9   3, and 4 already as more of a unit.  Can you expand on

10  what step 5, the procurement and attention of the

11  suspect's attention means?

12    A     Sometimes after a bit where the subject begins

13  to ingrain the notion of the theme and -- and they're

14  thinking about telling us what happened, they kind of

15  draw into a shell and they begin to think about what's

16  going to happen to them.  Am I going to go to jail?  Am

17  I going to lose my job?  What's going to happen to my

18  children, et cetera.  And so we really don't want them

19  thinking about the consequence of what they've done.

20  That reminds them not to tell the truth.  So what we'll

21  typically do is kind of maybe move a little bit closer

22  or get their attention by bringing eye contact to their

23  level, so they're focused on what we're saying and not

24  those thoughts of consequence.

25    Q     Okay.  And the next step would then be

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-01444 Document #: 145-2 Filed: 02/09/24 Page 61 of 136 PageID #:847

1    handling the suspect's passive mood.  Is this a step

2    that's always followed or is this something that is only

3    if there's a passive mood by the suspect?

4        A    It's -- it's kind of ingrained with the prior

5    one, passive mood meeting they're not saying anything.

6    They're looking down.  They seem disinterested.  They're

7    not focused on us.  Again, we -- they're -- they're kind

8    of part and parcel of each other.  Six -- you know, five

9    and six.

10       Q    Great.  And so the next step would then be

11   presenting an alternative question, correct?

12       A    Yes.

13       Q    There's the dog that just barked.  I don't

14   know if you heard him.  Turning back to the question:

15   Could you expand on what it means within the Reid

16   Technique to present an alternative question?

17       A    Alternative question is where we give the

18   subject -- (cough)excuse me.  A question of which we

19   juxtapose two different reasons for committing the

20   crime.  Is this the first time you've done something

21   like this or has it happened before?  Was this your idea

22   or did your buddies talk you into it?  Did -- did you

23   plan on doing it or was it a spontaneous action?  They

24   have three choices.  They can choose one of those two or

25   they can say, "Hey, wait a minute, pal, I didn't do

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    anything." I've lost your volume.

2          Q    So sorry.  Again, the dog just left so I

3    wanted you not to be distracted by that.  But once the

4    alternative question is presented, the next I believe is

5    the confirmation you were talking about, which is having

6    the suspect orally relate various details of the

7    offense;  is that correct?

8          A    Yes.

9          Q    And what are some of the other aspects of step

10   8 besides having that corroboration?

11         A    Well, you're going to -- first of all, when he

12   accepts the alternative and says, "Oh, this was a spur

13   of the moment thing.  I didn't plan on doing this at

14   all." Okay.  Can you start me out as to what happened

15   first and have them go through their statement as to the

16   sequence of events, along which we'll be asking

17   questions to develop additional details through their

18   story, part of which are the corroborating details.  So

19   it's orally walking them through as they describe what

20   they did, how they did it, the circumstances, et cetera.

21   Step 9 involves basically taking that verbal statement

22   and executing a written document.  Whether they write it

23   out, we write it for them and they read it and sign it,

24   you have it recorded.  Sometimes there's a stenographer

25   involved, but it's documenting that statement.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Great.  And so then when the suspects --

 2             MR. PASQUALINO:  Would this be a good time for

 3        five minutes?

 4        Q    I just wanted to ask one more question and

 5   then we can take a five minute break.  And so then once

 6   you have those statements corroborated, I believe the

 7   last step is elements of oral and written statements. So

 8   can you explain what that means in the Reid

 9   interrogation context?

10        A    Well, as I just said, it means documenting the

11   verbal version.  Take -- executing a written statement.

12   Now, whether we write it out and they read it and sign

13   it, whether they write it out in their own language,

14   whether we have somebody come in, you know, like a

15   sonographer and take it down, a court reporter.  If you

16   are -- a law enforcement agency might bring in a court

17   reporter in.  Creating a documented statement.  Now, if

18   you've been recording the interview and the

19   interrogation, you certainly have that, but we still

20   encourage people to get a written statement because

21   sometimes the recording isn't admissible because of

22   other things the subject has referenced or talked about.

23             MS. GARCIA:  Great.  Yes, and Mick, I think now

24        is a good time to take the five minute break or

25        maybe we can just make it around seven and come back
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1        around 11:30.

 2            MR. PASQUALINO:  That works.  Joe, that work

 3        for you?

 4            THE WITNESS:  Sure.

 5            MS. GARCIA:  Awesome.  And I think just for

 6        your purposes, Mick, I think I'm about halfway

 7        through, so it should be around three hours.

 8            MR. PASQUALINO:  I appreciate it.  Thank you

 9        very much.

10            MS. GARCIA:  Of course.

11            MR. PASQUALINO:  I'll see you guys at 11:30.

12            COURT REPORTER:  We're off the record.  Time is

13        11:23 a.m.

14            (OFF THE RECORD).

15            COURT REPORTER:  We're back on the record for

16        the deposition of Joseph P.  Buckley being conducted

17        by video conference.  My name is Kortney Chase.

18        Today is August 26, 2022 and the time is 11:31 a.m.

19    BY MS. GARCIA:

20        Q    Great.  When we left off, we had gone through

21    the nine steps of the Reid Technique for interrogation,

22    and I wanted to ask more specifically about what steps

23    are taken within Reid and Associates to either evaluate

24    or reform any standards you have around interrogation.

25        A    Well, the first place we look are courts and
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-01444-Document #: 145-2 Filed: 02/09/24 Page 65 of 136 PageID #:851
Deposition of JOHN REID & ASSOCIATES CORPORATE REPRESENTATIVE JOSEPH (5) - taken on August 26, 2022
30(b)(6)
64

1    to see if the Courts say anything where we have to

2    modify something we're saying or teaching.  We look at

3    state statutes.  For example, in Illinois, last year

4    they passed legislation that said investigators could

5    not misrepresent evidence to 17-year-old suspects

6    subjects or younger.  You know, you can't tell them you

7    got a witness when you don't kind of thing.  And that

8    had not been the law prior to this year, so that's the

9    first place we would look.  Second place we would look

10   is information that we're getting from subjects.  You

11   know, what they tell us in post confession interviews.

12   The reason I didn't tell that guy yesterday who talked

13   to me is because he did A, B, C, and D, and I wasn't

14   going to give him the time of day.  And so we learned

15   from talking to actual people.

16       Q    And are you aware of criticisms of the Reid

17   Technique of interrogation as being too heavy-handed in

18   attempting to illicit confessions?

19       A    Not from the Courts, but from social

20   psychologists and defense attorneys.

21       Q    And do you believe there's merit to those

22   criticisms?

23       A    No.

24       Q    Why not?

25       A    Simply from having worked with the process for

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   50 years and having seen it thousands and thousands of

2   times because number one, we don't engage in any of the

3   coercive behaviors that are attributable to false

4   confessions, threats, promises, denial of rights, et

5   cetera.  Secondly, we always give a person to explain

6   what they want to explain and if they do make an

7   admission, we need corroboration to make sure we've got

8   a legitimate statement.

9       Q    And is the Reid Technique of Interrogation a

10  foolproof method of eliciting confessions?

11      A    Of course not.

12      Q    Okay.  Have you had any experience or know of

13  any times in which a confession was elicited using the

14  Reid Technique and has turned out to not be true?

15      A    Not by our staff people.  I can't speak for

16  people who we've trained and have gone out there and

17  conduct interrogations that ended up being false

18  confessions, maybe stating they used the Reid Technique

19  when they may or may not have that.  That we don't --

20  we're not there.

21      Q    So over the past -- my math is bad.  That's

22  why I became a lawyer, but over the past two to three

23  decades, you've never been made aware of a time when

24  someone utilizing the technique who's within the John

25  Reid and Associates staff has elicited a false

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    confession of any kind?

2        A    Right.

3        Q    Okay.  And has Reid Associates ever engaged

4    with social psychologists in attempting to formulate the

5    Reid Technique?

6        A    Well, I think probably early on, John Reid and

7    Fred Ambo dealt with psychologists that they worked with

8    from the University of Illinois and Phillip Ash, A-S-H,

9    particularly in the '70s and early '80s.  I wasn't quite

10   involved at that level of conversation at that point,

11   but I know they worked with him on different elements of

12   the process.  I don't know the details, but other than

13   that, no.

14       Q    And so would it be fair to say that you

15   haven't worked with any social psychologists in

16   developing either the manuals or the books that you

17   referred to earlier?

18       A    No.  No.

19       Q    Okay.  And why is that?

20       A    Well, most of what they contribute doesn't

21   help us.  Most of what they contribute is on the

22   negative side.  You know, actually, many of them think

23   we're too effective.  They say interrogation is walking

24   into a room saying to a guy, "You did it," and saying

25   okay.  And if you do any more than that, you know,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

 1    you're coercing.  So they have a different mindset.

 2        Q    Okay.  That's fair enough.  And moving away

 3    from that, I know that the seminar itself that Reid and

 4    Associates teaches is interviews and interrogations.  So

 5    how would you classify an interview versus an

 6    interrogation?

 7        A    Interviews are non-confrontational, non-

 8    accusatory, information-gathering conversations.

 9    Interviews are typically Q&A.  There's two kinds of

10    questions we ask in our interviews.  Investigative, who,

11    what, when, where, why kind of questions and behavior-

12    provoking questions.  These are questions that we know

13    most truthful people answer one way, most deceptive

14    people answer the exact same question a completely

15    different way.  And I'll give you a -- a very simple and

16    clear example.  Someone has killed your next door

17    neighbor.  The police are interviewing all of the

18    immediate neighbors.  And during the course of

19    interviewing you, they ask you, "If we find the person

20    or persons who did this, what do you think should happen

21    to you -- to that person?" And of course you would say -

22    - well, you're probably thinking which neighbor?  No,

23    you would say prosecuted, sent to jail, behind bars for

24    the rest of his life.  But let's say, you're the person

25    who killed your neighbor, and they ask you what should

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-01444-Document #: 145-2 Filed: 02/09/24 Page 69 of 136 PageID #:855

```
 1    happen to the person who did this?  What are they asking
 2    you to say?  What should happen to you?  And so what do
 3    most bad -- bad guys say?  "Gee, I don't know.  It's
 4    hard to say.  It depends on the circumstances."  I mean,
 5    you -- you know this guy's a real jerk, don't you?  A
 6    very different kind of answer.  We have many of those
 7    that we interject into the interview to see what kind of
 8    responses we're getting from the person.
 9        Q    And what would you say in your experience, the
10    efficacy of this interview is in eliciting the truth of
11    someone's circumstance?  And I know I've phrased that in
12    a very awkward way, so I can rephrase that.
13        A    Yes.
14        Q    You said you'd use kind of like behavioral
15    markers to try and see how someone reacts when you ask
16    them a question in an interview.  Correct?
17        A    Could you repeat that?
18        Q    You said you used behavioral markers or
19    indications when conducting an interview under the Reid
20    method.
21        A    Interview and interrogation, we're looking at
22    their behavior in both circumstances.
23        Q    And this is part of the, you know, initial
24    questioning of a suspect, correct?
25        A    Yes, the interview.
```



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1      Q     And have you found that there's any sort of

2    correlation between these behavioral markers and then

3    whether or not someone is in this instance, for this

4    example, guilty of murdering their neighbor?

5      A     Are you asking me if there's correlation

6    between our judgment on their behavior going one way and

7    the outcome is that way, versus the opposite way?

8      Q     Yes.

9      A     Yes.  Yes.  See, here -- here's what I was

10   getting at before a little bit.  These people who do

11   research on behavior, they will have a convict on --

12   then they will film him on film, telling what he did

13   when he committed his crime.  Then in a separate day,

14   they'll have him -- tell him what he did on committing a

15   different crime, which he didn't do.  In other words,

16   the second one is a lie.  And the -- the convent is

17   agreeing to this.  He's getting some money to do this.

18   They show both independent films to a group of

19   researchers, like police officers, not researchers, but

20   audience, researcher, students, and they find that those

21   people are no better than chance at figuring out who's

22   lying, because there's no behavior that is really

23   definitive of deception.  So that's why we teach that

24   there's all kinds of things you have to do to assess

25   behavior.  Number 1, there's no behavior unique to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    lying.  Just because someone doesn't look at you when

2    they answer does not mean they're lying.  Maybe it's a

3    cultural issue, psychological issue, maybe they're

4    momentarily distracted by something.  So you have to put

5    it in context.  Secondly, the -- the thing that they

6    don't do in these studies is they don't establish a

7    behavioral baseline for the subject.  They don't just

8    talk to him about background, non-threatening questions,

9    something about the news kind of thing, to see how they

10   sit, look at, gesture, et cetera.  So the audience has

11   nothing to compare the behavior here when they're

12   telling their lie versus their normal behavior.  There's

13   all kinds of problems with those research.  So when they

14   say research is no better than chance in reading

15   someone's behavior, I can completely understand why

16   you're getting to that result.  But in the real world,

17   we oftentimes will see somebody who gives us the -- the

18   bad answer on punishment, as I described with you for

19   Mitchell, and many other ones who go down to confess and

20   gives us good corroboration.  We did a study that was

21   published in the Journal of Forensic Sciences.  I

22   believe it was 1991, '92, '93, where we had six

23   reviewers looked at 60 videotaped interviews.  And in

24   each of the interviews, we played 15 behavior-provoking

25   questions.  They were 85 percent correct in identifying

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  who was lying versus who was telling the truth by just

2  how they answered those 15 questions.  So they could be

3  very, very helpful.

4      Q    But would it be fair to say that there isn't a

5  one-to-one, if the, you know, indicators of deceptive

6  behavior and eventual confession down the line?

7      A    What do you mean by one-to-one?

8      Q    So would it be fair to say just because

9  someone has those indications of deceptive behavior,

10  that doesn't necessarily mean that they're going to be

11  guilty or confess to a crime down the line?

12      A    Oh, correct.  Correct.

13      Q    Okay.

14      A    Correct.

15      Q    Okay.  I wanted to turn to polygraphing

16  specifically now.

17      A    Sure.

18      Q    And what would you say the purpose of

19  polygraphing is within the process of interview and

20  interrogation?

21      A    I don't know what you're asking.

22      Q    Sure.  Asked another way: What is the purpose

23  of a polygraph examination?

24      A    To test somebody on the truthfulness of their

25  statement.  That's typically the purpose of a specific

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1   issue.  Did you commit this robbery, did you shoot this

2   person, did you sign this stolen check, that kind of

3   thing.

4       Q    And when is it appropriate under the Reid

5   technique for a polygraph to be utilized?

6       A    I would say in almost any investigation where

7   you have a specific issue that is o -- objective.  You

8   really shouldn't be using polygraph on intent.  Did you

9   intend to suggest to this person, A,B,C?  Was it your

10  intent to do this?  It's hard to measure intent.  Intent

11  changes moment to moment.  But the actual fact: Did you

12  set this fire, did you shoot that person, did you break

13  into this jewelry store, those are very concrete acts

14  that people know they did or did not do.

15      Q    And so would it be fair to say that a

16  polygraph examination can be used as a tool of

17  investigation?

18      A    It -- it -- it -- it typically is part of the

19  investigative process or could be part of the

20  investigative process.

21      Q    Right.  And in the process of polygraphing

22  someone, what is the first step within John Reid and

23  Associates, with the understanding that, you know -- or

24  like, let's ask this a better way.  In 1995, what

25  would've been the first step of polygraphing someone

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    within John Reid and Associates?

2        A    Well, the first thing we have to do is we have

3    to get information as to what the purpose of the test

4    is.  What's the issue, what's the background, et cetera.

5    This could come from the employer.  It could come from

6    the police.  It could come from an attorney.  It -- it

7    depends on who's interested in having someone tested. So

8    we have to get the background on what we call the case

9    information, from which we can focus on what kind of

10   questions we should ask or can ask, et cetera. That's

11   the first step.

12       Q    Okay.  And then what would the step after that

13   be?

14       A    The s -- step after that would be to conduct a

15   pre-test interview, in which you're sitting with the

16   subject, talking to him about what the focus of the

17   investigation is, what their statement is, depending on

18   the kind of investigation, what they did during the time

19   period in question, their relationship to the victim,

20   their alibi if they have one, et cetera, the who, what,

21   when, where questions, and some of the behavior-

22   provoking questions and all.  The interview is strictly

23   non-accusatory.  And the role of the interviewer in the

24   interview is to be a neutral objective fact finder.

25       Q    And is there any sort of time limitations that

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    **examiners are instructed to keep to within the pre-test**

2    **interview?**

3         A   No, no.  I mean, generally speaking, I would

4    say they're probably in the neighborhood of 45 to 60

5    minutes, probably at the outside.  But some issues may

6    be a little bit less, depending on the complication.

7    Others, when we get, for example, in a commodity stock

8    fraud exchange, that interview might go an hour and a

9    half because it's complicated to understand.

10        Q    **What occurs after the pre-test interview?**

11        A   Usually the examiner will step out of the room

12    and formulate the test questions he's going to ask based

13    on the conversation with the subject, and he'll come

14    back in and review them.  (clears throat) Excuse me,

15    read them to the subject so he knows what the questions

16    will be, there's no surprise questions or anything like

17    that.  And have the other answer them, so we know what

18    he's going to answer during the test itself.

19        Q    **Okay.**

20        A   Following that, we usually attach him to the

21    instrument and begin the testing process where we're

22    reading through the questions while the various

23    physiological elements are being recorded.

