UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

William Amor,

        Plaintiff,

           Case No. 20 C 1444

    v.

           Judge Jorge L. Alonso

John Reid & Associates, et al.,

        Defendants.

## Memorandum Opinion and Order

Before the Court is the motion for summary judgment ("Motion" or "Mot.") brought by Defendants John Reid & Associates, Inc. ("Reid & Associates"), Michael Masokas ("Masokas"), and the Estate of Arthur T. Newey ("Newey"). For the following reasons, the Court grants the Motion in part and denies the Motion in part.

## Background

In this civil rights action brought under 42 U.S.C. § 1983, Plaintiff Jeanne Olson, as Trustee of the William Amor Revocable Living Trust ("Plaintiff"),[1] alleges that the Defendant Officers violated William Amor's ("William Amor" or "Amor") constitutional rights under the Fifth and Fourteenth Amendments of the United States Constitution by coercing a false confession from him (Count II) and thereby conspiring to deprive Amor of his constitutional rights (Count IV) and failing to intervene to prevent the misconduct (Count V). Plaintiff also asserts claims under Illinois state law for intentional infliction of emotional distress (Count VII) and conspiracy (Count VIII). Finally, Plaintiff brings a claim against Reid & Associates for the

---

[1] William Amor died on January 31, 2023, and the Court substituted Jeanne Olson, not individually but as Trustee of the William Amor Revocable Living Trust, as Plaintiff. (Order, ECF No. 124.)

state-law torts of its employees on the basis of *respondeat superior* (Count IX).[2] Defendants now move for summary judgment in their favor on all claims against them.

In resolving a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The following facts are taken from the record and are largely undisputed unless otherwise noted.[3]

In September 1995, William Amor and his wife, Tina Miceli ("Tina"), lived with Tina's mother, Marianne Miceli ("Marianne"), in an apartment at 218 East Bailey, Naperville, Illinois. (PSOF ¶ 6.)[4] Around 6:20 p.m. on September 10, 1995, Amor and Tina left to go to a drive-in movie theater, while Marianne stayed behind. (*Id.* ¶ 11.) When Tina and Amor returned from the movies sometime around midnight, they learned from Naperville Police Department ("NPD")

---

[2] Plaintiff is not pursuing his claims for fabrication, substantive due process, or unlawful detention (Counts I and III) (Pl. Resp. in Opp'n to Defs.' Mot. for Summary Judgment 18 n.3) and so Counts I and III are dismissed. This Court previously dismissed Plaintiff's claim for malicious prosecution (Count VI), finding it abated with Amor's death. (Order, ECF No. 124.) The remaining counts for this Court's consideration on summary judgment are Counts II, IV, V, VII, VIII, and IX.

[3] Local Rule 56.1 outlines the requirements for the introduction of facts parties would like considered in connection with a motion for summary judgment and states that motions to strike are disfavored. The Court enforces Local Rule 56.1 strictly. *See McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 790 (7th Cir. 2019) ("We take this opportunity to reiterate that district judges may require strict compliance with local summary-judgment rules."); *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005) ("Because of the important function local rules like Rule 56.1 serve in organizing the evidence and identifying disputed facts, we have consistently upheld the district court's discretion to require strict compliance with those rules."). At the summary judgment stage, a party cannot rely on allegations; he or it must put forth evidence. Fed. R. Civ. P. 56(c)(1)(A); *see also Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) ("As the 'put up or shut up' moment in a lawsuit,' summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial."). Where one party supports a fact with admissible evidence and the other party fails to controvert the fact with citation to admissible evidence, the Court deems the fact admitted. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218–19 (7th Cir. 2015); *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817–18 (7th Cir. 2004). This does not, however, absolve the party putting forth the fact of the duty to support the fact with admissible evidence. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012). The moving party has the "ultimate burden of persuasion" to show entitlement to judgment as a matter of law. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006).

[4] The Court refers to the Defendants' statement of material facts as "DSOF" (ECF No. 145) and Plaintiff's statement of additional material facts as "PSOF" (ECF No. 160).

Officers that there had been a fire in their apartment. (*Id.* ¶¶ 16, 18.) Marianne died as a result of the fire. (PSOF ¶ 2.)

On the night of the fire, detectives Michael Cross and Robert Guerrieri questioned Amor, who denied having anything to do with it. (*Id.* ¶ 21.) On September 12, 1995, Richard O'Brien— the polygrapher that NPD regularly used to conduct polygraphs—gave Amor a polygraph. (*Id.* ¶ 22.) O'Brien determined that Amor's polygraph was inconclusive due to a lack of emotional responses, possibly because Amor had consumed alcohol prior to the exam. (*Id.* ¶¶ 23–24.)

On September 15, detective Cross arrested Amor on an outstanding traffic warrant. (*Id.* ¶ 27.) The detectives had a plan "to talk to [Amor] then at the police station" about the fire at 218 East Bailey. (*Id.*) During Amor's subsequent five hours of interrogation that day, Amor again told the detectives that he was innocent. (*Id.* ¶ 28.) Detectives Brian Cunningham and Cross told Plaintiff about "various aspects of the fire," including that "shortly after he and Tina left the apartment the fire broke out and spread quickly;" that Tina had told him "that she may have left a lit cigarette in the apartment;" and that the fire started near the swivel chair. (*Id.*) Detectives Cunningham and Cross also suggested the idea that on the day of the fire, Amor spilled vodka on newspapers and may have misplaced a lit cigarette. (*Id.* ¶ 29.) Amor wrote out a one-page handwritten statement to that effect. (*Id.*) That information was provided to Amor by the detectives and was false. (*Id.*) After Amor wrote out his statement, he was transported to DeKalb County Jail where he remained for the next two weeks. (*Id.* ¶ 30.)

On October 3, 1995, Amor was released from DeKalb County Jail around 2 p.m. (*Id.* ¶ 31.) At the time he was released, Amor had not yet eaten that day and he had only slept four hours the night before. (*Id.*) Cross and Guerrieri were waiting for Amor in the lobby of the jail. (*Id.* ¶ 32.) Cross and Guerrieri planned to give Amor a polygraph immediately after he was

released from custody, but instead of going back to their usual polygrapher, they took Amor to

Reid & Associates in Chicago, an hour-and-a-half away. (*Id.*) This was not the first time that

Cross had used Reid & Associates; Cross estimated that he brought a witness to Reid &

Associates 20 times, or possibly less. (*Id.* ¶ 33.)

When Cross and Guerrieri picked Amor up from the DeKalb County Jail, they told him

that they wanted him to "take a polygraph" in Chicago and that it was "in [his] best interest to

take it." (*Id.* ¶ 34.) Amor was not told that he was free to leave, and he did not feel as though he

had a choice. (*Id.*) When he was released from jail, Amor "had nowhere to stay," and "no wallet,

no keys, no money, no phone." (*Id.* ¶ 35.) Cross and Guerrieri drove Plaintiff to Reid &

Associates in a locked police car (*id.* ¶ 36), although Amor was not handcuffed while being

transported (DSOF ¶ 31). Amor assumed without asking that the police were working with Reid

& Associates based only on the fact that he was picked up and taken right to Reid & Associates.

(*Id.* ¶ 30.)