24        Q    **Okay.  And what physiological elements are**

25    **recorded?**

**Kentuckiana Reporters**
**30 South Wacker Drive, 22nd Floor**
**Chicago, Illinois 60606**

**KENTUCKIANA**
**COURT REPORTERS**

**502.589.2273 Phone**
**502.584.0119 Fax**
**schedule@kentuckianareporters.com**
**www.kentuckianareporters.com**

```
 1        A    Respiration, abdominal and thoracic, blood
 2   pressure, and what's called the galvanic skin reflex.
 3   Some of our chairs have moment recorders in them to
 4   record unobservable movements.
 5        Q    And is there any sort of time limitation
 6   within the polygraph examination itself when they're
 7   hooked up to the test?
 8        A    Well, let's take a test that has ten
 9   questions.  That ten question test is probably going to
10   run about maybe three, three and a half minutes with the
11   spacing between.  We don't like to go more than four
12   minutes.  I think the state loss is not more than five.
13   But we're -- we try to be under four, because after, you
14   know, four, four and a half minutes, five minutes, the
15   blood pressure cuff can become uncomfortable.
16        Q    Okay.  Is there any other reason why you tend
17   not to go over four minutes, other than the un-
18   comfortability of the blood pressure cuff?
19        A    Well, you -- you want to focus the subject's
20   attention on a limited number of questions.  If you're
21   asking three or four primary questions, that's fine.  If
22   you're asking eight or nine questions about the
23   incident, you know, hi -- his diversion is from one to
24   the other and it kind of dissipates his focus a little
25   bit, and you don't get the quality of responses you
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  might get otherwise if it's just one or two.

2      Q    And similarly, is there any sort of kind of

3  limitation on the number of questions, maybe not the

4  time period, but the number of questions that you'd

5  expect a polygraph examiner to ask?

6      A    Well, we never have more than 11, probably

7  most likely ten, four irrelevant questions; are you

8  currently in Chicago, are you over 21 years old, et

9  cetera, four relevant questions; did you steal the

10  missing money, do you know who did, et cetera, and two

11  control questions.

12     Q    Okay.  Those are a reason you tend to keep to

13  ten or 11 questions and not anymore?

14     A    And not any more, yeah, because the longer you

15  go, the more discomfort this gets and it becomes a

16  problem, yeah.

17     Q    Okay.  So similar reasoning for why you tend

18  not to go past four minutes or so when you're --

19     A    Yeah.

20     Q    -- you're conducting the test?

21     A    Uh-huh.

22     Q    And so once the test is conducted, what is the

23  next step?

24     A    Well, usually there's a series of tests.  We

25  have a set of questions we go through usually in

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-01444 Document #: 145-2 Filed: 02/09/24 Page 78 of 136 PageID #:864

1   numerical sequence the first time. Then we have a card

2   test, which is a stimulation test. We have the person

3   pick a card. We're going to say we're going to call up

4   to pick a card, number one, number two, and number

5   three, say no to all of them. And the idea is there to

6   let the -- reassure the truthful person that the -- the

7   physiological responses can identify when they're lying.

8   So if they're not lying, they'll be fine, and vice versa

9   for the deceptive. Then we oftentimes will step out of

10   the room for a few minutes, give the person a chance to

11   kind of catch their breath, relax a little bit. We come

12   back in, probably will repeat the original set of

13   questions in numerical sequence, and then it can vary.

14   We can do what's called a silent answer test, where the

15   person doesn't answer out loud, a mixed question test

16   where we change the sequence of questions we ask. And

17   then we have an option for what's called "a yes test,"

18   which is designed to see if the person will try to

19   manipulate the test. So that series sequence of a test

20   can vary. But if there's at least two of them with the

21   same sequence and a mixed question, minimum of those

22   three.

23   **Q   Okay. And is the subject hooked up to the**

24   **polygraph exam the entire time this testing is going on?**

25   A   When the actual testing is going on, yes, they

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  are attached to the instrument.

2       Q    So they'd be attached for the card test?

3       A    Yes.

4       Q    And then for whatever the kind of sequencing

5  tests are?

6       A    Well, we call them straight-through, because

7  it's one through ten in sequence.  So you've got your

8  first straight-through card test straight-through, and

9  the fourth spot may vary, silent answer test or a yes

10  test.  And it might be the mixed question test where we

11  simply mix the sequence of questions.

12       Q    And what is the purpose of the silent answer

13  test?

14       A    To create the -- the sense that the instrument

15  can detect what they're thinking in terms of the

16  response.

17       Q    Okay.  And with the silent answer test, if I'm

18  formulating this correctly, the polygraph examiner

19  asking a question then giving the examinee time to think

20  what the answer would be.

21       A    Correct.  Yes.

22       Q    Okay.  And then the mixed answer test is where

23  you ask out of order, correct?

24       A    Yeah.  Not mixed answer, mixed question.

25       Q    Mixed question, my apologies.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A     Yeah.

2      Q     And what is the purpose of the mixed question

3   test?

4      A     Well, if the person knows from the first two

5   or three tests that, did you steal the car is the first

6   question, he begins to anticipate it.  So by moving it

7   back at another spot on one of the tests, and he real --

8   you know, it changes his perception.  Now he's listening

9   carefully to the first one, because he -- it's -- we

10  tell him it's not going to be the same sequence.

11     Q     Okay.

12     A     And then we can also in the next question,

13  pair the relevant right next to a control, so we can

14  make that question-by-question comparison.

15     Q     Okay.

16     A     And a straight-through test, they're usually

17  separated.

18     Q     And then what is the purpose of the yes test?

19     A     The yes test, some people try to manipulate

20  the recordings.  So for example, when we ask them the

21  card test, and let's say you picked four, we tell you to

22  say no to four, or to say no to whatever you picked and

23  all the others.  When they come to number four, they

24  might do a few things, move their arm, take a few

25  breaths, because they want that to look like the lie,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    because they're not going to do that later on at the

2    test when we ask them if they stole the vehicle.  So

3    their thought is if we don't see that, we'll think

4    they're truthful.  On the yes test, they're thinking

5    that yes is actually the truthful answer.  Well, I can't

6    just sit there and just let it go.  I've got to make

7    that look like the lie, so they kind of do the same

8    thing.  Now, not every guilty person does that by any

9    means, but quite often they do, and that's why we use

10   it.

11       Q    Okay.  And so once you have done the testing,

12   I assume the next step would be the examiner scores the

13   test, correct?

14       A    Correct.

15       Q    And what is the process for scoring the test?

16       A    He's going to look at the affiliate

17   physiological charts, responses on the charts in front

18   of him.  He's going to make a mark on our question inter

19   -- interview sheet as to the strength of the response.

20   And we -- we use kind of check marks and how light or

21   heavy they are.  A very light check mark will respond to

22   a minimal response, a very heavy check mark indicates a

23   significant response.  And we would do that for each of

24   the relevant questions and the control question, then we

25   would do that for each of the three or four tests that

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-01444-Document #: 145-2 Filed: 02/09/24 Page 82 of 136 PageID #:868
Deposition of JOHN KIRS & ASSOCIATES CORPORATE REPRESENTATIVE JOHN (2) taken on August 26, 2022
30(b)(6)
81

1    we ran.

2        Q    Are you aware of other types of scoring that
3    is conducted when analyzing a polygraph examination
4    other than the check mark test?

5        A    Yeah, sure.  Numerical scoring.  Some of the
6    guys in the profession got very nervous with check
7    marks, because they felt it was too subjective.  You
8    know, what's a light shade to you versus a light shade
9    to the other guy?  So Cleve Backster out in San Diego,
10   developed a num -- mum -- us -- numerical scoring
11   process.  So we said, let -- instead of check marks,
12   let's put down numbers, one for a light response, two
13   for medium, because numbers seem more objective.  So
14   it's really just, you know, camouflage, but it's the
15   same principle.

16       Q    Okay.  When was the numerical testing
17   developed?

18       A    Oh, I don't know for sure.  Certainly the '90s
19   at some point, whether it was '91, '98, I -- I don't
20   know offhand.

21       Q    Okay.  And currently, is there any sort of
22   industry standard or preference for like a check mark
23   technique versus a numerical scoring?

24       A    Oh yeah.  Sure.  I think mostly industry does
25   check marks.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Okay.

2    A    Sure.

3    Q    Was there an industry standard in 1995?

4    A    In terms of scoring?

5    Q    Yes.

6    A    No.

7    Q    Okay.  Do you feel like there's any sort of

8    difference in efficacy or reliability using one

9    technique versus another?

10    A    Only -- only that the numbers have a

11    perception of being more objective.

12    Q    Within the polygraph testing and John Reid and

13    Associates, are there any prohibitive techniques that

14    you would not want a polygraph examiner to engage in

15    such as, you know, lying as an obvious example?

16    A    Sure.  Yeah.  No.  Well, number 1, we don't

17    want him to engage in any of the procedures that are

18    against our principles; threats, promises, denial of

19    rights, denial of physical needs, et cetera.  That'd be

20    number 1.  Number 2, we're not going to lie during the

21    interview about information in the case.  We may in the

22    -- we may in the interrogation, but we're not going to

23    do that in the interview, (cough) excuse me, because in

24    the interview, we're neutral objective fact finders.

25    We're not there to accuse anybody of anything.  We're

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1    not there just to accept their story.  We're there to

 2    kind of develop information, to determine the accuracy

 3    of what they're saying.

 4        Q    Would it be fair to say that if you had a

 5    situation where, you know, someone gave a pre-test

 6    interview, they gave a polygraph examination and they

 7    were found to be deceptive in some way, and an

 8    interrogation followed that a - lying would not be a

 9    prohibited within the interrogation itself?

10        A    Well, in 1969, the US Supreme court said you

11    can misrepresent evidence verbally, provided everything

12    else is proper, Frazier versus Cupp.  We don't encourage

13    people to do that because of the -- if you tell him

14    you've got a witness for example, and he knows there

15    never was anyone around there, and he knows you're

16    lying, you've lost your credibility.  So misrepresenting

17    things like this, we say in our book, is a last resort

18    tactic.  It's not something we go to first.  We don't do

19    it with juveniles.  We don't do it with people of mental

20    or psychological impairments.  We don't with subjects

21    who don't remember what they did that night, maybe

22    because of alcohol or drugs.  So there's some very

23    specific guidelines about that process.

24        Q    But outside of the prohibited persons you

25    listed, and with the understanding it's a last

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

**602.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  technique, lying isn't prohibited within interrogations

2  under the Reid technique?

3      A    Well, I -- it's -- it's a last resort option,

4  and the lying is about potential evidence; a witness we

5  don't have, a DNA match we don't have, that kind of

6  thing.

7      Q    Sure.  But I'm asking specifically, is it a

8  prohibited technique under the Reid technique?

9      A    Well, all of our guys know that it would be a

10  last resort.  It doesn't say you could never do it under

11  any circumstance.

12      Q    So lying is not prohibited within the Reid

13  technique?

14      A    In terms of evidence, correct.

15      Q    Okay.  Turning back to the polygraph

16  examination, it's my understanding that there's a couple

17  different types of conclusions that can be drawn, either

18  that it's inconclusive, unreliable, deceptive, or

19  truthful.  Is there any other classifications that I'm

20  missing or did I misrepresent the classifications there

21  are?

22      A    Well, there is no conclusion unreliable.

23      Q    Okay.

24      A    The conclusions are truthful, deceptive,

25  inconclusive, unresponsive and purposely non-

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  cooperative.  Those are the primary five.

2      Q    Okay.  And so can you explain what an

3  unresponsive finding would be?

4      A    Yeah, yeah.  An unresponsive test result

5  conclusion is when you sit down and you evaluate the

6  physiological changes.  There isn't really any change

7  from one question to another.  It's almost like a

8  straight line.  I mean, it -- it literally is not a

9  straight line, the respiration cycles that you've seen

10  are up and down, but there's no change at all.

11     Q    Right.

12     A    On anything.

13     Q    And in your experience, when is that sort of

14  unresponsive conclusion elicited by a subject rather?

15     A    Well, it's not elicited.  When it -- when it

16  occurs, the subject may be under medication that

17  inhibits physiological response.  We give them a medical

18  data sheet, as you know, and ask them what medication

19  they're on.  We don't always know if they tell us

20  everything accurately.  But nevertheless, that could be

21  a possibility.  It could be a possibility that the

22  person is just, you know, hasn't had sleep in four days,

23  is exhausted, fatigue, that could be a possibility, kind

24  of depends on their demeanor during the interview to

25  make that evaluation, though.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Deposition of JOHN RIES & ASSOCIATES CORPORATE REPRESENTATIVE JOHN (b) taken August 26, 2022
Case 1:20-cv-01444 Document #: 145-2 Filed: 02/09/24 Page 87 of 136 PageID #:873
30(b)(6)
86

1    Q    Okay.  And then --

2    A    I would say there's probably other things I'm

3  not even thinking of.

4    Q    -- of course.  And so in a situation where

5  someone is showing indications of deception, what

6  happens next?

7    A    Well, if we've scored the charts on our

8  opinion is deception, then we're going to come back in

9  and tell them that they're not passing the test.

10   Q    Okay.  And what happens after you tell a

11  subject that they didn't pass the test?

12   A    Well, we're going to say, so there -- there

13  has to be something on your mind, what might be

14  different options, what are you thinking about.

15  Depending on the severity of the response, we may say

16  then okay, the test indicates you're not telling the

17  truth, which is what happened in this case.  And so I

18  think you do have some knowledge as to how the fire

19  started, what happened, either directly or indirectly.

20  So we want to try to clear that up.  What kind of things

21  might there be?  And then we might suggest to them, as

22  we do in theme development, different options, you know.

23  If you were talking with your wife about setting fire to

24  the place, but you both decided, "Nah, nah, we don't

25  want to do that; that -- that'd be terrible," And you

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Deposition of John Kirk & Associates Corporate Representative John (8) taken 8/26/26, 2022
Case 1:20-cv-01444 Document #: 145-2 Filed: 02/09/24 Page 88 of 136 PageID #:874
30(b)(6)
87

1    were afraid to tell us in the interview, you talked

2    about doing that, now will be an important time to

3    explain that.  So that sometimes depending on the

4    subject explanation, we'll do a reexamination, another

5    test.  Once this explanation is verbalized and kind of

6    put on the side.

7         Q    And what would the appropriate time period be

8    prior to doing that kind of reexamination?

9         A    It might be a very well a different day.

10        Q    Okay.  Would there be circumstances in which

11   you would reexamine them during the same day after they

12   gave, in your example, that explanation?

13        A    Possibly.  I think not usually, but it could

14   be at some circumstance.

15        Q    And is there a reason why you wouldn't usually

16   polygraph someone again after they gave that

17   explanation?

18        A    Well, we -- we might -- might need time to let

19   them think about it, because maybe we're suspicious.

20   It's not everything, that they're still withholding

21   information.  We have to see if they would agree to take

22   a second examination.  And sometimes, people would tell

23   us a small piece of information, and in our opinion,

24   based on the way they're describing it, we know they're

25   not telling the full truth.  So the conversation will

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-01444 Document #: 145-2 Filed: 02/09/24 Page 89 of 136 PageID #:875

1  continue beyond that.

2      Q    Okay.  And so then in a scenario where a

3  deception's indicated, but the subject continues to deny

4  their involvement, what would happen next?

5      A    Well, it depends on how they deny it.  If a

6  person is listening to us with our theme development,

7  kind of nodding in agreement, you know, not verbalizing

8  anything for maybe five, ten, 15 minutes, and then the

9  investigator asks them a question that prompts for a

10  response, and he says, "Well, I didn't do it," we view

11  that as negative.  That's the kind of behavior deceptive

12  people typically exhibit.  Truthful people, they don't

13  listen to us for one second.  They're in our face and

14  they're all over us adamant that they had nothing to do

15  with it, and they're not going to listen to us say

16  anything about it.  So that depends on the kind of

17  denial.  In fact, when we teach step 3, we talk about

18  recognizing the probable deceptive denial versus the

19  probable truthful denial.

20      Q    Okay.  So it'd be fair to say that someone --

21  it has in deception indicated, you would then utilize

22  the Reid technique of interrogation to try and figure

23  out what occurred?

24      A    Yeah.  We would come in, tell them that they

25  didn't pass the test or at indicates you're not telling

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 the truth, and probably begin some sort of form of theme
2 development, suggesting possibilities as to what could
3 be on their mind, what could have happened, what they're
4 concealing, sure.
5     Q   Great.  And is there a time period that Reid
6 employees are trained to stay within when conducting a
7 post polygraphs interrogation?
8     A   Nothing different than we say with the three
9 to four hours of adamant denials.
10     Q   Okay.  And when polygraph examinations are
11 being typically scored by one person, or is there any
12 sort of, you know, collaboration or teamwork between
13 other employees?
14     A   Well, oftentimes the chief examiner would be
15 the second person to look at the test results, give a
16 second opinion, make sure we're on the right track.  In
17 this case, since Mike was the chief examiner, a co -- a
18 colleague of his, Art Newey who was a very senior
19 examiner, he scored up the charts.
20     Q   Okay.  And is that typical of examinations or
21 is it only in certain scenarios?
22     A   It's typical that another examiner will look
23 at them.  It's usually the chief examiner, but in this
24 case, obviously we had to have a second.
25     Q   And are there any policies or procedures

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com
KENTUCKIANA COURT REPORTERS

Case 1:20-cv-01444-Document #: 145-2 Filed: 02/09/24 Page 91 of 136 PageID #:877
Deposition of JOHN REID & ASSOCIATES CORPORATE REPRESENTATIVE JOHN (4), taken on August 26, 2022
30(b)(6)
90

```
 1   within Reid and Associates when it comes to the presence
 2   of law enforcement personnel during polygraph
 3   examinations?
 4        A    In the room?
 5        Q    Yes.
 6        A    We don't have them in the room when we conduct
 7   the polygraph test.
 8        Q    And why is that?
 9        A    We don't have anybody in the room except for
10   the two people.  A third person is a distraction, no
11   matter who it is.  The only time -- the only exception
12   would be an interpreter.  Other than that, it's just the
13   two of us.
14        Q    Okay.  I know we've touched on these, but I
15   just kind of wanted to expand on it.  Other than, you
16   know, someone having a psychological impairment or
17   showing other markers of not being able to sit for
18   polygraph examination --
19        A    Not being what?
20        Q    Not being able to sit for a polygraph
21   examination --
22        A    Okay.
23        Q    -- are there other behaviors or times when you
24   wouldn't do a polygraph examination on a suspect?
25        A    Sure.  I mean, if a person is talking nonsense
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  to us, we ask him his name, he says, "Well, today my

2  name is so and so," and you know, "What was it

3  yesterday?" "Oh, yesterday it was this one." I mean,

4  when you get some kind of verbal indication that

5  something is not right with this person, obviously that

6  would be a red flag.  If the person keeps falling asleep

7  on you every two minutes, he's -- he's got his head down

8  dozing off that might be a problem.  Okay?  So there's

9  usually something extreme that's pretty obvious.