When they arrived at approximately 3:50 p.m., Cross and Guerrieri went to speak with

Masokas, a polygrapher for Reid & Associates who was trained in the Reid technique for

polygraphing and interrogation. (PSOF ¶ 36.) Masokas had had past dealings with NPD (*id.* ¶

33), although Cross had not met Masokas or Newey before that day (DSOF ¶ 27). Masokas,

Cross, and Guerrieri spoke for a little less than an hour. (PSOF ¶ 37.) The detectives told

Masokas the fire was intentionally set (they had ruled out any accidental causes); Amor was a

scammer; the victim had a $100,000 life insurance policy; and Amor was their suspect. (*Id.*)

Masokas testified that as a polygrapher he would come up with the questions to ask a subject

during a polygraph. (*Id.* ¶ 38.) Cross testified that in this case, he might have told Masokas

questions he wanted Masokas to ask during the polygraph, but he did not remember. (*Id.*; Defs.'

4

Resp. to PSOF ¶ 38.) The parties dispute whether it can be inferred from this testimony that Cross gave Masokas questions to ask Amor.

At around 4:40 p.m., Masokas went to speak with Amor. (*Id.* ¶ 39.) Amor testified that while at Reid & Associates, no one raised their voice to him and he was only touched in order to administer the voluntary polygraph; he was treated "you know, good, bad or indifferent, they're just – they have a job just like you do and I do." (DSOF ¶ 33.) Prior to administering the polygraph test, Masokas had Amor fill out a form about his medical condition. (PSOF ¶ 40.) Amor told Masokas that he had a headache, cold symptoms and physical discomfort, and that he had only gotten four hours of sleep the night before (*id.*), which gave Masokas "a bit of a concern." (*Id.* ¶ 41.) Amor signed a consent form and *Miranda* waiver. (DSOF ¶ 35.) The parties dispute whether it can be inferred from these facts that Amor was "in custody" at Reid & Associates. (PSOF ¶ 41; Defs.' Resp. to PSOF ¶ 41.)

Amor was hooked up to the polygraph machine and given a polygraph examination from 5:30 p.m. to 6:15 p.m. (DSOF ¶ 38.) Amor was given five tests during his polygraph: two tests where he was asked questions "straight through" in the same order ("straight through test"); one test where he was asked the same questions but the order was mixed ("mixed question test"); one in which he was instructed to answer the questions silently ("silent answer test"); one where he was instructed to answer every question as "yes" but not asked the control questions ("yes test"); and a "card test" that is designed to show the subject that the polygraph instrument works. (PSOF ¶ 42.) During the straight through, mixed question, and silent answer tests, Amor was asked relevant, irrelevant and control questions. (*Id.*)

Amor was asked the following relevant questions during his polygraph:

> Question 3 (relevant): On Sunday, September 10th, did you do anything to start a fire in your apartment?

5

> Question 5 (relevant): Did you help or plan with anyone to start that fire?
>
> Question 8 (relevant): Before you left for the movies, did you know your apartment was going to be destroyed by a fire?
>
> Question 9 (relevant): Do you know who set that fire in your apartment?

(*Id.* ¶ 43.) Plaintiff answered "no" to each of these questions. (*Id.*)

Amor was asked the following control questions during his polygraph:

> Question 6 (control): Besides traffic violations and stealing, did you do anything against the law?
>
> Question 11 (control): Besides an argument, did you ever do anything to intentionally hurt someone?

(*Id.* ¶ 44.) Plaintiff answered "no" to each of these questions. (*Id.*)

Masokas found that Amor was not deceptive in his answers to either of the control questions. (*Id.* ¶ 45.) However, Masokas alleged that there were reactions—meaning Amor was answering deceptively—to each of the relevant questions. (*Id.* ¶ 46.). Masokas testified that he assessed whether each response indicted deception (*id.*; Defs.' Resp. to PSOF ¶ 46) and denied that there was a contradiction between his finding that Amor was not deceptive in answering the control questions—indicating that he had never intentionally hurt anyone and never broke the law beyond stealing or traffic—and his finding that Amor was deceptive in answering the relevant questions—whether Amor had knowledge or involvement in setting the fire at 218 E. Bailey. (PSOF ¶ 47.) Masokas memorialized his finding that Plaintiff was deceptive in a letter to Cross. (*Id.* ¶ 48.) In that letter, Masokas described Amor as having "significant emotional responses" throughout the polygraph. (*Id.*)

Plaintiff submits the report of polygraph expert Dan Sosnowski ("Sosnowski"), in which Sosnowski opines that Masokas's finding of deception was incorrect. (PSOF ¶ 49.) When asked

whether there was "any way that a neutral, objective, qualified polygraph examiner could look at the data generated during Mr. Amor's polygraph examination and reach the conclusion that deception was indicated," Sosnowski responded, "I don't believe that to be the case." (*Id.*; Defs.' Resp. to PSOF ¶ 49.) Sosnowski further opines that after scoring Amor's polygraph charts using well-accepted polygraph techniques, he does not believe Amor was being deceitful and a competent polygraph examiner should have been able to determine Amor was being truthful. (PSOF ¶ 50.)

To evaluate Amor's polygraph, Masokas used a "visual inspection," meaning he went "through the chart" and used a "check mark system." (*Id.* ¶ 51.) This was the scoring system in place at Reid & Associates at the time of Amor's polygraph. (*Id.*) Under the check mark system, "[a] very light check mark will respond to a minimal response, a very heavy check mark indicates a significant response." (*Id.* ¶ 52.) The polygrapher scores each relevant and control question using the check mark system to determine whether a person is being truthful or deceptive. (*Id.*) Masokas testified that for a particular question, if there was some emotional response indicated across multiple tests, that would be an indicator that there is some deception as to that question. (*Id.* ¶ 53.) Masokas could not say how many tests had to indicate an emotional response to a particular question for him to find deception; rather, he compared consistent emotional responses to a particular question across multiple tests with the lack of consistent or significant emotional responses to another question. (*Id.*) In other words, he considered both "consistency" and "significance in a response" across tests, although "there's a number of different factors that would be weighed in" and there was no rigid scoring system. (*Id.*)

Masokas testified that often a polygrapher could just "look[] at" the polygraph charts and that would be sufficient to reach a conclusion about whether a subject was being deceptive or not—a polygrapher would not have to actually score the charts. (*Id.* ¶ 54.) Because Amor's responses "were a little bit more subtle," he preferred "to write it out." (*Id.* ¶ 55.) Masokas testified that Amor's responses to relevant questions three, five, eight, and nine received a light check mark, indicating a "not real significant" response. (*Id.*) Masokas nonetheless evaluated each relevant question as deceptive. (*Id.*)

Sosnowski testified that although he did not know if the check mark system was disallowed at that time, no other institution recognized by the American Polygraph Association ("APA") used it. (*Id.* ¶ 56; Defs.' Resp. to PSOF ¶ 56.) Sosnowski opined that Masokas "used a scoring technique that was outdated and had no supporting research or documentation that would demonstrate that the technique was reliable." (PSOF ¶ 56.) In his opinion, a numeric scoring system is "much more objective" than the check mark system, which is "very subjective." (*Id.*) Reid & Associates' corporate representative, Joseph Buckley, testified that numerical scoring arose because "[s]ome of the guys in the profession got very nervous with check marks, because they felt it was too subjective." (PSOF ¶ 57.) Buckley further testified that there was no industry standard in 1995, that the industry standard at the time of his deposition (2022) was check marks, and that numerical scoring seems more objective but is the same in principle as check marks. (Defs.' Resp. to PSOF ¶ 57.)