10     Q     Okay.  And would that include someone who was

11  intoxicated?

12     A     I don't know what intoxicated means in your

13  definition.  If they had one drink, if they had 100

14  drinks, what does that mean?

15     Q     Someone who was under the influence of a

16  considerable amount of alcohol.

17     A     Of a considerable amount, did you say?

18     Q     Yes.

19     A     Okay.  What would that be?

20     Q     Can you -- is there any sort of --

21     A     Don't know what a considerable amount is.

22     Q     -- within your practice, is there a standard

23  that you would adhere to regarding --

24     A     If somebody came in --

25     Q     -- intoxicants?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 1:20-cv-01444-Document #: 145-2 Filed: 02/09/24 Page 93 of 136 PageID #:879

1       A    -- if somebody came in and was obviously

2    intoxicated, we would not test them.

3       Q    Okay.  So it'd be under the judgment of the

4    examiner?

5       A    Yes.

6       Q    Okay.

7       A    Sometimes they may say to the chief examiner,

8    "Look, could you talk to this guy for a minute?  Let me

9    know what you think." And I walk out and I go, "Man,

10   this guy's in never, never land.  We can't test him

11   today."

12      Q    And is it your opinion that a polygraph

13   examination is a stressful experience to undergo?

14      A    It can be.

15      Q    Actually, to expand on that, would there be an

16   instance when a polygraph examination wouldn't be

17   stressful?

18      A    Yeah.  If, -- if somebody has been wrongly

19   accused of something and they want to prove their

20   innocence, that they're anxious to take the test, they

21   may not feel a lot of stress, because they're very

22   confident in their answers, they know they're telling

23   the truth, and they want this on their record to

24   disprove what this person is saying about them.

25      Q    Okay.  And in the instance where someone's

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    being tested because they're being accused of a crime of

2    some sort, would it be fair to say that would be a

3    stressful examination regardless of whether they're

4    innocent or guilty?

5         A    It could be.  It depends on what happened to

6    them.  What was said to them.  Depends on their

7    individual personality.  It may be somebody who's

8    anxious to take the test and prove them wrong.  It could

9    be somebody who knows there's a lot at stake.  Sure.

10        Q    Okay.  When it comes to the length of

11   polygraph examinations, what would be a cause for

12   someone to interrogate someone for longer than four

13   hours?

14        A    They changed their story.

15        Q    And would that be one of the only causes or

16   would there be others that you can think of?

17        A    Well, if you're talking about this particular

18   case, I don't know how long the actual polygraph test

19   took, maybe an hour or so, maybe less than that, the

20   actual testing time and the pretest interview.  Then

21   there's Mike stepping out, scoring up the task, coming

22   back in for an hour, telling Mr. Amor that the results

23   indicated he didn't tell the truth.  Stepping out again,

24   discussing with Art, coming back in for a half hour.  So

25   there was that going on, and, in my view, that was all

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Deposition of John Reid & Associates Corporate Representative Louis Senese taken August 26, 2022
Case 1:20-cv-01444-Document #: 145-2 Filed: 02/09/24 Page 95 of 136 PageID #:881
30(b)(6)
94

```
 1    fine.
 2         Q    Okay.  I believe I asked this before, but I
 3    just wanted to -- for the record, have you taken any
 4    polygraph examinations that indicated deception where
 5    deception was later proven not to be truthful?  Like
 6    they were telling the truth, actually.
 7         A    Okay.  So you asked me if I've taken, I think
 8    you mean have I given one.
 9         Q    If you've given.
10         A    Yeah.
11         Q    My terminology may be not correct.
12         A    Yeah.  No, not that I know of.
13         Q    And you don't know of anybody during your
14    tenure at Reid & Associates who has given a polygraph
15    examination where there's indication of deception, but
16    it turned out that they were telling the truth?
17         A    Oh, no, that's happened.
18         Q    Okay.
19         A    Because the person had guilty knowledge and
20    didn't tell us, and we didn't find that out until
21    afterwards.
22         Q    And is there any other circumstances besides
23    someone having guilty knowledge, even if they didn't,
24    you know, do whatever they're being asked about?
25         A    Sure.  They could have lied about their alibi.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      Q     Lie about an alibi.

 2      A     We -- we had a priest once who was with a

 3   young woman the night of this particular murder.  He

 4   didn't want anybody to know that, of course, being a

 5   priest.  And so he had failed the test, not because he

 6   committed the murder, but because he was concealing this

 7   other information.  So there are different times where

 8   someone can fail a test, typically because they're

 9   concealing something relevant to the investigation.

10      Q     So would it be fair to say that someone can

11   fail a polygraph examination, but not be, you know,

12   guilty of or have guilty knowledge of the subject

13   they're being asked about?

14      A     As I say, an example might be if they lie

15   about their alibi.

16      Q     Okay.  But it is possible that a failure does

17   not indicate that they're guilty of, in this instance, a

18   crime they committed?

19      A     Well, as I think Mike testified too, it

20   indicates something is on their mind, and that's part of

21   the post-test interview process, is to find out, what

22   are they thinking of?  You know, for example, in this

23   case, there was some debate as to whether or not the

24   husband or wife talked about the insurance policy that

25   the victim had.  Family members said that they did.  They
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Deposition of JOHN REID & ASSOCIATES CORPORATE REPRESENTATIVE JOHN (6) taken August 26, 2022
Case 1:20-cv-01444 Document #: 145-2 Filed: 02/09/24 Page 97 of 136 PageID #:883
30(b)(6)
96

1   said they didn't.  In fact, Mr. Amor told Mike during

2   the interview, "If I did, I must have been drunk,

3   because I don't remember it." So you know, maybe that

4   was on his mind.  Maybe he was worried about, maybe I

5   did -- someone did hear me talking to my wife about the

6   insurance policy.  So we wanted to give him a chance to

7   explain anything that might be causing the negative

8   results.  So he did -- he, you know, he could have that

9   on his mind and once he were to maybe, I'm speculating,

10   because he never said this, once he talks about that,

11   then maybe a second test would be appropriate.  A second

12   examination, I should say, besides where you're

13   concerned about talking.  Yeah.

14       Q   Sure.  But just to go back to my original

15   question, a failure of a polygraph examination does not

16   mean someone's guilty of the crime they're being brought

17   in to be questioned about, correct?

18       A   There can be other alternatives.

19       Q   Okay, so the answer to that is yes?

20       A   Well, yes.

21       Q   Okay.  We'll wrap up with talking about Mr.

22   Amor's investigation itself.  What are these sort of, if

23   there are any, internal reviews and audits regarding

24   polygraph examination within Reid & Associates?

25       A   Well, we haven't done them for a while, but

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  what they were is that the chief examiner would, on a

2  regular basis, listen to someone conducting a polygraph

3  test, both the interview, pretest interview, the testing

4  itself, and any post-test questioning if there was some.

5  So we monitored them.  We had it set up so we could

6  monitor all of our interview rooms.  We would do that at

7  least once a week with everybody.  And they would review

8  charts that the person had on their different cases.  So

9  there was some regular basis of reviewing their work. It

10 wasn't written in stone.  It was very flexible.  But you

11 know, we do -- did have to be aware of what people were

12 doing.  Sure.

13      Q    Okay.  And when polygraph examinations were

14 occurring, or maybe more specifically within 1995, was

15 there any sort of annual review that would occur of

16 employees?

17      A    Not other than what I've described.

18      Q    Okay.  Going specifically to the polygraph

19 examination of Mr. Amor, what is your understanding of

20 what occurred, and this can be broad, and I'm not going

21 to hold you to this as all of your knowledge, but with

22 those caveats, what is your understanding of what

23 occurred on the night of October 3, 1995?

24      A    The -- the neighborhood PD made an appointment

25 to bring in a subject for an interview, polygraph test.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

 1    I don't know if we had the name or not at that point.  I

 2    believe when Mr. Amor arrived, he was placed in our

 3    lobby until the two accompanying investigators met with

 4    Mike in our, we call it the fact room, but it's a

 5    office, where he's taking down the background

 6    information as to what's going on, what are the

 7    circumstances, what -- what -- what is he being looked

 8    at for, and -- and, you know, taking the case facts and

 9    working with them on the general nature of the questions

10    they're going to ask.  After that, Mike probably

11    would've spent some time going through the interview or

12    the fact taking notes, anticipating some of the

13    questions he'd want to cover, the questions he wants to

14    ask in the pretest interview.  The receptionist at some

15    point would bring the subject back into the interview

16    room.  There would be a waiver agreement they would sign

17    that talks about the fact that they were there

18    voluntarily.  They knew they couldn't leave.  They

19    weren't under arrest.  Miranda rights would've been

20    given in this sort of circumstance.  That form would've

21    been executed.  There's a medical data sheet asking them

22    how much sleep they've had in the last number of hours,

23    what medication they might be on, that kind of thing.

24    Are they in any current discomfort.  And then after

25    that's all done, Mike would conduct the pretest

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  interview, which he did, step out, formulate his

2  questions, come back in, advise Mr. Amor these are the

3  questions we're going to as, let me read through them,

4  make sure they're clear to you.  Tell me how you're

5  going to answer them on the test.  Then administer the

6  series of tests, at some point stepping out for a

7  breather for the subject and then coming back in.  And

8  then at the end of the testing, look at the charts, make

9  an analysis.  In this case, they have a second examiner

10  eyeball them as well, and then move into the post

11  interrogation phase.  I believe Mike was in there for

12  about an hour.  He said that Mr. Amor was very passive.

13  Wasn't actively denying it.  Was listening to him,

14  nodding his head up and down, agreeing with the basic

15  suggestions he was making about possible explanations

16  for the negative test results, but continued to deny any

17  involvement in starting the fire.  Mike stepped out for

18  maybe ten, 15 minutes, talked to Art.  Thought maybe Art

19  could have a chance to develop some more rapport with

20  the subject, because, you know, we all have different

21  personalities and some people, you know, are more

22  responsive to one type of person than another.  I think

23  Art went in for about 30 minutes, whether he smoked with

24  Mr. Amor or not, I don't know.  They were both smokers.

25  They shouldn't have been smoking in the office, but Art

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  had a habit.  So at any rate, then he came out, and I

2  think Mike had gone by then, Mike's wife was expecting,

3  and I think she had some medical issues, so he had to

4  grab the last train out.  And I think the two detectives

5  then talked to Amor.  I don't know if Art was part of

6  that or not.  I don't think he was, but I don't recall

7  offhand.  And then at somewhere around 10:00 or 10:30,

8  they left.

9      Q    Okay.  And are you aware of anything that

10  happened after they left the interrogation?

11     A    No.

12     Q    Okay.

13     A    Oh, let me back up.  You mean the fact that he

14  eventually confessed?

15     Q    Yes.

16     A    Oh, I -- I heard that at some point.  Sure,

17  sure, sure.

18     Q    And do you have knowledge of any of the

19  circumstances surrounding the confession?

20     A    None.

21     Q    Okay.

22     A    None.

23     Q    Okay, so, backing up to the pre-test interview

24  and the medical data sheet, I can pull it up if you'd

25  like, but I'll represent to you that on the medical data

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   sheet Mr. Amor indicated that he had only received four

2   hours of sleep the night before.  Would that concern you

3   as to the efficacy of the polygraph examination?

4        A    In and of itself, no.  I would have to talk to

5   the person, see how they were responding, how alert they

6   were.  Were they responsive?  Were they conversive?  Et

7   cetera.  And if there was no indication of any issue, I

8   would continue on.  If they were obviously, you know,

9   dozing off and they were obviously just exhausted, then

10  we would postpone it.

11       Q    Okay.  And you spoke of kind of what occurs

12  after someone has being told that they have failed a

13  polygraph examination.  And in this instance I'll

14  represent to you that, you know, Mr. Masokas did spend,

15  or at least testified that he spent about an hour with

16  Mr. Amor.  And then Mr. Newey spent about 30 to 45

17  minutes.  Is that an appropriate amount of time under

18  your guidelines to spend after a deceptive conclusion to

19  a polygraph examination occurs?

20       A    Actually, I think they spent more time than

21  you're suggesting, because I think Masokas went in

22  alone, than him and Newey and then just Newey.  Okay? So

23  they were three stages.  And everything they did was

24  completely proper.  No problem at all.

25       Q    Okay.  And after Mr. Newey talked with him and

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1    after Mr. Masokas left, the officers talked to him for
 2    some time.  The officers, I'll represent, utilized Reid
 3    & Associates' offices to conduct those conversations
 4    with Mr. Amor.  Was it appropriate for the officers to
 5    utilize Reid & Associates' offices to continue the
 6    interrogation of Mr. Amor after the polygraph
 7    examination?
 8         A    It could have been.  So
 9              MR. PASQUALINO:  I'm going to object to
10         continued interrogation.  But go ahead.
11         Q    Sure.  Would you have any concerns about law
12    enforcement continuing or interrogating Mr. Amor at Reid
13    & Associates' offices after he had undergone a polygraph
14    examination and then several hours of questioning by Mr.
15    Newey and Mr. Masokas?
16         A    On the face of it, no.  I guess it depends on
17    what they were doing.  They might have been saying,
18    "Look, you failed the polygraph test.  We want to get
19    together with you tomorrow.  Here's the best time.  Can
20    you come in?  When can you come in?" That kind of thing.
21    And they might have been setting up a get together for
22    the next day.  I mean, I don't know.
23         Q    Okay.  And after the officers spoke with Mr.
24    Amor at Reid & Associates, I represent to you that they
25    then took Mr. Amor to Naperville to continue being
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-01444 Document #: 145-2 Filed: 02/09/24 Page 104 of 136 PageID #:890

Deposition of John Reid & Associates Corporate Representative Pursuant to Rule 30(b)(6), taken on August 26, 2022
30(b)(6)

103

1    interrogated.  And I guess my question is, if Naperville

2    Police Department had asked your opinion on whether or

3    not they should continue interrogating Mr. Amor after

4    the events of the polygraph at Reid & Associates, what

5    would you have said?

6        A    I'd have said, "That's your call."

7            MR. PASQUALINO:  Objection.

8        A    I'm sorry.  I would've said, "That's your

9    call."

10       Q    Would you feel like that continued

11   interrogation would be in line with the steps or

12   principles of the Reid technique?

13       A    It could be.  Particularly if when they talked

14   to him alone in the office, after our -- Newey had

15   stepped out, he said, "You know, okay, there is

16   something that, you know, I'm thinking about, but I want

17   to think about it for a little bit before I say

18   anything." So there'd be an absolute necessity to

19   further the questioning.

20       Q    And would you have any concerns with the fact

21   that Mr. Amor had the morning of the examination

22   recently spent two weeks in jail?

23       A    No.

24            MR. PASQUALINO:  Form.  Foundation.

25       Q    Okay.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    We test people who are inmates all the time.

2    Q    Okay.  I'll represent to you, again, that

3    during the course of the interrogation of Mr. Amor in

4    Naperville, he was served divorce papers prior to his

5    confession.  Is that a technique that you would utilize

6    under the Reid method or not?

7    A    Never ever have I been aware of a situation

8    where that approach -- that -- that was done or even the

9    opportunity to do that was done.  I mean, I -- I don't

10   know anything about that.

11   Q    Sure.  But, you know, with the understanding

12   that you don't -- you know, you weren't present at the

13   interrogation or the examination, would it concern you

14   to learn that during the course of the interrogation,

15   Mr. Amor was served with divorce papers within

16   Naperville Police Department?

17   A    That'll be for them to answer.  They're the

18   ones who did it.

19   Q    Well, if they asked your opinion, what would

20   you say?

21   A    I would say, "Well, you guys know what the

22   circumstances are.  Whatever you think is best."

23   Q    So you think that it would be an appropriate

24   tool of interrogation to serve Mr. Amor divorce papers

25   after he had spent hours being polygraphed, being

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1    accused of being deceitful about a fire that killed his
 2    mother-in-law, and after then more hours of
 3    interrogation by both the police and the Reid employees?
 4             MR. PASQUALINO:  Same objection.
 5       A    For all I know he was maybe anxious to get
 6    them.  I don't know.
 7       Q    So you do think it would be an appropriate
 8    tactic?
 9       A    It's not my judgment.
10       Q    And I'm asking you your judgment specifically.
11       A    I don't have any judgment.
12       Q    So in the scenario I described, and if I was a
13    Naperville police detective, and I came up to you and
14    said, "Are you okay with this?" You would say, "Yeah,
15    it's your call"?
16       A    I don't have any --
17             MR. PASQUALINO:  Object to the proffer.
18       Hypothetical.  Go ahead.
19       A    And I don't have any detail on the
20    circumstances, so it would be stupid for me to answer.
21       Q    Okay.  Do you believe that if someone who was
22    innocent of a crime they were being accused was told
23    that they were being deceptive on a polygraph
24    examination, that would be stressful for that person?
25       A    Yeah.  If a person who was innocent was told
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  they failed a polygraph test, that would be very

2  stressful.

3       Q    And could that stress, in your opinion, lead

4  to potential false confession?

5       A    In this case?

6       Q    No, broadly.

7       A    Okay.  While in our office?

8       Q    Not at your office, but down the line.

9       A    Yeah, because there is no confession at our

10  office.  There's nothing that happened at our office

11  that could have led to a false confession, because there

12  was no confession.  Now, what happened after they left

13  our office, we don't know.  And so I can't speak to what

14  may have happened.

15       Q    So you don't think that any of the

16  circumstances at your office may have led to a

17  confession by Mr. Amor down the line?

18       A    There was no -- there was no confession at our

19  office, so nothing we did would contribute to that.

20       Q    Sure.  But I'm asking for whether or not you

21  think that, with the understanding that you know that

22  the confession occurred, which you've testified to, and

23  your understanding that there was a, you know, lengthy

24  polygraph, at least six hours of polygraphing and

25  interrogation --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1       A    Oh, that's not accurate at all.

 2       Q    Sorry?

 3            MR. PASQUALINO:  Objection.

 4       A    That's --

 5            MR. PASQUALINO:  Mischaracterize of testimony.

 6       But go ahead.

 7       A    Yeah, that's not accurate.  The -- the length

 8  of time for the pretest interview and the polygraph,

 9  we're not talking about six hours of continuous

10  questioning kind of thing.  You've got the separate test

11  itself, which might have been 30 minutes, the different

12  tests, the pretest interview might have been 30, that's

13  one hour, you got a couple hours of the questioning, so

14  we're well short of any six hours, and it wasn't

15  continuous and it wasn't accusatory.

16       Q    Sure.  Well, what's your foundation for the

17  belief that none of the questioning at the office was

18  accusatory?

19       A    In our office?

20       Q    Yes.

21       A    Well, we know the polygraph tests were not

22  accusatory.  We were asking him if he did it.  We know

23  the interview wasn't accusatory, they were non-

24  accusatory, non-confrontational questions.  What

25  happened that day?  When did you leave for the movies?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    Et cetera, et cetera, et cetera.  So that whole first

2    process, the interview, the testing process, all of that

3    was not accusatory.  All of that was neutral.  It's only

4    after he failed the test that the examiner came in and

5    said, "We got a problem, the test indicates that you

6    know something or were involved with starting this

7    fire." And that was after a couple of hours.

8         Q    Sure.  But with the understanding, and I'll

9    rephrase my question -- with the understanding that

10   there was an eventual confession and that Mr. Amor spent

11   a couple hours, not the entire time, but a couple hours

12   dealing with accusatory lines of questioning at your

13   office, do you believe that it's possible the experience

14   at your office led to his eventual confession?

15        A    I don't think we did anything that led to his

16   confession.  No.

17        Q    So you don't believe any part of being told

18   that he had failed the polygraph examination and that he

19   was guilty of murdering his mother-in-law led to an

20   eventual confession?

21        A    He should have been enraged at that suggestion

22   if he was innocent.  He should have been all over us,

23   fighting us tooth and nail.  None of that happened.

24        Q    Based on your experience?

25        A    50 years of experience.  Sure.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    And based on any sort of social science?

2    A    No, no social science.

3    Q    Based on any sort of science?

4    A    No.

5    Q    Okay.  Just based on your experience?

6    A    Our experience collectively, Reid &

7    Associates.

8    Q    Okay.

9    A    Dozens of investigators over the years,

10   dealing with people in these situations.

11   Q    And so the fact that he, Mr. Amor,

12   continuously denied that he had anything to do with the

13   fire isn't an indication that he wasn't guilty of the

14   crime?

15   A    Oh, not at all.  There -- everybody in jail's

16   denying it.

17   Q    And so it specifically has to be in your face,

18   in this instance to have an indication that he was not

19   guilty?

20   A    Well, that would be -- that would be part of

21   it.  We look at the whole scene.  You see, even though

22   he gave that quote, unquote "false" confession, and I'm

23   not even sure if I know what it is.  I think it's

24   putting a cigarette in alcohol.  It doesn't mean he

25   didn't commit the murder.  Just means he didn't do it

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    that way.
 2        Q    Do you have any reason to believe that he
 3    committed the murder?
 4        A    Well, other than the polygraph test, he wasn't
 5    passing it.  We don't know why.
 6            MS. GARCIA:  Okay, Mick, I'm just going to take
 7        a couple more minutes to look at my notes and then I
 8        think I can finish up with questions.
 9            MR. PASQUALINO:  Nope, that's fine.  So wait a
10        couple minutes?
11            MS. GARCIA:  Yeah, just give me like five
12        minutes.
13            MR. PASQUALINO:  I'll use the restroom.  Joe,
14        you can use the restroom too if you need to.
15            COURT REPORTER:  We're off the record.  The
16        time is 12:29 p.m.
17            (OFF THE RECORD).
18            COURT REPORTER:  We are back on the record for
19        the deposition of Joseph P.  Buckley being convicted
20        by video conference.  My name is Kortney Chase.
21        Today is August 26, 2022, and the time is 12:34 p.m.
22    BY MS. GARCIA:
23        Q    Mr. Buckley, you said that you looked at the
24    polygraph file for Mr. Amor, correct?
25        A    The polygraph what?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-01444 Document #: 145-2 Filed: 02/09/24 Page 112 of 136 PageID #:898
Deposition of John Reid & Associates Corporate Representative 30(b)(6), taken August 26, 2022
30(b)(6)
111