After Masokas scored Amor's polygraph, Masokas asked Newey to also score the charts. (PSOF ¶ 58.) Newey also worked for Reid & Associates as a polygrapher at that time. (*Id.*) The parties dispute whether Newey scored the test results at all or whether he just looked at the polygraph. (PSOF ¶ 59; DSOF ¶ 39.) Masokas testified that he believed Newey created his own

physical scoring sheet, although it was possible "it was visual and he just looked at it." (PSOF ¶ 59.) There is no such scoring sheet in Amor's file. (*Id.*) Sosnowski testified that typically when a second polygrapher scores the polygraph chart, they do so on a separate piece of paper and give it to the original examiner, who then puts it in the file. (*Id.*)

After Masokas scored the exam, he conducted a post-test interrogation of Amor. (*Id.* ¶ 60.) That interrogation began at approximately 6:30 p.m. and lasted one hour. (*Id.*) Although Reid & Associates had the ability to videotape post-polygraph interrogations, none of Amor's interrogations were videotaped. (*Id.* ¶ 61.) Masokas told Amor that he failed the polygraph test. (DSOF ¶ 43.) Using lies or trickery during an interrogation, at least regarding misrepresenting evidence, was a permissible Reid & Associates interrogation technique, "provided everything else is proper." (PSOF ¶ 63.) Plaintiff submits the expert testimony of a false-confession expert, Dr. Richard Leo, who opines that falsely telling a subject they failed a polygraph is a risk factor for false confessions. (PSOF ¶ 67.) He further opined that "[t]he polygraph false evidence ploy often exerts a profound impact on suspects, inducing feelings of hopelessness and despair and moving them from denial to admission." (*Id.*)

Masokas described Amor's interrogation as "more of a monologue as opposed to a dialogue." (*Id*. ¶ 69.) During that "monologue," Masokas suggested options to Amor as to why he was failing the polygraph. (*Id.*) This is step two in the Reid method of interrogation in which an interrogator uses "themes" to "suggest reasons why the presumed guilty suspect committed the underlying act that minimizes his blameworthiness, culpability and/or the consequences he will face." (*Id.*) Masokas testified that Amor was cooperative and engaged during the interview and continued to deny any involvement in the crime. (*Id.* ¶ 70.) Masokas nonetheless refused to accept Amor's denials (*id.*) and, because he was not "making any progress with [Amor], they

decided that Newey should join the interrogation." (*Id.* ¶ 71.) Masokas clarified that he meant that he was not progressing towards getting Amor to agree that he had knowledge or responsibility for the fire. (*Id.*)

Newey and Masokas then returned to the interrogation room, and interrogated Amor from 7:45 to 8:30 p.m. (*Id.* ¶ 72.) Masokas described this interrogation as "very similar to the first discussion." (*Id.* ¶ 73.) Newey again offered Amor "suggestions as to why he may be failing the test" and Amor continued to deny any knowledge or involvement. (*Id.*) Masokas testified that it was possible they brought up Amor "spilling the vodka as was given to [them] by the investigators," although he did not remember. (*Id.*)

Newey and Masokas then left the interrogation room and spoke to Cross and Guerrieri. (*Id.* ¶ 74.) According to Masokas, he and Newey "went out to the lobby, conferred with [the detectives], let them know that Mr. Amor was not passing the polygraph, that we had spoken to him and he was still denying any involvement and that there was no explanation on his part why he was not passing." (*Id.*) After speaking with the detectives, Newey decided he wanted to talk with Amor one more time, on his own. (*Id.* ¶ 75.) Newey spoke to Amor from approximately 8:45 p.m. to 9:15 p.m., after which he conferred with the detectives again. (*Id.*) Amor still continued to deny any involvement or knowledge in the fire. (*Id.*) Cross and Guerrieri then interrogated Amor at Reid & Associates from approximately 9:30 to 10:00 p.m. (*Id.* ¶ 76.) Thereafter, the detectives again conferred with Newey. (*Id.*)

Both Masokas's and Newey's interrogations of Plaintiff included proposing reasons or justifications for Amor to have started the fire; this is considered a minimization technique. (*Id.* ¶ 77.) Leo opined that social science research has "repeatedly demonstrated that minimization techniques sometimes imply that the suspect will receive help, leniency, immunity, freedom

and/or a different benefit in exchange for compliance and confession." (*Id.* ¶ 78.) He further opined, "Mr. Masokas' and Mr. Newey's use of this minimization interrogation techniques during their polygraph interrogation of William Amor increased the risk that Mr. Amor's will would be overborne and that he would make or agree to a false and/or unreliable incriminating statements, admissions and/or confessions." (*Id.*)

All told, Amor was in the interview rooms at Reid & Associates for approximately five-and-a-half hours. (*Id.* ¶ 79.) Cross testified that that length of time was "different" and "unusual." (*Id.*) At no time was Amor given any food or drink while there. (*Id.* ¶ 80.)

At around 10:30 p.m., Amor, Cross, and Guerrieri left for the NPD. (*Id.* ¶ 81.) Amor was not asked if he would continue speaking with the detectives but was instead simply told that they would be continuing their interrogation in Naperville. (*Id.*) No one from Reid & Associates accompanied Amor to Naperville and Amor had no further interactions with Reid & Associates employees while at NPD. (DSOF ¶ 49.) Reid & Associates worked with police departments on an "ad hoc" basis and would not be involved in any continuing interrogation once a subject left. (PSOF ¶ 63.)

During the continued interrogation at Naperville, Cross told Amor that even Tina thought he was guilty and arranged for Amor to be served with divorce papers during his interrogation. (*Id.* ¶ 82.) In addition, Amor testified that Cross threatened and physically assaulted him during the interrogation. (*Id.* ¶ 83.) In particular, Amor testified that Cross grabbed Amor by his upper shoulders/neck, shook him and pushed him against the wall, then yelled: "I'm going to kick your fucking ass if you don't confess." (*Id.*) Either Cross or Guerrieri then told Amor that if he just signed a statement, he could go home. (*Id.*) Amor was again Mirandized and gave a statement

stating that he intentionally set the fire by pouring vodka on a newspaper and flicking a cigarette into the fire. (DSOF ¶ 50.)