```
 1        Q        The polygraph file for Mr. Amor?

 2        A        Yes.  Yes.  Yeah.

 3        Q        When you looked at the file, did you look at

 4    the raw data of the polygraph examination?

 5        A        The polygraph charts?

 6        Q        Yes.

 7        A        Yes I did.

 8        Q        When you looked at the polygraph charts, did

 9    you analyze the polygraph charts at all?

10        A        Yes I did.

11        Q        When you analyzed those charts, what were your

12    findings?

13        A        That deception was indicated.

14        Q        Okay.  And when you analyzed those charts, did

15    you use a check mark scoring method?

16        A        Yes.

17        Q        Did you take any notes where you did the

18    scoring of the examination?

19        A        Yes.

20        Q        Do you still have those notes?

21        A        Yes.  I just did them yesterday.

22        Q        Great.  Then I'll talk with Mick about getting

23    those notes, or a copy of those notes.

24        A        Okay.

25        Q        And then other than that I have no more
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-01444 Document #: 145-2 Filed: 02/09/24 Page 113 of 136 PageID #:899

1    **questions.**

2       A    Okay.

3            MR. PASQUALINO:  Great.  Signature we can

4    reserve.

5            MS. GARCIA:  Okay.

6            MR. PASQUALINO:  And thank you for being

7    efficient, Mariah.  I appreciate that.

8            MS. GARCIA:  I know.  I didn't think I was

9    going to end -- it ended 20 minutes earlier than I

10   thought.

11           MR. PASQUALINO:  I do appreciate it.  And my

12   future wife appreciates that, too.

13           MS. GARCIA:  Yeah.

14           MR. PASQUALINO:  Off the record.

15           MS. GARCIA:  Oh, sorry.  Off the record.  My

16   apologies.

17           COURT REPORTER:  We're off the record.  The

18   time is 12:36 p.m.

19               (DEPOSITION CONCLUDED AT 12:36 P.M.)

20

21

22

23

24

25

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-01444 Document #: 145-2 Filed: 02/09/24 Page 114 of 136 PageID #:900
Deposition of JOHN RILEY & ASSOCIATES, CORPORATE REPRESENTATIVE 30(b)(6), taken on August 26, 2022
30(b)(6)
113

1      CERTIFICATE OF REPORTER

2          STATE OF ILLINOIS

3

4    I do hereby certify that the witness in the foregoing

5    transcript was taken on the date, and at the time and

6    place set out on the Title page here of by me after

7    first being duly sworn to testify the truth, the whole

8    truth, and nothing but the truth; and that the said

9    matter was recorded digitally by me and then reduced to

10   type written form under my direction, and constitutes a

11   true record of the transcript as taken, all to the best

12   of my skill and ability. I certify that I am not a

13   relative or employee of either counsel, and that I am in

14   no way interested financially, directly or indirectly,

15   in this action.

16

17

18

19

20   

21

22   KORTNEY CHASE,

23   COURT REPORTER / NOTARY

24   MY COMMISSION EXPIRES ON: 09/24/2025

25   SUBMITTED ON: 09/06/2022

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

## $

**$1,000** 27:7

**$100,000** 27:7

**$200** 57:25

## (

**(cough)
excuse** 60:18

## 0

**0** 22:1,2

## 1

**1** 38:21 39:4
42:1 51:17
69:25 82:16,20

**100** 91:13

**10:00** 100:7

**10:02** 5:9

**10:30** 100:7

**11** 10:12 14:5
76:6,13

**11:23** 63:13

**11:30** 63:1,11

**11:31** 63:18

**12** 31:4 54:5

**12:29** 110:16

**12:34** 110:21

**12:36** 112:18,
19

**15** 27:9 31:4
57:24 70:24
71:2 88:8 99:18

**16** 48:22,24

**17-year-old**
64:5

**1960s** 40:12

**1962** 33:11

**1966** 33:5

**1969** 83:10

**1971** 10:7,10
11:10,18 16:11

**1973** 16:16

**1975** 30:19

**1976** 30:20

**1977** 33:6

**1978** 10:17,25

**1980** 10:19
11:3

**1980s** 40:19

**1982** 10:4,10,
14 11:10,18
15:5

**1988** 26:24
27:1

**1991** 70:22

**1995** 23:19
25:10 32:6
41:3,12,16
72:24 82:3
97:14,23

## 2

**2** 38:22 39:5
42:2 51:19
55:15 59:8
82:20

**20** 112:9

**20-CV-01444**
5:15

**2012** 39:12,17

**2013** 33:11

**2022** 5:8 63:18
110:21

**21** 76:8

**22nd** 5:7

**26** 63:18 110:21

**26th** 5:8

## 3

**3** 42:3 59:9
88:17 97:23

**30** 5:6 49:6,10
57:23 58:1,2
99:23 101:16
107:11,12

**30(b)(6)** 8:15

## 4

**4** 42:4 59:9

**45** 74:4 101:16

## 5

**5** 59:10

**50** 24:4 65:1
108:25

## 6

**60** 70:23 74:4

**60606** 5:7

**60s** 25:23
40:10

## 7

**70s** 10:11 13:8
25:23 40:11,18
66:9

**78** 11:2

## 8

**8** 59:5 61:10

**80** 11:2,3

**80s** 30:4 66:9

**82** 10:20 11:3

**85** 70:25

**89** 26:24 27:1

## 9

**9** 61:21

**90s** 81:18

**91** 81:19

**92** 70:22

**93** 70:22

**98** 81:19

## A

**A,b,c** 72:9

**A-S-H** 66:8

**a.m.** 5:9 63:13,
18

**abdominal**
17:8 75:1

**ability** 8:2,9

**absolute**
103:18

**abuse** 51:8

**accept** 83:1

**acceptable**
26:11 54:11,13

**accepted**
28:19

**accepts** 61:12

**access** 27:8

**accommodate
d** 31:4

**accompanyin
g** 98:3

**accordance**
31:16,21

**accountants**
14:19

**accuracy** 59:3
83:2

**accurate** 8:3,9
35:4 55:6
107:1,7

**accurately**
85:20

**accusatory**
67:8 107:15,18,
22,23,24 108:3,
12

**accuse** 82:25

**accused** 50:23
92:19 93:1
105:1,22

**acknowledge
ments** 37:7

**acknowledges**
51:18

**Act** 25:18 27:3,
14

**action** 60:23

**active** 12:18

**actively** 29:1
99:13

**activity** 14:21

**acts** 72:13

**actual** 26:4
28:8 64:15
72:11 77:25
93:18,20

**acute** 47:12,20

**ad** 23:16

**adamant** 49:19
52:6 88:14 89:9

**add** 34:11

**added** 12:14,
17,20

**addition** 34:19
36:8

**additional**
36:6 61:17

**adhere** 91:23

**administer**
99:5

**admissible**
62:21

**admission**
65:7

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**admissions**
37:8

**admit** 44:16
57:6 58:4

**advise** 99:2

**advised** 38:8,
10

**affect** 8:2,5,13

**affiliate** 80:16

**affirm** 6:9

**afraid** 51:22
87:1

**agencies** 26:6

**agency** 62:16

**agree** 6:3
24:17 46:6
50:16 87:21

**agreeing**
69:17 99:14

**agreement**
23:22 88:7
98:16

**agreements**
14:24

**agrees** 6:6

**ahead** 49:2,3
102:10 105:18
107:6

**alcohol** 83:22
91:16 109:24

**alert** 101:5

**alibi** 73:20
94:25 95:1,15

**allegations**
23:12

**allot** 24:14

**alternative**
40:2 60:11,16,
17 61:4,12

**alternatives**
96:18

**Ambo** 66:7

**American**

**17:12**

**Amor** 5:11 6:17
18:10,16 19:18
24:1 93:22 96:1
97:19 98:2
99:2,12,24
100:5 101:1,16
102:4,6,12,24,
25 103:3,21
104:3,15,24
106:17 108:10
109:11 110:24
111:1

**Amor's** 96:22

**amount** 34:16
49:23,24 91:16,
17,21 101:17

**analysis** 31:5
99:9

**analyze** 111:9

**analyzed**
111:11,14

**analyzing** 81:3

**and/or** 23:7

**annual** 97:15

**answers** 7:17
48:4 92:22

**anthology**
47:15

**anticipate** 79:6

**anticipating**
98:12

**anxiety** 48:9

**anxious** 92:20
93:8 105:5

**anymore**
76:13

**apologies** 22:6
78:25 112:16

**appearance**
5:16

**application**
14:4,9

**apply** 46:15,16,
17

**applying** 26:8

**appointment**
20:24,25 24:24
97:24

**Appointments**
11:24

**appreciates**
112:12

**approach**
34:10 36:7
104:8

**approximate**
49:24

**approximately**
13:20 18:20
27:24 30:17
33:4

**area** 48:2

**argument**
55:20

**arm** 25:24
79:24

**arrest** 98:19

**arrived** 98:2

**Art** 89:18 93:24
99:18,23,25
100:5

**Ash** 66:8

**asks** 88:9

**asleep** 91:6

**aspect** 14:22

**aspects** 61:9

**assess** 69:24

**Associate**
13:9 21:6 32:15
35:17 37:11,22

**Associate's**
29:11

**Associates**
5:12 6:23 7:1
8:17 9:21,25
10:6,10 15:24
16:3,19 20:18
21:18,23 22:13
23:6,22 25:10,

13,23 29:6,17
30:1,9,17 32:6
36:16 38:3
41:13 49:14
58:21 63:23
65:25 66:3 67:4
72:23 73:1
82:13 90:1
94:14 96:24
102:24 103:4,
109:7

**Associates'**
102:3,5,13

**Association**
17:12

**assume** 13:1
39:9 80:12

**attach** 74:20

**attached** 19:5
78:1,2

**attempt** 55:18

**attempting**
64:18 66:4

**attend** 26:16

**attending**
5:17,20,23

**attention**
28:23 39:25
59:10,11,22
75:20

**attorney** 6:17
12:1 17:25
18:1,2 73:6

**attorney's**
27:17

**attorneys** 12:8
18:20 64:20

**attributable**
65:3

**audible** 7:17

**audience**
69:20 70:10

**audits** 96:23

**August** 5:8
63:18 110:21

**authors** 33:12

**average** 48:21

**avoid** 56:5

**aware** 23:21
24:2 38:1 48:11
64:10 65:23
81:2 97:11
100:9 104:7

**Awesome** 63:5

**awkward**
68:12

**— B —**

**B-U-C-K-L-** 6:1

**B-U-C-K-L-E-Y**
6:21

**babies** 45:19

**baby** 45:17,19

**bachelor's**
16:10 17:14

**back** 24:6
36:14 41:4
49:21 50:4
52:15 57:8 59:7
60:14 62:25
63:15 74:14
77:12 79:7
84:15 86:8
93:22,24 96:14
98:15 99:2,7
100:13 110:18

**background**
12:4 25:1 48:1
52:12 70:8
73:4,8 98:5

**backing**
100:23

**Backster** 81:9

**bad** 47:10
65:21 68:3
70:18

**barked** 60:13

**bars** 44:11
67:23

**base** 27:15

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**based** 31:6,14
34:10 58:5
74:12 87:24
108:24 109:1,3,
5

**baseline** 47:25
48:3 70:7

**bases** 38:18

**basic** 31:4
99:14

**basically** 27:3
61:21

**basis** 23:16
34:2 56:25 59:1
97:2,9

**began** 21:13
22:7,8 24:25
28:8 36:6

**begin** 6:13
11:14 48:6
59:15 74:21
89:1

**beginning**
55:21

**begins** 57:11
59:12 79:6

**behalf** 8:17
9:20 38:13

**behavior** 31:5
68:22 69:6,11,
22,25 70:11,12,
15 71:6,9 88:11

**behavior-**
67:11 73:21

**behavior-**
**provoking**
70:24

**behavioral**
47:24 68:14,18
69:2 70:7

**behaviors**
47:9 48:8 58:6
65:3 90:23

**belief** 56:25
107:17

**Bill** 6:17

**bills** 54:6

**binding** 8:17
9:20

**bit** 7:9 14:18
42:10 52:9,16
59:12,21 69:10
74:6 75:25
77:11 103:17

**bizarre** 47:9

**blood** 75:1,15,
18

**bloody** 55:4

**blossom** 22:8

**blow** 49:8

**board** 15:17,
18,19,21

**body** 48:19

**book** 32:20
35:21 36:10
45:14 49:17
83:17

**books** 32:16
34:23 35:20,24
36:2 47:14
66:16

**branch** 30:9

**break** 7:20,23
10:24 53:6,8
62:5,24 72:12

**breaking**
11:16 53:16

**breaks** 7:21

**breath** 77:11

**breather** 99:7

**breaths** 79:25

**bribery** 23:12

**briefly** 17:19

**bring** 62:16
97:25 98:15

**bringing** 59:22

**broad** 38:25
97:20

**broadening**

58:18

**broadly** 20:18
21:7,9,10 33:21
106:6

**broke** 53:4

**brought** 38:6
96:16

**brutality** 23:12

**Bryan** 33:16

**Buckley** 5:10,
24 6:1,4,7,16,
20,22 7:3 9:3,
24 63:16
110:19,23

**buddies** 60:22

**building** 31:2

**business**
14:18,22 57:18

**businesses**
27:6

**buy** 54:9

**C**

**call** 17:25
18:19,21 19:4,
16 21:3 23:17
24:13 31:5 73:8
77:3 78:6 98:4
103:6,9 105:15

**called** 16:20
24:9 25:17,24
32:18 34:3
47:14 75:2
77:14,17

**calling** 24:15

**calls** 20:23

**camouflage**
81:14

**candidates**
12:3

**car** 79:5

**card** 77:1,3,4
78:2,8 79:21

**care** 43:25

54:7,12 56:15

**careful** 58:15

**carefully** 79:9

**case** 5:15 18:5
19:14 24:17
25:1,3,4 27:17,
45:17 47:1
48:22 51:8 54:2
73:8 82:21
86:17 89:17,24
93:18 95:23
98:8 99:9 106:5