Although the Reid & Associates' corporate representative admitted that he had never heard of having a suspect served with divorce papers during an interrogation following a polygraph, he testified that it was up to Cross and Guerrieri to decide "[w]hatever [they] think is best." (PSOF ¶ 64.) Similarly, Masokas testified that he had no idea what happened during Plaintiff's continued interrogation back at Naperville following his polygraph. (*Id.*)

Reid & Associates employees were not required to document the use of trickery or deceit in their post-polygraph interrogations. (PSOF ¶ 65.) Rather, Buckley testified that employees were trained to document only "the subject matter of the examination . . . , who the examinee was, the dated examination[;]" "any pre-test discussion that shed light on the issue;" "the test questions that were asked[;]" "our opinion as to whether the person was truthful or deceptive[;]" and "any post-test acknowledgements or admissions that might have taken place." (*Id.*) Indeed, Masokas's report in this case does not disclose that he used deception during his and Newey's post-polygraph interrogation of Amor—and there is no indication otherwise that he disclosed the same to the prosecutor. (*Id.*) Buckley testified that a polygrapher could lie about "potential evidence" such as "a witness we don't have, a DNA match we don't have, that kind of thing." (*Id.* ¶ 66.) That was true notwithstanding the fact that Buckley admitted that telling an innocent person that they failed a polygraph when they did not—*i.e.*, lying about "potential evidence"— "would be very stressful." (*Id.*)

At 1:14 a.m. on October 4, 1995, after 12 total hours of the pre-test interview, polygraph examination, and interrogation, Amor wrote a confession that he later contended is false and involuntary. (PSOF ¶ 84.) Amor testified that the following information in the confession was

"fed" to him: "When I got up I bumped the ashtray knocking the cigarette onto the newspaper with vodka spilled on it. I did not pick up the cigarette but instead continued to go use the restroom knowing a fire would probably result. . . . The loss was meant to be minimal for personal gain. No harm was ever supposed to come to any person or persons." (*Id.* ¶ 85.) The ignition scenario in Amor's false confession is scientifically impossible. (PSOF ¶ 86.) It is not possible to start a fire—let alone a fire of the magnitude of the fire at 218 E. Bailey—by dropping a cigarette onto a vodka-soaked newspaper. (*Id.*) Amor was tried in September 1997, and his confession was the centerpiece of the prosecution. (*Id.* ¶ 88.) Masokas testified at Amor's pretrial hearing and claimed that he found Amor to be deceptive in his polygraph. (*Id.* ¶ 87.) Amor was convicted of first-degree murder and aggravated arson and sentenced to 45 years on the murder charge and 20 years on the arson charge, to run concurrently. (*Id.* ¶ 89.)

On January 28, 2015, Amor filed a motion for leave to file a successive post-conviction petition and an attached proposed successive post-conviction petition. (*Id.* ¶ 90.) After a hearing, the circuit court granted Amor's post-conviction petition and vacated Plaintiff's conviction. (*Id.* ¶ 91.) The court held that modern science undercut the conclusions that the State's experts reached regarding the cause and origin of the fire. (*Id.*) The court further found that Amor's confession was "scientifically impossible." (*Id.* ¶ 92.) In so ruling, the court did not address how the confession came to be or reach a conclusion regarding Amor's claim of coercion and contamination. (*Id.*) Instead, the court held that "[w]hatever the reasons for [Amor's] scientifically impossible confession, the new evidence places the evidence presented at trial in a different light and undercuts this Court's confidence in the factual correctness of the guilty verdict." (*Id.*) Amor was retried for the arson-murder, and on February 21, 2018, Judge Brennan issued a 7-page opinion acquitting Amor of the crime. (*Id.* ¶ 93.)

On April 10, 2018, Amor filed a Petition for a Certificate of Innocence ("COI"). (*Id.* ¶ 95.) The State moved to dismiss the petition, arguing in part that Amor "failed to establish that he did not by his own conduct voluntarily bring about his conviction." (*Id.* ¶ 96.) The parties had agreed that Judge Miller, who was presiding over the COI, could review the relevant materials under 735 ILCS § 2-702(f). (*Id.* ¶ 97.) That would include "prior sworn testimony or evidence admitted in the criminal proceedings." (*Id.*) In addition, Amor submitted as exhibits Judge Brennan's opinion acquitting him, excerpts of the criminal retrial, and a letter from Amor to Tina in which Amor discusses (among other things) a plan for securing money and ensuring care for Marianne. (*Id.* ¶ 98.) For its part, the State submitted as exhibits to its motion to dismiss the grand jury testimony of a single witness, excerpts of the criminal trial and the Rule 23 order denying Amor's direct appeal. (*Id.*) After a brief oral argument, Judge Miller denied Amor's Petition for a COI. (*Id.* ¶ 99.) In doing so, Judge Miller "considered the filing of the parties," "the applicable case and statutory law," "the relevant portions of the Illinois Criminal Code," and "Judge Brennan's decision regarding the bench trial that occurred." (*Id.*) Based on the materials identified above, Judge Miller found that Amor voluntarily brought about his conviction because he gave a statement to the police. (*Id.* ¶ 100.) In support of that finding, the Judge stated that the appellate court on direct appeal had considered the voluntariness of Amor's confession, and after taking "a look at the defendant's education, the fact that he was provided with sustenance and, otherwise, apparently, treated fairly," the appellate court concluded that the confession was freely given. (*Id.*)

On April 9, 2018, Amor sued the City of Naperville and detectives Cross, Guerreri, Cunningham, and other NPD officers, asserting similar claims to those in the instant case. *See Jeanne Olson, as successor Plaintiff for William E. Amor v. Guerreri, et al.*, Case No. 1:18-cv-

2523 (N.D Ill. 2018) (Tharp, J.) (the "Naperville Case"). On August 5, 2024, a jury rendered a verdict in favor of Amor and against Cross and the City of Naperville on two of the claims. *See id.*, ECF Nos. 384–85.

Amor filed the instant lawsuit against Reid & Associates, Masokas, and Newey on February 27, 2020. Defendants now move for summary judgment in their favor on all remaining claims. For the following reasons, the Court grants in part and denies in part Defendants' Motion.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). The Court considers the entire evidentiary record and must view all the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). However, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Id.* at 248.

## Discussion

### I.     Section 1983 Claims—State Actors (Counts II, IV, and V)

Defendants argue that all of Plaintiff's claims that are brought pursuant to 42 U.S.C. §

1983 ("§ 1983" or "Section 1983") fail because Defendants were at all times private citizens not

acting under the color of state law. Plaintiff responds that Defendants Masokas and Newey can

be held liable as state actors because a reasonable jury could find they conspired with the NPD to

violate Amor's constitutional rights. The Court agrees.

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by

the Constitution and laws of the United States, and must show that the alleged deprivation was

committed by a person acting under color of state law." *L.P. v. Marian Cath. High Sch.*, 852 F.3d

690, 696 (7th Cir. 2017) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)). "Private persons are

considered state actors—that is, they are deemed to have acted under color of state law and thus

face § 1983 liability—in certain limited circumstances." *Camm v. Faith*, 937 F.3d 1096, 1105

(7th Cir. 2019). "The first is where the State effectively directs or controls the actions of the

private party such that the State can be held responsible for the private party's decision. . . . The

second situation is when the State delegates a public function to a private entity." *Id.* (cleaned

up). Additionally, "[a] private person acts under color of state law when she is a 'willful

participant in joint action with the State or its agents.'" *Marian Cath. High Sch.*, 852 F.3d at 696

(quoting *Dennis v. Sparks*, 449 U.S. 24, 27 (1980)). "Put another way, a private person may be

liable under § 1983 'for conspiring with a state actor to violate the constitutional rights of

another.'" *Huiras v. Cafferty*, No. 22-CV-1109-PP, 2023 WL 2188666, at *7 (E.D. Wis. Feb. 23,

2023) (quoting *Maniscalco v. Simon*, 712 F.3d 1139, 1145 (7th Cir. 2013)), *aff'd as modified*, No.