**cases** 12:21
37:17 45:14
48:19 57:4 97:8

**Casten** 58:13

**catch** 77:11

**Catholic** 51:10

**causing** 96:7

**caution** 42:6
43:6,7 46:11,20

**caveats** 97:22

**cease** 26:23

**cetera** 12:1
24:14 29:2 31:9
35:3,6 37:20
57:8 59:18
61:20 65:5
70:10 73:4,10,
20 76:9,10
82:19 101:7
108:1

**chairs** 75:3

**chance** 9:16
69:21 70:14
77:10 96:6
99:19

**change** 35:7
48:8 77:16
85:6,10

**changed** 93:14

**chapters**
34:22 47:15

**charged** 44:23

**Charles** 17:25

**Charlie** 54:3

**chart** 28:12

**charts** 12:23
80:17 86:7
89:19 97:8 99:8
111:5,8,9,11,14

**Chase** 5:4
63:17 110:20

**check** 72:2
80:20,21,22
81:4,6,11,22,25
111:15

**Chicago** 5:7,
20,23 10:20
11:4 13:11
14:8,16,25
23:11,18 76:8

**chief** 10:17,25
12:13,20 13:4,
7,12,19,20,24
14:7,20 89:14,
17,23 92:7 97:1

**child** 51:8

**children** 59:18

**choices** 60:24

**choose** 60:24

**cigarette**
109:24

**circle** 36:14

**circumstance**
68:11 84:11
87:14 98:20

**circumstance**
**s** 12:22 49:12
61:20 68:4,22
87:10 94:22
98:7 100:19
104:22 105:20
106:16

**City** 23:23

**claim** 57:15
59:1

**clarify** 15:2
51:15

**class** 28:16,20

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-01444 Document #: 145-2 Filed: 02/09/24 Page 118 of 136 PageID #:904

classes 30:18

classifications 84:19,20

classify 40:6 67:5

classroom 26:2 27:21,24

clear 67:16 86:20 99:4

clears 36:13 74:14

Cleve 81:9

client 12:9 21:4

clients 11:24

closer 59:21

clothes 55:4

coerced 49:5,9

coercing 67:1

coercive 44:12,18,22 65:3

collaboration 89:12

colleague 52:5 89:18

colleagues 33:16

collectively 109:6

college 16:20, 22 25:25 26:10, 20,23 27:18,19 28:11 29:4 40:25 57:23 58:8

combination 51:12

comfortability 75:18

commit 54:1 72:1 109:25

committed 54:18,20 69:13 95:6,18 110:3

committing 60:19 69:14

commodity 74:7

company 15:8 23:9 25:24

compare 70:11

comparison 17:7 79:14

compelling 50:25

completely 67:14 70:15 101:24

complicated 74:9

complication 74:6

concealing 89:4 95:6,9

concern 101:2 104:13

concerned 96:13

concerns 54:19 102:11 103:20

CONCLUDED 112:19

conclusion 84:22 85:5,14 101:18

conclusions 84:17,24

concrete 72:13

conditions 8:2,5

conduct 31:9, 15 34:3 43:25 65:17 73:14 90:6 98:25 102:3

conducted 63:16 76:22

81:3

conducting 11:10,21 17:2 37:23 48:13 68:19 76:20 89:6 97:2

conference 5:9 17:24 18:19,21 19:4, 16 63:17 110:20

confess 70:19 71:11

confessed 100:14

confesses 34:4 44:13 49:9

confession 34:3,24 48:19, 22 49:6,9 50:17 51:1 54:21,24 64:11 65:13 66:1 71:6 100:19 104:5 106:4,9,11,12, 17,18,22 108:10,14,16, 20 109:22

confessions 32:21 33:2,3,8, 10,13 35:13 36:9 64:18 65:4,10,18

confident 92:22

confirmation 61:5

confrontation 39:23 52:20,23 53:11,15

confronting 56:10

Congress 27:2

consent 8:23

consequence 46:8 59:19,24

consequences 42:6 43:2 45:25

considerable 91:16,17,21

considerations 22:21,22 28:13 31:22

considered 45:4 58:21

consisted 26:2

consistent 49:20

constant 48:22

contact 20:21 21:2 59:22

content 25:22 31:4

contents 39:15

context 62:9 70:5

continue 9:12 12:5 56:22 88:1 101:8 102:5,25 103:3

continued 99:16 102:10 103:10

continues 88:3

continuing 29:19,25 30:10 50:22,24 56:10 102:12

continuous 107:9,15

continuously 109:12

contract 20:19 23:15,16,21 24:7

contracting 23:5,6

contracts 23:1,10

contractual 14:23

contribute

66:20,21 106:19

control 76:11 79:13 80:24

convened 5:9

convent 69:16

conversant 48:3

conversation 66:10 74:13 87:25

conversations 17:21 18:19 67:8 102:3

conversive 101:6

convict 69:11

convicted 20:14 110:19

cooperative 85:1

copy 35:12 111:23

copyright 39:9,10

core 32:2 41:22,24 44:4,8 45:5 48:12

corporate 18:1 20:18

correct 10:1 11:1 22:14 23:19 27:22 30:12 43:2,20 44:18 48:14 50:21 52:20 53:13,20 55:14 60:11 61:7 68:16,24 70:25 71:12,14 78:21, 23 80:13,14 84:14 94:11 96:17 110:24

correctly 42:13 78:18

correlation 58:7 69:2,5

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

corroborated
62:6

corroborates
55:2

corroborating
34:5 51:19 57:7
61:18

corroboration
55:5 59:5,6
61:10 65:7
70:20

cough 82:23

coughing
18:24 43:9

counsel 5:18
17:22

country 26:7

couple 7:25
19:15 22:17
84:16 107:13
108:7,11 110:7,
10

courses 30:14,
22 40:22

court 5:3,5,13,
24 6:3,7,13
7:16 33:25
38:11 42:17
45:15 62:15,16
63:12,15 83:10
110:15,18
112:17

courts 31:17
38:7 42:3 44:9
49:10 63:25
64:1,19

cover 47:19
98:13

covered 38:18

covid 54:4

create 33:19
44:12 78:14

created 23:7
24:11 25:24

creating 36:3
57:21 62:17

credibility
31:6 83:16

crime 44:16
54:2,18,21 57:6
60:20 69:13,15
71:11 93:1
95:18 96:16
105:22 109:14

criminal 12:7
32:20,24 33:7,
9,12 35:12,23

critical 29:16

criticisms
64:16,22

critique 32:11

cuff 75:15,18

cultural 70:3

Cupp 83:12

current 35:12,
19 40:5 98:24

curriculum
28:11 29:13
30:25 31:12

custody 38:5,
12

CYA 38:13,14,
16

cycles 85:9

**D**

daily 28:3

data 85:18
98:21 100:24,
25 111:4

date 22:1 39:8

dated 37:3

dates 10:24

day 5:8 28:3
31:1 47:10
64:14 69:13
87:9,11 102:22
107:25

days 31:24,25
32:1,3 85:22

dealing 108:12
109:10

dealt 66:7

Dearborn 31:3

debate 95:23

decades 10:11
21:16 26:18
65:23

deceitful 105:1

decency 42:2,
14 44:5

deception
16:12,14,18
17:16 25:17
32:18 33:4
35:12,20 43:4
69:23 86:5,8
88:21 94:4,5,15
111:13

deception's
88:3

deceptive 37:7
51:18 53:11
56:12,17 57:1,
15 67:13 71:5,9
77:9 83:7
84:18,24 88:11,
18 101:18
105:23

decide 15:12
34:6,7,16

decided 27:18
86:24

deciding 14:12

decisions
33:25

defense 5:23
6:6 64:20

definition
91:13

definitive
69:23

degree 16:10,
12,15,18 17:1,
13,14,16

degrees 16:9

17:17

demeanor
85:24

denial 39:24
51:4,14 52:6
55:22 57:1 65:4
82:18,19 88:17,
18,19

denials 49:19,
20,25 55:13,16,
25 56:4,8,13
89:9

denied 109:12

Denver 13:10,
16

deny 51:15
56:3,10,11 58:2
88:3,5 99:16

denying 43:21
51:12 99:13
109:16

dep 19:6

department
12:1,6 23:11
24:1,3,9,16
103:2 104:16

departments
23:16 26:6 38:6

depending
11:25 12:22
20:24 35:23
36:7 58:4 73:17
74:6 86:15 87:3

depends 68:4
73:7 85:24
88:5,16 93:5,6
102:16

deposition
5:10 8:16 9:2,
16,22 17:20,23
18:4,8,14 19:5,
7,18 38:21
63:16 110:19
112:19

depositions
7:3,7

describe 61:19

describing
87:24

designated
8:16,19,22,25
13:18 15:10

designates
9:16

designation
8:1

designed
77:18

detail 34:5
51:19 105:19

detailed 25:22

details 40:3
54:25 61:6,17,
18 66:12

detect 78:15

detection
16:12,15,18
17:16 25:17

detective
24:16 105:13

detectives
100:4

Detector 32:19

determine
83:2

develop 11:14
36:6 61:17 83:2
99:19

developed
31:14 40:16,17
81:10,17

developing
55:17 66:16

development
55:15 86:22
88:6 89:2

developmenta
l 46:18

developmenta
lly 46:13

died 45:17

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Diego 81:9

difference 82:8

difficult 34:13

DIRECT 6:14

directly 86:19

director 10:20 11:4 13:17 14:8,10,16 23:1

directors 15:19,21

disability 46:18

disappears 27:8

disband 27:18

disbanding 27:19

disciplined 20:3,5,8

discomfort 76:15 98:24

discourage 56:2

discovery 38:20

discuss 20:23 24:17 37:3

discussed 18:5

discussing 93:24

discussion 37:4

disinterested 60:6

disorders 47:15

disprove 92:24

dissipates 75:24

distinguish 34:23

distracted 61:3 70:4

distraction 90:10

distress 47:13, 20

distribute 39:7

District 5:13

diversion 75:23

divorce 104:4, 15,24

DNA 48:19 84:5

document 38:24 39:2 61:22

documentatio n 24:11,20,24, 25 36:15

documented 62:17

documenting 36:16 61:25 62:10

documents 18:8,11 23:7

dog 60:13 61:2

door 67:16

Dozens 109:9

dozing 91:8 101:9

draw 59:15

drawer 57:25

drawing 58:16

drawn 84:17

drink 91:13

drinks 91:14

Drive 5:7

Drizen 48:21

drugs 54:9 83:22

drunk 96:2

---

**E**

E-Y 6:2

earlier 35:22 66:17 112:9

early 25:23 28:2 66:6,9

edition 33:5,6, 11 34:15,18,21

editions 33:14, 16,17,20 34:21 35:22

education 16:8 29:25

effect 57:3

effective 58:6 66:23

efficacy 58:23, 24 59:2 68:10 82:8 101:3

efficient 112:7

elect 15:18,20

elements 29:16 40:3 62:7 66:11 74:23,24

elicit 50:17 51:1 54:21

elicited 65:13, 25 85:14,15

eliciting 65:10 68:10

embarrassing 52:1

embezzlement 54:2

employee 6:23 12:7 27:2,14 41:12,16

employees 11:25 15:9,12 35:18,19 37:22 89:6,13 97:16 105:3

employer 73:5

employers 27:4

employment 16:4 19:24

encourage 62:20 83:12

end 7:12 14:18 99:8 112:9

ended 65:17 112:9

enforcement 35:2 38:13 62:16 90:2 102:12

engage 42:4 45:12 65:2 82:14,17

engaged 66:3

English 16:10

enraged 108:21

entered 23:22

entire 77:24 108:11

entities 14:25

entity 23:6

environment 44:12

environments 57:22

essentially 8:16 18:5

establish 47:24 57:12 70:6

established 25:20 31:17 42:3 49:11,14

et al 5:12

ethics 28:13

evaluate 31:6 63:23 85:5

evaluation 85:25

employers 27:4

event 48:2

events 61:16 103:4

eventual 71:6 108:10,14,20

eventually 26:3 100:14

evidence 57:7 64:5 83:11 84:4,14

exact 67:14

exam 12:10 24:19 36:21 77:24

examination 6:14 12:15 16:23 17:2,9 19:14 30:10 37:2,3 41:1 71:23 72:16 75:6 81:3 83:6 84:16 87:22 90:18,21,24 92:13,16 93:3 94:15 95:11 96:12,15,24 97:19 101:3,13, 19 102:7,14 103:21 104:13 105:24 108:18 111:4,18

examinations 11:11,21 15:3 17:3 21:11,24 22:14 28:5,9,24 36:17 89:10,20 90:3 93:11 94:4 97:13

examinee 37:2 78:19

examiner 10:13,15,17,25 11:13,18 12:13, 18,20,25 13:4,12, 19,20,25 14:7, 20 18:3 24:15 25:18 26:16 32:6 38:4 41:6 74:11 76:5 78:18 80:12

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

82:14 89:14,17,
19,22,23 92:4,7
97:1 99:9 108:4

**examiners**
13:7 21:3 24:13
26:2 28:5 36:20
74:1

**exception** 29:7
90:11

**excessive**
44:1 48:13,16,
25 49:16

**exchange** 74:8

**excuse** 18:24
35:9 36:13
43:10 74:14
82:23

**executed**
98:21

**executing**
61:22 62:11

**exercise** 46:20

**exhausted**
85:23 101:9

**exhibit** 38:21,
22 39:4,5 88:12

**exhibits** 18:15
19:5

**exist** 26:21,23

**existing** 27:1

**exonerations**
48:20

**expand** 36:6,
10,11 45:25
51:16 52:9,22
53:22 59:9
60:15 90:15
92:15

**expanded**
21:15 47:2
55:13

**expect** 38:4
41:6,12,16 76:5

**expecting**
100:2

**experience**
22:25 23:9
29:22 34:11
55:19 65:12
68:9 85:13
92:13 108:13,
24,25 109:5,6

**explain** 53:17
55:23 62:8
65:5,6 85:2
87:3 96:7

**explanation**
87:4,5,12,17

**explanations**
99:15

**extended**
42:10

**extensive**
11:15 30:6

**extent** 13:3

**extra** 42:6 43:6,
7 46:11,24

**extreme** 91:9

**eye** 59:22

**eyeball** 99:10

_____

**F**

**face** 46:8 88:13
102:16 109:17

**faces** 56:15

**fact** 6:4 20:23
35:20 37:15
38:11 72:11
73:24 82:24
88:17 96:1
98:4,12,17
100:13 103:20
109:11

**factor** 45:23

**facts** 53:15
98:8

**fail** 95:8,11

**failed** 95:5
101:12 102:18
106:1 108:4,18

**failure** 95:16
96:15

**fair** 12:13 13:1,
20 21:17 28:25
40:4 53:14
66:14 67:2
71:4,8 72:15
83:4 88:20 93:2
95:10

**fairly** 51:1

**falling** 91:6

**false** 34:24
36:8 48:19,21
54:21 57:22
65:3,17,25
106:4,11
109:22

**familiar** 41:1
58:14

**familiarity** 7:6

**family** 46:3
52:3 54:7,8,10,
13 95:25

**fathers** 45:19

**fatigue** 85:23

**federal** 8:21

**feedback**
32:12

**feel** 59:8 82:7
92:21 103:10

**fees** 24:18

**felony** 20:15

**felt** 81:7

**Fifteen** 27:8

**fighting** 108:23

**figure** 88:22

**figuring** 69:21

**file** 18:9,10,16
56:16 110:24
111:1,3

**files** 19:9

**film** 69:12

**films** 69:18

**financial** 22:21

**find** 34:6 39:8
67:19 69:20
94:20 95:21

**finder** 73:24

**finders** 82:24

**finding** 85:3

**findings**
111:12

**finds** 51:23

**fine** 75:21 77:8
94:1 110:9

**finish** 7:22
110:8

**fire** 72:12
86:18,23 99:17
105:1 108:7
109:13

**fired** 19:24

**firm** 18:2,4
30:23 32:9

**fit** 14:14

**flag** 91:6

**flexible** 97:10

**floor** 5:7

**focal** 34:17

**focus** 38:9
73:9,16 75:19,
24

**focused** 59:23
60:7

**focuses** 32:21

**folks** 24:25

**follow** 11:23
12:11 16:25
18:13 37:1 42:2
46:7

**foolproof**
65:10

**Forensic**
70:21

**Forgive** 15:16

**form** 49:2 89:1
98:20 103:24

**formal** 23:14
24:7

**formalized**
29:24 30:8,25

**format** 36:25

**formed** 18:16

**forms** 23:7
37:21,24 45:10

**formulate** 66:4
74:12 99:1

**formulated**
29:13 40:9
50:7,17

**formulating**
78:18

**formulation**
12:23 28:13

**found** 44:9
48:21 58:9 69:1
83:7

**foundation**
25:14 103:24
107:16

**fourth** 33:15,
17,20 34:21
52:4 78:9

**frame** 37:19,20

**frankly** 56:2

**fraud** 74:8

**Frazier** 83:12

**Fred** 32:19
33:14 40:10
66:7

**free** 44:15

**freezing** 25:5

**frequency**
55:25

**frequent** 22:11

**front** 19:10,11
80:17

**fruition** 21:14

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

full 5:25 87:25

fully 7:13

function 50:13,25

furloughed 54:5

future 45:22 112:12

_____

G

gain 29:22

galvanic 75:2

Garcia 5:19 6:5,15,16 49:1 62:23 63:5,10, 19 110:6,11,22 112:5,8,13,15

gave 83:5,6 87:12,16 109:22

gee 43:16 68:3

general 20:21 98:9

generally 58:19 74:3

gesture 70:10

gestures 56:20

give 6:9 7:21 9:2 10:8 16:3 24:12 25:1,6 28:22 32:11 34:5 38:12 48:18 55:1 60:17 64:14 65:5 67:15 77:10 85:17 89:15 96:6 110:11