23-1385, 2023 WL 6566492 (7th Cir. Oct. 10, 2023). "This is known as the 'conspiracy theory'

of § 1983 liability." *Amor v. John Reid & Assocs.*, No. 20 C 1444, 2021 WL 825609, at *6 (N.D. Ill. Mar. 4, 2021) (quoting *Spiegel v. McClintic*, 916 F.3d 611, 616 (7th Cir. 2019)).

Under the conspiracy theory of liability, "[t]he plaintiff must identify a sufficient nexus between the state and the private actor to support a finding that the deprivation committed by the private actor is 'fairly attributable to the state.'" *Marian Cath. High Sch.*, 852 F.3d at 696 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). "[T]o establish conspiracy liability in a § 1983 claim, the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance [of the agreement] actually deprived him of those rights." *Amor*, 2021 WL 825609, at *6 (quoting *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015)).

Defendants challenge the first element, arguing there is no evidence that suggests that the NPD, Masokas, Newey, and/or Reid & Associates reached an agreement to deprive Amor of his constitutional rights. Masokas previously made a similar argument on a Rule 12(b)(6) motion to dismiss in this case. The Court, Judge Lee then-presiding, found that Amor adequately pleaded a conspiracy theory of state action under Section 1983 because the following facts sufficiently alleged a "concerted effort" between the NPD, Reid & Associates, Masokas, and Newey: Defendants participated in Amor's interrogation pursuant to an agreement between Reid & Associates and the City of Naperville, under which the City "regularly delegated to [JR&A] and its employees the responsibilities of interrogating, testing, and eliciting statements from persons suspected of criminal activity;" Amor was taken to Reid & Associates' office for polygraph testing by NPD officers in a locked police car; once there, Masokas and Newey administered several rounds of polygraph testing; Masokas and Newey lied to Amor and told him that he failed a polygraph test; after the testing, Masokas and Newey questioned Amor at Reid &

Associates' offices until 11:30 p.m. on October 3, 1995—using mentally and emotionally abusive tactics—with the cooperation and involvement of the NPD. Thus, the Court found that "the complaint specifically alleges a 'concerted effort' between the NPD and Defendants during the allegedly abusive interrogation of Amor while he was held at JR&A." *Id.* (citing *Spiegel*, 916 F.3d at 616).

The Court further noted the following allegations: Amor later falsely confessed while detained at the NPD; the confession and other inculpatory statements were attributed to Amor by Masokas and Newey, in addition to employees of the NPD; and Masokas and Newey "subsequently memorialized a false account of their interrogation of Plaintiff, which was used to support the charges against Plaintiff and deny him bond pending trial." *Id.* at *7. The Court found that Amor "sufficiently 'raises the inference of mutual understanding' between Masokas, Newey, and the NPD, because these acts 'are unlikely to have been undertaken without an agreement.'" *Id.* (quoting *Amundsen v. Chi. Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000)). Accordingly, the Court held that the complaint "sufficiently alleges an 'express or implied agreement among defendants to deprive [him of his] constitutional rights,' and therefore states a claim that Defendants acted under color of law for the purposes of § 1983." *Id.* (quoting *Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988)).

Plaintiff now presents evidence—much of which is undisputed—in support of nearly all of the allegations that the Court considered to be sufficient to state a claim for a conspiracy theory of Section 1983 liability: Amor was taken to Reid & Associates' office for polygraph testing by NPD officers in a locked police car; once there, Masokas administered several rounds of polygraph testing; Masokas and Newey lied to Amor and told him that he failed a polygraph test; after the testing, Masokas, Newey, Cross, and Guerrieri alternately conferred with each

18

other and questioned Amor at Reid & Associates' offices until 10:00 p.m., using coercive tactics.

To be sure, Plaintiff no longer argues or submits evidence that Reid & Associates had an agreement with the NPD whereby the NPD "regularly delegated to [Reid & Associates] and its employees the responsibilities of interrogating, testing, and eliciting statements from persons suspected of criminal activity." However, a conspiracy often occurs behind closed doors outside the presence of the object of the conspiracy, *Hoskins v. Poelstra*, 320 F.3d 761, 764 (7th Cir. 2003) (a conspiratorial "meeting of minds. . . may need to be inferred even after an opportunity for discovery, for conspirators rarely sign contracts"), and so "[r]arely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire." *Bell v. City of Milwaukee*, 746 F.2d 1205, 1255 (7th Cir. 1984), *overruled on other grounds by Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005). Instead, "circumstantial evidence may provide adequate proof of conspiracy." *Id.* (cleaned up); *see also Hoffman-La Roche, Inc. v. Greenberg*, 447 F.2d 872, 875 (7th Cir. 1971) (same); *Smith v. Daniels*, No. 01-4157, 2003 WL 1717635, at *5 (N.D. Ill. March 23, 2003). "The question of whether an agreement exists should not be taken from a jury in a civil conspiracy case so long as there is a possibility that the jury can infer from the circumstances that the alleged conspirators had a meeting of the minds and thus reached an understanding to achieve the conspiracy's objectives." *Cameo Convalescent Ctr., Inc. v. Senn*, 738 F.2d 836, 841 (7th Cir. 1983) (cleaned up); *see also Krilich v. Vill. of S. Holland*, No. 92-5285, 1994 WL 457227, at *2 (N.D. Ill. Aug. 19, 1994) (same). "The existence or nonexistence of a conspiracy is essentially a factual issue that the jury, not the trial judge, should decide." *Cameo Convalescent Ctr.*, 738 F.2d at 841 (cleaned up).

Here, in addition to submitting evidence in support of nearly all the allegations this Court previously found relevant (outlined above), Plaintiff also submits evidence that the detectives

19

gave Masokas background information on the case, including telling Masokas that Amor may have started the fire by leaving a burning cigarette near a vodka-soaked newspaper; Cross's ambiguous testimony as to whether he gave Masokas the questions he wanted Masokas to ask Amor, which would be a deviation from ordinary practice; expert opinion that Masokas used an outdated, highly subjective scoring system that had no supporting research or documentation of reliability and that no other institution recognized by the APA used; expert opinion that no objective, qualified polygraph examiner could have looked at the data generated during Amor's polygraph and found that Amor was deceptive; Masokas's testimony that he gave light check marks to Amor's responses to the "relevant questions," yet falsely reported them to the detectives as "significant" (meaning deceptive); conflicting evidence as to whether Newey actually scored Amor's polygraph; all-told, Amor was at Reid & Associates' offices for five-and-a-half hours, which was unusually long; and Amor had not slept more than four hours the night before and was not given food or water. On balance, the Court finds that there is sufficient evidence upon which a reasonable jury could find that Masokas, Newey, Cross, and Guerrieri had a meeting of the minds such that the acts they performed were "unlikely to have been undertaken without an agreement." *Amundsen*, 218 F.3d at 718. All of the evidence Defendants point to purportedly countering these facts simply present genuine disputes of material fact for the jury to decide. Accordingly, summary judgment is denied in this respect.

The Court need not consider whether Masokas and Newey were performing a public function.