giving 8:23 51:13 54:10,14, 16 78:19

good 9:14 14:14 62:2,24 70:20

grab 100:4

graduates 16:25

graduating 16:5

great 6:22 9:7, 24 10:24 12:12 14:7 16:2,7 17:10 18:23 19:2 22:12 23:18 25:5 26:8 31:11 39:8 42:12 50:4 60:10 62:1,23 63:20 89:5 111:22 112:3

ground 7:8

group 69:18

guess 46:19 102:16 103:1

guidance 28:6 37:18

guidelines 31:16 32:17 42:3,17 44:6 83:23 101:18

guiding 31:14

guilty 51:15 52:14 56:3 57:10 58:3,9,10 69:4 71:11 80:8 93:4 94:19,23 95:12,17 96:16 108:19 109:13, 19

gun 49:7

guy 49:9 52:16 64:12 66:24 81:9 92:8

guy's 52:6 68:5 92:10

guys 37:11 63:11 68:3 81:6 84:9 104:21

_____

H

habit 100:1

half 28:7 58:2,3 74:9 75:10,14 93:24

halfway 63:6

hand 6:8 32:17

handle 20:22 56:8

handling 39:24 40:1 55:13,16 60:1

happen 58:11 59:16,17 67:20 68:1,2 88:4

happened 34:8 43:18 45:8 49:8 59:14 60:21 61:14 86:17,19 89:3 93:5 94:17 100:10,106:10, 12,14 107:25 108:23

happy 7:21 38:7

hard 52:15 56:7 68:4 72:10

harm 42:5,23 45:4,22

he'll 51:22 57:24 74:13

head 7:18 49:7, 8 52:16 56:22 91:7 99:14

headway 49:21

hear 56:18 96:5

heard 60:14 100:16

heavy 80:21,22

heavy-handed 64:17

held 10:3,9 11:17 23:2

helpful 71:3

Hey 60:25

high 27:13 55:7

higher 20:9

highlighting 39:20

hired 25:12 37:13

history 16:4 17:15

hit 49:16

hoc 23:16

hold 55:23 56:19 97:21

home 44:11, 16,20

homicide 44:23,24

honor 42:8

hooked 75:7 77:23

hour 74:8 93:19,22,24 99:12 101:15 107:13

hours 18:22 48:22,24 49:18 50:1,2 52:16 63:7 89:9 93:13 98:22 101:2 102:14 104:25 105:2 106:24 107:9,13,14 108:7,11

house 30:7

hundreds 55:7 57:11

husband 95:24

Hypothetical 105:18

_____

I

idea 60:21 77:5

IDENTIFICATI ON 39:4,5

identify 15:19 77:7

identifying 70:25

ignorance 15:16

ilk 17:15

illicit 64:18

Illinois 5:7,14, 21,23 16:13 25:16,17 26:13, 14,16 47:1 64:3 66:8

immature 43:9 46:14,15

impact 8:8

impairment 90:16

impairments 42:7 46:21 47:5,6 83:20

implement 25:25

important 7:10 87:2

improper 45:15,16

in- 30:6

in-house 37:12

inappropriate 43:16

Inbau 32:20 33:15 40:10

incident 41:4 75:23

include 14:23 91:10

included 34:22

inconclusive 84:18,25

independent 53:1,2,3 69:18

indication 91:4 94:15

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

101:7 109:13,
18

**indications**
68:19 71:9 86:5

**indicators**
71:5

**indirectly**
86:19

**individual**
28:23 32:8 93:7

**individuals**
16:22 26:3

**industry**
81:22,24 82:3

**inevitable** 42:6
43:1 45:25

**inevitably**
55:17

**inferences**
58:16

**influence**
91:15

**information**
34:22 36:1,6
52:12 55:1
64:10 73:3,9
82:21 83:2
87:21,23 95:7
98:6

**information-
gathering** 67:8

**ingrain** 59:13

**ingrained** 60:4

**inhaler** 43:16,
17

**inhibits** 85:17

**initial** 68:23

**initially** 40:9

**inmates** 104:1

**innocence**
92:20

**innocent** 44:13
51:15,20 58:9
93:4 105:22,25
108:22

**instance** 24:8,
11 69:3 92:16,
25 95:17
101:13 109:18

**instated** 11:6

**institution**
20:9,12

**instructed**
74:1

**instructor**
11:11 29:3

**instructors**
28:17

**instrument**
74:21 78:1,14

**insurance**
95:24 96:6

**intend** 72:9

**intent** 56:3,4
72:8,10

**inter** 80:18

**interest** 12:9

**interested**
26:1 73:7

**interject** 55:18
56:19 57:16
68:7

**intermingled**
55:15

**internal** 96:23

**internship**
26:3 28:7,8,23
29:10

**internships**
27:21

**interpretation**
28:12

**interpreter**
90:12

**interrogate**
49:18 93:12

**interrogated**
43:13 103:1

**interrogating**

41:7 43:8 45:11
47:7 102:12
103:3

**interrogation**
21:14,19 30:5,
14,18 31:10,23
32:10,21,22,25
33:1,9,13 35:1,
11,24 37:23,24
38:23 39:21,23
40:22 41:9,17
47:19,21 48:13,
23 50:5,9,14,21
51:17,20 52:19,
24,25 53:19
55:12 56:24
57:5 58:19
62:9,19 63:21,
24 64:17 65:9
66:23 67:6
68:21 71:20
82:22 83:8,9
88:22 89:7
99:11 100:10
102:6,10
103:11 104:3,
13,14,24 105:3
106:25

**interrogations**
31:16 32:5
33:10 35:3 36:9
43:25 57:11
65:17 67:4 84:1

**interrogators**
47:6

**interview**
12:24 21:24
23:11,14 30:4,
14,18 31:8,24
32:10,22 34:6
40:21 41:13
47:24 48:6
52:11,13 62:18
67:5 68:7,10,
16,19,21,25
71:19 73:15,22,
24 74:2,8,10
80:19 82:21,23,
24 83:6 85:24
87:1 93:20
95:21 96:2
97:3,6,25
98:11,14,15
99:1 100:23

107:8,12,23
108:2

**interviewed**
43:13 58:1

**interviewer**
73:23

**interviewing**
21:13,19 38:23
41:6,9,11 43:8
47:21,22 67:17,
19

**interviews**
10:19 14:3
31:15 32:4 34:3
35:11 64:11
67:4,7,9,10
70:23,24

**intimidation**
42:24 45:4,9,
11,23

**intoxicants**
91:25

**intoxicated**
91:11,12 92:2

**introduce** 37:1
55:22 56:12

**introduced**
22:7 37:15
40:19

**investigation**
21:12 24:2 33:7
38:10 48:7 53:4
72:6,17 73:17,
18 95:9 96:22

**investigations**
27:5 35:13

**investigative**
10:19 31:8
67:10 72:19,20

**investigator**
47:14 52:4
53:25 58:1 88:9

**investigators**
34:7 56:19 64:4
98:3 109:9

**invoice** 24:22
25:2

**involved** 21:2
29:1 33:22 54:6
61:25 66:10
108:6

**involvement**
48:10 52:21
88:4 99:17

**involves** 61:21

**IQ** 46:22

**irrelevant** 76:7

**issue** 21:12
25:8 35:1 36:9
37:4 48:7 70:3
72:1,7 73:4
101:7

**issues** 35:2
36:8 55:9 74:5
100:3

———

**J**

**J-A-** 33:16

**J-O-S-E-P-H**
6:20

**jail** 44:25 45:18
59:16 67:23
103:22

**jail's** 109:15

**James** 18:1

**Jason's** 53:5,
6,9

**Jayne** 33:16

**jerk** 68:5

**jewelry** 53:5,6,
9,17 55:4 57:8
72:13

**job** 19:25 20:3,
6 26:9 54:4
59:17

**Joe** 49:3 63:2
110:13

**John** 5:11 6:23,
25 8:17 9:25
10:9 15:8 16:19
23:5 25:10,12,
23 32:19 33:14

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

41:13 55:23
56:19 58:21
65:24 66:6
72:22 73:1
82:12

**joined** 33:15,
17

**Joseph** 5:10
6:1,4,20 63:16
110:19

**Journal** 17:12
70:21

**judgment**
48:10 69:6 92:3
105:9,10,11

**June** 10:7

**justifications**
54:1,20

**juvenile** 31:20
36:9

**juveniles** 42:7
43:9 47:2 83:19

**juxtapose**
60:19

---

**K**

**Kentuckiana**
5:6

**kids** 46:4

**kill** 45:19

**killed** 67:16,25
105:1

**killers** 45:19

**kind** 10:23
12:24 13:5
14:20 18:11
20:25 25:14
32:13 33:21
38:25 45:21,22
47:9,10 48:2,5
51:7 54:7 55:11
56:21 57:5,9
58:5 59:8,14,21
60:4,7 64:7
66:1 67:11
68:6,7,14 70:9
72:2 73:9,18

**kinds** 12:2 31:8
45:13,14 67:9
69:24 70:13

**knew** 98:18

**knowledge**
36:23 39:14
52:14 86:18
94:19,23 95:12
97:21 100:18

**Kortney** 5:4
63:17 110:20

---

**L**

**lag** 7:9

**land** 92:10

**language** 57:5
62:13

**late** 13:8 25:23

**law** 25:17 35:2
38:13 62:16
64:8 90:2
102:11

**laws** 31:14

**lawyer** 29:8
65:22

**lawyers** 14:19

**lay** 7:7 45:14

**lead** 106:3

**learn** 34:12
50:11 51:16
104:14

**learned** 34:1,9
64:14

**learning** 20:9

**leave** 20:9,11
44:15 98:18

107:25

**leaving** 43:24

**lectures** 30:7

**led** 106:11,16
108:14,15,19

**left** 15:8 61:2
63:20 100:8,10
102:1 106:12

**leg** 45:8

**legal** 28:13
29:7,8 31:21
33:25 42:9
43:20 44:6

**legally** 54:11,
13

**legislation**
31:19 47:2 64:4

**legislature**
25:16

**legitimate** 65:8

**lend** 44:12

**length** 93:10
107:7

**lengthy** 106:23

**leniency** 42:4,
20 44:8,10,17,
21

**Leo** 48:20

**level** 44:24
48:9 49:16
59:23 66:10

**license** 26:12

**licensed** 16:24
25:19

**licensure**
16:23 26:10
29:14

**lie** 31:19 32:19
69:16 70:12
79:25 80:7
82:20 95:1,14

**lied** 94:25

**life** 67:24

**light** 37:4
80:20,21 81:8,
12

**limitation** 75:5
76:3

**limitations**
73:25

**limited** 75:20

**lines** 46:12
108:12

**list** 19:11,19
37:5,6

**listed** 41:21
83:25

**listen** 56:14
88:13,15 97:2

**listening** 79:8
88:6 99:13

**literally** 85:8

**literature**
17:14,15

**litigation** 41:5

**live** 17:3 26:4
28:9,24

**living** 48:1

**lobby** 98:3

**located** 5:6

**location** 5:17
13:13

**long** 10:3 18:20
27:24 38:24
43:12,13,15
93:18

**longer** 23:1
27:15 76:14
93:12

**looked** 70:23
98:7 110:23
111:3,8

**lookout** 47:7

**lose** 59:17

**loss** 75:12

**lost** 54:4 61:1
83:16

**lot** 27:5 36:1
54:6 56:2 92:21
93:9

**loud** 77:15

**low** 46:22

**Loyola** 16:6,10
17:13

**lying** 69:22
70:1,2 71:1
77:7,8 82:15
83:8,16 84:1,4,
12

---

**M**

**made** 11:24
23:12 34:7
65:23 97:24

**make** 7:13 8:22
14:14 20:24,25
22:20 28:25
38:17 44:25
46:2,4,25 48:10
54:13,17 55:24
62:25 65:6,7
79:14 80:6,18
85:25 89:16
99:4,8

**makes** 9:9
46:10 54:14

**making** 42:20
49:20 54:14
99:15

**Man** 92:9

**mandatory**
26:9

**manipulate**
77:19 79:19

**Manslaughter**
45:1

**manual** 32:15
38:20

**manuals** 35:21
66:16

**Mariah** 5:19
6:16 112:7

**Marino** 17:25

---

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

| | | | |
|---|---|---|---|
| **mark** 80:18,21, 22 81:4,22 111:15 | 83:19 | **minute** 60:25 62:5,24 92:8 | **monitored** 97:5 | 102:25 103:1 104:4,16 105:13 |
| **MARKED** 39:4, 5 | **mentioned** 27:20 47:17 48:12 50:1 | **minutes** 62:3 74:5 75:10,12, 14,17 76:18 | **monologue** 53:25 | **nature** 31:20 44:22 98:9 |
| **markers** 68:15, 18 69:2 90:17 | **merit** 64:21 | 77:10 88:8 91:7 99:18,23 | **month** 25:20, 25 35:22 37:10 | **necessarily** 71:10 |
| **marks** 80:20 81:7,11,25 | **met** 98:3 | 101:17 107:11 110:7,10,12 | **months** 28:2,7 45:21 54:5 | **necessitate** 34:18 |
| **Mary** 55:23 | **method** 40:5 65:10 68:20 104:6 111:15 | 112:9 | **mood** 40:1 60:1,3,5 | **necessity** 103:18 |
| **Masokas** 18:3, 15 101:14,21 102:1,15 | **methodology** 11:12 | **Miranda** 38:4 46:23 47:2 98:19 | **morning** 103:21 | **needed** 14:24 |
| **Masokas'** 18:4 19:6 | **Michael** 5:22 18:3 | **mirror** 58:13 | **mother-in-law** 105:2 108:19 | **negative** 66:22 88:11 96:7 99:16 |
| **master's** 16:11 17:1,16 | **Mick** 62:23 63:6 110:6 111:22 | **Mischaracteriz e** 107:5 | **motivation** 57:19 | **neighbor** 67:17,22,25 69:4 |
| **match** 84:5 | **mid-1960s** 25:16 | **mischaracteri zes** 49:3 | **move** 59:21 79:24 99:10 | **neighborhood** 74:4 97:24 |
| **material** 36:10 | **mid-70s** 21:12 22:4,6,7 | **misleading** 58:12 | **movements** 75:4 | **neighbors** 67:18 |
| **math** 65:21 | **mid-80s** 11:15 21:15 22:6,9 | **mispronounce** 40:10 | **movies** 107:25 | **nervous** 81:6 |
| **matter** 5:11 37:2 90:11 | **Mike** 89:17 93:21 95:19 96:1 98:4,10,25 | **misrepresent** 64:5 83:11 84:20 | **moving** 45:3, 24 67:2 79:6 | **neurosis** 47:8 |
| **means** 53:22 55:1 59:11 60:15 62:8,10 80:9 91:12 109:25 | 99:11,17 100:2 | **misrepresenti ng** 83:16 | **mum** 81:10 | **neutral** 73:24 82:24 108:3 |
| | **Mike's** 100:2 | **missing** 76:10 84:20 | **municipalities** 23:2 | **Newey** 89:18 101:16,22,25 102:15 103:14 |
| **measure** 72:10 | **Milwaukee** 13:10,14 | **Mitchell** 70:19 | **murder** 55:3,7 57:7 95:3,6 109:25 110:3 | **news** 48:2 70:9 |
| **medical** 54:6 85:17 98:21 100:3,24,25 | **mind** 38:1 41:24 88:13 89:3 95:20 96:4,9 | **mix** 78:11 | **murdering** 69:4 108:19 | **night** 52:1 83:21 95:3 97:23 101:2 |
| **medication** 85:16,18 98:23 | **mindset** 67:1 | **mixed** 77:15,21 78:10,22,24,25 79:2 | **mutual** 24:17 | **nodding** 7:18 88:7 99:14 |
| **medications** 8:8,12 | **minimal** 80:22 | **modify** 64:2 | | **non-** 67:7 84:25 107:23 |
| **medium** 81:13 | **minimize** 55:25 | **moment** 25:6 61:13 72:11 75:3 | **N** | **non- accusatory** 73:23 |
| **meeting** 15:18 60:5 | **minimizing** 56:4 | **momentarily** 70:4 | **N-Y-E-S-T-E** 18:2 | **non- confrontation al** 67:7 107:24 |
| **members** 12:21 13:22 29:5 30:23 95:25 | **minimum** 77:21 | **money** 22:20 27:9 51:10 54:8,12 58:2,11 69:17 76:10 | **nah** 86:24 | |
| | **minor** 44:24 | | **nail** 108:23 | |
| | | | **named** 13:24 14:1 15:5 | **non- threatening** |
| **memory** 8:6,13 | **minors** 43:5 46:11,16 | **monitor** 97:6 | **naming** 15:6 | |
| **mental** 42:7 46:21 47:12,20 | | | **Naperville** 23:23 24:1,3,8 | |