## II.     Coerced Confession Claim (Count II)

### a.     Collateral Estoppel

Next, Defendants argue that Count II is barred by collateral estoppel because the

voluntariness of Amor's confession was previously adjudicated against him. On April 10, 2018, Amor filed a Petition for a COI. To prevail, Amor had to show in part that he "did not by his own conduct voluntarily cause or bring about his . . . conviction." 735 ILCS 5/2-702(g). The State filed a motion to dismiss, arguing, among other things, that Amor "failed to establish that he did not by his own conduct voluntarily bring about his conviction." The court denied the Petition, finding that Plaintiff voluntarily brought about his conviction because he gave a statement to the police. The appellate court affirmed. *See People v. Amor*, 180 N.E.3d 170 (Ill. App. Ct. 2020).

The parties agree that federal courts must give state court judgments the same preclusive effect as would a court in the state in which the judgment was rendered. 28 U.S.C. § 1738; *Allen v. McCurry*, 449 U.S. 90, 96 (1980). The Illinois COI statute states that "[t]he decision to grant or deny a certificate of innocence shall be binding only with respect to claims filed in the Court of Claims and shall not have a res judicata effect on any other proceedings." 735 ILCS 5/2-702(j); *Walker v. White*, No. 16 CV 7024, 2021 WL 1058096, at *13 (N.D. Ill. Mar. 19, 2021) (certificate of innocence lacks preclusive effect in federal court).

Defendants nonetheless argue that Illinois's COI statute does not preclude collateral estoppel here because (1) the statute specifically applies to the "decision," not the findings on issues of fact and law in reaching the ultimate decision; (2) the Illinois legislature has expressly prohibited the use of a court's findings of fact or law in other contexts, so its failure to do so here must have been an intentional omission; and (3) the statute is specific to "res judiciata" and not collateral estoppel. In the Naperville Case, the district court considered and rejected these same three arguments in a well-reasoned opinion denying the defendants' motion for summary judgment in relevant part:

> None of these arguments persuade the Court that Mr. Amor's coercion claim should be collaterally estopped. Contrary to the defendants' assertions, Illinois common

law does not use the term res judicata in exclusive reference to claim preclusion. Instead, res judicata is commonly described as a "judicial doctrine comprised of two corollary branches." *Osborne v. Kelly*, 207 Ill. App. 3d 488, 152 Ill. Dec. 422, 565 N.E.2d 1340, 1342 (1991); *see also Bagnola v. SmithKline Beecham Clinical Lab'ys*, 333 Ill.App.3d 711, 267 Ill. Dec. 358, 776 N.E.2d 730, 735 (2002) ("The doctrine of res judicata precludes relitigation of claims or issues previously decided. It is divided into two branches: estoppel by judgment, referred to as res judicata and estoppel by verdict, also known as collateral estoppel."). The Seventh Circuit held the same in *Council v. Vill. of Dolton.* 764 F.3d 747, 748 (7th Cir. 2014). In that case, even though the statute in question mentioned only res judicata and not collateral estoppel, the Seventh Circuit recognized that "collateral estoppel is a branch of res judicata" under Illinois law. *Id.* The statute therefore barred the operation of collateral estoppel when the statute stated that "no finding, determination, decision, ruling, or order . . . issued pursuant to this Act . . . shall . . . constitute res judicata." *Id.*

The defendant's reliance on the language in Section 702(j) referring to "the decision to grant or deny," and not the "findings" of the court, is similarly unavailing. In Mr. Amor's case, the state court's decision not to issue a COI ultimately turned on its determination that Mr. Amor voluntarily confessed, thereby foreclosing his ability to obtain a COI under Section 702(d). Granting preclusive effect to the state judge's finding regarding the voluntariness of Mr. Amor's confession is indistinguishable from granting preclusive effect to the decision to deny the COI in the first instance. It represents the entire issue before the court. Thus, in *Fields v. City of Chicago*, No. 10 C 1168, 2014 WL 12778835 (N.D. Ill. Apr. 29, 2014), Judge Kennelly entered an order stating that a state court's findings at a COI proceeding were not entitled to issue preclusive effect or judicial notice in federal court, citing Section 702(j). Order on Mot. Concerning Certificate of Innocence Proceeding, *Fields v. City of Chicago*, 10-cv-01168, ECF No. 551 ("[T]he Illinois statute governing COI petitions unambiguously provides that a decision on such a petition 'shall not have a res judicata effect on any other proceedings' . . . . Allowing the state trial judge's findings in evidence would essentially end-run this prohibition.").

Relatedly, in *Patrick v. City of Chicago*, the Seventh Circuit reviewed a district court's decision to admit a § 1983 plaintiff's COI at trial, finding that Fed. R. Evid. 403 did not operate to exclude it. 974 F.3d at 827. Though this case did not directly address issue preclusion, the Seventh Circuit acknowledged that the "principal purpose of a certificate of innocence is to remove legal obstacles that prevent a wrongly convicted person from receiving relief in the Illinois Court of Claims," which is why the statute specifies that a COI decision "shall not have a res judicata effect on any other proceedings." *Id.* at 833. The court clarified that this provision did not render "a certificate of innocence . . . categorically inadmissible in other proceedings," though it was a legitimate concern for the purposes of Rule 403 that jurors would give the COI "conclusive weight." *Id.* The Court ultimately found that the district court's decision to admit the COI with a limiting jury instruction was not an abuse of discretion. *Id.* at 834. Though addressing the issue in a different

context, *Patrick* illustrates that COIs, even if they are admissible at trial, are not entitled to conclusive weight. It follows that the same holds true at the summary judgment stage.

Because a judicial finding in a COI proceeding would not receive issue preclusive effect under Illinois law, Mr. Amor is not barred from litigating the voluntariness of his confession in these proceedings.

*Olson v. Cross*, No. 18 CV 2523, 2024 WL 361200, at *12–13 (N.D. Ill. Jan. 30, 2024).

While *Olson* is not binding on this Court, this Court is nonetheless persuaded by the district court's reasoning in the Naperville Case and, for the same reasons, concludes that collateral estoppel does not bar Plaintiff's coerced confession claim.

### b. Genuine Disputes of Material Fact Otherwise Preclude Summary Judgment on Plaintiff's Coerced Confession Claim Against Masokas and Newey

Next Defendants argue Plaintiff's coerced confession claim hinges on Masokas and Newey's false representation to Amor that he failed the polygraph, but misrepresenting the strength of evidence to a suspect during an interrogation does not constitute coercion.