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

70:8

**nonsense**
90:25

**nonverbal**
31:7 56:20

**norm** 47:24

**normal** 70:12

**north** 31:2

**Northern** 5:13

**notes** 19:15,20
98:12 110:7
111:17,20,23

**notice** 9:2,16
38:21

**notion** 59:13

**num** 81:10

**number** 5:15
8:18 28:18,25
33:23 34:9
42:1,2,3,4 65:2
69:25 75:20
76:3,4 77:4
79:23 82:16,20
98:22

**numbers**
81:12,13 82:10

**numerical**
77:1,13 81:5,
10,16,23

**Nyeste** 18:1

---

**O**

**object** 49:2
50:22 102:9
105:17

**objection**
51:3,6 103:7
105:4 107:3

**objections**
39:24 50:21,24
55:16

**objective** 72:7
73:24 81:13
82:11,24

**observation**
17:3

**observations**
33:25

**observe** 28:4
32:11

**observing**
29:2

**obvious** 82:15
91:9

**occur** 97:15

**occurred**
22:16 37:10
88:23 97:20,23
106:22

**occurring**
97:14

**occurs** 74:10
85:16 101:11,
19

**October** 97:23

**offense** 40:3
61:7

**offering** 54:19

**offhand** 81:20
100:7

**office** 10:20
11:4 12:2 13:17
14:8,17,25
20:22 23:18
54:25 98:5
99:25 103:14
106:7,8,10,13,
16,19 107:17,
19 108:13,14

**officer** 15:23
23:14 35:5

**officers** 15:20
69:19 102:1,2,
4,23

**offices** 13:9,13
29:11 102:3,5,
13

**officially** 20:2

**oftentimes**
27:10 29:22

70:17 77:9
89:14

**one-to-one**
71:5,7

**ongoing** 28:1
29:20

**online** 5:4

**opinion** 37:6
86:8 87:23
89:16 92:12
103:2 104:19
106:3

**opportunity**
104:9

**opposite** 69:7

**option** 77:17
84:3

**options** 32:12
86:14,22

**oral** 40:3 62:7

**orally** 40:2
61:6,19

**order** 78:23

**organization**
20:12

**original** 36:5
77:12 96:14

**Originally** 31:1

**outcome** 51:24
52:4 69:7

**outcomes**
51:17

**outline** 37:16

**outlining**
41:24

**outset** 47:23

**overcoming**
39:24 50:21
55:16

**oversees**
10:18

**overview** 10:8
16:4

**owned** 31:2

**ownership**
15:8

---

**P**

**P-A-U-L** 6:20

**p.m.** 110:16,21
112:18,19

**pages** 39:1,19

**pair** 79:13

**pal** 60:25

**paper** 17:10

**papers** 19:9
57:14,17,21
104:4,15,24

**parallel** 24:21

**parcel** 60:8

**part** 27:4 29:8,
9,13 44:2 57:17
60:8 61:18
68:23 72:18,19
95:20 100:5
108:17 109:20

**parties** 6:3

**partnering**
58:21

**party** 54:9

**Pasqualino**
5:22 6:6 17:25
49:2 62:2 63:2,
8,11 102:9
103:7,24 105:4,
17 107:3,5
110:9,13 112:3,
6,11,14

**pass** 21:2
86:11 88:25

**passed** 23:13
25:17 27:2
31:19 47:1 64:4

**passing** 86:9
110:5

**passive** 40:1
60:1,3,5 99:12

**past** 17:24
48:24 65:21,22
76:18

**pattern** 57:12,
13

**Paul** 6:1,20

**pauses** 56:22

**PD** 97:24

**pending** 5:12

**people** 12:6,8
13:5,7,21 15:21
17:4 23:12
26:1,5 27:8,9
28:16,18,24
29:1 31:4 34:10
37:18 38:12
42:7,14 44:5
46:12,20 51:15
52:10,11 55:7
56:3,12,14,15,
17 57:1,16,19
62:20 64:15
65:15,16 67:13,
14 69:10,21
72:14 79:19
83:13,19 87:22
88:12 90:10
97:11 99:21
104:1 109:10

**percent** 22:1,2
70:25

**perception**
79:8 82:11

**perform** 50:25

**period** 21:1
23:23 40:17
44:1 48:14,17
73:19 76:4 87:7
89:5

**permission**
56:13

**persistent**
49:25

**person** 10:21
13:14,18 24:15
26:5 32:9,11
37:6 38:5 44:13
51:11,18,19,24
54:18 55:21

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

56:22 57:10
65:5 67:19,21,
24 68:1,8 72:2,
9,12 77:2,6,10,
15,18 79:4 80:8
85:22 88:6
89:11,15 90:10,
25 91:5,6 92:24
94:19 97:8
99:22 101:5
105:24,25

**personal**
34:10

**personalities**
99:21

**personality**
47:15 93:7

**personnel**
90:2

**persons** 67:20
83:24

**phase** 51:14
99:11

**Phillip** 66:8

**phone** 12:12
20:23 25:2

**phrase** 44:15

**phrased** 68:11

**phrases** 56:13

**physical** 42:5,
10,23 45:3
82:19

**physiological**
74:23,24 77:7
80:17 85:6,17

**Physiology**
28:12

**pick** 77:3,4

**picked** 79:21,
22

**piece** 87:23

**place** 27:14
37:8 57:6 63:25
64:9 86:24

**plaintiff** 5:20
6:5,17

**plaintiff's** 5:18

**plan** 60:23
61:13

**played** 70:24

**plead** 44:24

**point** 14:6
22:12 34:15
40:19 52:17
55:24 66:10
81:19 98:1,15
99:6 100:16

**points** 34:18

**police** 12:1,3
23:11,14 24:1,
3,8 27:17 35:5
38:6 47:3 67:17
69:19 73:6
103:2 104:16
105:3,13

**policies** 89:25

**policy** 95:24
96:6

**polygraph**
10:13,15,18,22
11:10,13,18
12:15 15:3
16:2,19 17:9,12
18:3,10 20:20
21:11,23 22:2,
13,23 23:3,13,
24:10 25:11,19
26:1,9,16 27:2,
4,10,14 29:18
30:1,10 32:5,
18,19 36:17,20,
21 38:4 41:1,6
52:25 53:2,5,7,
10 71:23 72:5,
8,16 75:6 76:5
77:24 78:18
81:3 82:12,14
83:6 84:15
87:16 89:10
90:2,7,18,20,24
92:12,16 93:11,
18 94:4,14
95:11 96:15,24
97:2,13,18,25
101:3,13,19
102:6,13,18
103:4 105:23

106:1,24 107:8,
21 108:18
110:4,24,25
111:1,4,5,8,9

**polygraphed**
104:25

**polygraphing**
71:15,19 72:21,
25 106:24

**polygraphs**
89:7

**posit** 38:23
39:23

**position** 10:3
14:14

**positions** 10:9
15:23

**positive** 52:20,
22 53:10,14

**possibilities**
89:2

**possibility**
85:21,23

**possibly** 24:15
87:13

**post** 34:3 39:17
64:11 89:7
99:10

**post-test** 37:7
95:21 97:4

**postpone**
101:10

**potential** 84:4
106:4

**practice** 25:19
34:18 36:15
46:16 57:12,13
91:22

**pre-
employment**
21:11

**pre-test** 37:4
73:15 74:1,10
83:5 100:23

**prefer** 19:19

**preference**
81:22

**preparation**
17:20 29:14

**prepare** 17:23
19:7

**presence** 90:1

**present** 60:16
104:12

**presented**
35:5 61:4

**presenting**
40:1 60:11

**president** 7:2
9:25 10:16,21
11:7,15 6,7,10,
12,14,16,25
23:1 58:20

**pressure** 75:2,
15,18

**pressures**
54:3

**presuppose**
30:13

**pretest** 93:20
97:3 98:14,25
107:8,12

**pretty** 27:13
28:2 29:23 44:6
91:9

**prevented**
27:3

**previous** 19:6

**priest** 95:2,5

**primarily**
10:12 11:13
21:19

**primary** 11:17,
19 21:10 42:11
75:21 85:1

**principle** 46:1,
10 81:15

**principles**
31:15 41:20,22,
24 42:11 44:4,8
45:5 46:19

48:12 82:18
103:12

**prior** 16:2
25:12 27:5,19
34:23 60:4 64:8
87:8 104:4

**private** 27:3

**probability**
27:12

**probable**
88:18,19

**problem** 58:24
76:16 91:8
101:24 108:5

**problems**
70:13

**procedures**
36:8 82:17
89:25

**PROCEEDING
S** 5:1

**process** 12:5,
24 13:24 14:9
15:6,11,15
16:17 17:1
20:19 23:8 24:6
25:9 27:20
32:22 33:20
34:11 36:3 48:6
51:14 52:19
64:25 66:12
71:19 72:19,20,
21 74:21 80:15
81:11 83:23
95:21 108:2

**procurement**
39:25 59:10

**produced**
38:20

**profession**
81:6

**professional**
20:12

**professor**
57:23

**professor's**
57:25

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA COURT REPORTERS**

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

proffer 105:17

profile 55:7

program 11:15
25:21 26:1
27:11 30:5 31:1
32:2,7 35:22
36:1

programs
11:14 21:13
22:8 35:25 39:7

prohibited
83:9,24 84:1,8,
12

prohibitive
82:13

project 57:24

promise 44:17

promises
42:4,20 44:9,21
65:4 82:18

promising
44:8

prompts 88:9

proof 54:24

proper 83:12
101:24

proposes
53:25

prosecuted
67:23

prospective
21:3

Protection
27:3,14

protocol 11:23
12:10

prove 92:19
93:8

proven 94:5

provide 8:3,9,
17,23 9:20 21:8
47:11,18

provided 24:1,
3,22 37:11
83:11

providing 24:7

provoking
67:12 73:22

psychological
46:21 47:4,5
53:25 54:17,19
55:9,12 70:3
83:20 90:16

psychologically
54:10

psychologist
29:9 58:22

psychologists
34:25 35:1
64:20 66:4,7,15

psychology
28:12 29:8

psychopaths
47:9

psychopathy
47:8

publications
58:15

publish 34:14

published
17:10,11 32:17
33:4,8,23 57:15
70:21

pull 9:2 36:12
100:24

punishment
70:18

purpose 50:6,
11 71:18,22,25
73:3 78:12
79:2,18

purposely
84:25

purposes
50:13 63:6

put 27:16,17
44:11 49:7 70:4
81:12 87:6

putting 109:24

**Q**

Q&a 67:9

qualification
47:3

qualified 12:4

qualify 16:23
17:1

quality 75:25

question 7:11,
12,13 12:23
14:9 16:7 17:21
18:11,14 28:13
30:13 35:6 40:2
41:4 46:22
60:11,14,16,17,
18 61:4 62:4
67:14 68:16
73:19 75:9
77:15,21 78:10,
19,24,25 79:2,
6,12 80:18,24
85:7 88:9 96:15
103:1 108:9

question-by-
question 79:14

questioned
96:17

questioning
7:22 9:12 19:23
68:24 97:4
102:14 103:19
107:10,13,17
108:12

questions
7:25 19:12,19,
20 31:8 37:5,19
38:25 48:7 53:6
61:17 67:10,11,
12 70:8,25 71:2
73:10,21,22
74:12,15,16,22
75:9,20,21,22
76:3,4,7,9,11,
13,25 77:13,16
78:11 80:24
98:9,13 99:2,3
107:24 110:8
112:1

quickly 36:15

quote 26:18
109:22

**R**

raise 6:8

ran 81:1

ranks 45:2

rapport 99:19

rate 100:1

raw 111:4

reacts 68:15

read 8:21 9:9
35:20 50:9
61:23 62:12
74:15 99:3

reading 19:5
35:11 70:14
74:22

real 57:18,19
58:7,13,17 68:5
70:16 79:7

reason 26:25
44:2 51:13
54:11,14,17
57:20 64:12
75:16 76:12
87:15 110:2

reasonable
48:4

reasoning
34:14 44:4
76:17

reasons 54:1
60:19

reassure 77:6

recall 17:5
33:12 100:6

receive 16:9,
14

received 17:17
101:1

receiving
16:17

recent 48:2

recently
103:22

receptionist
20:25 24:12
98:14

receptionists
20:22

recognition
22:9

recognize 39:2
47:12,19

recognized
58:3

recognizing
88:18

recollection
30:15

recommendati
on 15:9

record 5:3,25
6:19 9:15,19
63:12,14,15
75:4 92:23 94:3
110:15,17,18
112:14,15,17

recorded
61:24 74:23,25

recorders 75:3

recording
62:18,21

recordings
17:8 79:20

red 91:6

reexamination
87:4,8

reexamine
87:11

refer 19:20

referenced
62:22

referred 19:15
66:17

refers 52:13

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

refined 31:13

reflex 75:2

reform 63:24

refresh 30:15

regular 34:2
97:2,9

regulations
25:22

Reid 5:11 6:23,
25 8:17 9:21,25
10:5,9,17 11:11
13:8 14:1,5,12
15:8,10,23
16:3,5,19,20,22
20:18 21:6,18,
22 22:13 23:5,
22 25:10,12,23,
24 26:10,20,23
28:11 29:3,6,
11,17 30:1,9,17
32:6,14,19
33:14 35:17
36:16 37:11,22
38:3,22 39:20
40:5,9,15,20,25
41:13,16,20
49:14 50:6,8,
13,16,20 52:18,
23 58:19,21
60:15 62:8
63:21,23 64:16
65:9,14,18,25
66:3,5,6 67:3
68:19 72:4,22
73:1 82:12
84:2,8,12 88:22
89:5 90:1 94:14
96:24 102:2,5,
12,24 103:4,12
104:6 105:3
109:6

reinstituting
15:15

reiterate 56:21

relate 40:2
61:6

relationship
73:19

relax 77:11

relevant 37:3
76:9 79:13
80:24 95:9

reliability 59:3
82:8

reliable 58:6

remember
83:21 96:3

reminds 59:20

repeat 32:23
57:10 68:17
77:12

rephrase
68:12 108:9

report 36:18,20
37:15

reporter 5:3,5,
24 6:3,7,13
7:16 62:15,17
63:12,15
110:15,18
112:17

Reporters 5:6

reports 37:18

represent
100:25 101:14
102:2,24 104:2

representing
5:5 24:16

require 8:21

required 25:18
29:19 30:3 32:5

requirement
25:21 30:8
35:13,17

requirements
25:11

research
34:25 48:20
57:14 58:5,16,
23,25 69:11
70:13,14

researcher
69:20

researchers
69:19

reserve 112:4

resort 83:17
84:3,10

respect 42:2,
14 44:6

respecting
43:19

respiration
17:8 75:1 85:9

respond 80:21

responding
101:5

response
78:16 80:19,22,
23 81:12 85:17
86:15 88:10

responses
68:8 75:25 77:7
80:17

responsibilitie
s 11:17,19
12:14,17,19
14:17

responsive
99:22 101:6

rest 67:24

restroom
110:13,14

result 70:16
85:4

results 53:3,7
89:15 93:22
96:8 99:16

retain 20:20

retention
39:25

review 9:16
18:8,15 29:16
74:14 97:7,15

reviewed 18:4

reviewers
70:23

reviewing
12:23 18:7,14
97:9

reviews 96:23

revoting 15:15

Richard 48:20

rights 38:9,11,
12 42:8,9
43:20,22 46:23
65:4 82:19
98:19

robbery 72:1

role 8:19 12:16
13:2 15:12
73:23

roles 10:9
11:16 14:17

room 31:3 45:7
49:6 52:5 57:25
66:24 74:11
77:10 90:4,6,9
98:4,16

rooms 97:6

rule 8:15 20:21

rules 7:8 8:21
25:21

run 75:10

**S**

safe 27:8 51:10

Sal 58:13

San 81:9

scenario 88:2
105:12

scenarios
89:21

scene 109:21

schedule 21:1
24:18

schizophrenia
47:8

school 16:20,
25 27:11 35:23

schools 26:11,
15

science 16:11
109:1,2,3

Sciences
70:21

scientific
57:14,17,21

scored 86:7
89:11,19

scores 80:12

scoring 80:15
81:2,5,10,23
82:4 93:21
111:15,18

screen 8:24
25:5

screws 58:8

scroll 9:11,13,
14 38:25

secondary
16:9

seconds 49:6,
10

secretary
15:25

selection 12:5

seminar 31:24
35:15 67:3

seminars
10:22 26:15
30:18

senior 17:4
26:4 27:11 28:5
29:1,5 32:10
37:18 89:18

sense 7:14 9:9
46:10 78:14

separate 69:13
107:10

separated
79:17

sequence
61:16 77:1,13,
16,19,21 78:7,
11 79:10

sequencing

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

78:4

**series** 76:24
77:19 99:6

**serve** 104:24

**served** 104:4,
15

**service** 21:10

**services** 20:20
21:6,18,22
23:3,25 24:3,7,
21

**set** 25:14 41:22
53:15 72:12
76:25 77:12
97:5

**setting** 86:23
102:21

**severity** 86:15

**shade** 81:8

**shaking** 7:18

**share** 8:24

**shareholders**
15:18

**shed** 37:4

**sheet** 80:19
85:18 98:21
100:24 101:1

**sheets** 18:11

**shell** 59:15

**shift** 12:16
22:13,22

**shifted** 31:12

**shoot** 45:8
72:1,12

**short** 107:14

**shorter** 32:2

**show** 69:18

**showing** 86:5
80:17

**sic** 35:13

**side** 20:18
66:22 87:6

**SIDS** 45:17

**sign** 56:21
61:23 62:12
72:2 98:16

**Signature**
112:3

**significant**
48:8 80:23

**significantly**
21:15

**signs** 47:16

**silent** 77:14
78:9,12,17

**similar** 14:8
17:15 76:17

**similarly** 14:12
21:5 76:2

**simple** 67:15

**simply** 23:16
38:13 64:25
78:11

**sit** 19:10 32:11
70:10 80:6 85:5
90:17,20

**sitting** 73:15

**situation** 83:5
86:4 104:7

**situations**
109:10

**size** 13:18

**skills** 31:7

**skin** 75:2

**sleep** 85:22
98:22 101:2

**small** 9:4 87:23

**smoked** 99:23

**smokers** 99:24

**smoking** 99:25

**social** 34:25
35:1 58:22
64:19 66:4,15
109:1,2

**socially** 43:9

46:14,15

**solemnly** 6:8

**someone's**
37:13 38:8
47:20 68:11
70:15 92:25
96:16

**sonographer**
62:15

**sort** 14:23
24:10,22 28:15
29:24 30:24
34:19 51:2
53:12 57:14
69:1 73:25 75:5
76:2 81:21 82:7
85:13 89:1,12
91:20 93:2
96:22 97:15
98:20 109:1,3