"The due process clause can apply to coerced confessions when the circumstances of the interrogation are grossly inappropriate." *Grayson v. City of Aurora*, 157 F. Supp. 3d 725, 741 (N.D. Ill. 2016) (citing *Chavez v. Martinez*, 538 U.S. 760, 774 (2003)). "This is because '[a] conviction obtained by the use of an involuntary confession violates due process.'" *Id.* at 741 (quoting *United States v. Stadfeld*, 689 F.3d 705, 709 (7th Cir. 2012)). "A confession is voluntary . . . where the totality of the circumstances demonstrate that 'it is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *United States v. Vallar*, 635 F.3d 271, 281 (7th Cir. 2011). Conversely, "[a] confession is involuntary when it was given in circumstances that were sufficient to overbear the confessor's free will." *Johnson v.*

*Pollard*, 559 F.3d 746, 753 (7th Cir. 2009) (citing *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963); *see also Weidner v. Thieret,* 866 F.2d 958, 963 (7th Cir. 1989)). The court must "examine the totality of the circumstances surrounding a confession to determine whether the confession is voluntary." *Id.*

Defendants rely upon *Johnson* for the proposition that misrepresenting a polygraph, without other facts indicating a person's will was overborne, is not sufficient to find a coerced confession. 559 F.3d at 753. In *Johnson*, the detective did not know the plaintiff had failed a polygraph when the detective stated, "It's my understanding you must have failed that polygraph because you're still here." *Id.* at 754. While the statement could be a mere reflection of the detective's belief that the plaintiff would have been released if he had passed the polygraph, even if the court assumed the detective made a misleading statement, "[t]he fact that the detective made a false or misleading statement during the course of the interrogation would not, by itself, render [the plaintiff's] confession involuntary." *Id.* "An interrogating officer's misrepresentations are neither dispositive of nor irrelevant to the question of whether a defendant's statement was voluntary." *Id.* When looking at the circumstances as a whole, the court found "even if [the detective] deliberately misrepresented the results of the polygraph examination, the circumstances surrounding [the plaintiff's] confession were not so coercive as to render the confession involuntary": the plaintiff was questioned on four separate occasions, but the interrogations were not unduly lengthy; the plaintiff was offered food, beverages, cigarettes, and short breaks; he was informed of his *Miranda* rights at the outset of all but one of his interactions with interrogators; and he was neither too young nor naïve to not comprehend the meaning of the warnings. *Id.* at 755–56.

The circumstances in *Johnson* are distinguishable and show that there are genuine issues

of material fact for the jury to decide in this case. Here, the totality of the circumstances surrounding the confession would permit a reasonable jury to find they overrode Amor's free will and induced him to make false inculpatory statements. Weighing against a finding that Amor's confession was involuntary is the fact that he was given his *Miranda* rights and that he was neither so young nor naïve as to not comprehend them, *see id.*; Amor described his treatment at Reid & Associates as "you know, good, bad or indifferent, they're just – they have a job just like you do and I do"; and the allegedly coerced confession did not occur at Reid & Associates, *see Holland v. McGinnis*, 963 F.2d 1044, 1050 (7th Cir. 1992) (whether there was a "break in the stream of events . . . sufficient to insulate" a confession from earlier taint depends on a number of factors, including the change in place of interrogations and identity of interrogators (citations omitted)). The fact that Masokas and Newey were not present when Amor confessed is not dispositive because they took steps that purportedly caused Amor's coerced confession. *Cf. Gibson v. City of Chicago*, No. 19 C 4152, 2020 WL 4349855, at *6 (N.D. Ill. July 29, 2020) (finding plaintiff sufficiently alleged personal involvement in individual coerced confession claim against two officers who allegedly "interviewed him and administered the polygraph examination, all steps that [plaintiff] alleges caused his coerced confession.").

Weighing in the other direction are the following facts (both undisputed and taken in the light most favorable to Plaintiff): Masokas and Newey falsely told Amor he failed the polygraph test; a jury could find that Masokas and Newey knew they were lying to Amor; Amor had no food or water that day; Amor had only slept four hours the night before; Masokas and Newey used minimization techniques during the interrogation to suggest a less culpable reason why Amor committed the crime; Masokas and Newey fed Amor false information about how the fire allegedly started; and Amor was at Reid & Associates for five-and-a-half hours, which was

unusual. *See Anderson v. Thieret*, 903 F.2d 526, 530 (noting food, sleep, and water deprivation and a mentally coercive interrogation would result in the conclusion that a confession was involuntary); *Grayson*, 157 F. Supp. 3d at 742 (finding a reasonable jury could find confession was coerced where, among other things, the detectives intentionally fed him details of the crime).

For these reasons, Plaintiff's coerced confession claim (Count II) against Masokas and Newey must go to a jury and summary judgment is therefore denied.

### c. *Monell* Claim Against Reid & Associates

Defendants next argue that Plaintiff's *Monell* claim fails because Plaintiff fails to show any widespread practice of Reid & Associates. "Liability under § 1983 is direct rather than vicarious." *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018). "[J]ust as a municipal corporation is not vicariously liable under a theory of *respondeat superior* for the constitutional torts of its employees, a private corporation is not vicariously liable under § 1983 for its employees' deprivations of others' civil rights." *Iskander v. Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982) (internal citations omitted); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691–94 (1978). As such, there is no vicarious liability on Reid & Associates for the alleged acts of Masokas, Newey, or other unidentified employees. Instead, Plaintiff alleges a *Monell* theory of liability against Reid & Associates, which "applies in § 1983 claims brought against private companies that act under color of state law." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016).

To hold Reid & Associates liable, Plaintiff "must have evidence of '(1) an action pursuant to a municipal policy, (2) culpability, meaning that policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations, and (3) causation, meaning the municipal action was the moving force behind the constitutional injury.'" *Pulera v. Sarzant*,

966 F.3d 540, 550 (7th Cir. 2020) (internal punctuation omitted) (citing *Hall v. City of Chicago*, 953 F.3d 945, 950 (7th Cir. 2020); *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404-07 (1997)). Defendants challenge the first element. To prove the existence of a municipal policy, Plaintiff can offer evidence of: (i) an express or written policy, (ii) a widespread custom or practice, or (iii) a deliberate act by a decision-maker with final policymaking authority. *King v. Kramer*, 763 F.3d 635, 649 (7th Cir. 2014) (citing *Ienco v. City of Chicago*, 286 F.3d 994, 998 (7th Cir. 2002)). Plaintiff pursues the second theory of liability, arguing Reid & Associates had two widespread practices as part of the so-called Reid technique: (1) an invalid check mark scoring system; and (2) allowing trickery without guidance or protections for the subject.

Although Defendants couch their argument in the first element (widespread practice), the Court's analysis overlaps with the third element (causation). *See Calderone v. City of Chicago*, 979 F.3d 1156, 1164 (7th Cir. 2020) ("The pivotal question is 'always whether an official policy, however expressed . . . , caused the constitutional deprivation.'" (quoting *Glisson v. Ind. Dep't of Corrs.*, 849 F.3d 372, 379 (7th Cir. 2017))). Defendants argue that the two practices that Plaintiff identifies are not themselves unconstitutional. *See Johnson*, 559 F.3d at 754 ("[T]he fact that the detective made a false or misleading statement during the course of the interrogation would not, by itself, render [the plaintiff's] confession involuntary."). "[W]here the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the [entity], and the causal connection between the 'policy' and the constitutional deprivation." *City of Oklahoma v. Tuttle*, 471 U.S. 808, 824 (1985); *see also Calderone*, 979 F.3d at 1164 ("One single incident cannot suffice; rather, [the plaintiff] must show 'a series of constitutional violations.'" (quoting *Estate of Novack ex rel. Turbin v. Cnty. of Wood*, 226 F.3d 525, 531 (7th Cir. 2000))). Defendants argue

that Plaintiff points to only one incident involving Amor alone and so fails to show sufficient frequency of conduct to impose *Monell* liability. *See Hildreth v. Butler*, 960 F.3d 420, 427 (7th Cir. 2020) ("[T]he frequency of conduct necessary to impose *Monell* liability must be more than three.").