**South** 5:6

**spacing** 75:11

**speak** 7:10
50:24 65:15
106:13

**speaking** 74:3

**specific** 21:12
24:5 31:19
34:15 39:17,19
49:11,15,23
71:25 72:7
83:23

**specifically**
19:18 26:14
39:18 40:16
47:17,19 63:22
71:16 84:7
97:14,18
105:10 109:17

**speculate** 58:5

**speculating**
96:9

**speed** 31:18

**spell** 6:18 18:1

**spend** 101:14,
18

**spent** 98:11

101:15,16,20
103:22 104:25
108:10

**spoke** 101:11
102:23

**spoken** 30:16

**spontaneous**
60:23

**spot** 78:9 79:7

**spur** 61:12

**staff** 12:21
13:14,22 29:5
65:15,25

**stage** 29:15

**stages** 101:23

**stake** 58:8 93:9

**stakeholders**
58:20

**standard**
28:15 81:22
82:3 91:22

**standards**
63:24

**start** 10:5
30:17 57:10
61:14

**started** 6:18
7:8 86:19

**starting** 5:17
16:2 99:17
108:6

**starts** 52:19

**state** 5:16,25
6:18 16:12,23
25:20 26:13,14
64:3 75:12

**statement**
44:20 52:21
55:6 61:15,21,
25 62:11,17,20
65:8 71:25
73:17

**statements**
37:20 40:4
62:6,7

**states** 5:12
31:18

**stating** 65:18

**statute** 25:20

**statutes** 64:3

**stay** 89:6

**steady** 28:2

**steal** 57:25
76:9 79:5

**stenographer**
61:24

**step** 47:22
49:21 52:15
53:19,21,24
55:13,15 59:5,
8,10,25 60:1,10
61:9,21 62:7
72:22,25 73:11,
12,14 74:11
76:23 77:9
80:12 88:17
99:1

**stepped** 99:17
103:15

**stepping**
93:21,23 99:6

**steps** 14:9
34:12 39:19,20
40:5,8,15,21,24
41:5,15,19
50:5,20 52:4,23
59:7 63:21,22
103:11

**Steve** 48:21

**stimulation**
77:2

**stipulates** 6:5

**stock** 74:7

**stole** 54:12
58:2,11 80:2

**stolen** 51:10
55:3 57:8 72:2

**stone** 97:10

**stop** 56:1,21

**stopped** 26:25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-01444 Document #: 145-3 Filed: 02/09/24 Page 131 of 136 PageID #:917
Deposition of JOHN REID & ASSOCIATES CORPORATE REPRESENTATIVE 30(b)(6), taken on August 26, 2022
30(b)(6)                                                                                              130

store 53:5,7,9, 17 72:13

story 61:18 83:1 93:14

straight 85:8,9

straight-through 78:6,8 79:16

straightforward 44:7

strategy 12:24

strength 80:19

stress 92:21 106:3

stressful 92:13,17 93:3 105:24 106:2

strictly 73:22

strong 52:6

structure 31:7

student 58:8, 16

students 27:11,16 30:3 35:25 39:7 57:23 69:20

studies 70:6

study 70:20

stupid 105:20

sub-basement 31:3

subject 31:6 37:1 42:1 43:12,20 45:12 47:25 50:18 51:8 54:1 59:12 60:18 62:22 70:7 73:16 74:13,15 77:23 85:14,16 86:11 87:4 88:3 95:12 97:25 98:15 99:7,20

subject's 39:25 40:1 42:8 75:19

subjective 81:7

subjects 8:18, 22 9:21 11:24 27:6 55:17 64:6,10 83:20

subpoena 9:22

subsequent 25:21

substance 19:21

subtopics 9:8

suffering 55:9

suggest 32:12 48:9 51:7 72:9 86:21

suggesting 89:2 101:21

suggestion 108:21

suggestions 99:15

supervising 13:21

supervision 26:4 27:12 28:9 29:20

supervisor 29:21

supervisory 13:2

supposed 52:2 58:2

Supreme 38:11 83:10

surprise 74:16

surrounding 100:19

suspect 12:8 38:8 40:2 41:7 45:6 47:7 60:3 61:6 68:24 90:24

suspect's

59:11 60:1

suspected 12:6

suspects 11:25 62:1 64:5

suspended 19:25

suspicious 87:19

swear 6:8

switch 22:5 49:25

switched 10:15

symptom 31:5

_____

T

table 39:15

tactic 83:18 105:8

taking 17:2 61:21 98:5,8,12

talk 17:19 21:3 24:15 46:25 47:25 52:11 60:22 70:8 88:17 92:8 101:4 111:22

talked 59:8 62:22 64:12 87:1 95:24 99:18 100:5 101:25 102:1 103:13

talking 12:23 61:5 64:15 73:16 86:23 90:25 93:17 96:5,13,21 107:9

talks 96:10 98:17

task 93:21

taught 28:10 30:15 56:9

teach 29:8,9 36:25 40:21 47:23 56:18 69:23 88:17

teaches 67:4

teaching 10:22 30:17,21 35:10 64:2

teamwork 89:12

technician 5:5 16:3 25:12 26:9 29:18 30:1

technique 11:12 32:19 38:22 40:6,16, 20 41:20 50:6, 8,9,13,16,20 52:19 53:23 58:19,23,25 59:2 60:16 63:21 64:17 65:9,14,18,24 66:5 72:5 81:23 82:9 84:1,2,8, 13 88:22 103:12 104:5

techniques 21:14,20,25 56:9 58:6 82:13

technology 25:8

telling 45:16 50:12 59:14 69:12 70:12 71:1 86:16 87:25 88:25 92:22 93:22 94:6,16

tells 34:4

ten 10:12 75:8, 9 76:7,13 78:7 88:8 99:18

tend 57:1,16 75:16 76:12,17

tending 43:11

tenure 94:14

term 23:1

terminology 94:11

terms 10:21 11:21 14:18 49:15 78:15 82:4 84:14

terrible 86:25

test 19:11 23:13 37:5 53:1,5,7,12 71:24 73:3 74:12,18 75:7, 8,9 76:20,22 77:2,14,15,17, 19 78:2,8,9,10, 13,17,22 79:3, 16,18,19,21 80:2,4,13,15 81:4 85:4 86:9, 11,16 87:5 88:25 89:15 90:7 92:2,10,20 93:8,18 95:5,8 96:11 97:3,25 99:5,16 102:18 104:1 106:1 107:10 108:4,5 110:4

tested 12:3,6,8 73:7 93:1

testified 95:19 101:15 106:22

testify 9:17 35:2

testimony 6:9 8:3,10,18,23 9:20 49:3 107:5

testing 10:18 25:19 27:6,15 29:14 57:22 74:21 77:24,25 80:11 81:16 82:12 93:20 97:3 99:8 108:2

tests 10:22 12:3 27:10,12 76:24 78:5 79:5,7 80:25 99:6 107:12,21

that'd 82:19

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

86:25

**That'll** 104:17

**theme** 55:15,
17 56:23 59:13
86:22 88:6 89:1

**themes** 39:24
53:19 55:12

**there'd** 103:18

**thesis** 17:2,5

**thing** 10:23
12:25 14:20
18:11 32:13
45:22 47:10
48:5 51:25 54:7
56:17 61:13
64:7 70:5,9
72:3 73:2 80:8
84:6 98:23
102:20 107:10

**things** 14:23
31:20 34:1,2,9
35:6 36:7 47:23
62:22 69:24
79:24 83:17
86:2,20

**thinking** 28:14
59:14,19 67:22
78:15 80:4
86:3,14 95:22
103:16

**thinks** 52:5

**thoracic** 17:8
75:1

**thought** 33:24
80:3 99:18
112:10

**thoughts**
59:24

**thousands**
65:1

**threat** 42:5,6
43:1

**threaten** 45:7

**threatening**
45:21

**threats** 42:23
45:10,24 65:4

82:18

**throat** 36:13
74:14

**time** 5:8 10:25
11:9 13:6,23
15:2,14 21:1
22:16 23:23
24:14,17,18,24
26:16 28:4
30:24 33:24
35:7 42:10,13
43:13,15 44:1,
25 46:24 48:14,
17 49:11,15,16,
21,24,25 58:20
60:20 62:2,24
63:12,18 64:14
65:23 73:18,25
75:5 76:4 77:1,
24 78:19 87:2,
7,18 89:5 90:11
93:20 98:11
101:17,20
102:2,19 104:1
107:8 108:11
110:16,21
112:18

**times** 24:2
56:23 65:2,13
90:23 95:7

**title** 6:25 13:5
32:23

**today** 5:5,7
8:3,10,15 9:17
32:15 41:2
63:18 91:1
92:11 110:21

**today's** 17:23

**told** 53:8 96:1
101:12 105:22,
25 108:17

**tomorrow**
102:19

**tool** 72:16
104:24

**tooth** 108:23

**top** 12:14

**topics** 8:24
9:7,8,17 28:10

**totality** 49:12

**touched** 90:14

**track** 49:22
56:6 89:16

**tracks** 49:25

**train** 16:22
26:5 45:11 47:6
49:15 100:4

**trained** 32:4
37:22 65:16
89:6

**training** 10:22
11:14 16:20
21:13,19,24
22:8,20,23 23:3
25:9,20,22,24,
25 26:2,4,15
27:21,25 29:19
30:5,11 32:8
35:21,22,25
36:1,19,23
37:9,12 39:7
47:11,18

**transition** 16:7

**treasurer** 16:1

**treat** 42:1

**treating** 42:14
44:5

**true** 44:19,20
65:14

**truth** 6:10,11
32:18 33:3
35:11,20 50:11,
12,25 51:16
53:8 59:20
68:10 71:1
86:17 87:25
89:1 92:23
93:23 94:6,16

**truthful** 8:3,9
12:10 27:13
34:23 37:6
51:24 56:14,15
67:13 77:6
80:4,5 84:19,24
88:12,19 94:5

**truthfulness**
71:24

**turn** 25:9 38:19
71:15

**turned** 65:14
94:16

**turning** 12:12
50:4 56:21 59:7
60:14 84:15

**two-step** 27:20

**type** 11:15
21:6,11,12 31:3
57:1 99:22

**types** 37:21
47:5 81:2 84:17

**typical** 89:20,
22

**typically** 29:3
36:18 47:22
53:24 55:8
59:21 67:9
71:25 72:18
88:12 89:11
95:8

**U**

**Uh-huh** 16:21
76:21

**un-** 75:17

**uncomfortable**
75:15

**undergo** 14:10
58:22 92:13

**undergone**
102:13

**underline**
41:23

**understand**
8:18 46:23 48:4
70:15 74:9

**understanding**
32:14 54:15,18
72:23 83:25
84:16 97:19,22
104:11 106:21,
23 108:8,9

**undoubtedly**
28:14

**unique** 69:25

**unit** 59:9

**United** 5:12

**University**
16:6,11 66:8

**unobservable**
75:4

**unofficially**
20:5

**unquote**
109:22

**unreliable**
84:18,22

**unresponsive**
84:25 85:3,4,14

**update** 33:25
34:17

**useless** 57:18

**utilize** 37:22
38:4 41:6,13,16
88:21 102:5
104:5

**utilized** 25:10
32:15 39:3,16
72:5 102:2

**utilizing** 65:24

**V**

**vary** 77:13,20
78:9

**vehicle** 80:2

**verbal** 7:17
31:7 61:21
62:11 91:4

**verbalized**
87:5

**verbalizing**
88:7

**verbally** 83:11

**verified** 57:4

**versa** 77:8

**version** 33:24
62:11

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS



**versions** 32:2 33:23

**versus** 5:11 21:24 67:5 69:7 70:12 71:1 81:8,23 82:9 83:12 88:18

**vice** 15:25 77:8

**victim** 73:19 95:25

**video** 5:4,9 63:17 110:20

**view** 29:16 88:10 93:25

**virtually** 5:20

**vocal** 49:19

**volume** 61:1

**voluntarily** 98:18

**volunteer** 57:23

_____

**W**

_____

**Wacker** 5:6

**wait** 60:25 110:9

**waiver** 38:4 98:16

**walk** 46:24 49:6 55:7 92:9

**walking** 54:25 61:19 66:23

**wanted** 17:19 20:17,24 25:18 28:22,25 42:12 44:3,7 61:3 62:4 63:22 71:15 90:15 94:3 96:6

**water** 18:25 19:1

**weapon** 55:3 57:7

**wearing** 55:5

**weather** 48:2

**Wednesday** 17:24

**week** 97:7

**weekend** 27:7

**weeks** 28:3 103:22

**wife** 54:4 86:23 95:24 96:5 100:2 112:12

**William** 5:11

**win** 55:19

**withholding** 87:20

**woman** 95:3

**words** 41:8 69:15

**work** 12:21,22 13:13 14:13 21:18 26:5 32:9 34:1 50:7 63:2 97:9

**workbook** 35:25 36:5 39:15

**workbooks** 36:4 39:6

**worked** 14:24 64:25 66:7,11, 15

**working** 10:5, 21 11:11 13:21 14:5,19,25 16:24 33:19 98:9

**works** 63:2

**world** 58:7,13, 17 70:16

**worried** 96:4

**would've** 18:16 24:11,21 25:11 26:11 32:7,8 39:2,12, 15 72:25 98:11, 19,20 103:8

**wrap** 96:21

**write** 33:24 36:18 61:22,23 62:12,13

**writing** 17:1 36:20 37:17

**written** 17:2 37:15,16 40:4 61:22 62:7,11, 20 97:10

**wrong** 93:8

**wrongdoing** 12:7

**wrongly** 92:18

_____

**Y**

_____

**Y-N-E** 33:17

**year** 10:12 15:17 16:14,25 26:23 28:16 33:3 64:3,8

**years** 10:12 13:7 14:6,13 22:18 23:10 24:4 29:22 31:12,18 33:23 34:9,16 40:17 47:1 65:1 76:8 108:25 109:9

**yesterday** 64:12 91:3 111:21

**young** 95:3

**younger** 64:6

_____

**Z**

_____

**zoom** 7:9 9:5

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

# DEPOSITION ERRATA

To the Reporter:

I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me. I request that the following changes be entered upon the record for the reasons indicated. I have signed my name to the Errata Sheet and the appropriate Notary Certificate and authorize you to attach both to the original transcript.

| PAGE NO. | LINE NO. | CHANGE | REASON |
|---|---|---|---|
| 49 | 8 | "out" should be "off" | |
| 50 | 9 | "read" should be "Reid" | |
| 55 | 24 | delete "for" | |
| 51 | 25 | "it" should be "I" | |
| 53 | 14 | insert "it be" between would + fair | |
| 56 | 15 | delete period after Truthful | |
| 58 | 13 | change "Sal Casten" to "Saul Kassin" | |
| 60 | 5 | change "meeting" to "Meaning" | |
| 66 | 7 | change "Ambo" to "Inbau" | |
| 69 | 13 | change "In" to "on" | |
| 69 | 16 | change "convent" to "convict" | |
| 75 | 3 | change "moment" to "movement" | |

_____  Joseph P. Buckley III   9/30/22
SIGNATURE               PRINT NAME              DATE

# DEPOSITION ERRATA

To the Reporter:

I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me. I request that the following changes be entered upon the record for the reasons indicated. I have signed my name to the Errata Sheet and the appropriate Notary Certificate and authorize you to attach both to the original transcript.

| PAGE NO. | LINE NO. | CHANGE | REASON |
|---|---|---|---|
| 75 | 12 | Change "loss" to "law" | |
| 80 | 16 | change "affiliate" to "affiliated" | |
| 87 | 14 | Change "at" to "in" | |
| 88 | 25 | change "at" to "it" | |
| 95 | 19 | change "too" to "to" | |
| 97 | 24 | Change "neighborhood" to "Naperville" | |
| 98 | 18 | Change "couldn't" to "could" | |
| 99 | 3 | change "as" to "ask" | |
| 101 | 6 | Change "conversive" to "conversational" | |
| 19 | 18 | I believe the reference should have been to Mr. Masokas, not Mr. Amor | |

SIGNATURE     Joseph P. Buckley III     9/30/22

                 PRINT NAME          DATE

# NOTARY CERTIFICATE

STATE OF: ILLINOIS

COUNTY/CITY OF: MC HENRY

Before me, this day, JOSEPH P BUCKLEY personally appeared, who, being duly sworn, states that the foregoing transcript of his/her Deposition, taken in the matter, on the date, and at the time and place set out on the title page hereof, constitutes a true and accurate transcript of said deposition. SUBSCRIBED and SWORN to before me this 30th day of SEPTEMBER, 2022 in the jurisdiction aforesaid.

```
OFFICIAL SEAL
AGNIESZKA C BACKUS
NOTARY PUBLIC, STATE OF ILLINOIS
My Commission Expires June 22, 2025
```

_____
Notary Public
My Commission Expires: June 22, 2025