Contrary to the Defendants' contention, the Court understands Plaintiff's position to be that Reid & Associates' practices amount to more than simply misleading the subject about the strength of the evidence (which by itself would be insufficient to show that a confession is involuntary), and that those practices together are coercive and facially unconstitutional. Namely, Plaintiff argues that Reid & Associates used a check mark system (undisputed) that was a manipulable and unreliable method for scoring polygraph tests (disputed), allowed the use of deception regarding potential evidence (undisputed), never documented any such deception or disclosed it to the prosecutor (undisputed), and turned a blind eye to the interrogation methods that were used by local law enforcement on a subject after the subject left Reid & Associates (undisputed), which together overbore Plaintiff's will and coerced a false confession.

In support, Plaintiff submits Reid & Associates' testimony that using lies or trickery during an interrogation, at least regarding misrepresenting evidence, was a permissible Reid & Associates interrogation technique; expert testimony that falsely telling a subject they failed a polygraph is a risk factor for false confessions; Reid & Associates' testimony that telling an innocent person that they failed a polygraph would be very stressful; Reid & Associates' testimony that it used the check mark system at the time of Amor's polygraph; expert testimony that Reid & Associates' check mark system was an outdated, highly subjective scoring system that had no supporting research or documentation of reliability and was not used by any other institution recognized by the APA; and Reid & Associates' testimony that a numeric scoring

28

system was developed in response to a concern that the check mark system was too subjective.[5]

The undisputed and disputed evidence, with all inferences drawn in Plaintiff's favor, is sufficient to show that Reid & Associates had widespread practices of using an unreliable and manipulable check mark scoring system and allowing deception during interrogation without certain guidance or protections for the subject, *see Davis v. Carter*, 452 F.3d 686, 695 (7th Cir. 2006), and to create a question for the jury as to whether those practices caused proximate harm to Amor, *LaPorta v. City of Chicago*, 277 F. Supp. 3d 969, 991 (N.D. Ill. 2017) ("As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." (citation omitted)). Plaintiff need not show evidence of other false confessions brought about by Reid & Associates' practices to survive summary judgment. *Davis*, 452 F.3d at 695.

For all of these reasons, summary judgment is denied as to Plaintiff's *Monell* claim.

## III.    Derivative Constitutional Claims (Counts IV and V)

Defendants argue that Plaintiff's claims for unlawful conspiracy to deprive constitutional rights (Count IV) and failure to intervene (Count V) are derivative of Plaintiff's coerced confession claim (Count II) and therefore also fail.[6] Because Plaintiff's coerced confession claim

---

[5] Plaintiff also points to a reference in a case to a 1982 published study concluding that of fifty charts that had been verified as truthful by subsequent confessions of other people, Reid & Associates' polygraphers independently rescored the charts and incorrectly classified 39% of the verified innocent examinees as guilty. *Veazey v. Commc'ns & Cable of Chi., Inc.*, 194 F.3d 850, 855 (7th Cir. 1999). Plaintiff does not submit the 1982 study itself, any related expert testimony, or any evidence that the scoring method used in 1982 was the same as the method used in 1995. Without more, the Court does not find this study to be compelling evidence that the inaccurate classifications in 1982 were a result of the same check mark method used with Amor's polygraph test in 1995.

[6] Plaintiff is not pursuing his claims for fabrication of evidence (Count I) and unlawful detention (Count III). *Supra* n.2.

survives summary judgment, the derivative claims do not fail for the reason argued by Defendants.

## IV.    Intentional Infliction of Emotional Distress ("IIED") (Count VII)

To prevail on an IIED claim under Illinois law, Plaintiff must prove (1) that Defendants' conduct was extreme and outrageous; (2) that Defendants knew that there was a high probability their conduct would cause Amor severe emotional distress; and (3) that Defendants' conduct in fact caused Amor severe emotional distress. *Fox v. Hayes*, 600 F.3d 819, 842 (7th Cir. 2010). Defendants challenge the first element, arguing that Plaintiff's IIED claim fails because there is no evidence of extreme or outrageous conduct.

Conduct is extreme and outrageous if it goes "beyond all possible bounds of decency" such that it is "intolerable in a civilized community." *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 83 (Ill. 2003) "The extreme and outrageous nature of the conduct may arise from the defendant's abuse of some position which gives him actual or apparent authority over the plaintiff or the power to affect the plaintiff's interests." *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 211 (Ill. 1992); *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988) ("The more control which a defendant has over the plaintiff, the more likely that defendant's conduct will be deemed outrageous."); *Fox*, 600 F.3d at 842 ("An important factor in this analysis is whether a defendant abused a position of authority.").

Defendants argue that because Plaintiff has no evidence that Defendants violated Amor's constitutional rights, no evidence of extreme or outrageous conduct remains, and the IIED claim must fail. *See Cooney v. Casady*, 746 F. Supp. 2d 973, 977 (N.D. Ill. 2010) ("Without any evidence of misconduct on defendants' part, I easily conclude that plaintiff's intentional infliction of emotional distress claim, which is based on the same conduct underlying her § 1983

30

claim, fails."), *aff'd,* 735 F.3d 514 (7th Cir. 2013). "This logic mirrors the argument put forth by the defendants in moving for summary judgment on Counts [IV and V]: if the underlying constitutional tort claim fails, then any claims based on those alleged violations also must fail." *Olson*, 2024 WL 361200, at *19. For the reasons explained above, Plaintiff has put forth sufficient evidence at this stage to survive summary judgment on his coerced confession claim. Accordingly, summary judgment is denied.

### V.     Illinois Conspiracy Claim (Count VIII)

Defendants argue that Plaintiff's Illinois conspiracy claim is derivative of the IIED claim and therefore must fail for the same reason. *See Mauvais-Jarvis v. Wong*, 987 N.E.3d 864, 895 (Ill. App. Ct. 2013) ("It is well-settled that conspiracy, standing alone, is not a separate and distinct tort in Illinois."). Because the IIED claim survives summary judgment, the derivative conspiracy claim does not fail on the basis argued by Defendants.

### VI.     Illinois *Respondeat Superior* Claim (Count IX)

Defendants argue that Plaintiff's Illinois claim for *respondeat superior* is derivative of the IIED claim and therefore must fail for the same reason. Because the IIED claim survives summary judgment, the derivative *respondeat superior* claim against Reid & Associates does not fail on the basis argued by Defendants.

### <u>Conclusion</u>

The Court grants in part and denies in part Defendants' motion for summary judgment [143]. Counts I and III are dismissed in full because Plaintiff states that he is not pursuing his claims for fabrication, substantive due process, or unlawful detention. Summary judgment is denied with respect to Counts II, IV, V, VII, VIII, and IX. The Court sets a status hearing for

10/17/2024 at 9:30 a.m. and directs the parties to file a joint status report by three business days prior to the status hearing.

**SO ORDERED.**                                    **ENTERED: September 26, 2024**

_____
**HON. JORGE ALONSO**
**United States District Judge**